4ð

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 1 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| RENE REYNA JR., | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| | § | CIVIL ACTION NO. B-01-64 |
| VS. | § | (JURY REQUESTED) |
| | § | |
| CITY OF BROWNSVILLE and | § | |
| RAFAEL MOLINA, | § | |
| Defendants. | § | |

## BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

COME NOW DEFENDANTS, the City of Brownsville and Rafael Molina, individually and

in his official capacity, and file this their Brief in Support of their Motion for Summary Judgment

and would respectfully show unto the Court the following:

## I.
## STATEMENT OF THE CASE

This is a Fourth Amendment excessive force allegation case brought under 42 U.S.C. § 1983.

(Ex. A). Plaintiff seeks recovery for injuries sustained when he was shot three (3) times in the course

of his arrest on June 23, 1998, by Defendant Rafael Molina, a Brownsville police officer, following

a vehicular pursuit during in which Plaintiff attempted to run over several people and intentionally

drove his car into other vehicles. Plaintiff later pleaded no contest to and was convicted of

aggravated assault. (Ex. B).

Plaintiffs seek compensatory and exemplary damages.

## II.
## STATEMENT OF FACTS

On June 23, 1998, at approximately 6:25 p.m. Officer Robert Garza was traveling south on the 900 block of Central Avenue in Brownsville. (Ex. C. at page 1). He noticed a blue Lincoln Continental driven by Plaintiff traveling on Morningside Road and saw Plaintiff's vehicle disregard a stop sign at the intersection. (Ex. C. at page 1). Officer Garza notified the communications division and was advised that the vehicle had just been reported stolen. (Ex. C. at page 1). He attempted to catch up to the vehicle and activated his emergency equipment. (Ex. C. at page 1). The pursuit continued on Central Avenue while the Lincoln was passing cars and almost hitting them before running a traffic light. (Exs. C. at page 1; D. page 59, lines 10-20).

At this point, Officer Rafael Molina, who had been monitoring his radio, advised Officer Garza that he was in the vicinity of the airport, where the Lincoln seemed to be headed, and that he would assist in the stop. (Ex. C. at page 3). Officer Molina positioned his vehicle with emergency equipment functioning to the left of the Plaintiff's vehicle. (Ex. C. at page 4). Plaintiff's vehicle approached and stopped approximately 30 feet away from Molina's patrol unit. (Ex. C. at page 3). Officer Molina began to exit his patrol unit when Plaintiff's vehicle accelerated directly at his patrol unit. (Ex. C. at page 3). Officer Molina jumped back into his vehicle and the Lincoln sideswiped the patrol unit and kept going onto Minnesota and then turned left onto Les Mauldin Boulevard. (Ex. C. at page 3). Both Officer Garza and Officer Molina were in pursuit at this point. (Ex. C. at page 3.) Plaintiff's vehicle then drove into a field and began to drive in circles. (Exs. C. at page 3; D. page 65 lines 15-25). Sgt. Pablo Flores arrived at this point to assist in the arrest, and his vehicle was

struck by Plaintiff's vehicle. (Exs. C. at page 6; D. page 70, lines 13-22; page 71, lines 2-8). Officer Garza's patrol unit was then struck by Plaintiff's vehicle. (Exs. C. at page 6; D).

Plaintiff's vehicle then headed back onto Billy Mitchell, but three vehicles were in front of it when it stopped for a red light. (Ex. C. at page 1.) Plaintiff's vehicle became boxed in. (Ex. D. page 70, lines 5-7). Plaintiff began to ram into the vehicles in front of him. (Exs. C.; D. page 70, lines 13-22). After ramming the vehicles in front of him, Plaintiff placed his vehicle in reverse, backed up, placed his vehicle in drive, and then turned the wheels of his car to the left, as though he were planning on trying to ram Officer Molina or his patrol unit. (See generally Ex. C. at page 4). At this point, fearing for the safety of the occupants of the vehicles, himself, and others and knowing that the driver had already demonstrated disregard for the lives of police officers and standers-by, Officer Molina fired his service revolver four (4) times at Plaintiff (Ex. C. at page 4). Three (3) shots hit Plaintiff on his left side, and he collapsed out of the vehicle and onto the street, (Ex. C. at page 10). The stolen Lincoln was still in gear and continued to move forward until Officer Molina ran after it and stopped it. (Ex. C. at page 5). Plaintiff was subsequently charged with the crime of aggravated assault on Defendant Molina arising out of the same incident made the basis of this lawsuit before pleading no contest to and being convicted of aggravated assault. (Ex. B.)

### III.
### ARGUMENT AND AUTHORITY

#### A.     Standard for Summary Judgment.

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, the rule permits summary judgment

even if the parties disagree as to some facts. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. *Id.* at 248. Should it appear that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the district court should grant summary judgment. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *accord Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986). Thus, the defendant is entitled to summary judgment when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff], will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact). *See also Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson*, 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

-4-

**B.    Summary Judgment Evidence Shows that Plaintiff's Claims Against Officer Rafael Molina Barred as a Matter of Law.**

Plaintiff's claims arise from his arrest on July 23, 1998. The Fourth Amendment governs uses of force occurring incident to arrests. *Tennessee v. Garner*, 471 U.S. 1 (1985). The Supreme Court has held that deadly force may be used incident to an arrest if it is necessary to prevent the escape of a fleeing felon and the police officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. *Id.* The Court noted that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 396-397. The standard is one of "reasonableness." *Johnson v. Morel*, 876 F.2d 477 (5th Cir. 1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.*

An excessive force claim is barred under 42 U.S.C. § 1983 as a matter of law if brought by an individual convicted of aggravated assault or some similar offense related to the same events necessitating the use of force. *See Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000), *cert denied* 531 U.S. 959, 121 S. Ct. 384(2000). (in "suicide by cop" case, officer who shot suspect who threatened him with a knife entitled to qualified immunity where suspect convicted of aggravated assault of officer); *Sappington v. Bartee*, 195 F.3d 234 (5th Cir. 1999) (arrestee's state-court conviction for

aggravated assault of police officer barred his excessive force claim against officer). The *Sappington* court reasoned as follows:

> [T]he criminal conviction necessarily implies that Garcia did not use excessive force. Sappington was convicted of aggravated assault.  Conviction for aggravated assault required proof that Sappington caused "serious bodily injury."  Tex. Pen. Code § 22.02(a)(1).  We hold as a matter of law that the force Sappington claims was used cannot . . . be deemed excessive. Under Texas law, any person can use force up to and including deadly force "to protect himself against the other's use or attempted use of unlawful deadly force."  Tex. Pen. Code § 9.32(3)(A). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury."  Tex. Pen.  Code § 9.01(3).  Further, a peace officer is justified in using deadly force in the course of an arrest if he reasonably believes that there is a substantial risk that the person to be arrested will cause death or serious bodily injury to the officer or another if the arrest is delayed.  Tex. Pen. Code § 9.51(c)(2).  Sappington's criminal conviction required proof that he caused serious bodily injury to Garcia.  Garcia was justified in using force up to and including deadly force to resist the assault and effect an arrest.  As a matter of law, therefore, the force allegedly used by Garcia cannot be deemed excessive.

*Sappington*, 195 F.3d at 237.

In the instant case, Plaintiff pled no contest and was convicted of aggravated assault arising out of the same incident Plaintiff has brought as a civil rights cause of action. (Ex. B at pages 2-5). Plaintiff pleaded no contest, freely and voluntarily, "as charged in the indictment" in Cause No. 98-CR-892-E, in the 357th Judicial District Court of Cameron County, Texas.  (Ex. B at pages at 3-5).

The indictment Plaintiff did not contest included a charge of aggravated assault, stating, in particular, that Defendant Rene Reyna "on or about the 23rd day of June, 1998, and anterior to the presentment of this Indictment, in the County of Cameron and the State of Texas, did then and there intentionally and knowingly threaten Rafael Molina with imminent bodily injury and did then and there use or exhibit a deadly weapon, to-wit: a motor vehicle, during the commission of said assault." (Ex. B at page 2). After pleading no contest, Plaintiff was duly convicted of aggravated assault of Rafael Molina, as charged in the indictment, and was sentenced to five (5) years of imprisonment. (Ex. B at page 8). Having been convicted of assaulting Rafael Molina with a deadly weapon on June 23, 1998, Plaintiff, under the rule applied in *Hainze* and *Sappington*, cannot now claim the force Rafael Molina used on that same occasion was excessive. To be sure, the force used by Officer Molina to apprehend Plaintiff, up to and including deadly force, was, *as a matter of law*, not excessive. Defendants are therefore entitled to judgment as a matter of law.

**C.    Summary Judgment Evidence Shows that Defendant City of Brownsville Not Liable under 42 U.S.C. § 1983.**

**1.    Plaintiffs' allegations.**

Plaintiff alleges that the City of Brownsville is liable under 42 U.S.C. § 1983. Specifically, Plaintiff alleges that Defendant City of Brownsville is liable "for its having failed to properly train the Defendant Molina in the proper use of force," and because "this is not the first case in which officers with the City of Brownsville have used improper force in the arrest and detention of prisoners or suspects and in fact a pattern seems to have developed that can only be explained by inadequate training." (Ex. A at page 3).

2.   **Plaintiff cannot show the City of Brownsville was deliberately indifferent by
failing to adequately train Officer Molina.**

Plaintiff's allegation that the City of Brownsville is liable under 42 U.S.C. § 1983 because it
failed to adequately train Officer Rafael Molina amounts to a claim of deliberate indifference.
Municipal liability inures only when the execution of a municipality's policy or custom causes the
injury, and does not arise vicariously through the acts of its employees. *Monell v. Department of
Social Services*, 436 U.S. 658, 694 (1978).   In order to hold a municipality liable under § 1983 for
a policy of hiring or training, a plaintiff must show that:

(1) the training procedures of the municipality's policymaker were inadequate;

(2) the municipality's policymaker was deliberately indifferent in adopting the training policy,
and

(3) the inadequate training policy directly caused the plaintiff's injury.

*Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996) (*citing City of Canton, Ohio v. Harris*, 489 U.S.
378, 385-87 (1989) and *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992)).

In *Board of the County Commissioners of Bryan County, Oklahoma v. Brown*, the United States
Supreme Court heightened the standard for showing deliberate indifference in hiring situations,
affirming that "'deliberate indifference' is a stringent standard of fault, requiring proof that a
municipal actor disregarded a known or obvious consequence of his action." 520 U.S.397, 117 S.
Ct. 1382, 1391 (1997).  The Supreme Court further held that deliberate indifference in hiring
situations is shown "[o]nly where adequate scrutiny of the applicant's background would lead a
reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the
applicant would be the deprivation of a third party's federally protected rights." *Id.*   Similar

-8-

standards have long applied in cases involving allegations of unconstitutional training. *See Benavides*, 955 F.2d at 972 (training practices); *Mouille v. City of Live Oak, Tex.*, 977 F.2d 924, 929 (5th Cir. 1992), cert. denied 508 U.S. 951, 113 S. Ct. 2443 (1993) (holding that inadequate training may predicate § 1983 liability only where it amounts to deliberate indifference); *Leffall v. Dallas Independent School dist.*, 28 F.3d 521, 531 (5th Cir. 1994) [*citing Manarite v. City of Springfield*, 957 F.2d 953, 956 (1st Cir. 1992), *cert. denied* 506 U.S.837, 113 S. Ct. 113, 121 (holding that deliberate indifference shown where defendant knew of unusually serious risk of harm and failed to take obvious steps to correct it)]; *Doe v. Taylor Independent School Dist.*, 15 F.3d 443, 454 (5th Cir. 1994), *cert. denied* 513 U.S. 815, 115 S. Ct. 70 (setting forth similar standard); *Hare v. City of Corinth, MS*, 74 F.3d 633, 649 (5th Cir. 1996) (holding that "deliberate indifference" amounts to "subjective intent to cause harm").

Plaintiff makes vague allegations, but does not explain how inadequate training caused Plaintiff's alleged constitutional deprivations. Plaintiff provides nothing more than the affidavit of Jose Armando Gonzalez in support of its allegations of "policy, custom, or practice." (Ex.G at pages 4 and 5). This affidavit purports only to describe the shooting made the basis of this lawsuit and does not speak in any manner to the City of Brownsville's policies, customs, or practices. Plaintiff simply has no evidence showing how any of the alleged conduct *affirmatively caused* the constitutional deprivations. Moreover, the competent summary judgment evidence as discussed below clearly shows that Officer Molina was more than adequately trained.

The competent summary judgment evidence shows that Officer Rafael Molina was more than adequately trained. The evidence reflects that Officer Molina successfully completed the following training:

(1)     Lower Rio Grande Valley Development Council Regional Training Center's 432-hour "Basic Certification Course in Applied Police Science" (Ex. E at page 1);

(2)     Texas Commission on Law Enforcement Officer Standards and Education intermediate peace officer requirements (Ex. E at page 2);

(3)     Texas Commission on Law Enforcement Officer Standards and Education advanced peace officer requirements (Ex. E at page 3);

(4)     Lower Rio Grande Valley Development Council Regional Police Training Center and Academy's 16-hour "Use of Force" course (Ex. E at page 4);

(5)     Brownsville Police Department's 320-hour "Field Training Program" (Ex. E at page 5);

(6)     Lower Rio Grande Valley Development Council Regional Training Center's 28-hour "Basic Confrontation Survival" course (Ex. E at page 6);

(7)     Certification of Weapons Proficiency (Ex. E at page 7); and

This evidence reflects that the training the Brownsville Police Department provided Defendant Molina was thorough, appropriate, and adequate.

**3.      Plaintiff cannot show municipal liability based on "custom or practice."**

Plaintiff also alleges, albeit in conclusory fashion, that a "custom or practice" of Defendant City of Brownsville caused the constitutional deprivation of which he complains.   In such cases, "*considerably* more proof than [a] single incident will be necessary . . . to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (emphasis added). A "pattern of similar incidents" that is "general or widespread" must be shown. *Languirand v. Hayden*, 717 F.2d 220, 227-28 (5th Cir. 1983) *cert denied* 467 U.S. 1215, 104 S. Ct. 2656 (1984).

Such a pattern is evident if there are "*numerous* prior incidents" showing a "systemic" violation of constitutional rights. *Hererra v. Valentine*, 653 F.2d 1220 (8th Cir. 1981) (emphasis added); *see also Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) *cert denied* 472 U.S. 1016, 105 S. Ct. 3476 (1985) (en banc) (*citing Adickes v. S.H. Kress 7 Co.*, 398 U.S. 144, 167 & n. 39 (1970)). In addition, it must be shown that this systemic and widespread pattern of numerous prior incidents must have *affirmatively* caused the complained of constitutional injury. *Reimer v. Smith*, 663 F.2d 1316 (5th Cir. 1981). Municipal liability under § 1983 cannot be derived from a single improvident incident, but only where it is shown that the injury alleged was "actually caused" by a policy, custom, or practice evidenced by numerous similar incidents showing a pattern of conduct. *Rodriguez v. Avita*, 871 F.2d 552 (5th Cir. 1989), *cert. denied* 493 U.S. 854, 110 S. Ct. 156 (1989) (upholding Judge Filemon Vela's dismissal under Rule 12(b)(6) of § 1983 claim against City of Brownsville); *see also Languirand v. Hayden*, 717 F.2d 220 (5th Cir. 1983) (holding that allegations of single shooting incident not sufficient to create liability under § 1983).

Plaintiff's allegations of "policy, custom, or practice" are conclusory and are not supported by competent summary judgment evidence. Specifically, Plaintiff has no evidence showing that any of the policies affirmatively caused the injuries of which Plaintiff complains. Indeed, Plaintiff's allegations on their face are insufficient to state a cause of action for municipal liability, as Plaintiff utterly fails to allege or prove that any causal connection existed between the alleged policies and Plaintiff's injuries. Aside from the conclusory allegations of constitutional deprivation, Plaintiff's complaint against Defendant rests on nothing more than a description of a single incident of alleged excessive force and conclusory allegations of unspecified prior incidents that are not affirmatively linked to the constitutional deprivations of which Plaintiff complains. These allegations, standing

-11-

alone, cannot create a genuine issue of fact material to Plaintiff's claims.   Defendant City of

Brownsville is therefore entitled to judgment as a matter of law.

### 4.      Plaintiff cannot show action by final policymaker.

To establish municipal liability under 42 U.S.C. § 1983, a complainant must demonstrate a

policy or custom which causes or occasions a constitutional deprivation.  *See   Monell*, 436 U.S. at

658.  Municipal liability under 42 U.S.C. § 1983 is not based on respondeat superior.  Rather,

> [it] attaches where--and only where--a deliberate choice to follow a course of action is made
>
> from among various alternatives by the official or officials responsible for establishing final
>
> policy with respect to the subject matter in question.

*Pembaur v.  City of Cincinnati*, 475 U.S. 469, 483 (1986).  In other words, it must be shown that an

official responsible for making municipal policy acts with deliberate indifference to the

constitutional rights of citizens.  *Id.*

The Supreme Court has recently reaffirmed that "'deliberate indifference' is a stringent standard

of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his

action." *Board of the County Commissioners of Bryan County, Oklahoma, v. Brown*, 520 U.S. 397,

117 S. Ct. 1382, 1391 (1997).  For an official to act with deliberate indifference, "the official must

both be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, (1994);

*Wilson v. Seiter*, 501 U.S. 294 (1991).  It must also be shown that the official failed to take action

that was obviously necessary to prevent or stop a perceived risk of serious harm.  *Walker v.  City of*

*New York*, 974 F.2d 293, 299 (2d Cir. 1992), *cert. denied*, 507 U.S.961, 113 S. Ct. 1387 (1993); *see*

*also Baker v.  Putnal*, 75 F.3d 190, 200 (5th Cir. 1996) *(citing City of Canton v.  Harris*, 489 U.S.

-12-

378, 385-87 (1989) and *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992)) (defining deliberate indifference standard). Finally, it must be shown that the official's failure to act caused the complained of constitutional deprivation. *Benavides*, 955 F.2d at 972.

In cases were it is alleged that the "custom or usage" of a governmental body evidences deliberate indifference to constitutional rights, the "custom or usage" will be attributed to the governmental defendant when the "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the . . . governing body that the practices have become customary among its employees." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987), *cert. denied sub. nom. City of Fayetteville v. Spell*, 484 U.S. 1027 (1988). Plaintiff has no evidence upon which a reasonable jury could find that the City of Brownsville acted with deliberate indifference to the constitutional rights of Plaintiff.

Plaintiff seems to allege that the City of Brownsville was deliberately indifferent to Plaintiff's constitutional rights because it knew that Rafael Molina was insufficiently trained and that he therefore constituted a threat of serious danger to the public. (Ex. A at page 3). To the extent that Plaintiff's claims are based on a theory of deliberate indifference, they have no merit, since Plaintiff cannot show that an official or officials of the City of Brownsville with final policy making authority were deliberately indifferent to Plaintiff's constitutional rights. The first necessary step in proving municipal liability based on deliberate indifference is to show that a person with final policymaking authority deliberately chose a course of action that caused a constitutional deprivation. *Pembauer*, 475 U.S. at 483. Plaintiffs have failed to adduce any evidence meeting this threshold burden.

The City of Brownsville is a home rule city. (Ex. F at page 2). It is governed by a five (5) member city commission over which a mayor presides. (Ex. F at pages 71, and 105-106). All of the

City's policymaking authority is vested in the City Commission. (Ex. F at pages 106-106). The City Commission appoints a city manager who is responsible for the administration and day-to-day operation of all City business. (Ex. F at pages 86-89). The city manager has ultimate decision making authority with respect to all City hiring decisions, other than his own. (Ex. F at page 87). He does not have ultimate decision making authority with respect to employment policies. (Ex. F at page 88).

A local governmental entity cannot be held vicariously liable for the unconstitutional acts of one of its officials unless the actions complained of are carried out by an official who is "responsible for establishing final government policy respecting such activity." *Worsham v. City of Pasadena*, 881 F.2d 1336 (5th Cir. 1989) (*quoting Pembaur*, 475 U.S. at 469). In cases where final decision making authority is delegated to a subordinate official, as in the instant case, local governmental liability can lie only if the action is taken by the official who has the final decision making authority. *Id.* "[I]f an official's actions are subject to review procedures, there has not been a complete delegation of power . . . so as to create municipal liability." *Id.* at 1340.

In the instant case it is clear that, as a matter of local positive law, the Brownsville City Commission alone had final decision making authority with respect to the City's employment policies. The actions of any subordinate official, even if deliberately indifferent, are not sufficient to create municipal liability. To prove deliberate indifference in this case, it must be shown that the Brownsville City Commission chose a course of action that caused a constitutional deprivation. *Pembauer*, 475 U.S. at 483. Plaintiffs have made no such showing, nor can they. Defendant City of Brownsville is therefore entitled to judgment as a matter of law as to Plaintiffs' claims under 42 U.S.C. § 1983.

**D. Officer Molina Entitled to Qualified Immunity.**

As a public official exercising discretionary functions, Officer Molina is shielded from suit and from liability unless Plaintiff can show that he "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). "The burden of proof is on the plaintiff to overcome the defendant's defense of qualified immunity. To do so, the plaintiff must show that the defendant's conduct was not objectively reasonable and, further, that the defendants violated clearly established law." *Burns-Toole v. Byrne*, 11 F.3d 1270, 1274 (5th Cir. 1994), *cert denied* 512 U.S. 1207, 114 S. Ct. 2680(1994) (footnotes omitted).

The Fifth Circuit has applied the deadly force standard articulated in *Tennessee v. Garner* in the context of qualified immunity in favor of police officers who reasonably believe a suspect poses a threat of death or serious physical harm. *See Snyder v. Trepagnier*, 142 F.3d 791 (5th Cir. 1998) cert dismissed 526 U.S. 1083, 119 S. Ct. 1493 (1999) (officer who shot fleeing suspect believed to have gun entitled to qualified immunity); *Colston v. Barnhart*, 130 F.3d 96 (5th Cir. 1997), *cert denied* 525 U.S. 1054, 119 S. Ct. 618(1998) (holding that a reasonable officer could have believed that he was in imminent danger of serious bodily harm or death where unarmed suspect knocked officer to ground and moved towards another officer's weapon); *Brothers v. Klevenhagen*, 28 F.3d 452 (5th Cir. 1994) *cert denied* 513 U.S. 1045, 1155 S. Ct. 639(1994) (Harris County deputy sheriffs did not use excessive force after shooting twelve (12) times at fleeing detainee solely in order to prevent detainee's escape); *Stroik v. Ponseti*, 35 F.3d 155 (5th Cir. 1994) *cert denied* 514 U.S. 1064, 115 S. Ct. 1692 (1995)(New Orleans police officer justified in shooting a fleeing suspect who pointed a gun at him); *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992), *cert. denied*, 506 U.S. 973 (1992)

(holding that officer who shot and killed suspect who attempted to run him over in car entitled to qualified immunity); *Reese v. Anderson*, 926 F.2d 494, 500 (5th Cir. 1991)(holding that officer who shot suspect who failed to raise hands so that officer could see them entitled to qualified immunity); *Young v. City of Killeen*, 775 F.2d 1349 (5th Cir. 1985) (police officer did not use excessive force in shooting and killing drug suspect believed to be armed). Again, as noted above, a police officer has been held to act reasonably in using deadly force against a person who is later convicted of aggravated assault with a deadly weapon arising out of the same incident. *See Hainze v. Richards*, 207 F.3d 795 *cert denied* 531 U.S. 959, 121 S. Ct. 384 (2000). (5th Cir. 2000); *Sappington v. Bartee*, 195 F.3d 234 (5th Cir. 1999).

In the instant case, Plaintiff was convicted of aggravated assault with a deadly weapon for the same acts giving rise to his claims under 42 U.S.C. § 1983. (See Ex. B at page 8). A Grand Jury who reviewed this incident concluded that Officer Molina's actions were legally justified. (See Ex. H). Accordingly, Defendant's summary judgment evidence and authorities establish that Officer Molina's use of force was objectively reasonable with respect to well-established law. Therefore, Defendant, Rafael Molina is entitled to qualified immunity and judgment as a matter of law.

WHEREFORE, PREMISES CONSIDERED, Defendants, the City of Brownsville and Rafael Molina, individually and in his official capacity, pray that this Court dismiss Plaintiff's claims against them with prejudice. Defendants also request any other relief, at law or in equity, to which they may show themselves to be justly entitled.

Signed on this January 10, 2002.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893


By: _Charles Willette Jr w/p E G_
　　 Charles Willette, Jr.
　　 State Bar No. 21509700
　　 USDC Adm. No. 1937
　　 Attorneys for Defendants


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has on this January 10,
2002, been delivered to counsel listed below, via certified mail, return receipt, requested.


George P. Powell
Hinojosa & Powell, P.C.
612 Nolana, Suite 410
McAllen, Texas 78504


_Charles Willette Jr w/p E G_
Charles Willette, Jr.


-17-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **RENE REYNA, JR.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **MISC ACTION NO. B-0017** |
| | § | |
| **CITY OF BROWNSVILLE** | § | |
| **and RAFAEL MOLINA,** | § | |
| **Defendants.** | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

## PRELIMINARY STATEMENT

TO THE HONORABLE JUDGE OF SAID COURT:

This is an action brought pursuant to the 4th, 5th, and 14th Amendments to the United States Constitution. The case is brought pursuant to 42 U.S.C. §1983. Plaintiff alleges that he was deprived of his constitutional rights by the Defendants. It is a case alleging police brutality.

## JURISDICTION

1.      This court has jurisdiction pursuant to 28 U.S.C. 1330; 1343.

## PARTIES

2.      The Plaintiff is a resident of Cameron County, Texas. The Defendant Rafael Molina is a police officer in the employment of the City of Brownsville. The City of Brownsville is a municipal corporation in the State of Texas.

C00001

Blumberg No. 5114   DEFENDANT'S EXHIBIT A

## FACTS

3.      The incident complained of took place on or about June 23, 1998 in Brownsville,

Texas.  At the time, the Plaintiff was twenty-one (21) years old.  The Plaintiff and friends

had taken a vehicle from a used car lot and without the authorization of the owner, were

driving the vehicle.  They were chased by the Brownsville Police.  The Plaintiff as well as

the others in the vehicle were unarmed.  After they stopped the vehicle the Plaintiff came out

of the vehicle with his hands in the air.  Without warning or justification, the Defendant

Rafael Molina, a police officer with the Brownsville Police Department shot the Plaintiff

three (3) times.  He shot him once in the arm, once in the abdomen and once in the thigh.

The shot to the stomach blew out his intestines and the shot to his leg shattered his thigh

bone.  After he was shot, the Defendant Rafael Molina put his knee on his back and

handcuffed him behind his back.  He was left on the ground until the ambulance arrived and

after excessive blood loss, the Plaintiff lost consciousness.  He awoke in the hospital where

he remained for approximately thirty (30) days.  He still has a bullet lodged in his leg which

has not been removed because it is too close to an artery.

4.      The Plaintiff suffers permanent internal injuries and permanent damage to his leg from

the bullet wounds.

## CAUSES OF ACTION

5.      Plaintiff has a cause of action pursuant to the 4th and 14th Amendments to the United

States Constitution, brought pursuant to 42 U.S.C. § 1983.  He was subjected to force greatly

in excess of that which was necessary to arrest in that the Defendant Molina, shot him three

000002

(3) as he was giving up, with his hands in the air and was unarmed.

6.       Defendant City of Brownsville is liable for its having failed to properly train the Defendant Molina in the proper use of force. This is not the first case in which officers with the City of Brownsville have used improper force in the arrest and detention of prisoners or suspects and in fact a pattern seems to have developed that can only be explained by inadequate training.

## DAMAGES

7.       The Plaintiff spent about one (1) month in the hospital. He has sizable medical bills that are a direct result of being shot by Officer Molina.

8.       The Plaintiff underwent and continues with considerable physical pain and suffering as the result of being shot three (3) times.

9.       The Plaintiff has suffered from considerable mental anguish as a result of being ruthlessly shot by the Defendant Molina.

10.      The Plaintiff suffers from continued impairment and disability as a result of being shot by the Defendant Molina. As a result of the aforementioned injuries, the Plaintiff is entitled to monetary damages.

11.      The Plaintiff is entitled to compensation for the intentional deprivation of his constitutional and civil rights.

12.      The Plaintiff is entitled to reasonable attorney's fees pursuant to 42 U.S.C. §1998.

         WHEREFORE Plaintiff prays as follows:

         1.       Plaintiff prays that the Defendants be found liable and ordered to pay Plaintiff

monetary damages;

2.  Plaintiff prays for attorney's fees;

3.  Plaintiff prays for pre and post judgment interest;

4.  Plaintiff prays for cost of court; and

5.  Plaintiff prays for all other relief to which the Court may find him entitled.

Respectfully submitted,

HINOJOSA & POWELL, P.C.
Attorneys at Law
612 Nolana, Suite 410
McAllen, TX 78504
(956) 686-2413
(956) 686-8462

BY: _____
GEORGE P. POWELL
Attorney at Law
State Bar No. 16196000

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been mailed, certified mail, return receipt requested, and/or telecopied to the opposing counsel of record on this 26th day of April 2001.

GEORGE C. KRAEHE
WILLETTE & GUERRA, L.L.P.
3505 Boca Chica Blvd.
Brownsville, TX 78521

_____
GEORGE P. POWELL



# CAMERON COUNTY DISTRICT ATTORNEY
CAMERON COUNTY COURTHOUSE
974 E HARRISON STREET ★ BROWNSVILLE, TEXAS 78520

**Yolanda de León**
County (Criminal District) Attorney

November 16, 2001

Mr. George C. Kraehe,
Willette, Guerra & Trevino, L.L.P.
International Plaza, Suite 460
Brownsville, Texas 78520

**VIA: HAND DELIVERY**

RE:   **Cause No. B-00-17**
      **Rene Reyna, Jr.**
      **vs. City of Brownsville Police Department and Rafael Molina**
      **For the Southern District of Texas; Brownsville Division**

Dear Mr. Kraehe:

Please find enclosed copies of the documents you requested as per your subpoena.

There is a charge of $28.00 for copying the 112 pages @ 25 cents each.

Should you have any questions, please contact the undersigned.

Very truly yours,

Francisco J. Martinez
Assistant District and County Attorney

Encl.:.

FJM: dsg

Received By: _____

Date: 11/6/01

DEFENDANT'S
EXHIBIT
B

Brownsville· (956) 544-0849          Fax  (956) 544-0869          Harlingen· (956) 425-6043

AGGRAVATED ASSAULT Sec. 22.02(2)(A) TWO COUNTS
DOB: 5-18-70

# IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS

THE GRAND JURORS, for the County of Cameron and State aforesaid, duly organized as such at the JULY Term, 1998 of the 107TH Judicial District in and for said County, upon their oaths in said Court, present that **RENE REYNA**, hereinafter called the Defendant, on or about the **23RD** day of **JUNE, 1998**, and anterior to the presentment of this indictment, in the County of Cameron and State of Texas, did then and there intentionally, knowingly, or recklessly cause bodily injury to **ROSA MARTINEZ** by by **striking ROSA MARTINEZ' vehicle with a motor vehicle**, and the defendant did then and there use or exhibit a deadly weapon, to-wit: **a motor vehicle**, during the commission of said assault,

## COUNT II

AND THE GRAND JURORS AFORESAID, upon their Oaths in said Court, do further present that **RENE REYNA**, hereinafter called the Defendant, on or about the **23RD** day of **JUNE, 1998** and anterior to the presentment of this Indictment, in the County of Cameron and State of Texas, did then and there intentionally or knowingly threaten **RAFAEL MOLINA** with imminent bodily injury and did then and there use or exhibit a deadly weapon, to-wit: **a motor vehicle**, during the commission of said assault,

000002

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 24 of 171

Regular
revised 03/23/95

OCT 12 1998

CAUSE NO. 98-CR-892-E

| | | |
|---|---|---|
| THE STATE OF **TEXAS** | § | IN THE DISTRICT COURT |
| VS. | § | CAMERON COUNTY, TEXAS |
| Rene Reyna JR | § | 357th JUDICIAL DISTRICT |

### WRITTEN WAIVER AND CONSENT TO STIPULATION OF TESTIMONY, WAIVER OF JURY, AND PLEA OF ~~Guilty~~ No Contest

Defendant, after having had his Federal and State constitutional and statutory rights fully explained to him by his attorney of record in this case, as well as the procedural requirements, rights and safeguards afforded to him by laws of the State of Texas, including the privilege against self-incrimination, the right to appearance, confrontation, and cross-examination of witnesses to be used against him, and the right to trial by jury, deliberately and knowingly agrees and consents, together with his counsel, to waive the appearance, confrontation and cross-examination of witnesses against him in this cause and further waives the right of trial by jury, and asks that he be tried by the Court without a jury.

Defendant, in person and together with his counsel, waives all formalities of arraignment and reading of the indictment and voluntarily and freely pleads Guilty, as charged in the indictment in this cause.

Defendant, in person, together with his counsel, in pleading Guilty further states under oath in open court to the Court:

1. I have never been treated for any mental illness and no one has ever suggested that I should receive treatment for any mental illness; I believe myself to be mentally competent now and sane at the time of the commission of the offense;

2. No one has threatened me in any way, used any f...

Regular
revised 03/23/95

4      I am not pleading Guilty with any delusive hope of
a pardon in my case; I have no hope of pardon;

**IF APPLICABLE: IF NOT A CITIZEN OF THE UNITED STATES OF
AMERICA I UNDERSTAND THAT A PLEA OF Guilty OR NOLO
CONTENDERE FOR THE OFFENSE CHARGED MAY RESULT IN
DEPORTATION, THE EXCLUSION FROM ADMISSION TO THIS
COUNTRY, OR THE DENIAL OF NATURALIZATION UNDER FEDERAL
LAW.**

5.     I understand that if I persist in pleading Guilty
and the evidence shows I am Guilty, the Court will
have no alternative but to find me Guilty;

6.     I understand that if the Court finds me Guilty, the
Court must and will assess my punishment as that
prescribed by law for the offense to which I here
plead Guilty;

7.     I understand that the punishment prescribed for the
offense to which I here plead Guilty is by
confinement in the Texas Department of Criminal
Justice Institutional Division (Texas Department of
Corrections) for a term of years not less than ___
___ 2 nor more than _20_, to which may be
added a fine not to exceed $ _10,000_ .

8.     I understand that the Prosecutor may or may not
make a recommendation as to punishment, but I
understand that the Court is not bound by such
recommendation of the prosecuting attorney as to
punishment;

9.     I affirm to the Court that there has been no plea
agreement in this case except as follows:_____

_No Agreed recommendation_

_____

And I understand that the Court is not bound to
accept a plea bargain and if the Court rejects a
plea bargain I may withdraw my plea of Guilty.

10.    I understand that if a punishment is being
recommended by the prosecutor and agreed to by me
and my attorney and the punishment assessed by the
Court does not exceed that agreed punishment that I
cannot, without the Court's permission, prosecute
an appeal on any matter in this case except for
those matters raised by written motions filed prior
to the trial;

STRIKE
ONE 11.    I went to the _____ grade in public school and
can **read write** and understand the English
language;

    11.  I do not read, write and understand the English

Regular
revised 03/23/95

further agree, **consent** and stipulate in writing in open **court** to the following:

The State **may** introduce affidavits, written **statements** of witnesses and any other documentary evidence in support of any judgement that **may** be entered in this cause, which **are marked** Exhibits No. ___1___, through No. ___2___, inclusive, and made **a part** hereof; that such **stipulated** evidence is true and correct; **that the** Defendant, is **the identical** person referred to in the **exhibits and** stipulate **evidence and** if the witnesses were present, **sworn and** testifying under **oath** that they would testify as set out in **their** written **statements and** would identify the Defendant as **the person** of whom they **speak in** said exhibits and stipulations; **that the** Defendant is **the identical** person named in the indictment **in the** above styled **and numbered** cause; that each and every allegation in said indictment **charging** the offense of: _Aggravated_ ____Assault____ is true and correct and each act therein alleged occurred in Cameron County, Texas.

_____
Defendant

SWORN TO AND **SUBSCRIBED** TO BEFORE ME, the undersigned authority, on this the __10__ day of __Oct_____, 19_98_

Clerk of the District Courts,
Cameron County, Texas

BY: _____
Deputy

APPROVED AND AGREED:

_____
Defendant's Attorney

_____
Assistant County (Criminal District) Attorney
Cameron County, Texas

Regular
revised 03/23/95

## CERTIFICATE OF DEFENDANT'S ATTORNEY

The undersigned attorney of record for the Defendant in the above styled and numbered cause, being a duly licensed member of the State Bar of Texas in good standing, does hereby certify that I have fully explained to the Defendant his Federal and State constitutional and statutory rights as Defendant in this case, including his constitutional right to a trial by jury and to have the witnesses present, testify and to cross-examine them, as well as all the procedural requirements and rights afforded him by the State of Texas, and the Defendant understanding his said rights, has deliberately and knowingly waived such rights in this case.

I further certify that I have read to the Defendant and explained to the Defendant the foregoing waiver and consent to stipulation to testimony, together with the stipulations and exhibits attached and made a part thereof, and I believe and state to the Court that the Defendant understands such waiver, consent and stipulation, and has voluntarily and knowingly, entered into the same with my advice and consent.

The undersigned attorney further states to the Court in connection with the Defendant's plea of Guilty that the undersigned has counseled and advised with the Defendant and that every statement above made by the Defendant is true and correct to the best of my knowledge and belief; and, in my opinion, the Defendant is now mentally competent and legally sane, was legally sane at the time of the offense charged, and is able to and does understand the nature and consequences of these proceedings and his plea of Guilty.

_____
Attorney for the Defendant

Regular
revised 03/23/95

APPROVAL OF TRIAL JUDGE:

The above and foregoing written waiver and consent to stipulation of testimony, waiver of jury and plea of Guilty having been made under oath by the Defendant in person in open court on this ___1___ day of ___April___, 19_96_ and the Court having interrogated the Defendant in person in open court, as well as his counsel, and being satisfied that the Defendant has had his constitutional and legal rights explained to him and that the Defendant has the age, education and discretion to fully understand and does understand his constitutional rights with regard to the right of trial by jury, the appearance, confrontation and cross-examination of witnesses against him, and the privilege against self-incrimination and further understands the waiver and the stipulations and the contents thereof to which he has agreed, the said waiver and consent and stipulation of testimony is hereby approved by the Court, and ordered filed in the papers of this cause.

The Court, having considered the plea of Guilty of the Defendant and it plainly appearing to the Court that the plea of the Defendant is free and voluntary and the Defendant is mentally competent; and the Court having duly admonished the Defendant of the range of punishment attached to the offense, that the recommendation of the prosecuting attorney as to punishment is not binding upon the Court and the fact that if the punishment assessed does not exceed the punishment recommended by the prosecutor and agreed to by the Defendant and his attorney, the Court must give its permission to the Defendant before he may prosecute an appeal on any matter in the case except for those matters raised by written motions filed prior to the trial; and the Defendant having persisted in pleading Guilty, accepts the Defendant's plea of

CAUSE NO. 98-CR-892-E

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
|---|---|---|
| VS | § | CAMERON COUNTY, TEXAS |
| RENE REYNA. | § | 357TH JUDICIAL DISTRICT |

## JUDGMENT OF CONVICTION: SENTENCE TO INSTITUTIONAL DIVISION

Judge Presiding:    Rogelio Valdez                    Date of Judgment: 11-24-98

State's
Attorney:    Chad Bull

Defendant's
Attorney:    Joe Valle

Offense
Convicted of: Aggravated Assault                    Date of Conviction: 11-23-98

Degree of Offense:    2nd degree felony                    Date Offense Committed: 06-23-98

Charging Instrument: Indictment

Plea to Court: No Contest                    Verdict of Court: Guilty

Term of Plea Agreement (In Detail): N/A

Plea to Enhancement: N/A                    Findings on Enhancement:    N/A

Finding on Special Issue (In Detail): N/A

Date Sentence Imposed:    11-23-98                    Costs: $186.25

Sentence of Imprisonment
Institutional Division:    five (5) years                    Fine:   N/A

Time Credited:    154 days                    Date to Commence: 11-23-98

Total Amount of Restitution: $5,411.87 upon  parole

Restitution To Be Paid To:

```
Texas Municipal League
P. O. Box 149194
Austin, TX  78714-9194
1-800-537-6655
Claim No.: 9800050153 A & B
Attn:  Aleeze Montgomery, Adjustor
Amount Due:  $682.38
```

```
Rosa Elvia Martinez
1669 El Matador Drive
Brownsville, TX  78521
(956) 546-2691
Amount Due:  $741.98

Accident & Injury Chiropractic Center
1100 North Expressway
Brownsville, TX  78520
(956) 504-5940
Re:  Rosa Elvia Martinez (patient)
Amount Due:  $1,730.00

Concepcion Garza
4929 Paso Doble Circle
Brownsville, TX  78521
(956) 548-0162
Amount Due:  $100.00

J & M Auto Sales
c/o Juan Manuel Lopez
4365 Southmost Road
Brownsville, TX  78520
(956) 550-0660
Amount Due:  $2,157.51
```

To run concurrent with 98-CR-893-E and 97-CR-469-E

On the date stated above, the above numbered and entitled cause was reached and called for trial, and the State appeared by the attorney stated above, and the Defendant and the Defendant's attorney were also present. Thereupon, both sides announced ready for trial, and the Defendant, Defendant's attorney, and the State's attorney agreed in open court and in writing to waive a jury in the trial of this cause and to submit it to the Court. The Court consented to the waiver of a jury herein. The Defendant further waived the reading of the indictment and, upon being asked by the Court as to how the Defendant pleaded, entered a plea of guilty to **Aggravated Assault**. Thereupon, the Defendant was admonished by the Court of the consequences of said plea, and, it appearing to the Court that the Defendant was competent to stand trial and that the Defendant was not influenced in making said plea by any consideration of

fear or by any persuasion prompting a confession of guilt, the free and voluntary plea of guilty was received by the Court and is now entered of record in the minutes of the Court as the plea of the Defendant. The Court, having heard all evidence from the State and the Defendant, and having heard argument of counsel for both parties, found that there was sufficient evidence to support the Defendant's plea and found the Defendant guilty of the offense stated above.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that the Defendant is guilty of the offense stated above, and, the Court having reviewed the pre-sentence investigation report, the punishment is assessed by the Court at **FIVE (5) YEARS** at the Texas Department of Criminal Justice, Institutional Division, and the State of Texas do have and recover of said Defendant all court costs in this prosecution expended for which execution will issue.

And thereupon the Court asked the Defendant whether the Defendant had anything to say why said sentence should not be pronounced upon said Defendant, and the Defendant answered nothing in bar thereof. Whereupon the Court proceeded, in the presence of said Defendant and the Defendant's attorney, to pronounce sentence upon said Defendant as follows:

IT IS ORDERED by the Court that the Defendant, who has been adjuged guilty of the offense stated above, be and is hereby sentenced to the punishment stated above. The Defendant shall be taken by the authorized agent of the State of Texas or by the Sheriff of Cameron County, Texas, and by him safely conveyed and delivered to the Director of the institutional division of the Texas Department of Criminal Justice, there to be imprisoned in the manner and for the period aforesaid. The Defendant is hereby remanded to the custody of the Sheriff, until such time as the Sheriff can obey the directions of this sentence.

IT IS FURTHER ORDERED by the Court that Defendant's left or right thumb be fingerprinted, and that said thumbprint be marked as Exhibit "A" and is made a part hereof for all purposes.

The Court has ordered that this case is to run concurrent with 98-CR-893-E and 97-CR-469-E.

The Court has ordered that the defendant is to pay restitution in the amount of $5,411.87 upon parole.

Said Defendant is given credit on this sentence for 154 days on account of the time spent in jail.

SIGNED FOR ENTRY:  November 24, 1998.

_____
Judge Presiding

065001

Case Number:   199830?6331

<u>ROBERTO GARZA</u>      <u>3150</u>            <u>LT  fm</u>          <u>?9?</u>
   Officer               Emp. #         Supervisor         Emp.

DEFENDANT'S EXHIBIT
Blumberg No. 5114
C

ON THIS DATE, JUNE 23, 1998 AT APPROX. 6:24 P.M. WHILE ON PATROL, I WAS TRAVELING SOUTH BY THE 900 BLK OF SOUTH CENTRAL AVE. AS I WAS APPROACHING THE INTERSECTION WITH MORNINGSIDE ROAD, I OBSERVED A VEHICLE HEADING EAST ON MORNINGSIDE GOING AGAINST TRAFFIC AND RAN THE STOP SIGN AT THE INTERSECTION ALMOST COLLIDING WITH MY UNIT AS THE VEHICLE TURN INTO CENTRAL AVE. I THEN PROCEEDED TO TURN AROUND IN ORDER TO CATCH UP WITH THE CAR. I THEN RADIOED TO THE POLICE COMMUNICATION CENTER THAT I WAS ATTEMPTING TO CATCH UP WITH A BLUE LINCOLN CONTINENTAL AND GIVE MY DIRECTIONS. I THEN WAS ADVISED BY COMM. CENTER THAT THEY HAD JUST RECEIVED A CALL OF A STOLEN BLUE VEHICLE. THE VEHICLE WAS STILL ON NTRAL AVE. TRAVELING NORTH PASSING CARS ALMOST HITTING THEM. VEHICLE THEN RAN A RED TRAFFIC LIGHT AT THE INTERSECTION OF CENTRAL AVE. AND BILLY MITCHELL ALMOST CAUSING AN ACCIDENT. VEHICLE THEN TURNED INTO BILLY MITCHELL TRAVELING EAST GOING TOWARDS THE AIRPORT. AS I WAS GIVING MY LOCATIONS, OFFICER RAFAEL MOLINA CAME ON THE RADIO AND ADVISED THAT HE WAS BY THE AIRPORT TO INTERCEPT THE VEHICLE. AS I CATCH UP WITH THE CAR AND WAS BEHIND THE SUSPECT VEHICLE, I PROCEEDED TO ACTIVATE MY EMERGENCY OVERHEAD LIGHTS AND SIREN AND CALLED IN THE PURSUIT IN PROGRESS. VEHICLE AT NO TIME ATTEMPTED TO STOP AND AS IT WAS APPROACHING THE AIRPORT I SAW OFFICER MOLINA'S PATROL UNIT WITH THE OVERHEAD LIGHTS ON THE INTERSECTION OF S. MINNESOTA AVE AND BILLY MITCHELL. VEHICLE JUST WENT STRAIGHT TO THE UNIT AND HIT THE REAR QUARTER PANEL OF THE PATROL UNIT AND KEPT ON GOING. VEHICLE TURN LEFT INTO S. MINNESOTA TRAVELING NORTH. VEHICLE THEN TURNED LEFT INTO LES MAULDIN AVE. TRAVELING WEST. AS I WAS FOLLOWING THE VEHICLE, I COULD SEE THREE SUBJECTS IN THE VEHICLE, ONE IN THE REAR SEAT AND TWO IN THE FRONT. VEHICLE THEN TURNED RIGHT INTO BILLY MITCHELL BLVD. SUSPECT VEHICLE THEN TURNED INTO THE DRIVEWAY OF THE OLD HAGGAR'S CLOTHING COMPANY. VEHICLE THEN WENT TO AN EMPTY LOT BY THE CORNER OF BILLY MITCHELL BLVD. AND CENTRAL AVE. THERE THE SUSPECT VEHICLE TURNED AROUND AND HIT MY PATROL UNIT AS HE WAS HEADING BACK TO THE ROAD WAY. BEFORE IT MADE IT TO THE ROAD, THE PASSENGER ON THE REAR BAIL OUT AND STARTED TO RUN CROSSING THE STREET. I THEN OBSERVED A UNIT GOING AFTER HIM AND I KEPT ON FOLLOWING THE SUSPECT VEHICLE. WHEN HE MADE IT TO THE ROAD, HE SLOWED DOWN BEHIND THREE CARS STOPPED FOR A RED TRAFFIC LIGHT AS OFFICER MOLINA HAD POSITION HIS UNIT TO THE LEFT SIDE OF IT. I THEN RD THE VEHICLE SPEEDING UP AND STRUCK THE VEHICLE THAT WAS IN FRONT OF M. AT THIS TIME I HEARD THREE TO FOUR SHOTS FIRED AND I SAW THE FRONT PASSENGER GETTING OUT OF THE CAR. I THEN SAW THE DRIVER OF THE SUSPECT VEHICLE GETTING OUT AND FELL TO THE ROAD AS OFFICER MOLINA APPROACHED HIM. I PULLED OUT MY GUN FROM MY HOLSTER AND I RAN AFTER THE PASSENGER. I THEN YELLED AT HIM TO STOP AND AIMED MY WEAPON TO HIM HE THEN STOPPED AND HE WAS SUBDUED. I HOLSTERED MY WEAPON BACK AND HANDCUFFED THE

SGT PABLO FLORES HAD DETAINED THE FIRST PASSENGER THAT GOUT OUT OF THE
SUSPECT CAR.  I WAS INSTRUCTED TO TRANSPORT ONE OF THE PRISONERS TO THE
STATION AND TO START THE PAPER WORK.

Case Number:  1996-3046337

Rafael Molina                 3701                    ᴌ̅ʜ ᠵ̅ⁿ              ꞓ/9ʲ7
    Officer                   Emp. =            Supervisor              Emp. =

ON JUNE 23, 1996, I WAS WORKING THE 2:45 P.M. TO 10:45 P.M. SHIFT.   AT
APPROXIMATELY 6:45   P.M. I WAS PATROLING THE BROWNSVILLE AIRPORT AREA.
AT THAT TIME I HEARD OFFICER ROBERT GARZA CALL OFF A VEHICLE WHICH HAD
RAN A STOP SIGN AT A VERY HIGH RATE OF SPEED AT THE INTERSECTION OF
MORNINGSIDE AND CENTRAL AVENUE.   THE VEHICLE WAS DESCRIBED BY OFFICER
GARZA AS A BLUE NEWER MODEL FOUR DOOR LINCOLN.   THE VEHICLE WAS
DESCRIBED BY OFFICER GARZA AS BEING OCCUPIED BY SEVERAL SUBJECTS.   I
THEN ADVISED OFFICER GARZA THAT I WAS NEAR THE AREA AND THAT I WOULD
ASSIST ON THE STOP.   OFFICER GARZA THEN ADVISED DISPATCH THAT THE
VEHICLE WAS GAINING SPEED AND THAT IT WAS APPROACHING THE INTERSECTION
OF CENTRAL AVENUE AND BILLY MITCHELL.   OFFICER GARZA THEN FURTHER
ADVISED DISPATCH THAT THE VEHICLE HAD RAN THE STOPLIGHT AT THE
INTERSECTION OF CENTRAL AVENUE AND BILLY MITCHELL AND WAS HEADING EAST
ON BILLY MITCHELL TOWARD THE AIRPORT.   KNOWING THIS INFORMATION AND
ATTEMPTING TO ASSIST OFFICER GARZA, I POSITIONED MY PATROL CAR AT THE
ENTRANCE OF THE AIRPORT.   AT THAT TIME I ENGAGED MY OVERHEAD LIGHTS SO
 THAT THE SUBJECTS COULD CLEARLY SEE THAT I WAS THERE TO ASSIST OFFICER
GARZA.   FROM WHERE I WAS POSITIONED I COULD SEE THE VEHICLE APPROACHING
MY DIRECTION AT A VERY HIGH RATE OF SPEED.   I THEN HEARD VIA DISPATCH
THAT THE VEHICLE THE SUBJECTS WERE DRIVING HAD BEEN REPORTED STOLEN FROM
A CAR LOT IN BROWNSVILLE.   AS THE SUBJECTS APPROACHED MY CAR I NOTICED
THAT THE VEHICLE CAME TO A STOP APPROXIMATELY 30 FEET FROM MY PATROL
CAR.   FROM THE INSIDE OF MY PATROL CAR I SIGNALED THE SUBJECTS TO STOP.
I THEN ATTEMPTED TO GET OFF MY PATROL CAR BY OPENING THE DOOR.   AS I
OPENED THE DOOR AND STEPPED OUT OF THE CAR, I NOTICED THE DRIVER OF THE
CAR ACCELERATE HIS CAR AND DRIVE TOWARDS ME.   I IMMEDIATELY JUMPED BACK
INTO MY CAR.   THE DRIVER SIDE SWIPED THE DRIVERS SIDE OF MY VEHICLE.
IT IS MY BELIEF THAT HAD I NOT TAKEN EVASIVE ACTION AS I DID I WOULD
HAVE BEEN PINNED BETWEEN THE DOOR  AND MY PATROL CAR.   IT WAS CLEAR IN
MY MIND THAT THE DRIVER HAD TOTAL DISREGARD FOR MY LIFE AND MY SAFETY.
AS THE DRIVER SIDE SWIPED MY PATROL CAR I NOTICED THAT OFFICER GARZA WAS
STILL PURSUING THE SUBJECT VEHICLE.   I THEN IMMEDIATELY FOLLOWED PURSUIT
BY MAKING A U TURN.   THE CAR PROCEEDED ON BILLY MITCHELL AND MADE A
LEFT TURN ONTO MINNESOTA AVENUE AND THEN AGAIN LEFT ON LES MAULDIN.   THE
CAR EVENTUALLY DROVE BACK WEST ON BILLY MITCHELL WITH OFFICER GARZA AND
MYSELF FOLLOWING.   AT THIS TIME BOTH OFFICER GARZA AND MYSELF HAD OUR
SIRENS AND OVERHEAD LIGHTS STILL ENGAGED.   THE CAR THEN SLOWED DOWN AND
DROVE UNTO AN EMPTY LOT LOCATED NEXT TO THE OLD HAGGARS BUILDING.   THE
CAR OCCUPIED BY THE SUBJECTS WAS BEING DRIVEN RECKLESSLY AS THE CAR WAS
BEING DRIVEN IN CIRCLES BY THE DRIVER AND US IMMEDIATELY FOLLOWING.   BY
THAT TIME OTHER OFFICERS FROM THE BROWNSVILLE POLICE DEPARTMENT HAD
 RRIVED TO ASSIST OFFICER GARZA AND MYSELF WITH THE STOP.   I THEN
 OTICED THE DRIVER OF THE CAR STRIKE WITH THE FRONT LEFT OF HIS CAR THE

(96-3046337 Continues on next page.)

                                                              CI0003

CK LEFT OF  SERGEANT PABLO FLORES'S PATROL CAR.  THE CAR THEN CONTINUED TRAVELING AND SIDE SWIPED OFFICER ROBERT GARZA'S FRONT BUMPER WITH THE SUBJECTS LEFT SIDE OF THE VEHICLE.  THE DRIVER THEN DROVE BACK TOWARDS BILLY MITCHELL AND STRUCK A UTILITY WARNING POLE LOCATED ALONG BILLY MITCHELL.  AS THE CAR WAS DRIVEN BACK TOWARDS BILLY MITCHELL, I POSITIONED MY PATROL CAR ON THE LEFT SIDE OF THE SUBJECT VEHICLE.  AT THIS TIME I STILL HAD ON MY SIREN AND OVERHEAD LIGHTS.  AS THE SUBJECT VEHICLE WAS ABOUT TO ENTER BILLY MITCHELL FROM THE EMPTY LOT, I NOTICED THAT TWO OF THE SUBJECTS FROM THE VEHICLE GOT OUT AND PROCEEDED TO RUN. AS THE CAR GOT UNTO BILLY MITCHELL, I WAS STILL POSITIONED TO THE LEFT OF THE SUBJECT VEHICLE.  I THEN NOTICED THAT THE DRIVER OF THE VEHICLE WAS NOT WANTING TO STOP AND TRAVELING TOWARD SEVERAL CARS THAT WERE STOPPED AT THE INTERSECTION OF BILLY MITCHELL AND CENTRAL AVENUE.  I THEN LOWERED THE PASSENGER'S SIDE WINDOW OF MY PATROL VEHICLE AND DREW MY WEAPON.  I SIGNALED THE SUBJECT TO STOP AND HE MOTIONED THAT HE WOULD FURTHER UP AHEAD.  THE SUBJECT'S VEHICLE WAS TRAVELING AT AN APPROXIMATE SPEED OF 30 MILES PER HOUR.  AS THE SUBJECT DROVE TOWARDS THE INTERSECTION, HE RAMMED THE SUBJECT VEHICLE INTO A CAR STOPPED AT THE INTERSECTION OF BILLY MITCHELL AND CENTRAL AVENUE, CAUSING A 4 TO 5 VEHICLE COLLISION.  IT WAS ABUNDANTLY CLEAR THAT THE DRIVER OF THE SUBJECT CAR WAS NOT GOING TO STOP AT ALL.  AFTER THE COLLISION I NOTICED THAT THE DRIVER PLACED THE CAR IN REVERSE AND OPENED HIS DOOR.  HE THEN TURNED THE WHEELS TO HIS CAR IN THE DIRECTION OF MY PATROL CAR.  BASED ON THE SUBJECTS PRIOR ACTIONS IN SIDE SWIPING MY PATROL, THE PATROL CAR F OFFICER GARZA, SGT. FLORES AND THE INNOCENT VICTIMS INVOLVED IN THE COLLISION, I FELT THAT THE SUBJECT WAS GOING TO CONTINUE ELUDING THE BROWNSVILLE POLICE DEPARTMENT.  AS A POLICE OFFICER I FEARED FOR MY SAFETY AND THE SAFETY OF THE PUBLIC.  IN AN EFFORT TO STOP THE SUBJECT FROM FURTHER SUBJECTING MY LIFE AND THE LIFE OF THE PUBLIC IN JEOPARDY I FIRED MY WEAPON AT THE SUBJECT.  AS I FIRED MY WEAPON AT THE SUBJECT, THE SUBJECT FELL OUT OF THE CAR.  THE SUBJECTS CAR WAS ON THE DRIVE GEAR BECAUSE AS THE SUBJECT FELL OUT OF THE CAR, THE CAR TRAVELED FORWARD IN BETWEEN THE VEHICLE HE HAD STRUCK AND MY PATROL CAR.  I THEN RAN AFTER THE CAR AND PLACED IT ON PARK.  BY THIS STATEMENT I HEREBY DECLARE THAT THE SUBJECT INVOLVED IN THIS PURSUIT INTENTIONALLY ATTEMPTED TO CAUSE MY DEATH OR SERIOUS BODILY INJURY AND I THEREFORE ASK THAT APPROPRIATE CHARGES FOR  AGGRAVATED ASSAULT BE FILED AGAINST THE SUBJECT.

Case Number:   19983046337

RAFAEL MOLINA _____   3701   _Sgt. Sandra L. Galan_   _225_
     Officer                 Emp. #        Supervisor         Emp. #


     ON JUNE 30, 1998 I SPOKE TO DETECTIVE TONY FLORES IN REFERENCE TO
THE CALL OF THE PURSUIT THAT OCCURRED ON JUNE 23,1998.  AFTER THE
SUSPECT VEHICLE STRUCK THIS OFFICER'S UNIT, I PROCEEDED TO JOIN IN ON
THE PURSUIT.  I WAS TRAVELING TO THE LEFT (DRIVER) SIDE OF THE SUSPECT
VEHICLE ALL ALONG THE PURSUIT.  WHEN THE SUSPECT VEHICLE ENTERED THE
EMPTY FIELD BY HAGGAR, THE DRIVER OF THE SUSPECT VEHICLE BEGAN TO DRIVE
IN CLOCKWISE CIRCLES (DOUGHNUTS) AND I CONTINUED TO THE LEFT.  AFTER THE
DRIVER OF THE SUSPECT VEHICLE STRUCK SGT. PABLO FLORES'S UNIT, IT
CONTINUED TO TRAVEL IN A CIRCULAR MOTION AND THEN STRUCK OFFICER ROBERT
GARZA'S UNIT.  THE SUSPECT VEHICLE THEN CONTINUED TO TRAVEL TOWARDS
BILLY MITCHELL AND IT RAN OVER A UTILITY POLE CLOSE TO THE STREET.
DURING THESE INCIDENTS, I KEPT ON SIGNALING WITH MY LEFT HAND FOR THE
DRIVER OF THE SUSPECT VEHICLE TO STOP.  AT THIS POINT TWO OF THE THREE
 SUSPECTS GOT OFF OF THE STOLEN CAR AND RAN ON FOOT FLEEING FROM OTHER
OFFICERS THAT WERE ALREADY RESPONDING TO THE SCENE.  WHEN THE SUSPECT
VEHICLE FINALLY BEGAN TO TRAVEL ON BILLY MITCHELL TO CENTRAL AVENUE, I
SAW THAT THERE WERE SEVERAL CARS STOPPED AT THE SIGNAL LIGHT (RED
LIGHT).  THE DRIVER OF THE SUSPECT VEHICLE CONTINUED TO DRIVE TOWARDS
CENTRAL AVENUE WITH THE DRIVER SIDE DOOR OPEN.  WHEN THE DRIVER OF THE
STOLEN VEHICLE DID NOT STOP, IT STRUCK THE LAST VEHICLE THAT WAS WAITING
AT THE SIGNAL LIGHT.  I THEN SAW THAT THE DRIVER OF THE STOLEN VEHICLE
PLACED THE STOLEN CAR IN REVERSE AND DROVE BACK A FEW FEET.  THE DRIVER
OF THE STOLEN VEHICLE THEN PLACED THE STOLEN CAR INTO DRIVE AND
ACCELERATED TOWARDS MY PATROL UNIT.  WHEN I SAW THAT THE DRIVER OF THE
STOLEN CAR WAS DRIVING FORWARD, I PROCEEDED TO FIRE MY SERVICE WEAPON
APPROXIMATELY FOUR TIMES FROM INSIDE OF MY PATROL VEHICLE (PASSENGER
SIDE WINDOW OPEN) AT THE DRIVER OF THE STOLEN CAR IN ORDER FOR HIM TO
STOP.  AFTER THE SHOTS WERE FIRED, I SAW THAT THE DRIVER OF THE STOLEN
VEHICLE FELL OUT OF THE CAR AND LANDED ON THE PAVEMENT.  I PARKED MY
UNIT AND WALKED AROUND AND SAW THAT HE WAS BLEEDING.  I THEN HEARD
SOMEONE SAY THAT THE STOLEN CAR WAS CONTINUING TO TRAVEL SO I RAN AFTER
IT AND I PLACED THE CAR INTO PARK WHERE IT CAME TO REST AT THE
INTERSECTION OF CENTRAL AVE..  I THEN RAN BACK TO WHERE THE DRIVER WAS
AT AND I PLACED MY HANDCUFFS ON HIM.  I THEN HEARD THAT OFFICER ROBERT
GARZA HAD CALLED FOR E.M.S. TO RESPOND.  I THEN CAME INTO THE STATION
AND MY WEAPON WAS SEIZED BY ONE OF MY SUPERVISORS. _R. Molina #3701_

Case Number:  1998-3? 5337

| Sgt. Pablo Flores | 0182 | _Sgt. PF._ | _182_ |
|---|---|---|---|
| Officer | Emp. # | Supervisor | Emp. # |

   While on patrol waiting at a stop light corner of Boca Chica &
International Blvd. I heard radio traffic as Officer Robert Garza
attempted to affect a traffic Stop some where on Boca Chica & Iowa. He
advised he was trying to pull over a blue Lincoln but that said vehicle
refused to stop. I heard dispatch advise that said vehicle Officer Garza
was attempting to stop had just been reported stolen from some address
on Southmost Road. Via Radio Officer Garza and Officer Molina attempted
to stop said vehicle which had taken a route down Iowa towards
LesMaldin. As I turned around to head in their direction to assist. Sgt.
Joe Bressler came on the air advising the Officers involved in the
pursuit to keep pace on the stolen vehicle and keep advising of their
location. As I approached Billy Mitchell via radio I heard the stolen
vehicle had gone back on Iowa onto Billy Mitchell headed back towards
Boca Chica. At this time I was on Billy Mitchell coming up to the
Resaca. I paused and heard radio traffic that the stolen vehicle was
approaching Haggars Slacks on Billy Mitchell. I proceeded to said
location and observed the police units over heads approaching Haggars. I
at this time turned my emergency lights and siren on as I observed the
stolen vehicle headed towards Central Ave. in an effort to keep traffic
out of the intersection. I Observed the stolen vehicle jump the curb at
Haggars and head into an empty soccer field as I waited at Billy
Mitchell and Central Ave.. Upon observing the stolen blue Lincoln headed
into the open field I proceeded to head towards the stolen vehicle and
police units. As I approached the stolen vehicle started to turn back
round towards Billy Mitchell. I proceeded to head the vehicle off which
seemed to want to stop as the passenger doors opened. I passed through
the front and saw that the vehicle was not going to stop. I attempted to
move out of the way but the suspect vehicle struck the Left Rear Bumper
with what appeared to be his left front or left side. As the other Units
maintained pursuit headed towards Billy Mitchell I saw one suspect
wearing a blue shirt and blue jeans slim, Medium complected jump out of
the stolen motor vehicle and take off running towards Billy Mitchell as
the stolen vehicle and police units headed towards Central Ave. I
maintained pursuit on the suspect mentioned later identified as Jose
Velasco. The suspect crossed Billy Mitchell then doubled back towards
Haggars Slacks fence where I caught up to and affected the arrest. As I
struggled with the suspect I heard about two to three shots fired from
the intersection of Billy Mitchell and Central Ave. As I turned I saw
the Officers out of their police units. I quickly handcuffed Mr. Velasco
and hurried over to their location. Upon arriving I observed two
suspects on the pavement. One suspect later identified as Rene Reyna had
been shot in the left arm, left side in the abdominal area and his left
leg. Emergency Medical Service, Criminal Investigation Division, Special
Investigations Unit and Shift Commander Lt. Ramiro Rodriguez  were
called to the scene as well as traffic investigators I.C.Rojano and
Antonio Barron. Suspect Rene Reyna driver of the stolen Lincoln was
transported to BMC escorted by Officer Roman Pineda where held under
custody pending arraignment for charges of Felony theft auto, aggravated
assault on a public servant, evading arrest. Suspect Jose Velasco was
transported to City Jail where booked in for Felony possession of stolen
ehicle and evading arrest.

(3046337 Supplement report continues on next page)

( ⌐ 463337 Supplement report continues)

The third suspect later identified as Mr. Jose Armando Gonzalez was also transported to City Jail where booked in for Felony Theft auto and evading arrest.
The stolen blue Lincoln Continental no license plates VIN 1LNLM81W4NY709988 was towed to the back ramp of the police station by City Wrecker for the Criminal Investigations Division for further investigation.

Sgt. B

Case Number: 19985046337

_____ JR. _____ 0725 _____ *Sgt Syrtha K. Button* __ 225
Officer          Emp. #            Supervisor            Emp. #

   TUESDAY, 23rd OF JUNE 1998...ON SAID DATE THIS OFFICER RECEIVED A
TELEPHONE CALL AT HIS RESIDENCE FROM DET. S. MANRRIQUE. THIS OFFICER WAS
ADVISED TO REPORT FOR DUTY IN REGARDS TO AN OFFICER INVOLVED SHOOTING
WHICH HAD JUST OCCURRED.

   THIS OFFICER PROCEEDED TO RESPOND TO THE SCENE WHICH WAS LOCATED AT THE
INTERSECTION OF BILLY MITCHELL BLVD. AND CENTRAL AVE.. UPON ARRIVAL
(7:05am) CONTACT WAS MADE WITH DET. LT. O. RODRIGUEZ AND PATROL SGT. J.
BRESSLER. THIS OFFICER LEARNED THAT A POLICE CHASE HAD TAKEN PLACE
INVOLVING A STOLEN CAR. THE STOLEN CAR HAD BEEN OCCUPIED BY THREE MALE
SUSPECTS. THE SUSPECT DRIVER HAD BEEN SHOT DURING THE COURSE OF THE
CHASE AS HE RAM SEVERAL VEHICLES (4) WHICH HAD BEEN STOPPED FOR A RED
LIGHT AT SAID INTERSECTION, AND AS THE CHASE APPROACHED THEM THEY HAD
ATTEMPTED TO PULLED TO THE SIDE OF THE ROAD. THE OTHER TWO MALE SUSPECTS
HAD BEEN APPREHENDED AS THEY ATTEMPTED TO FLEE THE SCENE.

   THE OFFICER WHO HAD FIRED THE GUNSHOTS WAS PATROLMAN, R. MOLINA.
PATROLMAN F. GARZA AND PATROL SGT. P. FLORES HAD ALSO BEEN INVOLVED IN
THE CHASE.

   THE POLICE CHASE WAS REPORTED TO HAVE BEGUN WHEN THE SUSPECT VEHICLE
HAD BEEN OBSERVED BY PATROLMAN GARZA TO BE DRIVING AT A HIGH SPEED AND
RECKLESSLY IN THE AREA OF THE INTERSECTION OF CENTRAL AVE. AND
MORNINGSIDE ROAD. THE SUSPECT VEHICLE REFUSED TO STOP AND PROCEEDED ONTO
BILLY MITCHELL BLVD. WHERE IT FLED EAST BOUND. IN THE AREA OF THE
INTERSECTION OF BILLY MITCHELL BLVD. AND MINNESOTA ROAD THE SUSPECT
VEHICLE ALMOST CRASHED INTO THE PATROL UNIT (D 21) OCCUPIED BY PATROLMAN
MOLINA. OFFICER MOLINA WAS ABLE TO TAKE EVASIVE ACTIONS AS THE SUSPECT
VEHICLE SCRAPED BY. THE SUSPECT VEHICLE WAS REPORTED TO MADE A SERIES OF
TURNS AND BEGAN TO TRAVEL WEST BOUND AGAIN ON BILLY MITCHELL BLVD.. AT
THE 1500 BLK. OF SAID BLVD. THE SUSPECT VEHICLE ATTEMPTED TO CROSS AN
OPEN FIELD LOCATED NEXT TO THE HORACE SMALL APPAREL COMPANY. ONCE ON THE
FIELD, THE SUSPECT VEHICLE PROCEEDED TO RAM INTO THE PATROL UNIT
OCCUPIED BY PATROL SGT. FLORES. THE SUSPECT VEHICLE LEFT THE OPEN FIELD,
AND AGAIN BEGAN TO TRAVEL WEST ON BILLY MITCHELL BLVD. TRAFFIC WAS
STOPPED OUT TO A RED LIGHT ON BILLY MITCHELL BLVD. AT CENTRAL AVE. AS
THE STOPPED VEHICLES ON THE WEST BOUND OUTSIDE LANE ATTEMPTED TO PULLED
TO THE SIDE OF THE ROAD THE SUSPECT VEHICLE RAM INTO A GRAY FORD CROWN
VICTORIA (T____ : TAG: ARM 918.) WHICH CAUSED A CHAIN REACTION INVOLVING AT
_____ IT WAS DURING THIS TIME THAT THE SHOOTING
TOOK PLACE. THE SUSPECT DRIVER PROCEEDED TO FALL OUT OR JUMP OUT ONTO
THE ROAD, LEAVING THE SUSPECT VEHICLE IN GEAR. THE SUSPECT VEHICLE
PROCEEDED TO ROLL ONTO THE MIDDLE OF THE INTERSECTION BEFORE BEING
STOPPED BY PATROLMAN MOLINA.

                                                         000008

. . . . . . . . . . . . . TO THE SCENE TO BE LOCATED ON A FOUR LANE (TWO WAY) ROAD (HEAVY TRAFFIC) WHICH HAD A TURNING LANE AND A PARKING LANE ON BOTH SIDES OF THE ROAD. THE ENTIRE WEST BOUND LANES HAD BEEN BLOCKED OFF ALONG WITH THE INTERSECTION BY PATROL UNITS.

OFFICER MOLINA'S PATROL UNIT (D 24) WAS STOPPED AT A SLIGHT ANGLE ON THE INSIDE LINE OF THE WEST BOUND LANE. THE GRAY FORD CROWN VICTORIA WAS . . . . . . . . . . . AD HAD BOTH OF ITS LEFT SIDE TIRE PUSHED ONTO THE CURB. A RED TOYOTA TERCEL (TX. LPS: MTP 95F) WAS STOPPED AHEAD OF THIS VEHICLE. ALSO ON THE PARKING LANE AREA AND A RED CHEVY. CAVILER (TX. LPS: LPS 260) WAS INFRONT OF SAID VEHICLE. THE SUSPECT VEHICLE ( A 1992 BLUE LINCOLN CONTINENTAL, V.I.N. 1LNLM81W4N7700988) HAD COME TO A STOPPED IN THE MID AREA OF THE INTERSECTION NEAR THE EAST BOUND TURNING LANE.

THE SUSPECT VEHICLE HAD DAMAGE TO ITS FRONT END AND ALONG BOTH OF ITS SIDES. DAMAGE FROM A BULLET IMPACT WAS PRESENT ON THE LOWER SIDE OF THE . . . . . . . . . . . AND NO OTHER GUNFIRE DAMAGE WAS NOTED.

THE AREA BETWEEN OFFICER MOLINA'S PATROL UNIT (D 24) AND THE GRAY FORD CROWN VICTORIA SIX ORANGE TRAFFIC CONES WERE OBSERVED. SAID CONES HAD BEEN PLACED PRIOR TO THIS OFFICER'S ARRIVAL AND WERE BEING USED TO . . . . . . . . . . . OF EVIDENCE WHICH LAID ON THE ROADWAY. THIS OFFICER PROCEEDED TO REPLACE SAID CONES WITH NUMBERED ORANGE EVIDENCE CONES. THIS OFFICER ALSO LEARNED THAT S.I.U. AGENTS AND FELLOW DETECTIVES HAD ALSO BEGAN TO PHOTOGRAPH THE SCENE. THIS OFFICER PROCEEDED TO TAKE ADDITIONAL PHOTOGRAPHS OF THE SCENE. AERIAL PHOTOGRAPHS OF THE SCENE WERE TAKEN BY DET. R. RODRIGUEZ FROM ON TOP A BUCKET LADDER (P.U.B.). THIS OFFICER ALSO VIDEO TAPE THE SCENE. MEASUREMENTS WERE ALSO TAKEN TO PREPARE A DIAGRAM. NOTE: TRAFFIC OFFICERS I.C. ROJANO AND R. BARRON ALSO TOOK MEASUREMENTS OF THE SCENE IN ORDER TO PREPARE A TRAFFIC ACCIDENT DIAGRAM.

THE FOLLOWING ITEMS WERE SEIZED BY THIS OFFICER AS EVIDENCE:

ITEM # 1. A "FEDERAL 45 AUTO" SPENT CASING.
ITEM # 2. A "FEDERAL 45 AUTO" SPENT CASING.
ITEM # 3. A BLACK BASEBALL CAP WITH A "NIKE" LOGO. (SUSPECT'S).
ITEM # 4. A SPLIT OPENED COPPER METAL JACKET.
ITEM # 5. A BULLET'S LEAD CORE (DISTORTED).
ITEM # 6. A BULLET SLUG WITH ITS METAL JACKET SPLIT.

PIECES OF GLASS DEBRIS AND FIBERGLASS DEBRIS WERE ALSO SEIZED FROM THE ROAD WAY NEAR ITEM #6 AND FROM THE OPEN FIELD. SAID DEBRIS IS BELIEVE TO BE FROM THE SUSPECT'S VEHICLE.

NOTE: A SPENT BULLET CASING WAS LATER FOUND (FOLLOWING MORNING) UNDER THE PASSENGER SEAT OF OFFICER MOLINA'S PATROL UNIT (D 24).

ONCE THAT SCENE HAD BEEN PROCESSED IT WAS RELEASED (9:20pm).

NOTE: OFFICER R. RODRIGUEZ TURNED OVER THE DEPARTMENT ISSUED SEMI-AUTO PISTOL WHICH HAD BEEN FIRED BY PATROLMAN MOLINA. SAID PISTOL BEING A "SMITH & WESSON" 45 CAL. MODEL #4501-1 SERIAL #VDW7182 (B.P.D.95-0019),

WITH A MAGAZINE CLIP CONTAINING FIVE LIVE ROUNDS. THIS OFFICER PROCEEDED TO PHOTOGRAPH SAID PISTOL AND THEN BOOKED IT INTO EVIDENCE.

IT APPEARS THAT FOUR GUNSHOTS WERE FIRED BY OFFICER MOLINA. ASSUMING HE HAD A FULL CLIP AND A ROUND IN THE CHAMBER. THE SUSPECT DRIVER WAS REPORTED TO HAVE SUSTAINED TWO GUNSHOT WOUNDS. A THROUGH AND THROUGH SHOT TO HIS LEFT FOREARM WHICH THEN ENTERED HIS LEFT SIDE, AND THE SECOND TO HIS LEFT LEG. THE GUNSHOT TO THE SUSPECT VEHICLE DID NOT PENETRATE THE DOOR AND MAY HAVE SPLIT UP, OR REMAIN INTACT AND IS EITHER ITEM(S) H 4/5 OR H6. A TOTAL OF THREE CASINGS HAVE BEEN RECOVERED. ONE IS MISSING. STILL TO BE DETERMINE IS OFFICER MOLINA'S LOCATION WHEN HE FIRED THE GUNSHOT WOUNDS (INSIDE OR OUTSIDE HIS PATROL UNIT OR A COMBINATION).

AT THIS TIME NO OTHER ACTION WAS TAKEN BY THIS OFFICER.

CASE ACTIVE.....

000040

TEXAS PEACE OFFICER'S ACCIDENT REPORT   ST-3 (Eff. 1/1/96)   MAIL TO: ACCIDENT RECORDS, TEXAS DEPARTMENT OF PUBLIC SAFETY, PO BOX 4087, AUSTIN TX 78773-0001

| PLACE WHERE ACCIDENT OCCURRED | BROWNSVILLE | CITY OR TOWN | CAMERON | 1998-3046355 |
|---|---|---|---|---|

SHOW ONLY IF INSIDE CITY LIMITS

IF ACCIDENT WAS OUTSIDE CITY LIMITS, INDICATE DISTANCE FROM NEAREST TOWN _____ MILES   NORTH  S  E  W  OF  _____ CITY OR TOWN

**DO NOT WRITE IN THIS SPACE**   OPS NO.

| ROAD ON WHICH ACCIDENT OCCURRED | 1700 | BILLY MITCHELL BLVD. | CONSTR. ☐ YES ☒ NO ZONE | SPEED LIMIT 45 | LOC. |
| INTERSECTING STREET OR RR X'ING NUMBER | BLOCK NUMBER | STREET OR ROAD NAME   ROUTE NUMBER OR STREET CODE | CONSTR. ☐ YES ☐ NO ZONE | SPEED LIMIT | CODE |

NOT AT INTERSECTION  325  XX FT. ☐ MI. ☐ N S E W  OF  CENTRAL AVENUE

SHOW MILEPOST OR NEAREST INTERSECTING NUMBERED HIGHWAY IF NONE, SHOW NEAREST INTERSECTING STREET OR REFERENCE POINT.

SEVERITY

FAT. REC.

DATE OF ACCIDENT  JUNE 23,  19 98  DAY OF WEEK  TUESDAY   HOUR 6:27 XX  ☐ A.M IF EXACTLY NOON ☒ P.M OR MIDNIGHT, SO STATE

OR. REC.

**UNIT NO. 1 - MOTOR VEHICLE**   VEH IDENT NO  1LNLM81W4NY709988   IF BODY STYLE = VAN OR BUS, INDICATE SEATING CAPACITY _____

YEAR MODEL  1992  COLOR & MAKE  DARK BLUE /LINCOLN  MODEL NAME  CONTINENTAL  BODY STYLE  4 DR.  LICENSE PLATE  NO LICENSE PLATES

YEAR  STATE  NUMBER

DRIVER'S NAME  REYNA, RENE (JR.) 317 WESTERN BLVD BROWNSVILLE TEXAS 78520  PHONE NUMBER _____

LAST  FIRST  MIDDLE  ADDRESS (STREET, CITY, STATE, ZIP)

DRIVER'S LICENSE _____  STATE  NUMBER  CLASS/TYPE  DOB 06/23/78  MO DAY YEAR  RACE W  SEX M  OCCUPATION _____

SPECIMEN TAKEN (ALCOHOL/DRUG ANALYSIS) 1-BREATH 2-BLOOD 3-OTHER 4-NONE 5-REFUSED [4]  ALCOHOL/DRUG ANALYSIS RESULT ___−___  PEACE OFFICER, EMS DRIVER, FIRE FIGHTER ON EMERGENCY? ☐ YES ☐ NO

LESSEE ☐ OWNER ☐  J&M LOPEZ AUTO SALES & LOPEZ, JUAN  4365 SOUTHMOST RD.  BROWNSVILLE, TEXAS 78520

NAME (ALWAYS SHOW LESSEE IF LEASED, OTHERWISE SHOW OWNER)  ADDRESS (STREET, CITY, STATE, ZIP)

LIABILITY XX YES INSURANCE ☐ NO  FLEET INS. _____  VEHICLE DAMAGE RATING

INSURANCE COMPANY NAME  POLICY NUMBER

FL-3/RP-4
LFQ-2/RFQ-2

MOTOR VEHICLE ☒ XX  TRAIN ☐  PEDALCYCLIST ☐
2  TOWED ☐ PEDESTRIAN ☐ OTHER ☐   VEH IDENT NO  2FALP71W6VX225106   IF BODY STYLE = VAN OR BUS, INDICATE SEATING CAPACITY _____

YEAR MODEL  1997  COLOR & MAKE  WHITE/ BLUE /FORD  MODEL NAME  CROWN VICTORIA  BODY STYLE  4 DR.  LICENSE PLATE  TEXAS 729-711  EXEMPT

YEAR  STATE  NUMBER

DRIVER'S NAME  GARZA, ROBERTO SANTILLAN 934 N. IOWA BROWNSVILLE, TEXAS  PHONE NUMBER (956) 548-7000

LAST  FIRST  MIDDLE  ADDRESS (STREET, CITY, STATE, ZIP)

DRIVER'S LICENSE  TEXAS 10461702 -C  STATE  NUMBER  CLASS/TYPE  DOB 9/21/63  MO DAY YEAR  RACE W  SEX M  OCCUPATION  POLICE OFFICER

SPECIMEN TAKEN (ALCOHOL/DRUG ANALYSIS) 1-BREATH 2-BLOOD 3-OTHER 4-NONE 5-REFUSED [4]  ALCOHOL/DRUG ANALYSIS RESULT ___−___  PEACE OFFICER, EMS DRIVER, FIRE FIGHTER ON EMERGENCY? ☐ YES ☐ NO

LESSEE ☐ OWNER XX  CITY OF BROWNSVILLE  P.O. BOX 911  BROWNSVILLE, TEXAS 78520

NAME (ALWAYS SHOW LESSEE IF LEASED, OTHERWISE SHOW OWNER)  ADDRESS (STREET, CITY, STATE, ZIP)

LIABILITY XX YES INSURANCE ☐ NO  SELF INSURED/TML INTERGOVERNMENTAL RISK POOL  9343  VEHICLE DAMAGE RATING  FD-1

INSURANCE COMPANY NAME  POLICY NUMBER

DAMAGE TO PROPERTY OTHER THAN VEHICLES  SOUTHWESTERNBELL CO.

WOOD POST/CABLE ROUTE  710 EAST WASHINGTON ST.  BROWNSVILLE, TEXAS  7' s  UNKNOWN

OBJECT  NAME AND ADDRESS OF OWNER (INCLUDE CITY/STATE/ZIP)  DAMAGE ESTIMATE

| LIGHT CONDITION | 1 | WEATHER | 0 1 | SURFACE CONDITION | 1 | TYPE ROAD SURFACE | 5/6 | DESCRIBE ROAD CONDITIONS (INVESTIGATOR'S OPINION) |
|---|---|---|---|---|---|---|---|---|

1-DAYLIGHT
2-DAWN
3-DARK-NOT LIGHTED
4-DARK-LIGHTED
5-DUSK

1-CLEAR/CLOUDY
2-RAINING
3-SNOWING
4-FOG
5-BLOWING DUST

6-SMOKE
7-SLEETING
8-HIGH WINDS
9-OTHER

1-DRY
2-WET
3-MUDDY
4-SNOWY/ICY
5-OTHER

1-BLACKTOP
2-CONCRETE
3-GRAVEL
4-SHELL
5-DIRT
6-OTHER GRASS

UNEVEN/

05001 1

IN YOUR OPINION, DID THIS ACCIDENT RESULT IN AT LEAST $500.00 DAMAGE TO ANY ONE PERSON'S PROPERTY?  XX YES  ☐ NO

CHARGES FILED

REYNA, RENE (JR.) _____ CHARGE  RECKLESS CONDUCT WITH MOTOR  CITATION NUMBER  PENDING

VEHICLE

_____ CHARGE _____  CITATION NUMBER

TIME NOTIFIED OF ACCIDENT  06/23/98  6:27 P M  HOW  POLICE DISPATCH

DATE  HOUR

TIME ARRIVED AT SCENE OF ACCIDENT 06/23/98  6:28 P M

DATE  HOUR

TYPED OR PRINTED NAME OF INVESTIGATOR  I C ROJANO III  DATE REPORT MADE  6/23/98  IS REPORT COMPLETE X YES ___ NO

SIGNATURE OF INVESTIGATOR _____  ID NO  166  DEPARTMENT  BPD  DIST./AREA  11

| SOLICITATION (SOL) | EJECTED | CODE FOR TYPE RESTRAINT USED | AIRBAG CODE | HELMET USE | CODE FOR INJURY SEVERITY | ALCOHOL/D... |
|---|---|---|---|---|---|---|

PERSON'S DESIRE TO RECEIVE CONTACT FROM PERSONS PROFESSIONAL EMPLOYMENT AS FOR AN ATTORNEY, ACTOR, PHYSICIAN, SURGEON, PRIVATE INVESTIGATOR, OR HER PERSON REGISTERED OR LICENSED BY A HEALTH CARE REGULATORY AGENCY

Y—O.K. TO SOLICIT    N—NO SOLICITATION

A - NOT APPLICABLE
Y - YES
N - NO
P - PARTIALLY
U - UNK

A - SEATBELT & SHOULDER STRAP
B - SEATBELT & NO SHOULDER STRAP
C - CHILD RESTRAINT
E - SHOULDER STRAP ONLY
N - NONE

D - DEPLOYED
N - NO DEPLOYMENT
U - UNK IF DEPLOYED

W - WORN-DAMAGED
2 - WORN-UNK IF DAMAGED
4 - NOT WORN
5 - UNK IF WORN

K - KILLED
A - INCAPACITATING INJURY
B - NON-INCAPACITATING
C - POSSIBLE INJURY
N - NOT INJURED

1 - BREATH
2 - BLOOD
3 - URINE
4 - NONE
5 - REFUSED

| UNIT NO. 1  FL-3/RP-4 | TOWED DUE TO DAMAGE | VEHICLE REMOVED TO | 600 EAST JACKSON ST. |
|---|---|---|---|
| DAMAGE RATING LFQ-2/RFQ-2 XXX YES ☐NO | | BY | CITY WRECKER |

| Item No. | OCCUPANT'S POSITION | NAME (LAST NAME FIRST) | ADDRESS (STREET, CITY, STATE, ZIP) | SOL | EJECTED | TYPE RESTRAINT USED | AIRBAG | HELMET | AGE | SEX | INJURY CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | DRIVER | SEE FRONT | SEE FRONT | N | N | N | – | – | 20 | M | N |
| 2 | FP | GONZALEZ, JOSE ARMANDO | | N | N | N | – | – | 22 | M | N |
| 3 | RB | VELASCO, JOSE | | N | N | N | – | – | 19 | M | N |
| 4 | | | | | | | | | | | |
| 5 | | | | | | | | | | | |

| UNIT NO. 2 (COMPLETE ONLY IF UNIT NO. 2 WAS A MOTOR VEHICLE) | TOWED DUE TO DAMAGE | VEHICLE REMOVED TO | DRIVEN AWAY |
|---|---|---|---|
| DAMAGE RATING FD-1 | ☐YES XX NO | BY | DRIVER |

| Item No. | OCCUPANT'S POSITION | NAME (LAST NAME FIRST) | ADDRESS (STREET, CITY, STATE, ZIP) | SOL | EJECTED | TYPE RESTRAINT USED | AIRBAG | HELMET | AGE | SEX | INJURY CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | DRIVER | SEE FRONT | SEE FRONT | N | N | A | N | – | 34 | M | N |
| 7 | | | | | | | | | | | |
| 8 | | | | | | | | | | | |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | | | |

COMPLETE IF CASUALTIES NOT IN MOTOR VEHICLE

| PEDESTRIAN, PEDALCYCLIST ETC. | CASUALTY NAME (LAST NAME FIRST) | CASUALTY ADDRESS (STREET, CITY, STATE, ZIP) | SOL | TYPE SPECIMEN TAKEN | RESULT | HELMET | AGE | SEX | INJURY CODE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

DISPOSITION OF KILLED AND INJURED

| | | | | IF AMBULANCE USED, SHOW | | |
|---|---|---|---|---|---|---|
| ITEM NUMBERS | TAKEN TO | | BY | TIME NOTIFIED | TIME ARRIVED AT SCENE | NO. ATTENDANTS INC. DRIVER |
| | | | | | | |

COMPLETE THIS SECTION IF PERSON KILLED

| ITEM NUMBER | DATE OF DEATH | TIME OF DEATH | ITEM NUMBER | DATE OF DEATH | TIME OF DEATH | ITEM NUMBER | DATE OF DEATH | TIME OF DEATH |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

INVESTIGATOR'S NARRATIVE OPINION OF WHAT HAPPENED (ATTACH ADDITIONAL SHEETS IF NECESSARY)

UNIT #1 WAS FLEEING. UNIT #2 A MARKED POLICE PATROL UNIT. UNIT #1 DROVE INTO VACANT LOT AND DROVE IN CIRCLE, AS UNIT #2 ATTEMPTED TO STOP SAME. UNIT #1 STRUCK THE FRONT OF UNIT #2 WITH THE FRONT LEFT SIDE. MINOR DAMAGES. UNIT #1 DRIVER ARRESTED. NO INJURIES REPORTED.

DIAGRAM ☐ ONE WAY ☐ TWO WAY ☐ DIVIDED

INDICATE NORTH

DIAGRAM SEE PAGE 2

FACTORS AND CONDITIONS LISTED ARE THE INVESTIGATOR'S OPINION

| FACTORS/CONDITIONS CONTRIBUTING | | | | OTHER FACTORS/CONDITIONS MAY OR MAY NOT HAVE CONTRIBUTED | | TRAFFIC CONTROL | |
|---|---|---|---|---|---|---|---|

| UNIT 1 | 72 | 43 | 3 |
| UNIT 2 | | | |

| UNIT 1 | | 2 |
| UNIT 2 | | 2 |

0-NO CONTROL OR INOPERATIVE
1-OFFICER OR FLAGMAN
2-STOP AND GO SIGNAL
3-STOP SIGN
4-FLASHING RED LIGHT

5-TURN MARKS
6-WARNING SIGN
7-RR GATES OR SIGNALS
8-YIELD SIGN
9-CENTER STRIPE OR DIVIDER

10-NO PASSING ZONE
11-OTHER CONTROL

0

1. ANIMAL ON ROAD – DOMESTIC
2. ANIMAL ON ROAD – WILD
   BACKED WITHOUT SAFETY
   CHANGED LANE WHEN UNSAFE
   DEFECTIVE OR NO HEADLAMPS
6. DEFECTIVE OR NO STOP LAMPS
7. DEFECTIVE OR NO TAIL LAMPS
8. DEFECTIVE OR NO TURN SIGNAL LAMPS
9. DEFECTIVE OR NO TRAILER BRAKES
10. DEFECTIVE OR NO VEHICLE BRAKES
11. DEFECTIVE STEERING MECHANISM
12. DEFECTIVE OR SLICK TIRES
13. DEFECTIVE TRAILER HITCH
14. DISABLED IN TRAFFIC LANE
15. DISREGARD STOP AND GO SIGNAL
16. DISREGARD STOP SIGN OR LIGHT
17. DISREGARD TURN MARKS AT INTERSECTION

19. DISTRACTION IN VEHICLE
20. DRIVER INATTENTION
21. DROVE WITHOUT HEADLIGHTS
22. FAILED TO CONTROL SPEED
23. FAILED TO DRIVE IN SINGLE LANE
24. FAILED TO GIVE HALF OF ROADWAY
25. FAILED TO YIELD WARNING SIGN
26. FAILED TO PASS TO LEFT SAFELY
27. FAILED TO PASS TO RIGHT SAFELY
28. FAILED TO SIGNAL OR GAVE WRONG SIGNAL
29. FAILED TO STOP AT PROPER PLACE
30. FAILED TO STOP FOR SCHOOL BUS
31. FAILED TO STOP FOR TRAIN
32. FAILED TO YIELD ROW – EMERGENCY VEHICLE
33. FAILED TO YIELD ROW – OPEN INTERSECTION
34. FAILED TO YIELD ROW – PRIVATE DRIVE
35. FAILED TO YIELD ROW – STOP SIGN

37. FAILED TO YIELD ROW – TURNING LEFT
38. FAILED TO YIELD ROW – TURN ON RED
39. FAILED TO YIELD ROW – YIELD SIGN
40. FATIGUED OR ASLEEP
41. FAULTY EVASIVE ACTION
42. FIRE IN VEHICLE
43. FLEEING OR EVADING POLICE
44. FOLLOWED TOO CLOSELY
45. HAD BEEN DRINKING
46. HANDICAPPED DRIVER (EXPLAIN IN NARRATIVE)
47. ILL (EXPLAIN IN NARRATIVE)
48. IMPAIRED VISIBILITY (EXPLAIN IN NARRATIVE)
49. IMPROPER START FROM PARKED POSITION
50. LOAD NOT SECURED
51. OPENED DOOR INTO TRAFFIC LANE
52. OVERSIZE VEHICLE OR LOAD
53. OVERTAKE AND PASS INSUFFICIENT CLEARANCE
54. PARKED AND FAILED TO SET BRAKES

55. PARKED WITHOUT LIGHTS
56. PASSED IN NO PASSING ZONE
58. PASSED ON RIGHT SHOULDER
59. PEDESTRIAN FAILED TO YIELD ROW TO VEHICLE
60. SPEEDING – UNSAFE (UNDER LIMIT)
61. SPEEDING – OVER LIMIT
62. TAKING MEDICATION (EXPLAIN IN NARRATIVE)
63. TURNED IMPROPERLY – CUT CORNER ON LEFT
64. TURNED IMPROPERLY – WIDE RIGHT
65. TURNED IMPROPERLY – WRONG LANE
66. TURNED WHEN UNSAFE
67. UNDER INFLUENCE – ALCOHOL
68. UNDER INFLUENCE – DRUG
69. WRONG SIDE – APPROACH OR IN INTERSECTION
70. WRONG SIDE – NOT PASSING
   WRONG WAY – ONE WAY ROAD
   OTHER FACTOR (WRITE – IN ON LINE BELOW

RECKLESS CONDUCT W/MTR

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 45 of 171

CASE# 1998-3046355
JUNE 23, 1998

PRIVATE DRIVE

#1

#2

#1

TURNING LANE

LIGHT
POLE

#1

#2

#1

#2

BILLY MITCHELL BLVD.

#1

#1

VACANT LOT

#1

SWB POST

#1

IMPROVED SHOULDER

PAGE

000013

ICR #166 (NOT TO SCALE)

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                BROWNSVILLE DIVISION

4

5    RENE REYNA, JR.,              )
                                   )
6          Plaintiff,             )
                                   )
7    VS.                           )CIVIL ACTION NO. B-00-17
                                   )
8    CITY OF BROWNSVILLE POLICE)
     DEPARTMENT AND RAFAEL         )
9    MOLINA,                       )
                                   )
10         Defendants.            )

11

12   *****************************************************

13                ORAL DEPOSITION OF

14               RENE REYNA, JR.

15                JULY 16, 2001

16   *****************************************************

17

18              ORAL DEPOSITION of RENE REYNA, JR.,

19   taken before Dianna Martin, a court reporter and

20   notary public in and for Harris County and the

21   State of Texas, at the Ferguson Unit located at

22   12120 Savage Drive, Midway, Texas  75852, beginning

23   at 12:28 p.m. on the 16th day of July 2001,

24   pursuant to notice and the Federal Rules of Civil

25   Procedure.

DEFENDANT'S
EXHIBIT
D
Blumberg No. 5114

```
1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4        Mr. George Powell
         HINOJOSA & POWELL
5        612 Nolana, Suite 410
         McAllen, Texas  78504
6        Fax (956) 686-8462

7    FOR THE DEFENDANTS:

8        Mr. George C. Kraehe
         WILLETTE & GUERRA, L.L.P.
9        International Plaza, Suite 460
         3505 Boca Chica Boulevard
10       Brownsville, Texas  78521-4086
         Fax (956) 541-1893
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Q.    What day of the week?

A.    What day of the week was it?  I wouldn't recall the exact date.  Maybe --  I'd say probably a Thursday.

Q.    Okay.  So you were speeding down Southmost avenue during rush hour?

A.    Yes, sir.

Q.    There were a lot of people on the road?

A.    There were quite a few.

Q.    About how many stop signs or stoplights did you run through?

A.    Well, after Southmost road, I turned one, two --  Well, there's stoplights in every, you know, few intervals.  So I'd say a few.

Q.    Like three or four or more than that?

A.    About three or four.

Q.    Do you recall ever stopping at all at any stoplight or stop sign?

A.    Do I recall stopping?  Not when the police started chasing me.

Q.    Okay.  And you first saw one police car behind you?

A.    At first.

Q.    Okay.  And did any other police cars join in?

```
 1        A.    A field?  I don't recall.

 2        Q.    And so you just made kind of a big

 3  circle in the --

 4        A.    In the parking lot.  It might have been

 5  a field.  I don't know.  I know it was a parking

 6  lot because there was gravel on there when I

 7  stopped.

 8        Q.    Okay.  Well, let me --  All right.  Let

 9  me show you those pictures.  Can you see those two

10  pictures on the -- my left?

11        A.    Uh-huh.

12        Q.    Do you see where there's tire tracks?

13        A.    So that was the parking lot kind of

14  field deal.  Okay.  So that was --

15        Q.    So you did leave the road?

16        A.    I did leave the road, yeah.

17        Q.    And you drove off into an open field.

18  Is that correct?

19        A.    Yes, sir.

20        Q.    Does that refresh your recollection?

21        A.    Yes, sir.

22        Q.    Okay.  And then you did, like, a big

23  circle in the field?

24        A.    Yes, sir, because I knew the cops were

25  coming my way.
```

1      Q.      -- to avoid you?  And what happened when
2  you made the big circle in the field?
3      A.      What happened when I made the big
4  circle?
5      Q.      Yeah, what happened after that?
6      A.      Well, I knew I was boxed in; so it was
7  pretty much over then.
8      Q.      Okay.  At what point did you --
9      A.      At what point did I finally stop?
10     Q.      Yeah.
11     A.      When I saw the police officer pointing a
12 gun at me telling me to stop.
13     Q.      Okay.  And did you ever ram your car
14 against anyone else's car?
15     A.      Did I ram the car?  Yes.
16     Q.      Okay.  Okay.  Now --
17     A.      That's where I got the aggravated
18 assault on a police officer.
19     Q.      Okay.  So you do admit to having used
20 this vehicle that you stole to ram into someone
21 else's car?
22     A.      That's why I have an aggravated assault.
23     Q.      Okay.  And whose car were you trying to
24 ram?
25     A.      Whose car was I driving?  The car

1   owner's.

2          Q.     No, I'm sorry.  Whose car did you ram?

3          A.     Whose car did I ram?  One police

4   officer's.

5          Q.     Okay.  Was he in front of you or behind

6   you?

7          A.     No.  He must have been in front of me if

8   I rammed him.

9          Q.     Okay.  And how fast were you driving

10  when you rammed into him?

11         A.     How fast was I driving?  It couldn't

12  have been too fast because I was going in circles.

13         Q.     Where did you ram into this police

14  vehicle?

15         A.     Where did I ram into him?  When they

16  were boxing me in.

17         Q.     Were you on a road or were you in the

18  field?

19         A.     I guess I must have been on the field at

20  that time.

21         Q.     Okay.

22         A.     If not I was probably on the road trying

23  to get into the field.

24         Q.     Was that Billy Mitchell?

25         A.     Billy Mitchell.

```
1   STATE  OF  TEXAS   )

2   COUNTY OF HARRIS   )

3              I, Dianna Martin, a court reporter,

4   and a notary public in and for the State of Texas,

5   do hereby certify that the matters set forth in the

6   caption to the foregoing deposition are true and

7   correct; that the witness appeared before me at the

8   time and place set forth; that said witness was

9   first duly sworn to tell the truth, and thereupon

10  proceeded to testify in said cause; that the

11  questions of counsel and the answers of the said

12  witness were taken down in shorthand by me and

13  thereafter reduced to typewriting under my

14  direction; and that the foregoing pages comprise a

15  true, correct, and complete transcript of the

16  testimony given, and the proceedings had during the

17  taking of said deposition.

18             I further certify that I am not counsel,

19  attorney, or relative of either party, or otherwise

20  interested in the events of this suit.

21             GIVEN UNDER MY HAND AND SEAL OF OFFICE on

22  this the 16th of July, 2001.

23

24  Commission
    Expires            Dianna L. Martin, a Notary Public
25  12/31/2002         in and for the State of Texas
```

DIANNA L. MARTIN
MY COMMISSION EXPIRES
December 7, 2004

# Lower Rio Grande Valley Regional Police Academy

## This is to certify that

RAFAEL MOLINA, JR.

has completed and satisfied the State of Texas requirements for the Basic course entitled:

BASIC CERTIFICATION COURSE IN APPLIED POLICE SCIENCE

This  Four-Hundred and Thirty-Two  hour course meets or exceeds the minimum requirements, set forth by the State of Texas, and the Texas Commission on Law Enforcement Officers Standards and Education.

This Basic course was given at the Lower Rio Grande Valley Regional Police Academy, under the sponsorship of the Lower Rio Grande Valley Development Council.

From  October 23rd, 1992    To  January 19th, 1993

Max A. Martinez
**Course Instructor**
Max A. Martinez
LRGVDC Academy Instructor

Chairman L.R.G.V.D.C.
**Regional Police Academy**
Chief John M. Cardoza
UT Brownsville Campus Security Director LRGVDC

Lower Rio Grande Valley
**Development Council**
Kenneth N. Jones, Jr.
Executive Director LRGVDC

DEFENDANT'S
EXHIBIT
E

000001

GEORGE W. BUSH
GOVERNOR

BOB BULLOCK
LT. GOVERNOR

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

FRANCES A. KAISER
PRESIDING OFFICER

D. C. JIM DOZIER
EXECUTIVE DIRECTOR

061202

# Texas Commission

## on

# Law Enforcement Officer

# Standards and Education

*Hereby Awards The Certification*

*of*

# INTERMEDIATE PEACE OFFICER

*To*

## RAFAEL S. MOLINA JR.

*as provided for in the laws of the State of Texas and the rules of the Commission*

*November 04, 1997*



000002

GEORGE W. BUSH
GOVERNOR

CHARLES W. "CHUCK" WILLIAMS
PRESIDING OFFICER

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

**Texas Commission**

**on**

**Law Enforcement Officer**

**Standards and Education**

*Hereby Awards The Certification*

*of*

# ADVANCED PEACE OFFICER

*To*

## RAFAEL S. MOLINA

*as provided for in the laws of the State of Texas and the rules of the Commission*

February 25, 2000

RICK PERRY
LT. GOVERNOR

FILE COPY

D. C. JIM DOZIER, J. D., PH. D.
EXECUTIVE DIRECTOR

061202

000003

# Lower Rio Grande Valley Development Council
## Regional Police Training Center And Academy



This is to certify that

__RAFAEL MOLINA__

has completed and satisfied the requirements of the __16-Hour__ course entitled

**USE OF FORCE**

Intermediate Core Course (3 Training Points TCLEOSE Credit)

given at the L.R.G.V. Regional Police Academy

sponsored by the Lower Rio Grande Valley Development Council

from __April 22, 1997__   to   __April 23, 1997__

_Instructor_

__4/23/97__
Date

_Mag A. Martinez_
Signature
LOWER RIO GRANDE VALLEY
DEVELOPMENT COUNCIL



Brownsville Police Department
Awards

This Certificate of Completion In

For successful completion of ___ 320 ___ hours of study in

RAFAEL MOLINA JR.

FIELD TRAINING PROGRAM

Which was held ___ APRIL 26th ___ through ___ JUNE 20th, 1993 ___

At ___ BROWNSVILLE POLICE DEPARTMENT ___

Witness our hands this ___ 21st ___ day of JUNE 19 93

_____
CHIEF OF POLICE

_____
DATE

_____
INSTRUCTOR

000000

# Lower Rio Grande Valley Development Council
## Regional Training Center



This certifies that

**RAFAEL MOLINA JR.**

has completed the full course of instruction in

**BASIC CONFRONTATION SURVIVAL**
**28 Hours**

Embracing the studies which meet or exceed the minimum requirements
set forth by the Texas Commission on Law Enforcement Officers Standards
and Education or The State of Texas governing body for this course.
The Lower Rio Grande Valley Development Council Regional Training Center
is awarding this

## DIPLOMA

Given on this ___14th___ day of ___January___ 19 _93_

_Course Instructor_

_May A. Martinez_
Lower Rio Grande Valley
Development Council

400000

# Certification of Weapons Proficiency

This is to certify that __Rafael Molina, Jr.__ has successfully demonstrated weapons proficiency based on the minimum basic training standards in compliance with Article 4413 (29aa) V.C.S., Section 7 (c), the Texas Commission on Law Enforcement Officer Standards and Education, and the Lower Rio Grande Valley Regional Police Academy.

__261.50__ from a possible 300 on __12/26/92__

(Score)                                                    (Date)

__M. MARTINEZ__                     _Maj. A. Martinez_

Rangemaster                      L.R.G.V. Regional Police Academy

OF—

# CITY CHARTER
# FOR THE CITY OF
# BROWNSVILLE,
# CAMERON COUNTY,
# TEXAS


DEFENDANT'S
EXHIBIT
F

# ORDINANCE NO. 93-1270

AN ORDINANCE OF THE CITY COMMISSION OF THE
CITY OF BROWNSVILLE CANVASSING THE RETURNS OF
A SPECIAL ELECTION HELD IN AND THROUGHOUT THE
CITY OF BROWNSVILLE ON TUESDAY THE 2ND DAY OF
NOVEMBER 1993 ON TWELVE PROPOSITIONS FOR THE
AMENDMENT OF THE CHARTER OF SUCH CITY;
DECLARING THE RESULTS OF SUCH ELECTION; AND
DEALING WITH OTHER MATTERS INCIDENT TO THE
SUBJECT.

WHEREAS, it appears to the City Commission of the City of
Brownsville, a Home Rule City organized and existing under and by
virtue of the Constitution and laws of Texas, and it is hereby so
found, that an election was duly and regularly held and conducted
in and throughout such City on Tuesday the 2nd day of November,
1993, which was within the time prescribed by law, in accordance
with and pursuant to Ordinance No. 93-1268, as amended, of the City
of Brownsville calling said election, and after notice of said
election duly given as required by law and said ordinance, upon the
following twelve propositions, to-wit:

## PROPOSITION #1

Shall Article II, Section 8, <u>Rules and regulations governing
liability for damages</u>, of the Charter of the City of Brownsville be
amended to read as follows:

The City shall not be liable on account of any claim for
specific performance, breach of contract, damages to the person, or
to any property. or for any character of tort, unless the person
asserting such claim shall give the City written notice of such
claim and of the facts upon which it is based within six (6) months
from the time it is claimed such cause of action arose, and no such
suit shall be instituted or maintained on any such claim until the
expiration of ninety (90) days from the time such notice shall have
been given.

Said written claim shall state the amount of damages claimed
and demanded of the city, and to be accompanied by a true statement
under oath as to the nature and character and extent of such injury
and damages, the time, date, and place when and where same
happened, the conditions causing the same, with a detailed
statement of each item of such damages or injuries, a list of the
names and addresses of witnesses, if known to or ascertainable by
the affiant, who witnessed said injury or the accident or happening
causing the same or the damages resulting from same.

PROPOSITION #2

Shall Article II, Section 22, <u>Peace and good order [30]</u>, of the Charter of the City of Brownsville be amended to read as follows:

To provide for a court for the trial of misdemeanor offenses, known as the "Corporation Court" or "Municipal Court", of which such powers and duties as are defined and prescribed in the Acts of the legislature of the State of Texas, and any Acts amendatory thereof.

PROPOSITION #3

Shall Article V, Section 4, <u>Qualifications</u>, of the Charter of the City of Brownsville be amended to read as follows:

The mayor and each commissioner shall be citizens of the United States and resident citizens of the City of Brownsville, and have the qualifications of electors therein. The mayor, commissioners, and other officers and employees shall not hold any other public office of emolument and shall not be interested in the profits or emoluments of any contracts, job, work, or service for the municipality, or interested in the sale to the city of any supplies, equipment, material, or articles purchased. Any elected officer, appointed managerial officer, or managerial employee of the city who shall cease to possess any of the qualifications herein required shall forthwith forfeit his office and any such contract in which any officer or employee is or may become interested may be declared void by the commission.

PROPOSITION #4

Shall Article V, Section 5, <u>Elections</u>, of the Charter of the City of Brownsville be amended to read as follows:

The elective officers of the city shall consist of four (4) commissioners and a mayor, the four to be designated as Commissioner No. 1, Commissioner No. 2, Commissioner No. 3, and Commissioner No. 4, each of whom shall be elected to the office for which he is a candidate by a majority of all the votes cast in the city at large for the office. Should no candidate receive a majority of votes at the regular election for which he is a candidate, the commission shall immediately order a special election to be held within the time provided by the laws of Texas after the result of the regular election has been declared, at which special election the names only of the two candidates receiving the highest number of votes for said office at the regular election shall be printed on the ballot and submitted to

the qualified voters for election, and the candidate receiving the majority of votes at such special election, for the place or office for which he was a candidate, shall be declared duly elected.

## PROPOSITION #5

Shall Article V, Section 8, Election day, of the Charter of the City of Brownsville be amended to read as follows:

The regular municipal election of the City of Brownsville hereafter shall be held on the first Saturday of May, or on such uniform election date in May as provided by the laws of Texas. And, that after this charter amendment the members of the commission shall first be elected on such dates as follows to four year terms:  the mayor, commissioner No. 2, and commissioner No.4 on the first Saturday of May, 1995; commissioners No. 1 and No. 3 shall be elected on the first Saturday of May, 1997.

## PROPOSITION #6

Shall Article V, Section 11, Duties of mayor, of the Charter of the City of Brownsville be amended to read as follows:

The mayor of the City shall be the presiding officer of the commission, except that in his absence a mayor pro tempore may be chosen; he shall be entitled to vote and make motions and seconds as a member of the commission; sign all bonds; be the official head of the city, and exercise all powers and perform all duties imposed upon him by this Charter and by the ordinances of the City.

## PROPOSITION #7

Shall Article V, Section 14, Legislative procedure, of the Charter of the City of Brownsville be amended to read as follows:

A majority of all members elected on the commission shall constitute a quorum to do business, and the affirmative vote of a majority of such quorum present shall be necessary to approve of any matter.  Except, the affirmative vote of a majority of all members of the commission shall be necessary to adopt any ordinance or resolution, unless otherwise provided by the laws of Texas.  The vote upon the passage of all ordinances and resolutions shall be taken by "YEA" and "NAY" and entered upon the journal.  Every ordinance or resolution passed by the commission shall be signed by the mayor and the person acting as city secretary, within two days, and by him recorded.

PAGE 3

PROPOSITION #8

Shall Article V, Section 20, Paragraph 3, <u>City manager; his responsibilities and powers of appointment and removal; removal of officers and employees; and non-interference with appointments and removals</u>, of the Charter of the City of Brownsville be amended to read as follows:

All appointments and removals of officers and employees shall be subject to the personnel policy adopted by the commission, except as otherwise provided by this Charter, or as provided by law.

PROPOSITION #9

Shall Article V, Section 28, <u>Audit and examination; budget</u>, of the Charter of the City of Brownsville be amended to read as follows:

An audit shall be conducted after each fiscal year. All budget matters and the audit process shall conform to the laws of Texas. And, any budget shall be balanced upon adoption.

PROPOSITION #10

Shall Article V, Section 29, <u>Contracts</u>, of the Charter of the City of Brownsville be amended to read as follows:

All contracts or purchases of the City are governed by the laws of Texas regarding competitive bidding with the exception that any required notice need only be advertised once and bids be awarded no sooner than ten (10) days thereafter.

PROPOSITION #11

Shall Article V, Section 31, <u>Hours and conditions of labor</u>, of the Charter of the City of Brownsville be amended to read as follows:

Hours and conditions of labor are governed by all applicable federal, state, and city laws, ordinances, resolutions, and rules and regulations.

PROPOSITION #12

Shall Article II, be amended by adding Section 15A, <u>Street Improvements</u>, to the Charter of the City of Brownsville to read as follows:

000305

A.  Adoption of state street improvement law.

The terms, powers, and provisions of Article 1105b of the Texas Revised Civil Statutes, as amended, are hereby adopted as and made a part of the Charter of the City of Brownsville.

B.  State street improvement law part of Charter.

·It is the intention and purpose hereof to write into and make a part of the Charter of the City of Brownsville all of the powers, terms and provisions of said Act, and such powers, terms and provisions shall exist, be in force, and may be exercised as alternative to, and independently of, other powers, terms and provisions of the Charter of the City of Brownsville with amendments thereto, and of the law in force in the City of Brownsville, and which in any wise relate to the same subject matter.  The City Commission of the City of Brownsville may proceed either under and in accordance with said Act or under and in accordance with any other law.

AND, WHEREAS, it appears to this City Commission, and it is hereby so found, that only the duly qualified voters of the City of Brownsville were permitted to vote in said election; that said election was called, held, and conducted as provided by law for general elections, in so far as applicable, and as modified by the Constitution and statutes of Texas and the Charter of the City of Brownsville with reference to charter amendment elections in such City; that due returns of the result thereof have been made to this City Commission as required by law and said ordinance;

AND, WHEREAS, after having canvassed said returns of said election and having determined the result thereof, it appears to this City Commission, and it is hereby so found and declared, that the total number of valid and legal votes cast at said election as to each of said twelve propositions was as follows:

PROPOSITION NO. 1

| PRECINCT VOTING AT | (COUNTY PRECINCTS) | FOR AMENDMENT | AGAINST AMENDMENT |
|---|---|---|---|
| EARLY VOTING | | 520  votes | 92  votes |
| (1)Victoria Ward School (No. 5) | | 76  votes | 12  votes |
| (2)Josephine Webb Elem. Sch. (No. 6 + 8) | | 58  votes | 16  votes |
| (3)Annie S. Putegnat School (No. 7 + 9) | | 73  votes | 24  votes |
| (4)Cromack School (No. 10 + 60) | | 97  votes | 25  votes |

(5) Skinner Elementary School (No. 11)     <u>90</u> votes     <u>25</u> votes

(6) Russell Elementary School (No. 12)    <u>147</u> votes    <u>32</u> votes

(7) Clearwater School (No. 13)     <u>51</u> votes     <u>8</u> votes

(8) El Jardin School (No. 14)     <u>40</u> votes     <u>9</u> votes

(9) R. L. Martin Elem. School (No. 15)    <u>198</u> votes    <u>35</u> votes

(10) J. T. Canales School (No. 37)     <u>64</u> votes    <u>23</u> votes

(11) Gertrude Sharp Elem. School (No. 38) <u>171</u> votes    <u>37</u> votes

(12) Faulk Intermediate School (No. 45)    <u>49</u> votes    <u>21</u> votes

(13) M. Gonzalez Elem. Sch. (No. 46 + 61) <u>318</u> votes    <u>84</u> votes

(14) Stell Intermediate School (No. 47)   <u>262</u> votes    <u>59</u> votes

(15) Yturria Elementary School (No. 48)    <u>95</u> votes    <u>22</u> votes

(16) Palm Grove Elem. School (No. 53)     <u>9</u> votes     <u>8</u> votes

(17) Burns Elementary School (No. 54)    <u>151</u> votes    <u>46</u> votes

(18) James Pace High School (No. 62)     <u>50</u> votes    <u>15</u> votes

(19) Oliveira Intermediate Sch. (No. 63)  <u>154</u> votes    <u>28</u> votes

     TOTALS                    <u>2673</u> votes    <u>621</u> votes

AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 1, a majority of 2052 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;

PROPOSITION NO. 2

| PRECINCT VOTING AT | (COUNTY PRECINCTS) | FOR AMENDMENT | AGAINST AMENDMENT |
|---|---|---|---|
| EARLY VOTING | | 563 votes | 72 votes |
| (1)Victoria Ward School (No. 5) | | 81 votes | 12 votes |
| (2)Josephine Webb Elem. Sch. (No. 6 + 8) | | 63 votes | 14 votes |
| (3)Annie S. Putegnat School (No. 7 + 9) | | 75 votes | 24 votes |
| (4)Cromack School (No. 10 + 60) | | 101 votes | 28 votes |
| (5)Skinner Elementary School (No. 11) | | 94 votes | 21 votes |
| (6)Russell Elementary School (No. 12) | | 146 votes | 28 votes |
| (7)Clearwater School (No. 13) | | 52 votes | 11 votes |
| (8)El Jardin School (No. 14) | | 39 votes | 5 votes |
| (9)R. L. Martin Elem. School (No. 15) | | 212 votes | 30 votes |
| (10)J. T. Canales School (No. 37) | | 59 votes | 24 votes |
| (11)Gertrude Sharp Elem. School (No. 38) | | 190 votes | 25 votes |
| (12)Faulk Intermediate School (No. 45) | | 49 votes | 17 votes |
| (13)M.Gonzalez Elem. Sch. (No. 46 + 61) | | 349 votes | 57 votes |
| (14)Stell Intermediate School (No. 47) | | 270 votes | 55 votes |
| (15)Yturria Elementary School (No. 48) | | 62 votes | 17 votes |
| (16)Palm Grove Elem. School (No. 53) | | 15 votes | 5 votes |
| (17)Burns Elementary School (No. 54) | | 164 votes | 35 votes |
| (18)James Pace High School (No. 62) | | 46 votes | 11 votes |
| (19)Oliveira Intermediate Sch. (No. 63) | | 145 votes | 39 votes |
| TOTALS | | 2775 votes | 530 votes |

000008

AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 2 a majority of 2235 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;

PROPOSITION NO. 3

| PRECINCT VOTING AT | (COUNTY PRECINCTS) | FOR AMENDMENT | AGAINST AMENDMENT |
|---|---|---|---|
| EARLY VOTING | | 513 votes | 110 votes |
| (1)Victoria Ward School (No. 5) | | 79 votes | 15 votes |
| (2)Josephine Webb Elem. Sch. (No. 6 + 8) | | 55 votes | 18 votes |
| (3)Annie S. Putegnat School (No. 7 + 9) | | 75 votes | 19 votes |
| (4)Cromack School (No. 10 + 60) | | 96 votes | 27 votes |
| (5)Skinner Elementary School (No. 11) | | 89 votes | 26 votes |
| (6)Russell Elementary School (No. 12) | | 150 votes | 34 votes |
| (7)Clearwater School (No. 13) | | 54 votes | 7 votes |
| (8)El Jardin School (No. 14) | | 39 votes | 9 votes |
| (9)R. L. Martin Elem. School (No. 15) | | 196 votes | 41 votes |
| (10)J. T. Canales School (No. 37) | | 54 votes | 31 votes |
| (11)Gertrude Sharp Elem. School (No. 38) | | 184 votes | 32 votes |
| (12)Faulk Intermediate School (No. 45) | | 53 votes | 18 votes |
| (13)M.Gonzalez Elem. Sch. (No. 46 + 61) | | 328 votes | 76 votes |

PAGE 8

(14)Stell Intermediate School (No. 47)    262  votes       61  votes

(15)Yturria Elementary School (No. 48)     93  votes       21  votes

(16)Palm Grove Elem. School (No. 53)       11  votes        6  votes

(17)Burns Elementary School (No. 54)      159  votes       41  votes

(18)James Pace High School (No. 62)        48  votes       12  votes

(19)Oliveira Intermediate Sch. (No. 63)   149  votes       35  votes

    TOTALS                            2687 votes      639  votes


AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 3, a majority of 2048 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;


PROPOSITION NO. 4


| PRECINCT | (COUNTY PRECINCTS) | FOR | AGAINST |
|---|---|---|---|
| VOTING AT | | AMENDMENT | AMENDMENT |
| EARLY VOTING | | 567  votes | 65  votes |
| (1)Victoria Ward School (No. 5) | | 84  votes | 12  votes |
| (2)Josephine Webb Elem. Sch. (No. 6 + 8) | | 61  votes | 19  votes |
| (3)Annie S. Putegnat School (No. 7 + 9) | | 72  votes | 27  votes |
| (4)Cromack School (No. 10 + 60) | | 103  votes | 19  votes |
| (5)Skinner Elementary School (No. 11) | | 0  votes | 14  votes |
| (6)Russell Elementary School (No. 12) | | 161  votes | 27  votes |

000010

| | | | |
|---|---|---|---|
| (7)Clearwater School (No. 13) | 64 | votes | 7 votes |
| (8)El Jardin School (No. 14) | 39 | votes | 11 votes |
| (9)R. L. Martin Elem. School (No. 15) | 230 | votes | 27 votes |
| (10)J. T. Canales School (No. 37) | 70 | votes | 22 votes |
| (11)Gertrude Sharp Elem. School (No. 38) | 196 | votes | 26 votes |
| (12)Faulk Intermediate School (No. 45) | 51 | votes | 18 votes |
| (13)M.Gonzalez Elem. Sch. (No. 46 + 61) | 354 | votes | 59 votes |
| (14)Stell Intermediate School (No. 47) | 292 | votes | 45 votes |
| (15)Yturria Elementary School (No. 48) | 108 | votes | 8 votes |
| (16)Palm Grove Elem. School (No. 53) | 15 | votes | 4 votes |
| (17)Burns Elementary School (No. 54) | 173 | votes | 31 votes |
| (18)James Pace High School (No. 62) | 49 | votes | 10 votes |
| 19)Oliveira Intermediate Sch. (No. 63) | 165 | votes | 27 votes |
| TOTALS | 2854 | votes | 478 votes |

AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 4, a majority of 2376 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;

PROPOSITION NO. 5

| PRECINCT<br>VOTING AT | (COUNTY PRECINCTS) | FOR<br>AMENDMENT | AGAINST<br>AMENDMENT |
|---|---|---|---|

PAGE 10

000011

| | | | |
|---|---|---|---|
| EARLY VOTING | 547 votes | 81 votes |
| (1)Victoria Ward School (No. 5) | 72 votes | 23 votes |
| (2)Josephine Webb Elem. Sch. (No. 6 + 8) | 57 votes | 23 votes |
| (3)Annie S. Putegnat School (No. 7 + 9) | 68 votes | 25 votes |
| (4)Cromack School (No. 10 + 60) | 101 votes | 24 votes |
| (5)Skinner Elementary School (No. 11) | 99 votes | 18 votes |
| (6)Russell Elementary School (No. 12) | 154 votes | 29 votes |
| (7)Clearwater School (No. 13) | 58 votes | 9 votes |
| (8)El Jardin School (No. 14) | 38 votes | 8 votes |
| (9)R. L. Martin Elem. School (No. 15) | 196 votes | 47 votes |
| (10)J. T. Canales School (No. 37) | 60 votes | 28 votes |
| (11)Gertrude Sharp Elem. School (No. 38) | 188 votes | 33 votes |
| (12)Faulk Intermediate School (No. 45) | 53 votes | 13 votes |
| (13)M.Gonzalez Elem. Sch. (No. 46 + 61) | 345 votes | 70 votes |
| (14)Stell Intermediate School (No. 47) | 269 votes | 60 votes |
| (15)Yturria Elementary School (No. 48) | 92 votes | 22 votes |
| (16)Palm Grove Elem. School (No. 53) | 14 votes | 3 votes |
| (17)Burns Elementary School (No. 54) | 159 votes | 42 votes |
| (18)James Pace High School (No. 62) | 49 votes | 11 votes |
| (19)Oliveira Intermediate Sch. (No. 63) | 146 votes | 41 votes |
| TOTALS | 2765 votes | 610 votes |

AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 5, a majority of 2155 votes being in favor thereof,

000012                         PAGE 11

thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;

PROPOSITION NO.6

| PRECINCT VOTING AT | (COUNTY PRECINCTS) | FOR AMENDMENT | AGAINST AMENDMENT |
|---|---|---|---|
| EARLY VOTING | | 403 votes | 265 votes |
| (1)Victoria Ward School (No. 5) | | 57 votes | 41 votes |
| (2)Josephine Webb Elem. Sch. (No. 6 + 8) | | 43 votes | 28 votes |
| (3)Annie S. Putegnat School (No. 7 + 9) | | 60 votes | 37 votes |
| (4)Cromack School (No. 10 + 60) | | 72 votes | 51 votes |
| (5)Skinner Elementary School (No. 11) | | 73 votes | 42 votes |
| (6)Russell Elementary School (No. 12) | | 111 votes | 67 votes |
| (7)Clearwater School (No. 13) | | 38 votes | 28 votes |
| (8)El Jardin School (No. 14) | | 36 votes | 12 votes |
| (9)R. L. Martin Elem. School (No. 15) | | 146 votes | 93 votes |
| (10)J. T. Canales School (No. 37) | | 41 votes | 46 votes |
| (11)Gertrude Sharp Elem. School (No. 38) | | 107 votes | 109 votes |
| (12)Faulk Intermediate School (No. 45) | | 42 votes | 29 votes |
| (13)M.Gonzalez Elem. Sch. (No. 46 + 61) | | 229 votes | 189 votes |
| (14)Stell Intermediate School (No. 47) | | 188 votes | 150 votes |
| (15)Yturria Elementary School (No. 48) | | 61 votes | 53 votes |
| (16)Palm Grove Elem. School (No. 53) | | 12 votes | 5 votes |
| (17)Burns Elementary School (No. 54) | | 113 votes | 87 votes |

PAGE 12

000013

(18) James Pace High School (No. 62)    <u>41</u> votes    <u>18</u> votes

(19) Oliveira Intermediate Sch. (No. 63) <u>96</u> votes    <u>88</u> votes

     TOTALS                    <u>1969</u> votes    <u>1438</u> votes

AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 6, a majority of 531 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;

PROPOSITION NO. 7

| PRECINCT (COUNTY PRECINCTS) VOTING AT | FOR AMENDMENT | AGAINST AMENDMENT |
|---|---|---|
| EARLY VOTING | <u>537</u> votes | <u>89</u> votes |
| (1) Victoria Ward School (No. 5) | <u>78</u> votes | <u>14</u> votes |
| (2) Josephine Webb Elem. Sch. (No. 6 + 8) | <u>67</u> votes | <u>15</u> votes |
| (3) Annie S. Putegnat School (No. 7 + 9) | <u>73</u> votes | <u>19</u> votes |
| (4) Cromack School (No. 10 + 60) | <u>92</u> votes | <u>25</u> votes |
| (5) Skinner Elementary School (No. 11) | <u>86</u> votes | <u>27</u> votes |
| (6) Russell Elementary School (No. 12) | <u>154</u> votes | <u>28</u> votes |
| (7) Clearwater School (No. 13) | <u>53</u> votes | <u>8</u> votes |
| (8) El Jardin School (No. 14) | <u>37</u> votes | <u>6</u> votes |
| (9) R. L. Martin Elem. School (No. 15) | <u>201</u> votes | <u>33</u> votes |
| (10) J. T. Canales School (No. 37) | <u>57</u> votes | <u>22</u> votes |
| (11) Gertrude Sharp Elem. School (No. 38) | <u>176</u> votes | <u>40</u> votes |

(12) Faulk Intermediate School (No. 45)      47   votes       19   votes

(13) M. Gonzalez Elem. Sch. (No. 46 + 61)   335   votes       66   votes

(14) Stell Intermediate School (No. 47)     280   votes       49   votes

(15) Yturria Elementary School (No. 48)      92   votes       22   votes

(16) Palm Grove Elem. School (No. 53)        15   votes        4   votes

(17) Burns Elementary School (No. 54)       161   votes       44   votes

(18) James Pace High School (No. 62)         48   votes        9   votes

(19) Oliveira Intermediate Sch. (No. 63)    154   votes       29   votes

   TOTALS                                  2743  votes      568   votes


   AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 7, a majority of 2175 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;


PROPOSITION NO. 8

| PRECINCT | (COUNTY PRECINCTS) | FOR | AGAINST |
|---|---|---|---|
| VOTING AT | | AMENDMENT | AMENDMENT |
| EARLY VOTING | | 532 votes | 89 votes |
| (1) Victoria Ward School (No. 5) | | 85 votes | 15 votes |
| (2) Josephine Webb Elem. Sch. (No. 6 + 8) | | 62 votes | 17 votes |
| (3) Annie S. Putegnat School (No. 7 + 9) | | 69 votes | 20 votes |
| (4) Cromack School (No. 10 + 60) | | 99 votes | 27 votes |
| (5) Skinner Elementary School (No. 11) | | 93 votes | 20 votes |

(6) Russell Elementary School (No. 12)     151 votes        25 votes

(7) Clearwater School (No. 13)              60 votes         5 votes

(8) El Jardin School (No. 14)               39 votes         6 votes

(9) R. L. Martin Elem. School (No. 15)     204 votes        31 votes

(10) J. T. Canales School (No. 37)          58 votes        28 votes

(11) Gertrude Sharp Elem. School (No. 38)  182 votes        28 votes

(12) Faulk Intermediate School (No. 45)     52 votes        17 votes

(13) M. Gonzalez Elem. Sch. (No. 46 + 61)  358 votes        53 votes

(14) Stell Intermediate School (No. 47)    281 votes        49 votes

(15) Yturria Elementary School (No. 48)    101 votes        13 votes

(16) Palm Grove Elem. School (No. 53)       12 votes         6 votes

(17) Burns Elementary School (No. 54)      162 votes        40 votes

(18) James Pace High School (No. 62)        47 votes        13 votes

(19) Oliveira Intermediate Sch. (No. 63)   154 votes        29 votes

    TOTALS                            2801 votes       531 votes


AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 8, a majority of 2270 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;


PROPOSITION NO. 9


PRECINCT        (COUNTY PRECINCTS)        FOR              AGAINST

```
VOTING AT                                          AMENDMENT              AMENDMENT

EARLY VOTING                                       577  votes             52  votes

 (1)Victoria Ward School (No. 5)                    77  votes             18  votes

 (2)Josephine Webb Elem. Sch. (No. 6 + 8)           73  votes              9  votes

 (3)Annie S. Putegnat School (No. 7 + 9)            77  votes             18  votes

 (4)Cromack School (No. 10 + 60)                    95  votes             26  votes

 (5)Skinner Elementary School (No. 11)              97  votes             14  votes

 (6)Russell Elementary School (No. 12)             162  votes             20  votes

 (7)Clearwater School (No. 13)                      58  votes              5  votes

 (8)El Jardin School (No. 14)                       42  votes              6  votes

 (9)R. L. Martin Elem. School (No. 15)             216  votes             21  votes

 (10)J. T. Canales School (No. 37)                  61  votes             22  votes

 (11)Gertrude Sharp Elem. School (No. 38)          197  votes             17  votes

 (12)Faulk Intermediate School (No. 45)             57  votes             11  votes

 (13)M.Gonzalez Elem. Sch. (No. 46 + 61)           351  votes             60  votes

 (14)Stell Intermediate School (No. 47)            298  votes             33  votes

 (15)Yturria Elementary School (No. 48)            103  votes             13  votes

 (16)Palm Grove Elem. School (No. 53)               13  votes              4  votes

 (17)Burns Elementary School (No. 54)              173  votes             24  votes

 (18)James Pace High School (No. 62)                43  votes             12  votes

 (19)Oliveira Intermediate Sch. (No. 63)           160  votes             22  votes

    TOTALS                                         2930 votes            407  votes
```

AND, WHEREAS, it thus appears to the City Commission, and it
is hereby so found and declared, that a majority of the qualified
voters voting at said election have voted in favor of said

Proposition No. 9, a majority of 2523 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;

PROPOSITION NO. 10

| PRECINCT          (COUNTY PRECINCTS) | FOR AMENDMENT | AGAINST AMENDMENT |
|---|---|---|
| VOTING AT | | |
| EARLY VOTING | 523 votes | 104 votes |
| (1)Victoria Ward School (No. 5) | 71 votes | 22 votes |
| (2)Josephine Webb Elem. Sch. (No. 6 + 8) | 58 votes | 17 votes |
| (3)Annie S. Putegnat School (No. 7 + 9) | 77 votes | 16 votes |
| (4)Cromack School (No. 10 + 60) | 96 votes | 27 votes |
| (5)Skinner Elementary School (No. 11) | 90 votes | 23 votes |
| (6)Russell Elementary School (No. 12) | 150 votes | 30 votes |
| (7)Clearwater School (No. 13) | 48 votes | 12 votes |
| (8)El Jardin School (No. 14) | 36 votes | 11 votes |
| (9)R. L. Martin Elem. School (No. 15) | 202 votes | 32 votes |
| (10)J. T. Canales School (No. 37) | 55 votes | 29 votes |
| (11)Gertrude Sharp Elem. School (No. 38) | 174 votes | 42 votes |
| (12)Faulk Intermediate School (No. 45) | 53 votes | 20 votes |
| (13)M.Gonzalez Elem. Sch. (No. 46 + 61) | 298 votes | 110 votes |
| (14)Stell Intermediate School (No. 47) | 270 votes | 61 votes |
| (15)Yturria Elementary School (No. 48) | 92 votes | 22 votes |
| (16)Palm Grove Elem. School (No. 53) | 11 votes | 6 votes |
| (17)Burns Elementary School (No. 54) | 150 votes | 41 votes |

(18)James Pace High School (No. 62)     44   votes     11   votes

(19)Oliveira Intermediate Sch. (No. 63)   146   votes     32   votes

    TOTALS                  2644 votes    668   votes

AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 10, a majority of 1976 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;

PROPOSITION NO. 11

| PRECINCT<br>VOTING AT | (COUNTY PRECINCTS) | FOR<br>AMENDMENT | AGAINST<br>AMENDMENT |
|---|---|---|---|
| EARLY VOTING | | 517 votes | 72 votes |
| (1)Victoria Ward School (No. 5) | | 81 votes | 13 votes |
| (2)Josephine Webb Elem. Sch. (No. 6 + 8) | | 65 votes | 11 votes |
| (3)Annie S. Putegnat School (No. 7 + 9) | | 73 votes | 17 votes |
| (4)Cromack School (No. 10 + 60) | | 103 votes | 18 votes |
| (5)Skinner Elementary School (No. 11) | | 99 votes | 16 votes |
| (6)Russell Elementary School (No. 12) | | 152 votes | 28 votes |
| (7)Clearwater School (No. 13) | | 54 votes | 9 votes |
| (8)El Jardin School (No. 14) | | 41 votes | 7 votes |
| (9)R. L. Martin Elem. School (No. 15) | | 203 votes | 27 votes |

| | | | |
|---|---|---|---|
| (10)J. T. Canales School (No. 37) | 61 votes | 26 votes |
| (11)Gertrude Sharp Elem. School (No. 38) | 178 votes | 32 votes |
| (12)Faulk Intermediate School (No. 45) | 52 votes | 15 votes |
| (13)M.Gonzalez Elem. Sch. (No. 46 + 61) | 341 votes | 64 votes |
| (14)Stell Intermediate School (No. 47) | 280 votes | 47 votes |
| (15)Yturria Elementary School (No. 48) | 100 votes | 15 votes |
| (16)Palm Grove Elem. School (No. 53) | 18 votes | 4 votes |
| (17)Burns Elementary School (No. 54) | 167 votes | 27 votes |
| (18)James Pace High School (No. 62) | 47 votes | 11 votes |
| (19)Oliveira Intermediate Sch. (No. 63) | 160 votes | 27 votes |
| TOTALS | 2792 votes | 486 votes |

AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 11, a majority of 2306 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;

PROPOSITION NO. 12

| PRECINCT (COUNTY PRECINCTS)<br>VOTING AT | FOR<br>AMENDMENT | AGAINST<br>AMENDMENT |
|---|---|---|
| EARLY VOTING | 496 votes | 81 votes |
| (1)Victoria Ward School (No. 5) | 77 votes | 16 votes |
| (2)Josephine Webb Elem. Sch. (No. 6 + 8) | 64 votes | 13 votes |

| | | |
|---|---|---|
| (3)Annie S. Putegnat School (No. 7 + 9) | 68 votes | 22 votes |
| (4)Cromack School (No. 10 + 60) | 102 votes | 25 votes |
| (5)Skinner Elementary School (No. 11) | 93 votes | 23 votes |
| (6)Russell Elementary School (No. 12) | 144 votes | 36 votes |
| (7)Clearwater School (No. 13) | 52 votes | 9 votes |
| (8)El Jardin School (No. 14) | 44 votes | 6 votes |
| (9)R. L. Martin Elem. School (No. 15) | 209 votes | 29 votes |
| (10)J. T. Canales School (No. 37) | 66 votes | 22 votes |
| (11)Gertrude Sharp Elem. School (No. 38) | 172 votes | 36 votes |
| (12)Faulk Intermediate School (No. 45) | 59 votes | 13 votes |
| (13)M.Gonzalez Elem. Sch. (No. 46 + 61) | 344 votes | 61 votes |
| (14)Stell Intermediate School (No. 47) | 271 votes | 56 votes |
| 15)Yturria Elementary School (No. 48) | 98 votes | 15 votes |
| (16)Palm Grove Elem. School (No. 53) | 17 votes | 2 votes |
| (17)Burns Elementary School (No. 54) | 158 votes | 38 votes |
| (18)James Pace High School (No. 62) | 49 votes | 10 votes |
| (19)Oliveira Intermediate Sch. (No. 63) | 154 votes | 32 votes |
| TOTALS | 2737 votes | 545 votes |

AND, WHEREAS, it thus appears to the City Commission, and it is hereby so found and declared, that a majority of the qualified voters voting at said election have voted in favor of said Proposition No. 12, a majority of 2192 votes being in favor thereof, thereby approving the same, and that said amendment shall, therefore, become a part of the Charter of the City of Brownsville;

AND, WHEREAS, the results of such special election being as

hereinabove found and declared:

NOW, THEREFORE, BE IT ORDAINED BY THE CITY OF BROWNSVILLE:

Section 1.    THAT it is hereby ordered, found, and declared that the amendments set forth in the hereinabove propositions numbered one through twelve have been duly and legally adopted, and from and after the entry of this ordinance upon the records of the City of Brownsville, such amendments so adopted shall be and become part of the Charter of the City of Brownsville and shall be added to such Charter, as it now exists, at the appropriate places; and

Section 2.    THAT the City Secretary shall record such amendments at length upon the records of the City in the separate book kept in her office for such purpose, and when the same shall have been so recorded they shall be deemed public acts, and all Courts shall take judicial notice of the same and no proof shall be required thereof; and

Section 3.    THAT the City Secretary shall prepare full, true, and correct copies of such amendments as so recorded and shall authenticate the same by her certificate under her hand and the seal of the City, and the Mayor shall certify to the Secretary of State such copies of such amendments so authenticated.

INTRODUCED AND PASSED to the First Reading on the __4th__ day of __November__, A.D., 1993.

Passed to the Second and Final Reading and Approved on this the __16th__ day __November__, A.D., 1993.



PAGE 21

Patricio "Pat" M. Ahumada,
Mayor

ATTEST:

Melissa Dennany Morales,
City Secretary

# PART I

# CHARTER*

Art.    I.    [Incorporation; Boundaries], §§ 1—4
Art.    II.    [Miscellaneous Powers], §§ 1—24
Art.    III.    Taxation, §§ 1—34
Art.    IV.    Finance, §§ 1—7
Art.    V.    [Administrative Provisions], §§ 1—33
Art.    VI.    Utilities Board, §§ 1—4
[Art. VII.]    General Provisions, §§ 1—8

## ARTICLE I. [INCORPORATION; BOUNDARIES]

### Section 1. Incorporation and corporate name.

The inhabitants of the City of Brownsville, Texas, within the boundaries as now established or as hereafter established in the manner provided by law, shall continue to be a body politic and corporate, incorporated and known by the name and style of the "City of Brownsville", with such powers, rights and duties as are hereinafter provided, and all other powers and rights not specifically designated in this Charter that are granted by the Constitution and Laws of Texas to cities having more than five thousand (5,000) inhabitants.

### Section 2. Boundaries.

The official boundaries and limits of the City of Brownsville shall be as are now established and hereinafter fixed from time to time by ordinance in accordance with provisions of this charter or by charter amendments, the official records

---

*Editor's note—The city's Home Rule Charter was adopted at an election held on December 13, 1915, and is set out herein as amended through June 28, 1963, for the convenience of the user of this Code of Ordinances. The original arrangement and article and section numbers have been retained. Where the same were omitted, the editor has provided article heading and section catchlines in brackets for ease of reference. Also, the editor has used a uniform system of capitalization. Future amendments to this Charter will be set out herein as enacted and indicated by notes following the amended sections.

State law reference—Adoption, amendment, etc., of Home Rule Charters. Vernon's Ann. Civ. St., art. 1165 et seq.

Supp. No. 11

of such boundaries and limits being retained in the office of
the city secretary, the official map being maintained in the
office of the city engineer. (Ord. No. 871, Prop. No. 1, 7-
29-75)

## Section 3. Extension of boundaries.

The boundaries and limits of the City of Brownsville, as now
or hereafter existing, may be extended, so as to include
within the corporate limits of said city any territory or several
areas adjoining such limits as then existing by ordinance
passed by the city commission, specifically defining the limits
of the city after such inclusion, provided such ordinance shall
be effective as an extension of the corporate limits only when
it has been approved by a majority of the votes of the quali-
fied voters residing within such limits, as extended, cast at a
special election held for that purpose not less than thirty nor
more than ninety days after the passage of such ordinance.

The ordinance shall fix and specify the date of the election,
the boundaries of the voting precincts, the polling places in
the several precincts and the form of the ballot (which shall
be substantially as follows: "For the Ordinance Extending the
City Limits" and "Against the Ordinance Extending the
City Limits"), and shall name the presiding judges of the
election. Notice of such election, issued by the mayor or by a
majority of the city commission, shall be published once a
week for at least three weeks before the day of the election in
some newspaper published in said city. The election shall
be held, returns thereof made, the returns canvassed and the
result declared and recorded, in the same manner, and under
the same laws, ordinances and rules as provided for general
elections within said city.

Provided, however, that before enacting such ordinances the
city commission shall hold a public hearing, after notice
thereof, given by a publication once each week for three suc-
cessive weeks prior to the date set for hearing, in some news-
paper published at Brownsville, Texas, setting forth therein
the territory or several areas proposed to be brought within
the city limits (at which hearing the inhabitants of such terri-

000025

tory or several areas, and the owners of property within the same may in person or by counsel offer evidence and present their views in favor of or against such inclusion, in addition to the presentation of evidence for or against the same on the part of the existing City of Brownsville and the inhabitants

and taxpayers thereof), and shall find from the evidence submitted that the inclusion of such territory or several areas or some portion thereof, to be described in the findings and in the succeeding ordinance, is urban or suburban in character and adjacent to the city limits, and that the inclusion thereof within said limits would be a benefit to the inhabitants thereof and to the owners of property therein equal to or greater than the tax burden and other obligations that would fall upon them as the result of such inclusion, and that the inclusion of such territory or portion thereof would likewise be a benefit to the existing City of Brownsville. The findings made by the city commission after such notice and hearing shall be final and conclusive as to the facts so found, and shall be a sufficient and legal basis for the enactment of the ordinance above provided for.

### Section 3a. Extension of the city boundaries by a petition.

Whenever a majority of the property owners who are citizens of the state and inhabitants of any territory adjoining the City of Brownsville desire the annexation of such territory to said city, they may present a written petition to that effect to the city commission, describing the territory desired to be annexed and shall attach to said petition the affidavit of two or more of their number to the effect that said petition is signed by a majority of such qualified voters; and thereupon the city commission, at any regular session held not sooner than fifteen days after the presentation of said petiton, and after giving ten days notice through a local paper of the presentation of said petition, and of a hearing on said petition, and after finding, that said petition has been signed by a majority of the resident property taxpayers of said territory desiring to be annexed, and that it is to the interest of the City of Brownsville that said territory should be annexed, may, by ordinance, annex such territory to the City of Brownsville, and thence forth said territory shall be a part of the City of Brownsville, and the inhabitants thereof shall be entitled to all the rights and privileges of other citizens and shall be bound by the acts, ordinances, resolutions and regulations of said city.

CH-3



**Section 3b. [Extension by ordinance.]**

The city commission shall have power by ordinance to fix the boundary limits of the City of Brownsville; and to provide for the alteration and the extension of said boundary limits and the annexation of additional territory lying adjoining to the city; provided that upon the introduction of any such ordinance in the city commission, it shall be published in the form it may be passed in a daily newspaper published in the City of Brownsville at least one (1) time, and said ordinance shall not be finally adopted until after the expiration of thirty (30) days from and after the date of the first publication thereof; and upon the final passage and adoption of such ordinance and when the boundaries of the City of Brownsville shall thereafter be fixed in such ordinance and when any additional territory has been so annexed, same shall be a part of the City of Brownsville for all intents and purposes, and the property situated therein shall bear its pro rata part of the taxes levied by the city and the inhabitants thereof shall be entitled to all the rights and privileges of all the citizens and shall be bound by the acts, ordinances, resolutions and regulations of the city.

Provided, however, that if within thirty (30) days from and after the first publication of said ordinance a petition requesting an election to determine whether said territory shall be annexed shall be filed with the city secretary of the said City of Brownsville, signed by at least 33 1/3% of the aggregate number of voters qualified to vote in said city and in said territory sought to be annexed on the date of the filing of said petition, then and in that event the city commission shall, by ordinance within sixty (60) days after the filing of said petition, order and call an election to be held in said city for the purpose of determining whether a majority of the legally qualified voters residing within the territorial limits of said city and qualified to vote in said election favor the annexation of said territory proposed to be annexed, and shall at the same time order and call an election to be held at some convenient place within said city limits so that the legally qualified voters residing in the territory contiguous to said city and proposed to be annexed may appear and cast their votes for

CH-4

Case 1:01-cv-00064  Document 40  Filed in TXSD on 01/10/2002  Page 88 of 171

the purpose of determining whether a majority of the legally qualified voters residing in said territory proposed to be annexed and qualified to vote in said election favor the annexation of said territory proposed to be annexed. The city commission shall give notice of said elections by publishing same one (1) time in a newspaper published in the City of Brownsville, in which said notice the territory proposed to be annexed shall be described. Said elections shall be held in accordance with the provisions of the City Charter of the City of Brownsville concerning elections, except that the ballot shall read, in part, substantially as follows: "For the Ordinance Extending the City Limits" and "Against the Ordinance Extending the City Limits". If a majority of the qualified voters of the City of Brownsville qualified to vote at said election and voting at said election and a majority of the qualified voters residing within the territory proposed to be annexed qualified to vote at said election and voting at said election, each vote for said ordinance extending the city limits, the said ordinance shall then be finally passed by said city commission; otherwise not. In the event said elections do not approve said annexation no ordinance attempting to annex all or any part of said territory shall be introduced until after the expiration of one (1) year from and after said elections except by Charter amendment.

The word "newspaper" as used hereinabove means a newspaper as defined by the General Laws of the State of Texas.

**Section 4. Platting of property.**

Should any property lying within the city limits, as established by this Charter, be hereafter platted into blocks and lots, the owners of said property shall plat and lay the same off to conform to the streets and alleys abutting the same, and shall file with the mayor a correct map thereof; provided that in no case shall the City of Brownsville be required to pay for any of said streets or alleys, at whatever date opened, but when opened by reason of the platting of said property, at whatever date platted, they shall become, by such act, the property of the City of Brownsville for use as public highways, and shall be cared for as such.

CH-5

## ARTICLE II. [MISCELLANEOUS POWERS]

### Section 1. Corporate powers.

The City of Brownsville, made a body politic and corporate by the legal adoption of this Charter and the amendments thereto, shall have perpetual succession; may use a corporate seal; may sue or be sued; implead or be impleaded in all courts and places, and in all matters whatsoever; may contract and be contracted with; may take, hold, purchase and acquire real estate or personal property within or without its boundaries, for any municipal purpose, governmental, proprietary or otherwise, in fee simple or lesser interest, title or estate, by purchase, gift, devise, lease or condemnation; and may sell, lease, hold, manage and control such property as its interests may require; and except as prohibited by the Constitution of Texas, or restricted by this Charter, shall exercise and enjoy all municipal powers, functions, rights, privileges, immunities and franchises of every name and nature, and be subject to all the duties and obligations now pertaining to or incumbent upon said city as a corporation. The enumeration of particular powers by this Charter shall not be held or deemed to be exclusive, but in addition to the powers enumerated therein or implied thereby, or appropriate to the exercise of such powers, it is intended that the City of Brownsville have, and may exercise, all powers which, under the Constitution of Texas, it would be competent for this Charter specifically to enumerate. All powers of the city, whether expressed or implied, shall be exercised in the manner prescribed by this Charter, or, if not prescribed therein, then in the manner provided by ordinance or resolution of the governing body.

### Section 2. Powers of ordinance.

The City of Brownsville shall have the power to enact and enforce all ordinances necessary to protect health, life and property and to prevent and summarily abate and remove all nuisances, and to preserve and enforce the good government, order and security of the city and its inhabitants, and to enact

CH-6

and enforce ordinances on any and all subjects, provided that no ordinance shall be enacted inconsistent with the provisions of this Charter or the General Laws or Constitution of the State of Texas.

## Section 3. Style of ordinances.

The style of all ordinances of the City of Brownsville shall be: "Be It Ordained by the City of Brownsville", but the same may be omitted when published in book or pamphlet form by the City of Brownsville.

## Section 4. Real estate, etc., owned by the city.

All real estate owned in fee simple title or held by lease, sufferance, easement or otherwise; all public buildings, fire stations, parks, public squares, streets, alleys and all property of whatever kind, character or description, whether real or personal, which has been granted, donated, purchased or otherwise acquired by the City of Brownsville, through any means or agency, and all causes of action, choses in action, rights and privileges of every kind and character, and all property of whatsoever character and description which may have been held or is now held, controlled or used by the said City of Brownsville for public ways or in trust for the public, shall vest in and remain in and inure to the said corporation of the City of Brownsville by the legal adoption of this Charter, and all suits and pending actions to which the City of Brownsville heretofore was or now is a party, plaintiff or defendant, shall in nowise be affected or terminated by the provisions of the Charter or by the legal adoption of the same, but shall continue unabated.

## Section 5. Acquisition of property.

The City of Brownsville shall have the power and authority to acquire by purchase, gift, devise, condemnation or otherwise any character of property, including any charitable or trust fund.

**Section 6. Public property exempt from execution.**

The property, real and personal, belonging to the city shall not be liable to be sold or appropriated under any writ of execution or cost bill.

**Section 7. City funds not subject to garnishment or assignment.**

The funds belonging to the city, in the hands of any person, firm or corporation, shall not be liable to garnishment on account of any debt it may owe, or funds it may have on hand due any person, firm or corporation, nor shall the city or any of its officers or agents be required to answer any writ of garnishment on any account whatsoever, nor shall said city be liable to the assignee of any wages of any officer, agent or employee of said city, whether earned or unearned, upon any claim or account whatsoever, and as to the city any such assignment shall be absolutely void.

**Section 8. Rules and regulations governing liability for damages.**

*Subsection 1.* The City of Brownsville shall not be held responsible or liable on account of any claim for damages or injury to any person by reason or the negligence of the city, its officers, agents or employees unless, first, the person making such complaint or claiming such damage or suffering said injury, or his or her authorized representative, shall, within thirty days, after the time at which it is claimed or alleged such injury was inflicted upon such person, present his or her claim therefor to the city commission of said city in writing, at a regular meeting thereof, or if there be no regular meeting, within said thirty days, then at the first regular meeting thereof after such injury is suffered, said written claim to state the amount of damages claimed and demanded of the city, and to be accompanied by a true statement under oath as to the nature and character and extent of such injury and damages, the time, date and place when and where same happened, the conditions causing the same, with a detailed statement of each item of such damages or injuries, a list of the

CH-8

names and addresses of witnesses, if known to or ascertainable by affiant, who witnessed said injury or the accident or happening causing the same or the damages resulting from same, provided, that, if, after thirty days from the date of said accident or injury and after the presentation of such claim to the governing body as hereinbefore provided, if the said injured person shall discover additional damage not known or ascertainable within said thirty days after said injury, then the City of Brownsville shall not be held responsible or liable on account of such additional damages unless an amended claim is presented at the first regular meeting of said city commission after the discovery of said additional damages, said supplementary claim to state, under oath, in full detail, all the matters and things hereinbefore provided for the original claim, and, second, no suit against the City of Brownsville shall be brought until after sixty days after any such claim shall have been presented to the city commission of said city within the time, in the manner and form hereinbefore provided, and in accordance with the provisions hereof.

*Subsection 2.* The City of Brownsville shall not be held responsible or liable on account of any claim for damages by reason of the death of any person resulting from negligence of the said city, its officers, agents or employees, unless, first, the legal representative of the estate of such person shall, within thirty days after the death of such person, present to the city commission of the city at a regular meeting thereof, or, if there be no regular meeting, within said thirty days, at the first regular meeting thereof, a written demand or claim for such damages, said written claim to state the amount of damages claimed and demanded of the city, and to be accompanied by a true statement under oath, to the best of affiant's information and belief, as to the nature and character of such injury, the time, date and place when and where same happened, the conditions causing the same, with a detailed statement showing how the amount of damages claimed is determined, a list of the names and addresses of witnesses, if known to or ascertainable by affiant, who witnessed said injury or the accident or happening causing the same or the results thereof, and, second, no suit against the

CH-9

000033

Case 1:01-cv-00064  Document 40  Filed in TXSD on 01/10/2002  Page 93 of 171

City of Brownsville shall be brought until after sixty days after such claim shall have been presented to the city commission of the city within the time, in the manner and in accordance with the provisions hereof.

## Section 9. Right of eminent domain.

Said city shall have the right of eminent domain and the power to appropriate private property for public purposes whenever the governing authority shall deem it necessary; and to take any private property, within or without the city limits, for any of the following purposes, to-wit: city halls, police stations, jails, calabooses, fire stations and fire alarm systems, libraries, hospitals, sanitariums, auditoriums, market houses, slaughterhouses, reformatories, abattoirs, streets, alleys, parks, highways, playgrounds, sewer systems, storm sewers, sewage disposal plants, filtering beds and emptying grounds for sewer systems, drainage, drainage water, water supply sources, wells, water and electric light and power systems, street car systems, telephone and telegraph systems, gas plants or gas systems, cemeteries, crematories, prison farms, pest houses, and to acquire lands, within or without the city, for any other municipal purpose that may be deemed advisable. That the power herein granted for the purpose of acquiring private property shall include the power of improvement and enlargement of waterworks, including water supply, riparian rights, stand pipes, watersheds, and the construction of supply reservoirs. That in all cases wherein the city exercises the power of eminent domain it shall be controlled as nearly as practicable, by the laws governing the condemnation of property by railroad corporations in this state; the city taking the position of the railroad corporation in any such cases.

## Section 10. Ownership of public utilities.

Said city shall have the power to buy, own or construct, and to maintain and operate, within or without the city limits a complete water system or systems, gas or electric lighting or power plant or plants, telephone systems, street railways, sewer systems, sewage plants, fertilizing plants, abattoirs, munici-


34

pal railway terminals, or any other public service utility, and to demand and receive compensation for such services furnished by the city for private purposes or otherwise, and to have the power to regulate by ordinance the collection of compensation for such services. That said city shall have power to acquire by lease, purchase or condemnation the property of any person, firm or corporation now or hereafter conducting any such business, for the purpose of operating such public utility or utilities for the purpose of distributing such service throughout the city or any portion thereof.

### Section 11. Funds for acquisition of any public utility; security for same, etc.

Should the city determine to acquire any public utility by purchase, condemnation or otherwise, as herein provided, said city shall have the power to obtain funds for the purpose of acquiring said public utility and paying the compensation therefor, by issuing bonds or notes or other evidence of indebtedness, and shall secure the same by fixing a lien upon the property constituting the public utility so acquired, and said security shall apply to said property so pledged.

No public utility or utilities owned or hereafter acquired by the city shall ever be sold until such sale is authorized by a majority vote of the qualified property taxpaying voters of the city, nor shall such utility or utilities ever be mortgaged or encumbered except as may be authorized by a majority vote of the qualified property taxpaying voters of the city, or for the purchase price of the particular property so mortgaged. Such vote in either case shall be ascertained at an election, of which notice shall be given in like manner as in cases of the issuance of municipal bonds by the city.

### Section 12. Manufacture or purchase of public utility products.

Said city shall have the authority to manufacture its own electricity, gas or anything else that may be needed or used by it or the public; to make contracts with any person, firm or corporation for the purchase of gas, water, electricity or

CH-11

any other commodity or articles used by it or the public, and
to sell same to the public, as may be determined by governing
authority.

### Section 13. Right to operate and maintain public utility acquired, exclusive.

In the event said city shall acquire, by purchase, gift,
devise, deed, condemnation or otherwise, any waterworks system, electric light or power system, gas system, street railway
system, telephone system, or any other public service utility to operate and maintain for the purpose of serving the
inhabitants of said city, the right to operate and maintain such
public service utility, so acquired shall be exclusive.

### Section 14. Right to regulate charges, etc., of holder of franchise or privilege.

Said city shall have the power to determine, fix and regulate the charges, fares and rates of any person, firm or corporation exercising, or that may hereafter exercise, any right of
franchise or public privilege in said city, and to prescribe the
kind of service to be furnished, the equipment to be used, the
manner in which service shall be rendered, and to change such
regulations from time to time; that in order to ascertain
all of the facts necessary for a proper understanding of what
is or should be a reasonable rate or regulation the governing
authority shall have full power to inspect the books and other
records of such person, firm or corporation, and compel the
attendance of witnesses for such purposes; provided that in
adopting such regulations and in fixing or changing such compensation, no stock or bond authorized or issued by any person, firm or corporation exercising such franchise or privilege
shall be considered unless proof be made that the same have
been actually issued by such person, firm or corporation for
money, or its equivalent, paid and used for the development of
the property under investigation.

### Section 15. Street powers.

The city shall have dominion, control and jurisdiction in,
upon, over and under its public streets, squares, avenues, al-

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 96 of 171

leys and highways, and to provide for the improvement thereof, upon the initiative of the commission, or upon a petition of property owners, as hereinafter provided, by paving, repaving, raising, grading and draining, and in connection therewith, opening, widening, narrowing or straightening, and by construction of sidewalks, and curbs or culverts, or otherwise. The word highway as used herein shall include all streets, alleys, public places, avenues and squares in the city. The city shall have the power to assess not more than three-fourths of the cost of such work, except the cost of intersections and cost to be paid by owners of railroads and street railroads, against the owners of property abutting the highway or section thereof improved, and against said property, and to fix a lien against said property which shall be superior to all other liens and claims, except city, state and county and other taxes, and a charge of personal liability against owners of said property. The portion of the cost assessed against said owners of abutting property may be made payable in deferred installments, the last maturing of which shall become due not more than five (5) years from the completion of the improvements, and which shall bear interest at the rate of not exceeding eight (8) per cent per annum. Said assessments may include reasonable attorney's fees and cost of collection, if incurred, and the commission shall have the power to fix the terms of payment, maturity and conditions of said assessments and of the assignable certificates hereinafter provided for.

The entire cost of making such improvements between or under the rails, tracks and switches of railroads or street railroads, occupying any highway or intersection improved, and for two feet on the outside of said tracks, shall be paid by the owners thereof, and secured by a lien assessed on the roadbed, rails, ties, tracks, franchises and other property of said owners, which lien shall be superior to all other liens, claims or interests in or upon said property. The ordinance making such assessment shall provide the time and terms of payment thereof, and for the payment of interests, costs and attorney's fees as above set out.

No assessment shall be made against owners of abutting property or against railroads or street railroads, or their prop-

37

erty, until after a hearing to said owners, and to lienholders or other interested parties, before the commission, preceded by reasonable notice thereof, which shall consist of a general notice published not less than ten days prior to the hearing in some newspaper of general circulation published in the City of Brownsville. The commission shall have authority to give other additional notice in its discretion, but the published notice shall be sufficient and binding upon lienholders and other interested parties and owners.

At said hearing, owners and other interested parties shall have the right to contest said assessments, the legality or regularity of any proceeding with reference thereto, or the special benefits arising from said improvements.

No assessment shall be made against any owner of abutting property or his property in excess of special benefits thereto in enhanced value thereof arising from said improvements.

All protests, contests and objections at said hearing shall be in writing, and the commission shall have power to hear evidence, summon witnesses and take testimony with reference thereto.

Said assessments may be enforced, either by suit in any court having jurisdiction, brought by the city for the benefit of the holder and owner of said assessments or the certificates evidencing same, or brought by said owner and holder, or by sale of the property assessed in the same manner or as near as possible, as is prescribed for sale of real estate for municipal taxes.

The lien of the assessments herein mentioned shall relate back and take effect as to all subsequent purchasers and creditors from the date of the ordinance or resolution ordering the improvement.

*Subsection 1.* The commission shall have power to cause to be issued in the name and on behalf of the city assignable certificates in writing, declaring the liability of the owners and their property for the payment of assessments and to fix the terms and conditions of such certificates. If any such certificate shall recite that the proceedings with reference to mak-

ing such improvements have been regularly had in compliance with law, and that all prerequisites to the fixing of the assessment lien against the property, and the personal liability of the owners, have been performed, such recitals shall be prima facie evidence of the facts so recited, and no further proof thereof shall be required in any court.

*Subsection 2.* Nothing herein contained shall empower the city to fix a lien by assessment against any property exempt by law from sale under execution, but the owner of such exempt property shall nevertheless be personally liable for the pro rata portion of said cost which would hereunder be assessed against such property were it not exempt, and such cost shall be assessed against said owner.

The fact that any improvement is omitted in front of exempt property shall not invalidate the lien of assessments made against other property.

*Subsection 3.* In apportioning costs of improvements among owners of the abutting property, the commission shall act in accordance with the front foot rule, in proportion as the front feet of property of each owner abutting the highway to be improved is to the whole frontage thereof. But if in particular cases the application of this rule would be unequal or unjust, the commission shall adopt such rule as shall effect substantial justice and equality, in view of special benefits received and burdens imposed.

*Subsection 4.* No error, mistake or informality in the ordinance of assessment or in any other step or proceeding prerequisite to said assessment shall invalidate the same, but the commission shall at any time correct the same.

No error or mistake in describing any parcel of abutting property or the name of its owner shall invalidate an assessment, but it shall notwithstanding have full force and be in effect against said premises and the real and true owner thereof.

Whenever in the opinion of the commission any error, mistake or invalidity exists in any proceeding with reference to said improvements or assessments, it shall correct said error,

CH-15

mistake or invalidity, and reassess said property and the owners thereof, with reference to which same exists. Such reassessments shall be made after a notice and hearing as herein provided, and not in excess of benefits in enhanced value of the property assessed, and otherwise as near as possible in accordance with the provisions hereof with reference to original assessments. After such reassessments the city shall have power to issue assignable certificates evidencing the same, as hereinbefore provided, which may be payable in deferred installments, the last maturing not over five years from date of said reassessment, and the terms and conditions of said certificates shall as near as possible comply with the preceding provisions hereof having reference thereto.

No reassessment shall be made unless proceedings therefor are begun within three (3) years from the date of the original assessments provided that if the validity of any assessments shall be involved in litigation, the period of time consumed therein shall not be considered in computing said three (3) years.

The commission shall have power to adopt rules, regulations and ordinances not inconsistent herewith for the purpose of carrying into effect every part of this section and its subsections and to effect said assessments and reassessments.

*Subsection 5.* Whenever the owners of more than fifty (50) per cent of the front feet of property abutting any highway or section thereof which they desire improved, shall petition the commission in writing (which may be one or more separate petitions) and shall state the limits within which the work is to be done, the general description thereof and the materials and methods or alternative materials and methods with which it is desired said improvements shall be made, and the signers of said petition shall agree therein to pay the several amounts which may be assessed against them respectively under the terms thereof, the said petition shall be filed with the commission, and shall be by it examined and in its discretion approved or disapproved by resolution.

The approval of such petition by the commission shall be conclusive of its regularity and validity, and if so approved,



the commission shall order the work done as nearly as possible with the materials and in accordance with the methods, or if alternative materials or methods shall be set out in said petition, in accordance with some method and with some material or materials therein specified.

When procedure is under this subsection, the commission shall make said improvements and assess and apportion the cost thereof, after notice and hearing as hereinbefore provided, and shall take all steps and do all things with reference thereto in strict accordance with the provisions of this section. Provided that when said work is done pursuant to petition, the city shall pay the whole cost of improvement of intersections of other streets and alleys with the highways named to be improved, except the portion thereof assessed against railroads and street railroads so occupying said highway and intersections; said railroads and street railroads shall pay the whole cost of such improvement of said highway or portion thereof between and under their rails and tracks and two (2) feet on the outside thereof, which cost shall be assessed against the owners thereof and their property, and collected in the manner provided in this article; and the owners of property abutting the highway or section thereof to be improved shall pay the whole remaining cost of such improvements, and the same shall be apportioned among them and assessed against them and their property in the manner provided in this article.

*Subsection 6.* In any suit brought for the enforcement of an assessment, reassessment or personal liability, the allegation in the petition or other pleading that all proceedings with reference to making such improvements have been regularly had in compliance with the law, and that all prerequisites to the fixing of the assessment lien upon the property assessed and the personal liability of the owner, or the issuance of the assignable certificates, have been performed, shall be deemed a sufficient allegation of every proceeding required by law, the City Charter or its ordinance with reference to such improvement or prerequisites to the fixing of such lien or liability and issuance of said certificates, and shall dispense with the necessity of pleading each of said preceding steps or

CH-17

⌐ ⌐ ⌐ ⌐41

prerequisites specifically and shall in all courts be taken as if each of said steps, proceedings or prerequisites had been alleged and set out in full.

Any property owner against whom or whose property an assessment or reassessment has been made shall have the right within twenty days thereafter to bring suit in any court having jurisdiction to set aside or correct the same or any proceeding with reference thereto, on account of any error or invalidity therein. But thereafter such owner, his heirs, assigns or successors shall be barred from any such action or any defense of invalidity in such proceedings or assessments or reassessments in any action in which the same may be brought in question.

*Subsection 7.* All contracts for street improvements heretofore entered into by the city and not fully performed, and all proceedings had by it with reference thereto, are hereby ratified, confirmed and validated, and all powers heretofore enjoyed by the city whereby it was empowered to provide for the execution of said contracts, and for the assessment of any portion of the cost of said improvements against owners of property abutting same, and their said property, or against the owners of railroads and street railroads and their property, and also all powers of the said city for the enforcement of said assessments and collections thereof, are hereby extended and preserved in full force for the purpose of making said assessments and enforcing said existing contracts, and it shall be the duty of said commission to pass all ordinances and resolutions and take all steps necessary or proper to fully execute said contracts or validate or ratify the same and to make and enforce said assessments.

All the powers granted by this section and its subsections, when adopted, shall be applicable to the enforcement of said existing contracts, and to the making and enforcement of the assessments therein provided to be made against owners of abutting property, and their property, and against the owners of railroads and streets railroads and their property, and to the issuance of assignable certificates as herein provided; and the commission shall fully exercise said powers to make and

CH-18

enforce said assessments, and to issue said certificates, under and in accordance with terms of this section and its subsections, when adopted.

### Section 16. Construction of sidewalks and curbs.

Said city shall have power to provide for the construction and building of sidewalks and to charge the entire cost of the construction of said sidewalks, including the curb, against the owner of the abutting property, and to make a special charge against the owner for such cost, and to provide by special assessments a lien against such property for such cost.

### Section 17. Sidewalks, improvement; defective may be declared nuisance.

Said city shall have the power to provide for the construction, improvement or repair of any such sidewalk, or the construction of any such curb, by penal ordinance, and to declare defective sidewalks to be a public nuisance.

### Section 18. Franchises for use of streets.

Said city shall have the power and authority to grant franchises for the use and occupancy of streets, avenues, alleys and any and all public grounds belonging to or under the control of the city. No telegraph, telephone, electric light or power, street railway, interurban railway, steam railway, gas company, waterworks, water systems or any other character of public utility shall be granted any franchise or permitted the use of any street, avenue, alley, highway or grounds of the city without first making application to and obtaining the consent of the governing authorities thereto, expressed by ordinance, and upon paying such compensation as may be prescribed, and upon such conditions as may be provided for by such ordinance, and before such ordinance proposing to make any grant for franchise or privilege to any applicant to use or occupy any street, avenue, alley or any other public ground belonging to or under control of the city, shall become effective, publication of such ordinance, as finally proposed to be passed, shall be made in some newspaper published in the

CH-19

000043

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 103 of 171

City of Brownsville once a week for three (3) consecutive weeks, which publication shall be made at the expense of the applicant desiring said grant, and said proposed ordinance shall not be thereafter changed unless again republished as in the first instance, nor shall any such ordinance take effect or become a law or tract or vest any rights in the applicants therefor until after the expiration of thirty days from the last publication of said ordinance, as aforesaid.

Pending the time such ordinance may become effective, it is hereby made the duty of the governing authority of the city to order an election if requested so to do by written petition signed by at least ten (10) per cent of the legally qualified voters, as determined by the number of votes cast in the last regular municipal election; at which election the qualified voters of said city shall vote for or against the proposed grant, as set forth in detail by the ordinance conferring the rights and privileges upon the applicant therefor. Such election shall be ordered not less than thirty (30) days nor more than ninety (90) days from the date of filing said petition, and if at said election the majority of the votes cast shall be for the granting of such franchise or privilege, said ordinance and the making of said proposed grant shall thereupon become effective, but if a majority of the votes cast at said election shall be against the granting of such franchise or privilege, such ordinance shall be ineffective and the making of such proposed grant shall be null and void.

## Section 19. Public works, improvements.

Said city shall have the power to open, extend, straighten and widen any public street, avenue, boulevard or alley, and for such purpose to acquire the necessary land, by purchase or condemnation, and to provide that the cost of improving such street, avenue, boulevard or alley by opening, extending, straightening or widening the same shall be paid by the owners of property lying in the territory of such improvement to the extent they are especially benefited thereby, and to provide that the cost shall be charged, by special assessment, against such owners and their property for the amount due by

CH-20

them, and three (3) special commissioners shall be appointed by the county judge of Cameron County, Texas, for the purpose of condemning said land and apportioning said cost, and such apportionment shall be especially assessed by the governing authority of said city against the owners and their property lying in the territory so found by said special commissioners to be specially benefited in enhanced value, and said city may issue assignable certificates for the payment of any such cost against such property owners and their property, and may provide for the payment thereof in deferred payments, which deferred payments shall bear interest at the rate of not exceeding eight (8) per cent per annum. Said city shall pay such portion of such cost as may be determined by said special commissioners to be due by it; provided the cost paid by the city shall never exceed one-third (1/3) of the cost of such improvement.

### Section 20. Altering streets, obstructions, encroachments, etc.

Said city shall have the power to control, regulate and remove all obstructions, encroachments and incumbrances on any public street, avenue, boulevard or alley, and to narrow, alter, widen, straighten, vacate, abandon and close same; to provide for sprinkling and cleaning same, and to regulate and control the moving of buildings and structures of every kind and character upon and along the same.

### Section 21. Parks and playgrounds.

Said city shall have exclusive control over all city parks and playgrounds, and may control, regulate and remove all obstructions and prevent encroachments thereupon, and may provide for raising, grading, filling, terracing, landscape gardening, erecting buildings, providing amusement therein, establishing walks and paving driveways around, in and through said parks, playgrounds and other public grounds; and shall have power to set up and maintain a system of parks for the use of the public, and shall have power to acquire park sites

by gift, purchase or condemnation; and said powers so granted shall, in part, but not exclusively, be exercised as follows, to-wit:

*Subsection 1.* As soon as practicable the city commission of said city shall designate the resacas now owned by the city as public parks, and shall acquire by gift, purchase or condemnation all lands in the city resaca not now owned by the city, and sufficient land bordering said resaca on either side for roads on each side thereof, and insofar as practicable, said city commission shall provide that the costs of making any such improvements shall be paid by the property owners owning property in the territory specially benefited in enhanced value by reason of making such improvements, and a personal charge be made against such owners as well as a lien fixed by special assessment against any such property and in other respects the provisions in Article 1180 of Revised Civil Statutes of Texas, 1925, shall be followed in acquiring and improving said resaca lands for park purposes.

*Subsection 2.* There shall be and is hereby established the office of park superintendent, appointment to which office and the salary to be paid therefor shall be as in the case of other non-elective city employees and officers.

*Subsection 3.* Upon the adoption of this amendment, there shall be appointed by the city commission three members of a park commission for terms, respectively, of one, two and three years, the successors to whom shall each be appointed for a term of three years, who shall serve without compensation and who shall constitute an advisory body, to advise with and make recommendations to the city manager with reference to park management, care and planting of trees, shrubs, flowers and other ornamental plants, and the improvement and maintenance of city parks.

*Subsection 4.* The city commission may annually appropriate monies from the general fund of the city to the aggregate amount of not to exceed one-half mill on each one dollar assessed valuation of the taxable property within the city in any one year for the extension, improvement, maintenance and care of the city park system.

046

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 106 of 171

## Section 22. Peace and good order.

Said city shall have the power:

[1] To define all nuisances, prohibit the same within the city and outside the city limits for a distance of five thousand (5000) feet; to police all parks, grounds, speedways, streets, avenues and alleys owned by said city, within or without the city limits; to prohibit the pollution of all sources of water supply of said city, and to provide for the protection of watersheds.

[2] To provide for the inspection of dairies, cows and dairy herds, slaughter pens and slaughterhouses and abattoirs, within or without the city limits, from which meat, milk, butter or eggs from same are furnished to the inhabitants of said city, and to provide for the inspection of meat markets, grocery stores, drugstores confectioneries, fruit stands, ice cream factories, laundries, bottling plants, hotels, restaurants and bakeries; the source, storage and distribution of water, and other places where food or drink for human consumption are manufactured, handled, sold or exposed for sale, and to regulate and inspect the character and standard of such articles of food and drinks so sold or offered for sale.

[3] To provide for the inspection and regulation of the sanitary conditions of all premises and vacant lots within the city limits; for the removal of garbage, night soil, refuse and unsanitary vegetation; to provide for establishing a lien against the property for any expenses incurred by the city in enforcing this provision, and further to provide for the making and enforcing of all proper and reasonable regulations for the health and sanitation of said city and its inhabitants.

[4] To provide for a health department and the establishment of rules and regulations protecting the health of the city; the establishment of quarantine stations, pest houses and hospitals, and to provide for the adoption of necessary quarantine laws to protect the inhabitants against contagious and infectious diseases.

CH-23



[5] To provide for a sanitary sewer system and for the maintenance thereof; to require property owners to make connections to such sewers with their premises, and to provide for fixing a lien against any property owner's premises who fails or refuses to make sanitary sewer connections, and to charge the cost against the said owner and make it a personal liability, and to fix penalties for failure to make sanitary sewer connections.

[6] To require property owners, their agents and lessees to remove, within a reasonable time, ice, slush, snow and other debris from sidewalks fronting on property owned, occupied or controlled by such owner, agent or lessee, and to require such owner, agent or lessee to remove all low hanging limbs from trees adjacent to sidewalks in said city.

[7] To prohibit the driving of herds of horses, mules, cattle, hogs, sheep, goats and all herds of domestic animals along or upon the streets, avenues or alleys of said city.

[8] To establish and regulate public pounds, and to regulate, restrain and prohibit the running at large of horses, burros, mules, cattle. sheep, swine, goats, geese, chickens, pigeons, ducks and other domesticated animals or fowl, and to authorize the restraining, impounding and sale of same for the cost of the proceedings and the penalty incurred, and to order their destruction when they can not be sold, and to impose penalties upon the owner thereof for the violation of any ordinance regulating or prohibiting the same, and to tax, regulate, restrain and prohibit the running at large of dogs, and to authorize their destruction and impose penalties on the owner or keepers thereof.

[9] To prohibit the inhumane treatment of animals and provide punishment therefor.

[10] To prohibit and restrain the flying of kites, firing firearms, firecrackers, rolling of hoops and the use of velocipedes, bicycles and skates, or the use and practice

CH-24

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 108 of 171

of any amusement on the streets or sidewalks, to the annoyance of pedestrians or persons using such streets or sidewalks, and to restrain, regulate and prohibit the ringing of bells, or blowing of horns, bugles and whistles, crying of goods and all other noises, practices, and performances tending to the collection of persons in the streets, or tending, unnecessarily, to interfere with the peace and quietude of the inhabitants of said city; and to suppress and regulate all unnecessary noises.

[11] To license any lawful business, occupation or calling that is susceptible to the control of the police power, and to license, regulate, control or prohibit the erection of signs, or billboards.

[12] To license, tax and regulate or suppress and prevent hawkers, peddlers and pawnbrokers.

[13] To license, tax and regulate all charges or fares made by any person, firm, or corporation owning, operating or controlling any vehicle operated for the carriage of passengers or freight for hire, on the public streets of the city.

[14] To regulate the operation of railway trains and street-cars operated on, along or across the streets, avenues or alleys of said city; to license and control the operation of automobiles, motorcycles, taxicabs, busses, cabs and carriages and all character of vehicles using the public streets, and to regulate the use and occupancy of the streets by any of such vehicles.

[15] To provide for the regulation and control of plumbers and plumbing works and to secure efficiency in the same.

[16] To provide for the inspection of weights, measures and meters, and fix a standard of such weights, measures and meters, and require conformity of such standards and provide penalties for failure to use or conform to the same, and to provide for inspection fees.

CH-25

00049

[17] To provide for the issuance of permits for erecting all buildings; for the inspection of the construction of all buildings in respect to proper wiring for electric lights and other electric appliances; piping for gas, flues, chimneys, plumbing and sewer connections, and to enforce proper regulations in regard thereto.

[18] To provide for establishing and maintaining a public library.

[19] To provide for the establishment and designation of fire limits; to prescribe the kind and character of structures to be erected therein; to provide for the erection of fireproof buildings within said limits, and for the condemnation of dangerous or dilapidated structures which are calculated to increase the fire hazard.

[20] To enact and enforce all ordinances and resolutions necessary to regulate the safety of all office buildings, hotels, apartment houses, rooming houses, hospitals, theaters, store buildings and all public buildings.

[21] To require the construction of fire escapes in connection with public buildings, and to determine the sufficiency and regulate the safety of all exits and fire escapes provided on public buildings of every kind and character.

[22] To provide for the establishment of districts and limits, within said city, wherein saloons for the sale of spirituous, vinous and malt liquors may be located and maintained, and to prohibit the sale of such liquors or the location of such saloons without such defined districts or limits; and to regulate the location, permit, forbid, regulate and control theatres, moving picture shows, vaudeville shows, dance halls, ten pin alleys, pool halls and all other public amusements, whenever the preservation of order, tranquility, public safety or good morals demand it.

[23] To restrain and punish vagrants, mendicants, beggars and prostitutes.

CH-26

[24] To prohibit and punish keepers and inmates of bawdy, assignation and disorderly houses, and to prevent and suppress such bawdy, assignation and disorderly houses, and to punish such keepers, inmates and owners, or agents of such owners, of such houses, knowingly permitting such houses to be occupied as such bawdy, assignation or disorderly houses, and to determine such inmates and keepers to be vagrants.

[25] To provide for establishing and maintaining the fire department of the city.

[26] To require waterworks corporations, gas companies, street car companies, telephone companies, electric light and power companies or other companies or individuals, exercising franchises, now or hereafter, from the city, to make and furnish extensions of their service to such territory as may be required by ordinance.

[27] To establish and maintain the city police department, prescribe the qualifications and duties of policemen and regulate their conduct.

[28] To provide for the enforcement of all ordinances enacted by it by a fine not to exceed two hundred dollars ($200.00), provided that no ordinance shall provide a greater or less[er] penalty than is prescribed for a like offense by the laws of the state.

[29] To provide for the commutation of fines imposed by labor in a workhouse, in the public streets and public ways of the city; and for the collection of any fine imposed, execution may be enforced as executions issued in civil cases.

[30] To provide for a court for the trial of misdemeanor offenses, known as the "corporation court", of which such powers and duties as are defined and prescribed in an Act of the Legislature of the State of Texas, and any Acts amendatory thereof, entitled "AN ACT TO ESTABLISH AND CREATE IN EACH OF THE CITIES, TOWNS AND VILLAGES OF THIS STATE A COURT TO BE KNOWN AS THE CORPORATION

CH-27

COURT IN EACH CITY, TOWN OR VILLAGE, AND
TO PRESCRIBE THE JURISDICTION AND ORGANI-
ZATION THEREOF, AND TO ABOLISH MUNICIPAL
COURTS", said Act being Title 22, Chapter 5, Articles
903 to 922, inclusive, of the Revised Statutes of the
State of Texas.

[31] To appoint as soon as practicable after the adoption of
this Charter, some suitable person for the position of
judge or recorder of the corporation court, who shall
discharge the duties of said office under the terms and
provisions of the state law creating said court, and
subject to the provisions of this Charter.

[32] To establish, maintain and regulate the city prison,
workhouses, and other means of punishment for va-
grants, city convicts and disorderly persons, and such
hospitals, orphanages and charitable institutions as
may be deemed expedient by the governing authority.

[33] To divide the city into zones for the regulation of build-
ings therein, and in each zone to establish building lines
and to regulate the location, height, dimensions and
material of all buildings to be erected therein, with full
power to make different regulations and building lines
in different zones, and to regulate the purpose for which
the property in said zones may be used, and there-
after to alter the same.

In addition to the foregoing, the city shall have the powers
enumerated in Article 1175 of the Revised Civil Statutes of
Texas, Rev. 1925, and all Acts amendatory thereof, and under
any other laws enacted by the Legislature of the State of
Texas, applicable to cities of more than five thousand popula-
tion, not in conflict with the existing provisions of this Char-
ter, and such provisions and rights are hereby specifically
adopted.

## Section 23. Purchase of property for city hall.

The City of Brownsville shall have authority to purchase or
condemn Lot No. One (1) in Block Fifty Six (56), City of

000052

Brownsville, Texas, and the building thereon located, formerly occupied by First National Bank in Brownsville, Texas, for use as City Hall and for other municipal purposes, at a total cost to the City of Brownsville, of not in excess of thirty-two thousand, five hundred dollars, exclusive of taxes and assessments thereon at the time of purchase or condemnation of same, and to execute vendor's lien notes for any part of the purchase price of same, and accept a deed thereto in which a vendor's lien for the unpaid purchase price is retained by the grantor, or to issue first lien mortgage coupon bonds of the City of Brownsville, in a sum not to exceed thirty-two thousand, fiev hundred dollars, the interest and sinking fund necessary to be created therefor to be charged against a tax to be levied for the general fund of the City of Brownsville, Texas, provided, however, that the City of Brownsville may pay off and retire said vendor's lien notes or coupon bonds out of any amount available out of the net income from any of the public utility plants now owned and operated by said City of Brownsville.

Upon the adoption of this Charter amendment, such vendor's lien notes may be executed by authority of a resolution of the city commission of the City of Brownsville, or, in the discretion of said city commission, such first lien mortgage coupon bonds may be issued in accordance with the existing charter of the said city and in compliance with the Constitution and Laws of the State of Texas, to bear a rate of interest not to exceed five per cent, and run for a period of time prescribed by the Charter, but not to exceed ten years, and the adoption of this amendment shall fully authorize the acceptance of deed to such property subject to vendor's lien for the unpaid purchase price and execution of vendor's lien notes, or the issuance of said bonds without any further submission of the same at any election for such purpose.

**Section 24. No bond required.**

It shall not be necessary in any action, suit or proceeding in which the city shall be a party for any bond, undertaking or security to be executed in behalf of the city.

## ARTICLE III. TAXATION

### Section 1. [General levy.]

The city shall have the power and is hereby authorized annually to levy and collect for general municipal purposes an ad valorem tax of not more than $2.50 on each one hundred dollars ($100.00) of assessed valuation of all real, personal or mixed property situated within the city, not exempt from taxation by the Constitution and Laws of the State of Texas.

### Section 2. [Property taxed.]

All property, real, personal or mixed, tangible or intangible, lying or being within the corporate limits of the City of Brownsville, Texas, on the first day of January of each year, and all property sent out of the said City of Brownsville, Texas, prior to the first day of January of each year for the purpose of evading taxation thereon, and afterwards returned to said city, excepting such property as may be exempt from municipal taxation under the Constitution and Laws of the State of Texas, shall be subject to taxation, including in such designation all rights, privileges and franchises heretofore or hereafter granted to and held by any person, firm or corporation in the streets, alleys, highways or public grounds or places in said city, and all easements or rights-of-way granted to and held by any person, firm or corporation, in, over, through or under any real property, public or private, said franchises and easements or rights-of-way each to be assessed for taxation and subject to taxation separately from and in addition to the other assets of such person, firm or corporation, and the city commission of the city shall require the rendition and assessment thereof accordingly, provided, the specific inclusion of said franchises and easements or rights-of-way in this section shall not, by implication, exclude any other property from the provisions hereof, and provided further, that no franchise hereafter granted by the City of Brownsville, Texas, shall, in any manner, exempt any person, firm or corporation from ad valorem taxation on said franchise, easement or right-of-way.

CH-30

## Section 3. [Assessor's assessment. lists.]

It shall be the duty of the assessor and collector of taxes, between the first day of January and the first day of May of each year, to make and return to the city' commission of the city a full and complete list and assessment of all property, real, personal and mixed, held, owned, or situated in said city on the first day of January of each year and not exempt from municipal taxation, and also a list of all banks, and other corporations whose capital stock is liable to taxation, with the cash value¯of the shares of stock of each such bank or other corporation and the names of the owners thereof.

## Section 4. [Authority to collect.]

The city commission of the city shall have full power to provide by ordinance for the prompt collection of taxes assessed, levied and imposed under the Charter, and is hereby authorized, and to that end may and shall have full power and authority to sell or cause to be sold all kinds of property, real, personal or mixed, in any manner not prohibited by the Constitution and Laws of the State of Texas, and may and shall make such rules and regulations and ordain and pass all ordinances deemed necessary to the levying, laying, imposing, assessing and collecting of any taxes provided for in the Charter. Unless otherwise provided by ordinance or in this Charter, all property in such city liable to taxation shall be assessed in accordance with the provisions of the General Laws of the State of Texas, insofar as applicable.

## Section 5. [Procedural regulations.]

The city commission of the city shall have¯power by ordinance to regulate the manner and mode of making out tax lists, inventories and appraisements of property herein, and to prescribe the oath that shall be administered to each person on rendition of his property, and to prescribe how, when and where property shall be rendered, and to prescribe the number and form of assessment rolls, not less than two, and fix the duties and define the powers of city assessor and collector, subject to the provisions of this Charter, and adopt such

CH-31



measures as the city commission may deem advisable to se-
cure the assessment of all property within the city limits and
collect the tax thereon, and the city commission may provide a
fine for all persons· neglecting, failing or refusing to render
their property for taxation.

## Section 6. [Notice to submit property lists.]

The assessor and collector of taxes shall, at least ten days
before the first day of January each year, give public notice
by advertisement in the official newspaper that all persons
owning or controlling, as agents or otherwise, any personal
property or real estate or mixed property subject to municipal
taxation, are required to render same for taxation on or
before the first day of April of each year. All merchants doing
business in the city are required within the same time to
furnish the assessor and collector of taxes a true statement,
verified by affidavit, of all goods, wares and merchandise
owned or kept on hand by such merchant on the first day of
January. All persons, firms or corporations holding any rights,
privileges or franchises heretofore or hereafter granted to
any of them in the streets, alleys, highways or public
grounds or places in said city are required within the same
time to furnish the assessor and collector of taxes a true
statement, verified by affidavit, of all property, real, mixed
or personal, including franchises, easements and rights-of-
way, owned or kept on hand by such person, firm or corpora-
tion on the first of January, such statement to be in sufficient
detail that it shall show all legal descriptions of real estate
and shall separate tangible from intangible property, and shall
show each different kind or class of property separately.

## Section 7. [Supplement rolls of unlisted property.]

If the assessor and collector of taxes shall discover any real
or personal property which was subject to taxation for any
previous year, and which from any cause has escaped
taxation for that year, he shall assess the same in a supple-
ment to his next assessment roll at the same rate under which
such property should have been assessed for such year,

CH-32

stating the year, and the taxes thereon shall be collected the same as other assessments; provided, that such supplement roll may be made at any time and reported to the city commission of the city for its approval and any number of such rolls may be made that may be necessary. The taxes assessed in such supplement rolls for years previous to the approval of such rolls shall be due at once upon the approval of such rolls by the city commission of the city, and such taxes may bear interest at the rate of six per cent per annum from the date on which the same would have been delinquent if levied and assessed, and if the same shall not be paid within thirty days after the date of such approval, the city collector shall proceed to collect the same by advertisement and by sale of such property as soon as practicable; such advertisement and sale to be made in the same manner and for the same times as in cases of the sale of such property for other city ad valorem taxes, as prescribed by the City Charter; or may enforce the collection thereof in any other manner prescribed by law. Provided, that a misnomer of or failure to name the owner in the assessment rolls shall not affect the validity of the assessment of any taxes, and provided, further, that when such taxes have not been attempted to be assessed for such previous year, such taxes shall bear interest only from date of approval of the supplemental rolls. The assessor and collector of taxes may in any year reassess property which, because of irregularity in the assessment of any previous year may have been improperly assessed; such reassessment shall be at the value at which it should have been assessed in any such year, and property owners of such property shall take notice of such reassessment, if made prior to the first of April in any year, but if made after such date, notice shall be given by the assessor and collector of taxes as in case of the raising of an assessment. Any property owner whose property has been reassessed, may appeal to the board of equalization as in the case of an original assessment.

## Section 8. [All property assessed.]

The assessor and collector of taxes shall assess all property which for any cause has not been rendered, placing such valu-

ation thereon as he may deem just. If the owners of such property are unknown, such assessment may be made in the name "unknown".

## Section 9. [Irregularity not to invalidate assessment.]

No irregularity in the time or manner of making or returning the city assessment rolls or the approval of such rolls shall invalidate any assessment.

## Section 10. [Valuation of assessed property.]

All property, real and personal shall be rendered for taxation by the owner thereof or his agent, as provided by the laws of the state for the rendition of property for assessment by the county, insofar as applicable; provided, however, that in making such renditions the owner or agent shall not be required to state the value of the real property, but shall furnish to the assessor and collector, verified by the oath of the party making such rendition, a full and complete list and schedule of all property, real and personal, belonging to the person, firm or corporation in whose name such property is rendered. It shall be the duty of the assessor and collector to value each and every item of the property so rendered in accordance with the fair cash market value thereof upon a basis of valuation to be applied alike to all taxpayers, and to transmit to the city commission of the city all renditions thus made together with a statement by him, verified by his oath, to the effect that he has truly, fairly and equally valued all such property.

## Section 11. Board of equalization.

The city commission of the city shall each year prior to the first day of June appoint a board of equalization, to be composed of three members who may or may not be members of the city commission, and who are taxpaying citizens, well acquainted with the real estate values, one of whom shall be designated as chairman of the said board. The said board shall convene as near as practicable on the 15th day of June and continue its labors until its said work is completed, but not

CH-34

to continue longer than the 15th day of July following. It shall be the duty of the city commission, as soon as the assessment rolls are completed to refer the same to the board of equalization, whose duty it shall be to equalize the taxes assessed on said rolls and to make all necessary correction and adjustment to that end; and, in addition to the powers granted it by this Charter amendment, said board shall also have the same powers and perform the same duties as the county commissioners court of this state in regard to the assessment of property for taxation and the equalization thereof, and shall be governed in its procedure and acts in this respect as now provided by the laws of this state relating to the equalization of state and county taxes by said commissioners courts. In addition to the foregoing, the said board shall have the power, when sitting, to compel the production of all books, documents, stocks, bonds, and other papers pertinent to the investigation, to be produced before it in the investigation of the taxable values of any person or persons, firm or corporation having or owning property within the corporate limits of the city subject to taxation. Said board shall have full power to correct any mistake or injustice or inequality in the assessment of property, the rendition of same, or in the payment of taxes, and shall have power to correct such mistakes and make redress therefor; and the said board may add to the rolls and property omitted therefrom either for the current year or for previous years, and lawfully taxable within said city. A majority of the said board shall constitute a quorum for the transaction of business. The city secretary or his assistant shall be ex officio the clerk of said board. Members of the board, while serving, shall receive such compensation as may be provided for them by the city commission of the city. Immediately upon completion of its work the board of equalization shall certify its approval of the assessment rolls, which shall be returned to the city commission of the city, which shall thereupon either approve the said rolls as returned to them or make such corrections and changes therein as it may deem advisable, and thereupon adopt the same as the assessment rolls to be used for the collection of taxes for the current year.

059

### Section 12. Board of equalization; appeals to by owners; procedure.

Any person aggrieved by reason of any act of the assessor and collector of taxes in making up the assessments, or in the valuation of property for taxing purposes, shall be entitled to make complaint to the board of equalization to appeal to said board for revision and correction of the matter upon which said complaint is based. The said board shall hear and examine such complaint or appeal and may examine the complainant, his agent or attorney, and all other persons who may shed light on said controversy on oath touching the matter complained of and may compel the attendance of witnesses and the production of books and papers necessary to enlighten the board and elucidate the controversy.

### Section 13. [Notice of assessment increase.]

If the assessor and collector of taxes or the board of equalization proposes to increase any assessment over the amount assessed in the preceding year, notice shall be issued to such property owner stating the fact that the assessment of the owner's property is about to be increased, without specifically designating the particular property or the amount to be increased, and be addrssed to the owner, agent or representative thereof and mailed at the postoffice in the City of Brownsville, and, in the event the owner of said property is unknown, notice shall be given by publication for one day in the official newspaper in the City of Brownsville; provided, that when the owner of the property is unknown it shall be sufficient to give a general description of the property, and the newspaper notice shall be the only notice required. The city secretary shall be ex officio secretary of the board of equalization and he shall give notice by publication in the official newspaper one time advising all taxpayers that the board of equalization will convene on a certain day for the transaction of business and adjourn on a certain day, and that all parties interested in the work of said board shall repair to the office of the assessor and collector of taxes without delay

000060

and inform themselves of the determinations of said board, and, if dissatisfied therewith, to bring the matter to the attention of said board before its final adjournment.

Substantial compliance with the provisions of this section with reference to notice shall be sufficient, and no assessment shall be invalidated by reason of failure to comply with this section of the Charter.

## Section 14. [Assessment list prepared.]

As soon as practicable after the tax rolls shall have been revised and finally adopted, the assessor and collector of taxes shall prepare an alphabetical list of the taxpayers of the city, together with the total amount of property assessed against each, which list shall be preserved in his office and shall be accessible to the public.

## Section 15. [Tax lien created.]

A lien is hereby created on all property, personal and real, or mixed in favor of the City of Brownsville, for all taxes, ad valorem, occupation or otherwise. Said lien shall exist from January 1st in each year until the taxes are paid. Such lien shall be prior to all other claims, and no gift, sale, assignment or transfer of any kind, or judicial writ of any kind, shall ever defeat such lien, but the assessor and collector of taxes shall pursue such property, and whenever found out, shall seize and sell enough thereof to satisfy such taxes.

All persons or corporations owning or holding personal property or real estate in the City of Brownsville, on the first day of January of each year shall be liable for all municipal taxes levied thereon for such year.

The personal property of all persons owning any taxes to the City of Brownsville is hereby made liable for all of said taxes whether the same be due upon personal or real property, or upon both.

## Section 16. [Where taxes payable.]

All taxes shall be payable at the office of the assessor and collector of taxes in the City of Brownsville, in current money.

CH-37

No demand for such taxes shall be necessary but it is made the duty of the taxpayer to make payment of such taxes in cash within the time specified.

### Section 17. [Seizure, sale of property for taxes.]

The assessor and collector of taxes shall, by virtue of his tax rolls, have power and authority to seize and levy upon personal property and sell the same to satisfy delinquent taxes. When he seizes personal property for such purposes he shall keep the same at the expense of the owner until the sale is made, and shall give notice of the time and place of sale of same by posting a written notice at the city hall door and one at the courthouse in the City of Brownsville, at least ten days before the date of sale. He shall sell the same to the highest bidder for cash for all taxes, interest, cost and expense of caring for said property, and shall make an entry in the book of sales of the amount realized. All such sales shall be made at any door of the city hall.

### Section 18. [Tax sale title.]

A sale of personal property for delinquent taxes shall convey with it an absolute title and the owner shall have no right to redeem the same. The city shall have the right to become a purchaser of property at tax sales, and the city manager shall attend such sales for such purpose or may empower any person to so bid on behalf of the city.

### Section 19. [Validation of previous levies.]

All levies of ad valorem taxes heretofore made by the City of Brownsville, and all assessments heretofore made, and assessment rolls heretofore placed in the hands of the city assessor and collector of taxes for collection are hereby validated and the same shall be legal and binding, regardless of any irregularities that may exist in the manner of making such levies, and the making and returning of such assessment rolls. This provision shall apply to all suits and actions now pending, as well as those hereafter prosecuted.



### Section 20. [Description of property in suit.]

In any suit by the City of Brownsville for the collection of any delinquent tax where it shall appear that the description of any property in the city assessment rolls shall be insufficient to identify such property, the city shall have the right to set up in its pleading a good description of the property intended to be assessed, and to prove the same, and to have its judgment foreclosing its tax lien upon the same, and personal judgment against the owner, for such taxes, the same as if the property were fully described upon the assessment rolls.

### Section 21. [Sufficiency of listed property description.]

When the owner of any property, or his agent shall render any property to the assessor and collector of taxes for assessment, and such property is assessed in accordance with the description furnished by such owner or his agent, the sufficiency of such description shall not be disputed by such owner in any action or suit for the collection of such taxes, but the same shall be binding upon such owner, and shall be sufficient for all purposes of such assessment.

### Section 22. [Article not preemptive.]

The provisions herein for the collection of taxes shall not be construed to prevent the city from filing suit in any court of competent jurisdiction for the collection of any taxes due on real estate, as well as personal property, and for the enforcement of levies for such taxes; and the assessment rolls shall be prima facie evidence of the facts stated in said rolls and that all taxes assessed on such rolls have been regularly levied and assessed in accordance with the provisions of this Charter amendment and of the law; and no irregularity in the manner of levying or assessing taxes shall invalidate the same unless it appears from affirmative proof that such irregularity operated injuriously to the taxpayer attempting to avoid the payment of such tax. Nothing in this section shall be construed to prevent the city commission from hearing all complaints as to erroneous and unjust assessment and making such adjustments with reference thereto as said city commission may deem just.

CH-39

**Section 23. [Assessment pursuant to state law.]**

Unless otherwise provided by this Charter amendment and by ordinances passed thereunder, all property in such city liable to taxation shall be assessed in accordance with the provisions of general laws of the state, insofar as applicable.

**Section 24. [Monthly reports.]**

It shall be the duty of the assessor and collector of taxes to make reports to the city manager monthly, or oftener if required by the city commission of the city, showing all taxes collected by him since the date of his last report.

**Section 25. Assessment or property; joint, common and conflicting interests in real estate; separate assessments of.**

The city assessor and collector of taxes shall not be required to make separate assessments of individual or joint common or conflicting interests in any real estate, but the owner of such interest may furnish to said assessor and collector of taxes at any time before the 1st day of April of each year, and not thereafter, a written description of any parcel of land in which he has an interest less than the whole, showing the amount of his interest therein, and the said assessor and collector may thereupon assess such interest as a separate parcel and the remaining interest as a different parcel and proceed to fix the value of each.

**Section 26. [Payment on particular portion of property.]**

The assessor and collector of taxes may receive the taxes on parts of any lots or parcels of real property or on an undivided interest therein, but no such taxes shall be received until the person tendering the same shall have furnished the said assessor and collector of taxes a particular description of the particular part of interest on which payment is tendered, and the assessor and collector shall enter such specification in the name of the person paying and at the proper place in the

CH-40

064

assessment books, so that the part or interest on which payment has been made and the part or interest on which taxes remain unpaid may clearly appear.

## Section 27. Delinquent taxes; penalties.

The taxes herein and hereby authorized to be levied shall become due and payable in two equal installments. The first installment, which amount shall be fifty per cent of the total sum of the taxes due and payable for the current year shall be due and payable on or before the thirty-first day of January of the ensuing year, and the second installment, which amount shall be the remaining fifty per cent of the total sum due and payable in taxes for the current year shall become due and payable on the thirty-first day of July of the ensuing year. No demand for taxes shall be necessary in order to insure or enforce their collection; but it is made the duty of the taxpayer to make payment of such taxes in cash as herein provided. The first installment of taxes required to be paid by virtue of this Charter amendment for the current year shall become delinquent on the first day of February of the ensuing year and the second installment of taxes required to be paid by virtue of this Charter amendment for the current year shall become delinquent on the first day of August next succeeding. Should any taxpayer permit his taxes to become delinquent by failure or refusal to pay the first installment, said installment being fifty per cent, of the total amount of taxes due for the current year, before the first day of February of the ensuing year as above specified, then the second installment shall also immediately become due and payable and delinquent and a penalty shall attach to the payment of all such taxes at the rate of two per cent per month on the first day of each month thereafter, until such penalty shall be ten per cent of the taxes paid. All delinquent taxes shall bear interest at the rate of six per cent per annum from original delinquent date. Should any taxpayer pay the first installment of his taxes as hereinabove provided and permit the second installment of his taxes to become delinquent, by failure or refusal to pay said second installment before the first day of August of the next ensuing year, as above specified, then

Case 1:01-cv-00064  Document 40  Filed in TXSD on 01/10/2002  Page 125 of 171

ten per cent penalty and interest shall immediately attach to the second installment of delinquent taxes. In addition to the penalties above prescribed, such delinquent taxpayer shall be subject to the payment of all costs and expenses that may be incurred by the advertisement of such delinquent property and the collection of such taxes through any method prescribed by this Charter amendment and any of the laws of the State of Texas, and such penalties and interest and costs and expenses, including any lawful attorney's fees, shall be an obligation of the taxpayer and be secured by the same lien and collected in the same manner as the taxes.

### Section 28. [Seizure, sale for delinquent taxes.]

It shall be the duty of the assessor and collector of taxes promptly after any taxes become due and delinquent, and within sixty days thereafter, to seize and sell for taxes any personal property he may find subject, under the law, to be seized and sold for such delinquent taxes, and, as to all other taxes, promptly and within three months thereafter, to prepare in alphabetical order of the names of persons owing such taxes triplicate copies of schedules of said delinquent taxes, including any taxes delinquent for prior years, and deliver to the city attorney of the City of Brownsville, Texas, said triplicate copies of said schedules of delinquent taxes, with all information on the tax rolls as to description of property, name and address of owner, and any and all other pertinent information in his possession and knowledge for the purpose of instituting suit or pursuing other legal remedy for the collection of said taxes and the establishment and foreclosure of any liens securing the payment of same.

### Section 29. [Collection suits.]

When taxes due the city have become delinquent, suit shall be brought for the collection of such delinquent taxes, together with penalties, interest, attorney's fees, and costs provided by law or legally accruing thereon and for the foreclosure of any and all liens securing the payment of the same.

CH-42

000088

### Section 30. [Failure of officers no defense.]

Failure of the assessor and collector of taxes and the city attorney to do any of the things it is made their duty to do in this Charter as amended at any time, within the time specified therein, shall not be a defense to any suit for collection of taxes and establishment and foreclosure of any liens, nor shall such delay prohibit any other action taken for collection of said taxes.

### Section 31. [Officer's liability for nonfeasance.]

In the event either the assessor and collector of taxes or the city attorney fails or refuses to do or perform any of the duties assigned to either of them in this Charter as amended at any time, strictly within the time specified herein, then and in that event such officer so failing to perform his duty within the time specified shall without further action, ipso facto, cease to hold such office and cease to be entitled to receive the salary therefor, and become bound and liable to repay to the City of Brownsville any salary paid to him as such officer for any time thereafter, provided, however, that such officer may, prior to the expiration of any such time designated herein, apply to the city commission of the city for an extension of time for the performance of any such duty, which said city commission of this city may, by resolution, grant for a specified time, on showing of necessity satisfactory to them. Should either the said assessor and collector of taxes or the city attorney forfeit his office for the reasons set forth in this section of the Charter, he may not again be employed in any capacity by the City of Brownsville, Texas, for a period of two years.

### Section 32. [When tax levied.]

The city commission of the city, at its first meeting in June of each year, or as soon thereafter as practicable, shall levy the annual tax for each year, but special taxes or assessments allowed by this Charter or the Laws of the State of Texas, may be levied, assessed and collected at such time as the city commission may provide; provided, that should the city com-

CH-43

mission fail or neglect to levy the annual tax herein provided not later than the thirtieth day of October of said year, the annual tax levy for the preceding year last made by the city commission shall and will be in force and effective for the year for which no annual tax levy was made, prior to the first day of November of such year.

### Section 33. [Article cumulative.]

In addition to the powers herein conferred with reference to the assessment and collection of taxes, the City of Brownsville shall have and may exercise all powers and authority now conferred or that may hereafter be conferred upon cities having a population of more than five thousand inhabitants by the General Laws of the State of Texas.

### Section 34. [Effective date.]

This amendment shall be in effect on and after the first day of January, 1940.

## ARTICLE IV. FINANCE

### Section 1. [General authority.]

The governing body of the city shall have the power and authority to appropriate so much of the general revenue of the city as may be necessary for the purpose of retiring and discharging the existing indebtedness of the city and for the purpose of making permanent public improvements, purchasing, erecting and constructing and maintaining public works and public utilities of every kind and such other public improvements as the governing body may, from time to time, deem expedient; and in furtherance of any and all of such purposes the city shall have the power to borrow money upon the credit of the city, within the limits prescribed by law, and to issue bonds of the city therefor, in such sum or sums as the governing body may deem necessary or expedient.

All bonds shall specify the purpose for which they are issued, shall not be sold for less than their par value and accrued interest and when any bonds are issued by the city a

CH-44

separate fund shall be provided to pay the interest as it matures and to create a sinking fund to redeem said bonds as they are scheduled to mature; such fund shall not be used or drawn upon for any purpose except to pay interest on and redeem the bonds for which such fund was created or to invest any surplus monies accumulated therein in such obligations as may be authorized by laws pertaining to the investment of sinking funds of cities. The person or corporation acting as treasurer of the city shall honor no drafts, vouchers, checks or warrants drawn on such fund except for the purposes herein named.

Such bonds may be issued to mature serially or otherwise not more than forty (40) years from their date, within the discretion of the governing body and may contain such options of prior redemption as may be prescribed by the ordinance or resolution authorizing their issuance and in the face of such bonds; bear interest at not more than 5% payable annually or semi-annually, at such place or places as may be designated in such ordinance or resolution; said bonds shall be signed by the mayor, countersigned by the city secretary or city clerk and shall have impressed thereon the seal of the city.

The ordinance or resolution authorizing the issuance of such bonds shall provide for the levy and collection of a tax annually on all taxable property in the city, sufficient to pay the interest as it accrues and create a sinking fund for the payment of the bonds as they mature.

No such bonds shall be issued until the proposition shall have been submitted to the resident, qualified property tax-paying voters of the city at an election held for such purposes and a majority of the valid votes cast therein shall be in favor of the issuance of the bonds. Such election shall be held in the manner provided in Chapter I, Title 22, Revised Civil Statutes of Texas, 1925, as amended; and all such bonds shall be submitted to the attorney general of Texas for his approval and the comptroller of public accounts for registration in the manner and with the effect provided by law.

## Section 2. [Refunding bond ordinances.]

· The governing body shall have the power to pass all necessary ordinances to provide for the refunding of any legally outstanding bonds of the city and matured and unpaid interest due thereon, provided such refunding bonds shall not bear interest at a rate greater than the bonds being refunded and shall be authorized and issued in the same manner as other bonds of the city provided that no election shall be required to authorize such bonds.

## Section 3. [Time warrants.]

No time warrants shall be issued by the governing body of the city except in cases of public calamity where it becomes necessary to act at once [to] appropriate money to relieve the necessities of the citizens, or to preserve the property of the city, or when it is necessary to preserve or protect the health of the citizens or in case of unforeseen damage to public property, machinery or equipment, and then only [by] the unanimous vote of all five members of the commission. (The words "time warrants" as used herein are defined as meaning that form of municipal obligation issued in the form of a bond without being submitted to the voters at an election, and shall not be construed to mean bank notes customarily used for short-time financing.)

## Section 4. [Sinking funds.]

، All monies arising from the collection of taxes by the city for the purpose of paying interest on and providing a sinking fund for bonds, warrants and other indebtedness of the city shall be kept in one or more funds separate and distinct from either the fund designated as the "Plant Fund" or the fund designated as the "General Fund". The books of the city shall, at all times, show, separately, the amount of money collected from taxes or other sources for each year for the payment of interest or as a sinking fund to service each separate issue of bonds, warrants or other indebtedness.

CH-46

70

Section 5. [Utility **improvement** revenue bonds.]

(a) The city is authorized and empowered to issue its fully negotiable coupon bonds hereafter called "Utility Improvement Revenue Bonds", to finance repairs, replacements, extensions and improvements of and to one or more of its utility systems, payable from and secured as to principal and interest by a pledge of the net revenues only of any or all of said utility systems, provided that so long as any refunding bonds issued under the provisions of Chapter 103, Acts of the Regular Session of the 47th Legislature of Texas remain outstanding and unpaid, either as refunded originally or as again subsequently refunded the pledge of the net revenues securing such Utility Improvement Revenue Bonds shall be of equal dignity with the pledge securing such refunding bonds, provided further, that while any of such refunding bonds are outstanding no Utility Improvement Revenue Bonds shall be issued except to the extent expressly permitted by the ordiance authorizing such outstanding refunding bonds and in no event shall Utility Improvement Revenue Bonds be issued in an amount and under terms which would cause the aggregate amount of all annual pledges, securing the refunding bonds and Utility Improvement Revenue Bonds to exceed sixty-six and two-thirds per cent (66-2/3%) of the average net revenue of such utility systems for the three completed fiscal years next preceding.

(b) Such Utility Improvement Revenue Bonds may be issued to mature serially or otherwise not more than forty (40) years from their date, with or without option of prior redemption as may be determined by the city commission, the terms of which option, if any, shall be prescribed in the authorizing ordinance and in the bonds, bearing interest at not exceeding 5% per annum. No such Utility Improvement Revenue Bonds shall be issued until authorized at an election for such purpose called and held in the manner provided in Chapter I, Title 22, Revised Civil Statutes of Texas, 1925, as amended, for the issuance of bonds by cities.

(c) When Utility Improvement Revenue Bonds shall have been issued hereunder they shall constitute special obligations

of the City of Brownsville and such bonds shall never be a
debt of the city, but solely a charge upon the pledged revenues
and shall never be reckoned in determining the power of
the city to incur obligations payable from taxation. The bonds
hereby authorized shall contain substantially the following
provisions:

"The holder hereof shall never have the right to demand
payment of this obligation out of any funds raised or to
be raised by taxation."

(d) The term "net revenues" as used herein shall mean the
amount of gross revenues of the city's utility systems remain-
ing after deducting:

(1) Expense of operation of said systems and collection of
the income, including salaries and wages of employees
thereof;

(2) Maintenance and repair of same;

(3) Five per cent (5%) of gross income therefrom as a
reserve for depreciation and obsolescense, which sum
may be invested in bonds of the City of Brownsville the
State of Texas, or the United States of America,
and which reserve may be used for repairing damage
caused by wars, riots, floods, hurricanes, fires, or acts
of God or other causes not within the control of the
governing body of the city.

(4) Cost of such extensions and repairs, as in the judgment
of the city commission are necessary to keep the
utility systems in operation and render adequate serv-
ice to the city and its inhabitants or such as may be
necessary to meet some physical accident or condition
which would otherwise impair the efficient operation of
the utility system.

(e) When any such bonds shall have been authorized and
issued as herein permitted it shall be the duty, enforceable by
any bondholder through mandamus or through any other
method, of the governing body of the city to fix and maintain
rates for services rendered by any and all of the city's utility
systems sufficient to pay all operating and maintenance ex-

000072

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 132 of 171

penses, depreciation, replacement and betterment charges and to assure payment of the interest and principal of any of such outstanding bonds;

(f) Before any such Utility Improvement Revenue Bonds are sold they shall be submitted to and approved by the attorney general in the manner and with the effect provided in Articles 709 to 715, both inclusive, Revised Civil Statutes of Texas, 1925, as amended and except as prescribed in this amendment said bonds shall be executed and issued in the manner provided by the Charter of the city.

### Section 6. Income from utility plants.

The entire income from the municipal waterworks system, electric power and light system[,] sewer system, or other public utilities owned now or hereafter by the City of Brownsville, Texas, is hereby set aside for the following purposes, in the order named below, to-wit:

*Subsection 1.* For the payment of expenses of operation of said utility plants, and of the collection of said income, including salaries and wages of employees thereof.

*Subsection 2.* For the maintenance and repair of such public utilities so that same shall continue to operate efficiently.

*Subsection 3.* For the setting aside in a separate account of not less than five per cent (5%) of the total income from such utility plants or systems as a reserve for depreciation and obsolescence, which sums, however, may be used to retire, pay off and discharge revenue bonds of said utility plants in excess of the amount then due thereon or to become due during the current year, or invested in other valid bonds of the City of Brownsville, or bonds of the State of Texas, or the United States. Said sum may be used for the purpose of making necessary repairs of damage caused by wars, riots, floods, hurricanes, fire or acts of God or causes not within the control of the governing body of the City of Brownsville.

*Subsection 4.* Cost of such extensions and repairs, as in the judgment of the city commission are necessary to keep the utility systems in operation and render adequate service to the

73

city and its inhabitants or such as may be necessary to
meet some physical accident or condition which would other-
wise impair the efficient operation of the utility systems.

*Subsection 5.* For the payment, as due, of revenue bonds
heretofore or hereafter issued for repairs to or extensions of
said utilities.

*Subsection 6.* Any income remaining after the foregoing
requirements have been met shall be available to the city for
use in any manner authorized or permitted by law.

### Section 7. Power to control and manage finances.

The city shall have the power to control and manage the
finances of the city; to provide its fiscal year and fiscal
arrangements.

## ARTICLE V. [ADMINISTRATIVE PROVISIONS]

### Section 1. Municipal government.

The municipal government of the City of Brownsville shall
consist of the city commission, which shall be composed of five
(5) commissioners, one of whom shall be the mayor of the
city.

### Section 2. Term of office.

At the first election after this charter amendment, the
mayor and four (4) commissioners shall be elected. The mayor
shall be elected for a term of four (4) years. After the elec-
tion of the four (4) commissioners, the canvass of the returns
and declaration of results, the four (4) commissioners shall
meet at the city hall and determine by lot which two (2)
commissioners shall serve for two (2) years and which two
(2) commissioners shall serve for four (4) years. Thereafter
in each odd-numbered year, two (2) commissioners shall be
elected, each of whom shall serve a four-year term. (Ord. No.
871, Prop. No. 2, 7-29-75)

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 134 of 171

same power, duties and authority, as if they comprised the whole number of members provided for in this Charter, provided, if a majority of the city commission is vacated at any one time, such vacancies shall then be filled by majority vote of the qualified electors of the said city, at a special election for the remainder of the term, as provided by ordinance to be adopted by the remaining members of the city commission.

## Section 4. Qualifications.

The mayor and each commissioner shall be citizens of the United States and resident citizens of the City of Brownsville, and have the qualifications of electors therein. The mayor, commissioners and other officers and employees shall not be indebted to the city; shall not hold any other public office of emolument and shall not be interested in the profits or emoluments of any contracts, job, work or service for the municipality, or interested in the sale to the city of any supplies, equipment, material or articles purchased. Any officer or employee of the city who shall cease to possess any of the qualifications herein required shall forthwith forfeit his office and any such contract in which any officer or employee is or may become interested may be declared void by the commission. No officer or employee of the city (except policemen and firemen in uniform, or wearing badge) shall accept any frank, free ticket, passenger service, or anything of value, directly or indirectly, from any person, firm or corporation, upon terms more favorable than are granted to the public. Any violation of this section shall be a misdemeanor, and on conviction for such violation, such office or employment, shall be forfeited.

## Section 4A. Nominations.

*Subsection 1. Nomination by petition.* The mode of nomination of candidates for the city commission provided for by this Charter shall be by petition. The name of any elector of the city shall be printed upon the ballot whenever a petition,

CH-51

### Section 3. Vacancies.

Vacancies in the city commission shall be filled by majority vote of the remaining members of the said city commission at the first regular meeting thereafter, at which a majority of the remaining members of said city commission can agree, and, until the majority of the remaining members of said city commission can agree, such remaining members shall have the

78

as hereinafter prescribed, shall have been filed in his behalf with the city secretary. Such a petition shall be signed by not less than one hundred nor more than five hundred electors. No elector shall sign more than one petition for the same office, and should an elector do so, his signature shall be void as to the petition or petitions last filed.

*Subsection 2. Signatures to and form of nomination papers.* The signatures to the nomination petition need not all be appended to one paper, but to each separate paper there shall be attached an affidavit of the circulator thereof, stating the number of signers of such paper and that each signature appended thereto was made in his presence and is the genuine signature of the person whose name it purports to be. With each signature shall be stated the place of residence of the signer, giving the street and number, or other description sufficient to identify the same.

The form of the nomination petition shall be substantially as follows:

"We, the undersigned electors of the City of Brownsville, hereby nominate _____, whose residence is _____, for the office of _____ to be voted at the election to be held in the City of Brownsville, on the _____ day of _____, 19_____, and we individually certify that we are qualified to vote for a candidate for the office named, and that we have not signed any other nomination petition for the same office.

Name _____ .
                   (Space for Signature)

Street and Number _____

THE STATE OF TEXAS )
COUNTY OF CAMERON )

_____being duly sworn, deposes and says that he is the circulator of the foregoing petition papers containing ____ signatures, and that the signatures appended thereto were made in his presence and

CH-52

are the signatures of the persons whose name they pur-
port to be.

(Signed) ........ .... ..    ..._ ..... ....

Sworn to and subscribed before me this the ....   .......... .
day of ..... ......... .... ...... ...................., 19......... .

........ .......... ........ ...
Title

This petition, if found insufficient by the City Commis-
sion shall be returned to ................................. ...................... at
No. ................. ... ..........................____ Street."

*Subsection 3. Filing and verification of nomination pa-
pers.* All nomination papers comprising a petition shall be as-
sembled and filed with the city secretary as one instrument,
not earlier than ninety days nor later than thirty days before
the election. Within five days after the filing of a nomination
petition the city secretary shall notify the person who filed
such petition whether or not it is found to be signed by the
required number of qualified voters. If a petition be found
insufficient, the city secretary shall return it immediately to
the person who filed it, with the statement certifying wherein
the petition is found insufficient. Within the regular time al-
lowed for the filing of petitions, such petition may be amended
and filed again as a new petition, or a different petition
may be filed for the same candidate. Any eligible person
placed in nomination as hereinbefore provided shall have his
name printed on the ballots if within five days after notifica-
tion to him by the city secretary he shall have filed with such
secretary a written acceptance of the nomination. In no event
shall such person or group of persons appear on the ballots by
national political party designation. Nothing in this paragraph
shall be construed to prohibit candidates being grouped under
local designations. Any three or more candidates, upon making
application to the city secretary, shall have their names placed
upon the ballots grouped in a column, separate and apart
from other candidates. All candidates not making such appli-
cation shall be placed in one column, and any disagreement as
to position in said column, shall be determined by lot. The
petition of each person nominated to be a member of the

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 138 of 171

commission shall be preserved by the election authorities until the expiration of the term of office for which he has been elected.

*Subsection 4.* The city commission shall make all needful rules and regulations, not inconsistent with this Charter or the general laws for the conduct of all elections, general and special, for the prevention of fraud in the elections and for the recount of ballots, in case of doubt or fraud, provided, the following rules and regulations shall apply to all elections, to-wit:

    a.   The city commission shall appoint all election officers and designate the voting places, but may appoint one of their number or the city manager to fill vacancies among such election officers thereafter in the event of the failure or refusal of any of them to serve. Said appointments shall be made not less than two weeks prior to the day of the holding of any election and the city secretary shall within one day thereafter mail to each candidate for office at such election the list of election officers so appointed.

    b.   The city commission shall have power and authority to appoint supervisors of elections, selecting such supervisors from lists furnished to said city commission not less than five days prior to said election. Each supervisor shall reside in the election precinct in which he serves. Nothing in this provision shall prohibit the appointment of supervisors by agreement among the candidates as provided by state law.

    c.   The polls shall open at eight o'clock in the morning and close promptly at seven o'clock in the evening and no votes shall be cast after seven o'clock in the evening, nor shall any vote received after seven o'clock in the evening be counted.

    d.   If any election officer, except as permitted by state law, shall give out information relative to the number of votes cast for or against any candidate during the period the polls are open for voting, or talk over the

telephone or communicate with any person outside the polling place other than duly appointed election officials, or leave the polling place, such election officer shall be immediately removed and another appointed in his place.

e.  The city commission shall have the power and authority to prohibit professional canvassers from working for or against any candidate in the general city election.

## Section 5. Elections.

The elective officers of the city shall consist of five (5) commissioners, one of which shall be designated as mayor, the others to be designated as Commissioner No. 1, Commissioner No. 2, Commissioner No. 3 and Commissioner No. 4, each of whom shall be elected to the office for which he is a candidate by a majority of all the votes cast in the city at large for that office. Should no candidate receive a majority of votes at the regular election for which he is a candidate, the commission shall immediately order a special election to be held not less than ten (10) nor more than twenty (20) days after the result of the regular election has been declared, at which special election the names only of the two candidates receiving the highest number of votes for said office at the regular election shall be printed on the ballot and submitted to the qualified voters for election, and the candidate receiving the majority of votes at such special election, for the place or office for which he was a candidate, shall be declared duly elected.

## Section 5a. Recall election.

*Subsection 1. Power to recall.* The people of the City of Brownsville reserve the power to recall any member of the city commission and may exercise such power by filing with the city secretary a petition signed by at least twenty-five per cent (25%) of the qualified voters of the city demanding the removal of a member of the city commission. The petition may consist of one, or more, petition-papers or instruments, but all such petition-papers shall be assembled and filed with

CH-55

80

the city secretary as one instrument. Each petition-paper shall contain a general statement of the grounds for removal together with an affidavit by one of its signers that such statement is true. Each petition-paper must be signed in ink or indelible pencil by the person whose signature it purports to be, adding thereto his place of residence by street and number. One of the signers of said petition-paper shall make an affidavit, and attach it thereto, that he, and he only, personally circulated such instrument and that each signature thereon was made in his presence and is the genuine signature of the person whose name it purports to be.

*Subsection 2. Recall election.* Within twenty (20) days after a recall petition is filed, the city secretary shall examine the same and determine whether it is signed by the requisite number of qualified voters, and meets the other requirements hereinabove set forth. Once it is filed, the petition shall neither be amended nor withdrawn. After completing examination of the petition the city secretary shall certify the result thereof to the city commission at its next regular meeting, stating the number of persons found on the petition who are, and the number of those who are not, qualified voters of the city, and whether or not such petition meets the other requirements set forth in subsection 1 hereof. If the certificate of the city secretary shall show such petition to be insufficient, the city commission shall order him to so notify the person who filed the same; but if the petition is certified by the city secretary to be sufficient, and the member of the city commission whose removal is sought does not resign within five (5) days after such certification to the city commission, the commission shall order and hold a recall election not less than thirty (30) nor more than sixty (60) days from such certification.

*Subsection 3. Recall ballot.* Ballots used at recall elections shall conform to the following requirements:

(1) With respect to each person whose removal is sought, the question shall be submitted "Shall (name of member of commission) be removed from the office of Mayor or Commissioner No.___ . . . .) ?"

CH-56

(2) Immediately below each such question there shall be printed the two following propositions, one above the other, in the order indicated:

"For the recall of (Name of Mayor or Commissioner)"

"Against the recall of (Name of Mayor or Commissioner)"

*Subsection 4. Results of recall election.* If a majority of the votes cast at a recall election shall be for the removal of the mayor or commissioner named on the ballot, the city commission shall immediately declare his office vacant and such vacancy shall be filled in accordance with the provisions of the City Charter for the filling of vacancies. A mayor or commissioner thus removed shall not be eligible to fill the vacancy thereby created.

*Subsection 5. Limitation on recall.* No recall petition shall be filed against a mayor or commissioner within six (6) months after he takes office, and no mayor or commissioner shall be subjected to more than one recall election during a term of office.

## Section 6. [Commission judge of elections.]

The commission shall be the judge of the election and qualification of its members.

## Section 7. Election returns.

The commission shall, at the next regular meeting day of said commission, after each regular and special election, canvass the returns and declare the result of such election.

## Section 8. Election day.

The regular municipal election of the City of Brownsville hereafter shall be held on the first Tuesday of November, A. D. 1939, and on said day every two years thereafter, provided, that the city commission may, by ordinance duly adopted and published once a week for two consecutive weeks in some newspaper published in the City of Brownsville not less than 60 nor more than 90 days before the proposed date of such

election, advance the date of said election to a date earlier than theretofore established either by this Charter or any such ordinance but not earlier than April of any odd numbered year, and subject to all provisions in this Charter with reference to advertising said election, publication of the audit and all provisions to be carried out at specified times before such election.

### Section 9. Elections, law controlling.

All elections provided for in this Charter, except the regular election for the election of commissioners at the expiration of a regular term shall be called special election, and all elections shall be conducted and results canvassed and announced by the election authorities prescribed by the General Election Laws of the State of Texas, and said general election laws shall control in all municipal elections, except as otherwise herein provided.

### Section 10. Commission constituted legislative and governing body of the city.

The commission shall enact all ordinances and resolutions, and adopt all regulations; and constitute the legislative and governing body of the city, with all the powers and authority herein granted.

### Section 11. Duties of mayor.

The mayor of the city shall be the presiding officer of the commission, except that in his absence a mayor pro tempore may be chosen; he shall be entitled to vote as a member of the commission; sign all bonds; be the official head of the city, and exercise all powers and perform all duties imposed upon him by this Charter and by the ordinances of the city.

### Section 12. Meeting of the commission.

On the first Monday at 10 o'clock A. M., after the election of the commission has been declared, the commission shall meet in the council chamber of the city hall, at which time the commissioners shall qualify and assume the duties of their

83

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 143 of 171

offices. Thereafter the commissioners shall meet at such time as may be prescribed by ordinance or resolution, but they shall meet at least once each month. The mayor, any two commissioners or the city manager, hereinafter provided for, may call special meetings of the commission at any times deemed advisable. All meetings of the commission shall be public, except such executive sessions as may be provided for by ordinance, and any citizens shall have access to the minutes and records thereof at all reasonable times. The commission shall determine its own rules and order of business, and shall keep a journal of its proceedings.

## Section 13. Compensation.

The mayor and city commissioners elected after the adoption of this amendment shall each receive as compensation for their services during their term of office the sum of ten dollars ($10.00) for their attendance for the full duration of each regular and special meeting; provided, however, that in no event shall they be paid for more than two regular and three special meetings in any one calendar month.

## Section 14. Legislative procedure.

A majority of all members elected on the commission shall constitute a quorum to do business, and the affirmative vote of a majority of all five commissioners shall be necessary to adopt any ordinance or resolution. The vote upon the passage of all ordinances and resolutions shall be taken by "YEA" and "NAY" and entered upon the journal. Every ordinance or resolution passed by the commission shall be signed by the mayor and the person acting as city clerk or secretary, within two days, and by him recorded.

## Section 15. Ordinance enactment.

Each proposed ordinance or resolution shall be introduced in written or printed form; shall not contain more than one subject, which shall be clearly stated in the title, but general appropriation ordinances may contain the various subjects and accounts for which moneys are to be appropriated. No ordi-

84

nance, unless it be declared an emergency measure, and passed by unanimous vote of all members of the commission present and voting, shall be passed on the day on which it shall be introduced.

### Section 16. Emergency measures; defined and provided for.

An emergency measure is an ordinance or resolution for the immediate preservation of the public peace, property, health or safety, or providing for the usual daily operation of a municipal department, in which the emergency is set forth and defined as a preamble thereto. Ordinances appropriating money, not exceeding two hundred fifty dollars ($250.00), and ordinances for the payment of salaries and wages, may be passed as emergency measures, but no measure making a grant, renewal or extension of a franchise, or other special privilege, or regulating the rate to be charged for its services by any public utility, shall ever be passed as an emergency measure.

### Section 17. Ordinances; publication of.

Except as expressly otherwise provided by the general laws of Texas with reference to home rule cities or by the terms of the ordinance itself, ordinances of the City of Brownsville shall be considered and held to be published when recorder by the city secretary in an ordinance book to be kept as a public record for that purpose and shall be effective when so recorded; provided, that, if said ordinance, provides for a penalty for violation thereof, such ordinance shall be published in some newspaper published in the City of Brownsville, at least one time, and in compliance with general laws of Texas with reference to publication of such ordinances of home rule cities.

### Section 18. Ordinances; recording.

Every ordinance or resolution when adopted and approved, shall immediately be recorded by the city secretary in a book kept for that purpose and designated as an ordinance book and shall be authenticated by the signature of the mayor and the

CH-60

person exercising the duties of city clerk or city secretary, provided, ordinances which must be published before they are effective shall be recorded in said book immediately after publication thereof and there shall be recorded with such ordinance proof of publication of same in accordance with this Charter and the law, which shall constitute evidence of such publication.

### Section 19. Investigations by commission.

The commission may investigate the financial transactions of any office or department of the city government, and the acts and conduct of any official or employee. In conducting such investigation, the commission may compel the attendance of witnesses, the production of books and papers, and other evidence, and for that purpose may issue subpoenas or attachments which shall be signed by the mayor; which may be served and executed by any officer authorized by law to serve subpoenas or other process, or any peace officer of the city. If any witness shall refuse to appear or to testify to any facts within his knowledge, or to produce any papers, or books in his possession, or under his control, relating to the matter under investigation before the commission, the commission shall have the power to cause the witness to be punished for contempt, not exceeding a fine of one hundred dollars ($100.00) and three days in the city prison. No witness shall be excused from testifying, touching his knowledge of the matter under investigation in any inquiry, but such testimony shall not be used against him in any criminal prosecution except for perjury committed upon such inquiry.

### Section 20. City manager; his responsibilities and powers of appointment and removal; removal of officers and employees; and non-interference with appointments and removals.

The commission shall apppoint an officer whose title shall be city manager, and he shall be the chief executive officer and head of the administrative branch of the city government. The city manager shall be chosen by the commission solely on the basis of his executive and administrative qualifications

with special reference to his actual experience in or his knowledge of accepted practices in respect to his duties of the office as hereinafter outlined. At the time of his appointment he need not be a resident of the city or state, but during his tenure of office he shall reside within the city. No person elected to membership on the city commission shall, subsequent to such election, be eligible for appointment as city manager until one year has elapsed following the expiration of the term for which he was elected. The city manager shall be appointed for an indefinite term, but he may be removed by a majority vote of the members of the city commission on thirty days prior notice of their intention to remove him. The action of the city commission in removing the manager shall be final. In case of the absence of the manager, he may, with the approval of the city commission, designate a qualified administrative officer of the city to perform his duties during his absence, and absence shall include temporary disability on account of sickness, or otherwise.

The city manager shall be responsible to the city commission for the proper administration of all affairs of the city in his charge and to that end, except as otherwise provided in this Charter, and, subject to any provisions herein with reference to civil service, he shall have the power to appoint and remove all officers and employees in the administrative service of the city, except the city attorney, who shall be appointed by the city commission but the manager may authorize the head of a department or office, responsible to him to appoint and remove subordinates in such department or office. Appointments made by or under the authority of the city manager shall be on a basis of executive and administrative ability and of the training and experience of such employees in the work which they are to perform; all such appointments shall be without definite term.

Any officer or employee to whom the city manager, or the head of a department or office, may appoint a successor, may be removed by the city manager, or other appointing officer, at any time, but the decision and action of the manager with reference to appointments, as well as removals, shall be final and there shall be no appeal therefrom to any other office, body or court whatsoever.

CH-62

JCC J87

The city commission and its members shall deal with the administrative service of the city solely through the city manager. Neither the city commission nor any of its members shall in any manner dictate the appointment or removal of any city administrative officers or employees whom the city manager or any of his subordinates are empowered to appoint, but the city commission may express its views and fully and freely discuss with the city manager anything pertaining to appointment and removal of such officers and employees. (Ord. No. 871, Prop. No. 4, 7-29-75)

**Section 21. Duties of city manager; rights of manager and other officers at commission meetings; heads of departments and divisions thereof; investigation of city manager by city commission.**

It shall be the duty of the city manager to act as chief conservator of the peace within the city; to supervise the administrative affairs of the city; to see that the ordinances of the city and laws of the state are enforced; to make such recommendations to the commission concerning the affairs of the city as may seem to him desirable; to keep the commission advised of the financial condition and needs of the city; to prepare and submit to the commission the annual budget estimate; to prepare and submit to the commission such reports as may be required by that body, and to perform such other duties as may be prescribed by this Charter.

The city manager shall be entitled to a seat in all commission meetings, but shall have no vote therein. On vote of the commission, the heads of all departments and such other officers of the city as may be designated by vote therefor, shall also be entitled to seats in the commission meeting, but shall have no vote therein. The matters coming before the commission meeting, and the heads of all departments and other officers shall be entitled to take part in all discussions of the commission relating to their respective departments and offices.

There shall be such departments as are established by this Charter and as may be established by ordinance. The city commission may change or abolish any department or office

established by ordinance, and may prescribe, distribute or discontinue the functions and duties of departments and offices so established. Additional functions and duties may be assigned by ordinance to departments and offices established by this Charter, but no function or duty assigned by this Charter to a specific department or office shall be discontinued or assigned to any other department or office by ordinance.

For each department there shall be an officer designated as the head, or director, thereof, who shall have the supervision and control thereof subject to approval by the city manager to whom such head, or director, shall be responsible and accountable. Each head, or director, shall subject to the approval of the city manager, have power to prescribe rules and regulations, not inconsistent with this Charter and the ordinances passed in pursuance thereof, for the conduct of the officers and employees of the department of which he is in charge, for the distribution and transaction of its business, and for the custody of the books, records, papers and property under its control. The work of each department shall be distributed among such divisions thereof as may be established by ordinance upon the recommendation of the manager, provided, that pending the passage of an ordinance, or ordinances, distributing the work of departments under the supervision and control of the city manager among specific divisions thereof, the city manager may establish temporary divisions.

The city commission, the city manager, or any person or committee authorized by either of them, to be compensated as provided by the city commission, shall have power to inquire into the conduct of any department, office, or officer of the city, and to make investigations as to municipal affairs, and for that purpose may subpoena witnesses, administer oaths and compel the production of books, papers and other evidence. Failure to obey such subpoena, or produce books, papers or other evidence as ordered under the provisions of this paragraph, shall constitute a misdemeanor and shall be punishable by a fine not to exceed $100.00 or by imprisonment not to exceed five days, or both.

Supp. No. 11

### Section 22. Contracts for services.

No contract shall ever be made which binds the city to pay for personal services to be rendered for any stated period of time, but all appointive officers and employees shall be subject to peremptory discharge as herein provided, subject, however, to the provisions for civil service herein or hereinafter made a part of this Charter.

### Section 22-A. Civil service.

The city commission, shall promptly after the adoption of this amendment, appoint a civil service commission of five members for a term of two years and until their successors have been appointed and have qualified, to be compensated as provided by ordinance, none of whom shall hold any public office, or be a candidate for any public office, none of whom shall hold any office or employment of emolument under any city, county, state or other government, or be related within the second degree by affinity or the third degree by consanguinity to any person who holds such office or employment, who shall hold office for two years, and whose duty it shall be to recommend civil service regulations to be adopted by the city commission and thereafter to be administered by said civil service commission in accordance with the provisions of said ordinances, which ordinances, when enacted and adopted, shall supersede the provisions of this Charter with reference to employment of appointive officers and employees of the City of Brownsville, but which shall not entitle any officer or employee of said city to employment except during such time as said ordinances are in effect and have not been amended or repealed. It shall, further, be their duty, at the expiration of each two years, to recommend in writing any Charter provisions they may deem to be necessary to the effective adminis-tration of civil service regulations.

### Section 23. Departments.

The commission shall create and consolidate such offices and may divide the administration of the city's affairs into such departments as they may deem advisable, and may discontinue any such office or department at their discretion.

**Section 24-A. Board of city development.**

The city commission may annually appropriate monies from the general fund of the city for the establishment and maintenance of a board of city development, chamber of commerce, or other similar organization under whatsoever name, devoted to the growth, advertisement, development, improvement and increase of the taxable values of said city.

The board of city development or other similar organization herein provided for shall consist of nine (9) members, who shall serve without compensation, to be appointed by the city commission, who shall hold office for two years from the date of their appointment by the city commission and until their successors are so appointed, provided, however, the first board appointed by the city commission shall be appointed from the present members of the board of directors of the present board of city development, who are in office at the time the city commission makes such appointment under this provision, four of whom shall be appointed for one year and five for two years, and thereafter the city commission shall appoint four one year and five the next to serve for a term of two years; and they shall be appointed from a list of persons equal to twice the number to be selected, nominated by the then existing board of city development or other similar organization, provided, however, that no officer or employee of the City of Brownsville, and no person who has announced his candidacy for any office of the City of Brownsville shall be appointed to such board of directors or continue to hold office as a member of such board of directors. All vacancies caused by death, resignation and nonattendance of more than three consecutive meetings, may be filled by the city commission for the unexpired term.

The amount of money so appropriated each year by the city commission shall be paid to the board of city development or other similar organization in twelve equal monthly installments. (Ord. No. 871, Prop. No. 5, 7-29-75)

**Section 24-B. Public library.**

The city commission may annually appropriate monies from the general fund of the city for the establishment and main-

tenance of a public library under such rules and regulations and to be managed by such library board, librarian or other officers and employees as are now or shall be, in the future, by ordinance provided. (Ord. No. 871, Prop. No. 6, 7-29-75)

## Section 24-C. Indigent orphan minors and sick or infirm persons who are indigent.

The city commission may annually appropriate monies from the general fund of the city for the care of indigent orphan minors not more than fourteen (14) years of age, and sick or infirm persons who are indigent under such rules and regulations and to be expended by such board or other officers, employees or appointees, as are now or shall be in the future, by ordinance provided. (Ord. No. 871, Prop. No. 7, 7-29-75)

## Section 25. Salaries; general.

The commission shall fix and determine the wages and salaries of all appointive officers and employees of the city, and provide for the payment thereof.

## Section 26. Payment of claims.

No voucher or check for the payment of any claim shall be issued by the city, unless such claim shall be evidenced by a itemized account sworn to by the claimant, approved by the city manager and audited and allowed by the commission at a regular meeting, and all vouchers or checks shall be signed by the city manager and countersigned by the party acting as auditor.

## Section 27. Accounting procedures.

An accounting procedure shall be devised and maintained for the city adequate to record in detail all transactions affecting the acquisition, custodianship and disposition of values, including cash receipts, credit transactions and disbursements; and the recorded facts shall be presented periodically to officials and to the public in such summaries and analytical schedules in detailed support thereof as shall be necessary to

show the full effect of such transactions for each fiscal year,
upon the finances of the city and in relation to each depart-
ment of the city government, including distinct summaries and
schedules for each public utility owned and operated.

## Section 28. Audit and examination.

The city commission shall cause a complete audit of the
books of accounts of all records and transactions of the ad-
ministration of the affairs of the city to be made at least once
every two years and as often as the commission may deem it
necessary; an audit, however, must be made not more than
six months nor less than two months before each regular city
election for officers, and shall be made by a certified public
accountant. The duty of the certified public accountant shall
include the certification of all statements required in section
27 of this Charter; such statements shall include a general
balance sheet showing summaries of income and expenditures,
and also comparisons, in proper classifications, with the
last previous audit; such summaries shall be published in some
newspaper published in Brownsville, one time, within ten
(10) days after the completion of such audit.

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 153 of 171

## Section 29. Contracts.

All contracts for public printing, public improvements, public work and the purchase of supplies for use in any department of the city, exceeding an expenditure of one thousand dollars ($1,000.00) shall be let on sealed competitive bids after ten days advertising in some newspaper published in the city, but the commission may permit or require proposals to be filed for doing of such work, or furnishing said materials upon alternative or different plans and methods, or for different materials or upon proposals and specifications of different characters adopted by the city, or submitted by bidders with their bids, and may select and adopt such bids and let the work to or purchase the supplies in question from the bidder whose bid is in the opinion of the commission most advantageous to the city.

Provided, that in case of public calamity, where it is necessary to act at once to appropriate money to relieve the necessities of the citizens, or to preserve the property of the city, or when it is necessary to preserve or protect the health of the citizens, or in case of unforeseen damage to public property, machinery or equipment, this provision shall not apply; and provided, further, that it shall not apply to contracts for personal or professional services.

## Section 30. Nepotism.

No person related within the second degree by affinity, or within the third degree by consanguinity, to the mayor or any of the commissioners, shall be appointed by the city commission, nor a person thus related to the city manager shall ever be appointed by him to any office, position, clerkship or service of the city.

## Section 31. Hours of labor upon public works.

Eight (8) hours shall constitute a day's work for all laborers, workmen or mechanics, who may be employed by or on behalf of the city, in any one calendar day, where such employment, contract or work is for the purpose of construc-

000094

tion, repairing or improving buildings, bridges, streets, avenues, alleys, highways or other public improvements of a similar character, requiring the services of laborers, workmen or mechanics.

## Section 32. Official bonds.

The city manager and the person or persons exercising the duties of the city treasurer and city tax collector, shall give official bonds in such sums as may be prescribed by the commission from time to time. Such bonds shall be payable to the City of Brownsville, and shall in each instance be conditioned for the faithful discharge of the duties of such respective offices and for the faithful accounting for all moneys, credits and things of value coming into the hands of such respective officers. Such bonds shall be procured from some regularly accredited surety company authorized to do business under the laws of the State of Texas.

The city manager shall have the right to acquire official bonds from other appointive officers of the city in such amounts and conditions as he may deem best for the efficiency of the public service.

All official bonds shall be approved by the commission and filed and recorded with the person exercising the duties of city clerk, and all premiums on such bonds shall be paid by the City of Brownsville.

## Section 33. Oath of office.

Every officer of the city shall, before entering upon the duties of his office, take and subscribe to the oath prescribed by the Constitution of the State of Texas for county officials.

## ARTICLE VI. UTILITIES BOARD

## Section 1. Management.

(a) There is hereby created and established as a separate and distinct agency of the City of Brownsville, Texas, a board to be known as the "Public Utilities Board of the City of

CH-70

Brownsville, Texas". Said board is hereinafter referred to as the "utilities board", or, more simply, the "board". Except as otherwise provided in this article, the utilities board shall have absolute and complete authority and power with reference to the control, management and operation of the power and light, water and sewage systems owned by the City of Brownsville, Texas, and the expenditure and application of the revenues of the systems, subject to the provisions contained herein, all of which shall be binding upon and shall govern the utilities board.

(b) In connection with the management and operation of the various systems, and the expenditures and application of the revenues therefrom, the utilities board shall be vested with all of the powers of the city with respect thereto, except the fixing of rates, fees and charges for such services, except that no charge shall be made for any utilities furnished or used for city purposes, and shall have full power and authority to make rules and regulations governing the furnishing of electricity, water and sewage service to customers, within and without the city, and for the payment of the same, and for the discontinuance of such service upon the failure of customers to pay therefor, and to the extent authorized by law shall have full power and authority with reference to the making of extensions, improvements and additions to the systems, and the acquiring, by purchase or otherwise, of properties of every kind in connection therewith, but the board shall not have the power to encumber, sell or hypothecate the utilities system; provided that when deemed essential to the operation of the utilities system the city commission shall be authorized to enter into a contract for such period of time, with such renewal and extension privileges as may be prescribed therein, with any person, firm or corporation under the terms of which such supplier will make or hold available for delivery to and use by the system all or a part of the electrical power and energy to be used in or for the distribution system of the city. Such contract shall be payable solely out of the system revenues as an operating expense of the utilities system and rates and charges for services rendered by the system shall be fixed and maintained in an amount sufficient to

000096

pay all maintenance and operation expenses of the system and
provide for the payment of principal of and interest on any
revenue bonds of the city payable from the revenues of the
utilities system. No such contract shall be made when the
sum contracted to be paid annually is in such amount as will
reduce "net revenues" of the system, as defined in Article IV,
section 5(d) of this Charter, to a sum less than 150% of the
aggregate average annual requirements for payment of princi-
pal of and interest on all outstanding revenue bonds payable
from the revenues of the utilities system, based upon such
"net revenues" for the fiscal year next preceding the making
of such contract.

(c) The board shall be composed of six members. The
mayor of the City of Brownsville shall ex officio be one of the
members of the board. The remaining members of the board
shall be appointed by a majority of all five city commissioners
of the City of Brownsville to serve the following terms of
office: One of such members to serve a term ending two years
from the date of the adoption of this amendment to the
Charter of the City of Brownsville; two to serve a term ending
three years from said date of adoption; and two to serve a
term ending four years from said date of adoption. All vacan-
cies in membership on the board, other than the mayor
whether occasioned by failure or refusal of any person named
to said board to accept appointment, or by expiration of the
term of office, or otherwise, shall be filled by the majority
vote of all five city commissioners of the City of Brownsville.
No person who is related within the second degree of consan-
guinity or affinity to any member of the city commission
shall be eligible to membership on the board. The term of
office of each member appointed to the board after the initial
terms above named, shall be four years. A person who has
served as a member of the board either for an initial term as
above specified, or for the four year term thereafter provided,
shall be eligible to be re-appointed for one additional four
year term, and one only. A member who is appointed to the
board to serve out an unexpired portion of a retired member's
term shall not be considered to have served a "term" unless
the unexpired portion of the term so served is two years or
more.

CH-72

(d) No person who is not a resident of the City of Browns-
ville, Texas, and an owner of real property therein, shall be
appointed to the board, and permanent removal of residence
from the city, by any member of the board, shall vacate his
office as a member thereof. No person shall be named a mem-
ber of the board who is in default in the payment of any valid
indebtedness or obligation due the city. Any member of the
board, other than the mayor, who shall be continuously absent
from all meetings held by the board, for a period of four
consecutive months, shall, unless he shall have been granted
leave of absence by the unanimous vote of the remaining
members of the board, be considered to have vacated his
office as a member thereof.

(e) A recall election shall be called by the city commission
to vote on the removal of not more than one member of the
board, other than the mayor, at any one election, upon submis-
sion of a petition or petitions requesting said recall, signed, in
the aggregate, by at least thirty-three (33) per cent of the
qualified electors of the city who own real property therein,
and provided further that said petition shall contain at least
900 such signatures and be accompanied by an affidavit signed
by one or more of said qualified electors stating their rea-
sons why the removal of such member of the board is being
sought. If a majority of the qualified voters of the city voting
in said election favor the removal of such member, the vacancy
created by the election shall be filled in accordance with
the other provisions of this section. No such recall petition
shall be accepted until after the member sought to be recalled
shall have served in office for at least one year. No such
election shall be held oftener than once in any twelve months
period. No member thus recalled shall be eligible for reappoint-
ment.

(f) The board shall elect one of its members as chairman,
and one as vice-chairman, and shall appoint a secretary and
treasurer, or a secretary-treasurer, who may, but need not be,
a member or members of the board. The board may adopt
such rules for the orderly handling of its affairs as it may see
fit, and may manage and conduct the affairs of the systems

with the same freedom and in the same manner ordinarily employed by the board of directors of private corporations operating properties of a similar nature.

(g) The board shall appoint and employ all officers and employees which it may deem desirable, including a general manager of the system and an attorney or attorneys. No officer or employee of the board may be employed who shall be related within the second degree of consanguinity or affinity to any member of the board.

(h) The board shall obtain and keep continuously in force, a fidelity and idemnity bond of the so-called "blanket" type, covering both members of the board and any employees who are charged with the handling of any funds of the board, written by a solvent and recognized idemnity company and covering such members, officers and employees in an amount of not less than one hundred thousand dollars ($100,-000.00).

(i) The members of the board shall receive no compensation.

(j) The members of the board shall not be personally liable, either individually or collectively, for any act or omission not wilfully fraudulent or in bad faith.

## Section 2. Accounts and records.

(a) The board shall keep full and proper books and records of accounts in which full, true and proper entries will be made of all business dealings and affairs of the board which in any way affect or pertain to the operation of the utilities systems of the city, and shall furnish to the city commission and to any bondholder or underwriter of utility revenue bonds of the city or revenue bonds of any agency created to assist the city in financing any utility improvements, that may request such statement, at least once each six months, and at such other times as the city commission may reasonably request, statements in reasonable detail showing the earnings and expenses of the various utilities systems, including bond retirement and

Case 1:01-cv-00064   Document 40   Filed in TXSD on 01/10/2002   Page 159 of 171

service expenses, and the application of funds in the plant fund as herein established, for the preceding six months' period. Said board shall also furnish to the city commission, from time to time, such other data as to the plants, systems, property and equipment operated by it as the city commission shall reasonably request.

(b) As soon after the close of each fiscal year as may reasonably be done, said board will furnish to the city commission and to all revenue bondholders or underwriters as provided in (a) above, who may so request, full audits and reports covering the operations of the various systems for the preceding fiscal year, and showing the earnings and expenses of the properties and the disposition made of all revenues for said fiscal year, in such detail as the city commission may request, the assets, liabilities and financial condition of the various systems at the close of such fiscal year. Such audits and reports shall be made available for examination at the city hall by any interested citizen. If any such audit discloses any discrepancies or misapplication of funds, the board shall be charged with the duty of rectifying such misapplication as far as possible and of remedying any deficiences of payments hereunder from the first funds available for such purpose.

(c) The board shall, upon request of the city commission, permit said commission at all reasonable times, by their agents, engineers, accountants and attorneys, to examine and inspect the plants, property, books of account, records, reports and other data relating to the utilities systems, and to make copies and extracts therefrom, and will afford a reasonable opportunity to make any such examination and inspection, and will furnish any and all such other information as it may reasonably request.

(d) The board shall, so far as practicable and to the extent consistent with the provisions of this article, keep its books and records in accordance with the standards promulgated for municipal utilities by the National Committee on Governmental Accounting.

CH-75

## Section 3. Application of revenues.

(a) The board herein established shall administer the revenues and funds of the several utility systems, carry out, perform and respect each and every covenant and agreement heretofore provided, made and entered into in any contract relating to the utility systems and in any ordinance passed or hereafter passed authorizing the issuance of any bonds payable wholly or in part from any secured by a pledge of the revenues derived and to be derived from the operation of said utilities.

(b) Funds under the control of the board shall be kept in the depository bank selected by it in accordance with the provisions of law relating to the selection of an official depository for the city. Board funds shall be paid out by said depository bank upon checks or vouchers signed by the chairman or vice-chairman of the board and countersigned by the secretary, secretary-treasurer, or such other person or persons as shall have been duly designated by the board in his stead.

(c) "Surplus funds" as used herein shall mean the money or income remaining in the plant fund at the close of each fiscal year after the requirements of section 6, article IV of the Charter have been met and after all payments have been fully and timely made into the several funds created by the ordinances authorizing revenue bonds at any time outstanding payable from and secured by a pledge of the net revenues of the utilities systems. Surplus funds in the plant fund at the close of each fiscal year, after retaining in the plant fund an amount deemed by the board to be sufficient to pay necessary operation and maintenance expenses of the systems for the next succeeding sixty days, shall be transferred as follows:

(1) To the general fund of the city the sum of $400,000, to the extent available, or an amount equal to 50% of the surplus funds, whichever is the greater, provided the payment of such minimum sum shall not be cumulative. The board may estimate at the beginning of each fiscal year the amount thus contemplated to be paid at the close of the fiscal year and to the extent funds may

be available for such purpose shall make such payment in substantially twelve equal monthly installments. Appropriate adjustments shall be made at the close of each fiscal year to the end that the general fund of the city shall receive annually the amount of money herein provided to be paid into said fund, but only to the extent of the surplus funds available in such year for such purpose.

(2) Next, to a fund to be established by the board, designated "Improvement and Debt Retirement Fund", the balance of the money remaining in the plant fund. Such fund shall be used for the following purposes in order:

First, the making of repairs and replacements which ordinarily under standard accounting practices would not be considered a maintenance expense;

Second, improvements, additions and extensions to the system;

Third, retiring by calling or purchasing any such bonds prior to scheduled maturity dates;

Fourth, to supplement debt service funds for bonds outstanding payable wholly or in part from the net revenues of the system; and

Fifth, any funds then remaining, and which in the discretion of such board are not needed for any of the foregoing purposes, may in the discretion of the board be transferred to the general fund of the city.

**Section 4. Miscellaneous.**

(a) The board shall have full power and authority to furnish utilities service to territory outside the corporate limits of the City of Brownsville, if to do so does not impair its ability to furnish adequate service to the inhabitants of the city. Such service shall be provided on such terms and conditions as the board shall decide. It shall also have full power

and authority to make necessary contracts for the purchase of fuel, power, and water supplies and any person, firm, corporation or association having or holding a proper contract or franchise granted by the governing body of this city may own, construct, operate, reconstruct and maintain within the corporate limits of this city as the same now exist or may hereafter from time to time be extended a plant or plants, stations or substations, and all transmission lines, power lines, pipe lines, their appurtenances and accessories necessary or convenient in the production and transmission of power, water, gas or other utility for sale to the City of Brownsville or for sale, use or consumption outside the corporate limits of this city, as the same now exist or may hereafter from time to time be extended.

(b) The board periodically shall review the rates, fees and charges for services rendered by the utilities system, with due consideration being accorded to the terms, covenants and conditions contained in any contract of the city or the board relating to the utilities system or ordinance authorizing the issuance of any utility system revenue bonds, and in the event such review reflects a necessity for the adjustment, either by an increase or a reduction of such rates, fees and charges, then the board shall submit to the city commission a report of the review and the basis upon which the proposed adjustment is predicated, accompanied by a written request for approval and adoption of the rates, fees and charges recommended by the board. If the city commission approves the adjustment thus recommended it shall pass an appropriate ordinance placing such rates, fees and charges in effect.

(c) Members of the initial utilities board shall be appointed by the city commission immediately following the effective date of this amendment, and they shall qualify immediately after such appointment and take over and assume control of all assets now belonging to the city as part of its various utilities systems, including physical properties, monies on hand, debts to and by the city with regard to the various utilities systems, and all outstanding contracts with regard to such systems.

CH-78

(d) The board shall hold a regular meeting at least once each month on such day as the board may select; the selection of such day for regular meetings shall be by resolution of the board, and the substance of all such resolutions shall be published in two consecutive issues of a local newspaper of general circulation in this community. Special meetings may be called at any time by the chairman of the board or by any two of the other members thereof. Action by the board shall be by majority vote, except where otherwise specifically provided. All regular meetings of the board shall be open to the public and final action on any matter shall be taken by the board only at meetings open to the public.

(e) No provision in this article VI shall be construed so as to impair any present obligation of the City of Brownsville as now evidenced by outstanding bonds heretofore issued by said city, or any contract with regard to the various bonds and/or utilities systems which is now outstanding and binding upon the city. Any provision hereof which may be contrary to the general laws of the State of Texas shall be inoperative, but the invalidity of any section or part hereof shall not affect the remainder of this article. If any provision of this article is in conflict with the provisions of any other article in the City Charter, the provisions hereof shall prevail.

## [ARTICLE VII.] GENERAL PROVISIONS

### Section 1. [Construction of charter.]

The enumeration of powers made in this Charter shall never be construed to preclude, by implication or otherwise, the city from exercising the powers incident to the enjoyment of local self-government, nor to do any and all things not inhibited by the Constitution and Laws of the State of Texas.

### Section 2. Ratification of ordinances.

All ordinances and resolutions in force at the time of the taking effect of this Charter or any amendment thereto, not inconsistent with its provisions, shall continue in force until amended or repealed.

CH-79

**Section 3. Amendments to charter.**

This Charter, after its adoption, may be amended in accordance with the provisions of an Act of the Thirty-Third Legislature of the State of Texas, entitled "An Act Authorizing Cities Having More Than 5,000 Inhabitants, by a Majority Vote of the Qualified Voters of said City, at an Election Held for that Purpose, to Adopt and Amend Their Charter, Etc.," approved April 7th, 1913, and any Acts amendatory thereof.

**Section 4. Vote on proposed charter, manner, etc.**

This Charter shall be submitted to the qualified voters of the City of Brownsville for adoption or rejection, on the second Tuesday in December, A. D. 1915, at which election, if a majority of the qualified voters voting in such election shall vote in favor of the adoption of this Charter, then it shall become the Charter of the City of Brownsville, until amended or repealed.

The present city council of Brownsville shall call such election and the same shall be conducted and returns made, and results declared as provided by the laws of the State of Texas governing municipal elections, and in case a majority of the votes cast at such election shall be in favor of the adoption of such Charter, then an official order shall be entered upon the records of said city, by the city council of Brownsville, declaring the same adopted, and the city secretary shall record, at length, upon the records of the city, in a separate book to be kept in his office for such purpose, such Charter so adopted, and such secretary shall furnish to the mayor a copy of such Charter, which copy of the Charter shall be forwarded by the mayor of the City of Brownsville to the secretary of state, and shall show the approval of such Charter by a majority vote of the qualified voters of the City of Brownsville at such election.

**Section 5. Election of mayor and commissioners.**

The present city council of Brownsville shall call an election to be held upon the same date as the election for the adoption of the Charter, for the election of a mayor and four commis-

CH-80

sioners, and if such election shall not result in the choice of a mayor and four commissioners, each by a majority vote of the city at large then the present city council shall call a special election, as provided for in this Charter, for the election of such officers failing to receive a majority vote, which election shall be held on the fifth Friday in December, A. D. 1915, being the 31st day of December, A. D. 1915, which election or elections shall be held under the direction of the city council, according to the laws of the State of Texas regulating municipal elections.

### Section 6. [Commissioner's oath.]

Within five days after the election of all the commissioners they shall each take the oath of office and qualify as such mayor and commissioners, and shall hold their respective offices until the second Tuesday in December, A. D. 1917, and until their successors are elected and qualified, unless sooner removed under the provisions of this Charter.

### Section 7. [New governing body.]

Upon their qualification, such mayor and commissioners shall be and constitute the governing body and authority of the City of Brownsville and shall thereafter administer its affairs agreeable to the provisions of this Charter; provided that the present city secretary, city treasurer, city assessor and collector, city attorney and city marshal shall hold and retain their respective offices, if they so desire, and enjoy the emoluments thereof, as now provided, until the first Tuesday in April, A. D. 1918.

### Section 8. Saving clause.

If any article, section, subdivision, subsection, paragraph, clause, sentence, phrase, word or words or provision of this Charter shall be adjudged invalid or held to be unconstitutional by any court of competent jurisdiction, such judgment shall not impair, affect or invalidate the remainder of this Charter or any other part or provision hereof which shall remain in full force and effect thereafter.

CH-81

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **RENE REYNA, JR.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **MISC ACTION NO. B-0017** |
| | § | |
| **CITY OF BROWNSVILLE POLICE** | § | |
| **DEPARTMENT and RAFAEL** | § | |
| **MOLINA,** | § | |
| **Defendants.** | § | |

## PLAINTIFF'S ANSWERS TO INTERROGATORIES

**TO:   CITY OF BROWNSVILLE POLICE DEPARTMENT and RAFAEL MOLINA, defendants, attorney of record:**

GEORGE C. KRAEHE
WILLETTE & GUERRA, L.L.P.
3505 Boca Chica Blvd.
Brownsville, TX 78521

COMES NOW, Plaintiff in the above-styled and numbered cause, and pursuant to the provisions of the Texas Rules of Civil Procedure, makes the following responses to Interrogatories and Request for Production.

Respectfully submitted,

HINOJOSA & POWELL, P.C.

BY:＿＿＿＿＿＿＿＿＿＿＿＿＿＿
GEORGE P. POWELL
Attorney at Law
State Bar No. 16196000

*REYNA, RENE/ANS TO INT & RQ PRD/1*

000001

DEFENDANT'S
EXHIBIT
G

612 Nolana, Suite 410
McAllen, TX 78504
(956) 686-2413
(956) 686-8462

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been mailed, certified mail, return receipt requested, and/or telecopied to the opposing counsel of record on this 12th day of July 2001.

GEORGE C. KRAEHE
WILLETTE & GUERRA, L.L.P.
3505 Boca Chica Blvd.
Brownsville, TX 78521

_____
GEORGE P. POWELL

*REYNA, RENE/ANS TO INT & RQ PRD/2*

000042

bleeding wouldn't stop.  It was close to quitting time (3:30 p.m.) When this occurred, so I was in the emergency room until about 4:30 p.m.

INTERROGATORY NO. 17:
Please describe in detail all information and statements you have obtained and materials in your possession or which you have accessed which show or trend to show that defendants deprived your right to be free from unnecessary force, brutality, and injury at the time of the incident made the basis of this lawsuit.  Please include the name, title, address, and telephone number of all persons from whom you have gained any statement, information, or materials responsive to this interrogatory.

ANSWER:
See enclosed affidavit of Jose Armando Gonzalez.

INTERROGATORY NO. 18:
Please describe in detail all information and statements you have obtained and materials in your possession or which you have accessed which show or tend to show that defendants have a policy, custom, or practice of depriving persons of their right to be free from unnecessary force, brutality, and injury.  Please include the name, title, address and telephone number of all persons from whom you have gained any statement, information, or materials responsive to this interrogatory and a detailed description of the policy, custom, or practice of defendant City of Brownsville that you allege caused the injuries of which you complain.

ANSWER:
None other than affidavit of Joe Armando Gonzalez.

INTERROGATORY NO. 19:
Please describe in detail all motorized vehicles or tangible personal or real property alleged negligent use of which by an employee of defendant City of Brownsville caused the damages of which you complain.

ANSWER:
Gun

INTERROGATORY NO. 20:
Please describe in detail all information and statements you have obtained and materials in your possession or which you have accessed which show or tend to show that defendants have a policy, custom, or practice of depriving persons of their right to life, liberty, or property without due process of law as secured by the Fourth and Fourteenth Amendments to the Constitution of the United States.  Please include the name, title, address, and

*REYNA, RENE/ANS TO INT & RQ PRD/10*

# RESPONSES TO REQUEST FOR PRODUCTION

REQUEST FOR PRODUCTION NO. 1:
Please produce all statements, invoices, receipts, canceled checks, medical records, notes, or memoranda which evidence the medical, psychiatric, psychological, or nursing expense or condition which you claim to have incurred as a result of the subject incident.

RESPONSE:
Records have been requested. Will supplement upon receipt.

REQUEST FOR PRODUCTION NO. 2:
Produce all documentation substantiating any claim for damages, other than medical, as a result of the incident and/or incidents made the basis of this lawsuit.

RESPONSE:
None.

REQUEST FOR PRODUCTION NO. 3:
Please produce copies of any and all statements, written and/or recorded, from any witness about the incident made the basis of this lawsuit that you will seek to make known to the trier of fact in this matter.

RESPONSE:
See enclosed affidavit from Jose Armando Gonzalez.

REQUEST FOR PRODUCTION NO. 4:
Please produce each photograph, movie, videotape, sound recording or similar recorded material which in any manner whatsoever depicts the location or circumstances surrounding the incident which is the subject of this lawsuit that you will seek to introduce as evidence at the time of the trial of this matter. This request includes, but is not limited to, any item depicting the injury complained of and made the basis of this lawsuit. In the event photocopies of photographs are produced, please state whether the original photographs are in color or black and white.

RESPONSE:
See enclosed photographs.

REQUEST FOR PRODUCTION NO. 5:
Please produce all documents, including all tangible reports, physical models, compilations of data, calculations, tests, factual custody or control which have been prepared by or for any

*REYNA, RENE/ANS TO INT & RQ PRD/12*

෴ 000004

THE STATE OF TEXAS                    §
                                      §
                                      §
COUNTY OF CAMERON                     §

## AFFIDAVIT

My name is Jose Armando Gonzalez. I live at Rt. 1 Box 91 in Los Fresnos, Texas. My phone number is (956) 233-1578. I am 22 years old and am competent to make this affidavit.

I would like to state that on or about June 23, 1998, at about 6:30 p.m., I was with Rene Reyna when he was shot by a Brownsville Police officer. I want to state that on that day the Brownsville Police was trying to stop the vehicle Rene Reyna was driving. When Rene finally stopped the vehicle we were in, he exited the vehicle with his hands up. All of a sudden a police officer shot him for no reason at all. I remember hearing about three shots and Rene stating while on the ground in Spanish that he was going to die. (Me voy a morir, me voy a morir)

_Jose A. Gonzalez_
Jose Armando Gonzalez

Sworn and subscribed to me this the 28th day July, 1998.

_Notary signature_
Notary Public in and for
The State of Texas

000005



## CAMERON COUNTY DISTRICT ATTORNEY
CAMERON COUNTY COURTHOUSE
974 E. HARRISON STREET · BROWNSVILLE, TEXAS 78520

**Yolanda de León**
County (Criminal District) Attorney

August 13, 1998

Chief Ben Reyna
Brownsville Police Department
600 Jackson Street
Brownsville, Texas 78520

Re:     Officer Rafael Molina

Dear Chief Reyna:

      Yesterday we presented to the Grand Jury the June 23, 1998 incident in which Officer Rafael Molina discharged his weapon shooting an auto theft suspect named Rene Reyna Jr.. The Grand Jury correctly determined that Officer Molina's actions were legally justified and that no action should be taken.  The Grand Jury indicted Mr. Reyna for two counts of Aggravated Assault and one count of Auto Theft.  We will retain the submitted file for the prosecution of Mr. Reyna.

      If you have any further questions please do not hesitate to call me.  Thank you very much for your kind assistance with this matter.

Yours truly,



Yolanda de León
County (Criminal District) Attorney

YDL:bs



RECEIVED
JUN 14 1998
OFFICE OF THE
CHIEF OF POLICE

DEFENDANT'S
EXHIBIT
H

Brownsville: (210) 544-0849          Fax  (210) 544-0869          Harlingen  (210) 425-6043