IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 0 1 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| RENE REYNA, JR., | § | |
| Plaintiff, | § | |
| | § | Civil |
| vs. | § | MISC ACTION NO. B-01-64 |
| | § | |
| CITY OF BROWNSVILLE POLICE | § | |
| DEPARTMENT and RAFAEL | § | |
| MOLINA, | § | |
| Defendants. | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In considering the Summary Judgment, the Court is to view the evidence in the light most favorable to the non-movant and make all reasonable and justifiable inferences in favor of the plaintiff, the non-movant. *U. S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986).

The description of events as stated by Rene Reyna, Jr. in his deposition of July 16, 2001 (pg.54 line 16, pg. 102 line 24, see attached as Exhibit #1) are as follows:

On June 23, 1998, Rene Reyna, Jr. and acquaintances went to a car lot in Brownsville. They drove off in an automobile without paying for the automobile. The police pursued and a chase took place. Rene Reyna, Jr. was driving and he was attempting to escape from the police. A number of police cars were involved. The vehicle driven by Rene Reyna, Jr. collided with at least two (2) police cars in his attempt to escape. No police

1

were injured and as the chase became futile and the vehicle driven by Reyna was stopped, Reyna got out of the vehicle with his hands raised and he was shot by defendant Molina. Molina shot him in the arm, stomach and the leg. Reyna underwent extensive surgery and almost died. He was in the hospital for over a month (see Rene Reyna's deposition pg. 100 line 7-25, pg. 115 line 13-25, Exhibit #1). At all times, it should be made clear, Rene Reyna had surrendered, was out of his vehicle with his hands raised and facing Officer Molina at the time Officer Molina gunned him down.

Officer Molina's version is that he shot through the passenger side window of his vehicle, leaning across the car and shot from an angle approximately 45 degrees behind and to the left of Reyna. He claims that Reyna was seated in the vehicle with his hands on the wheel. It is uncontroverted that the door to the vehicle driven by Reyna was opened at the time of the shooting. Reyna was shot in the front of his left leg, (Brownsville Medical Center records, 000359, 000373 and 000378, Exhibit #2) on the inside of his left arm and according to Molina, in the left side. Molina's argument is that the shooting took place from the side, yet, from the side angle, from behind, he shot Reyna in the front of the leg and the inside of the left arm. It is uncontroverted that Molina shot Reyna from an angle starting higher than the side entry wound and at a downward angle (see deposition of defendant's expert DeMaio pg.30 line 19, pg. 31 line 4, Exhibit #3 ). It is also uncontroverted that the exit wound on the right side of Reyna is higher than the alleged entry wound. (See deposition of DeMaio pg. 32 line 16-19, Exhibit #3). The obvious implication is that if Molina shot him in the left side from a downward trajectory, the bullet would have exited lower than the

2

entry wound; instead, it came out higher. It should be understood from Reyna's deposition testimony that at the time he was shot, he had surrendered. Reyna readily admits to having stolen the vehicle, trying to escape and colliding with the police cars. His version is that he had given up at the time he was shot by an officer outside of his vehicle, in a shooting stance, with clear knowledge that he had surrendered.

Molina claims to have shot Reyna while he was seated in the drivers seat, looking forward, with both hands on the wheel. Forensics indicate three shots were fired, (see DeMaio deposition pg. 34 line 2-9, Exhibit #3) and one bullet is inside Reyna's leg (Brownsville Medical Center records 00043, Exhibit #2) and two were found in the street. (See defendants' disclosures sketch of scene, Exhibit # 4). One bullet entered Reyna's abdomen on one side and came out the other. No bullets were found in the car, which would have been the case if Molina's story was true.

It should also be noted that Molina claims to have shot Reyna on the left side of his body. The operative report indicates that Reyna was indeed shot on the right side of his body with the exit wound on the left side of his body. (See Brownsville Medical Center records 000182, Exhibit #2). The exact opposite of Molina's story and consistent with a downward trajectory angle with the right side being higher than the left. There is not a single bit of evidence in Reyna's story that would invalidate his conviction because the shooting took place after surrender and after the events to which he pled guilty.

I posit the Court with this hypothetical: a person flees the police in a high speed chase, collides with police cars, runs from the police, is captured and knocked to the ground,

handcuffed, and then severely beaten and shot. Based on the defendant's argument, the fact that he pleads guilty would absolve the police of clearly unconstitutional and reprehensible conduct. The hypothetical just presented is absolutely no different in practical application from the real events described by Rene Reyna, Jr. and supported by the evidence. Now we will proceed to the law as it really is, not as described by the defendants.

Another hypothetical: A person in a house has a gun battle with police, after shots are fired, the gunman throws out his gun, gives up and comes out with his hands in the air. Are the police entitled to shoot him? Unquestionably they are not.

In the rule set forth in ***Heck v. Humprhey***, 512 U.S. 477, 114 S. Ct. 2364 (1994) a lawsuit which seeks damages for excessive force applied during the course of an arrest which would invalidate a conviction or sentence, when that conviction has not been reversed, expunged or called into question by issuance of a writ of habeas corpus, should be dismissed. ***Heck***, 114 Sup. Ct. 2372. ***Heck*** in other words, says that if a criminal conviction arising out of the same facts stands and is fundamentally inconsistent with the unlawful behavior for which §1983 damages are sought, then 1983 damages must be dismissed. However, Heck strongly qualifies that position by stating that this argument applies ***only when the 1983 action would necessarily invalidate the conviction***. This is an important distinction as we shall see. ***Heck*** also expressly held that where plaintiff's action "even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit" Supreme Court at 2372-73 (emphasis in original). Because a successful 1983 action

4

for excessive force would not "necessarily" imply the invalidity of Reyna' conviction, **_Heck_** does not preclude Reyna from pursuing an excessive force claim. **_Heck_** 2372 (n. 7). And as stated in **_Heck_** if ..."the plaintiff's actions, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, ..." pg. 2372.

In **_Wells v. Bonner_**, 45 F3d 90, 95 (5th Cir. 1995) the Court assumed without deciding that a finding of excessive force during the plaintiff's arrest would not imply the invalidity of plaintiff's conviction. See also **_Graham v. Conner_**; 490 U.S. 386, 394, 109 Sup. Ct. 1865, 1870 (1989) where the Court held that an excessive force claim in the context of an arrest is properly characterized as a 4th Amendment claim alleging "unreasonable seizure of a person". This ruling has also been following by **_Hudson v. Hughes_**, 98 F.3d 868 (5th Cir. 1996) in which the Court recognized without disagreeing with a 9th Cir. case; which we shall discuss in a moment; but distinguishes its facts from the 9th circuit case.

In **_Rivera v. The City of Irving_**, (2000 W.L. 370668) N. D. Tex. ) (see Exhibit #5), a copy of which is attached, the Court addresses the situation very similar to the case at bar. In the cases referred to by the defendants in their motion for summary judgment, the plaintiffs allege false arrest (obviously invalidating the conviction) and excessive force. The plaintiffs were convicted of assault on a police officer resulting from fights which took place _during_ the arrest. In the case before the Court, Reyna had given up and had his hands over his head. The assault on Reyna took place after the events to which he plead guilty. In **_Rivera_** the Court held that because the excessive force allegedly took place after the arrest,

5

as with Reyna, it would not *"necessarily invalidate the conviction and should be allowed to proceed"*. In the 9th Circuit case of ***Smithart. v. Towery***, 79 F3d 951 (c.a. 9 1996) the 9th circuit considered a case identical to the one before this Court. It is also the case which was addressed in ***Hudson v. Hughes***, supra without disagreement. In ***Smithart***, the plaintiff tried to run over police officers with his vehicle. He was charged with assault with a deadly weapon and plead guilty. The weapon was Smithart's 1973 Chevrolet truck which he drove at the police officers. After Smithart, exited his vehicle he was severely beaten by the defendant. Smithart sued for false arrest and excessive force. There was no question that ***Heck*** barred Smithart's claim for false arrest "however, the Court held that Heck did not preclude Smithart's excessive force claim "referring to ***Wells v. Bonner*** supra and in fact allowed it; also referring to ***Graham v. Conner***, supra (pg. 952). The Smithart's case is identical to the case before the Court.

The following cases and other citations disagree with the defendants position and support the plaintiff:

1  Swangin v. California State Police, 168 F.3d 501, 501+ (9th Cir.(Cal.) Feb 25, 1999) (Table, text in WESTLAW, NO. 98-15458) **HN: 1,2,3**
2  Ellis v. State of Cal., 1997 WL 142798, *2+ (N.D.Cal. Mar 20, 1997) (NO. C-96-1422 EFL)  **HN: 1,2**
3  Jackson v. Suffolk County Homicide Bureau, 135 F.3d 254, 256 (2nd Cir.(N.Y.) Jan 20, 1998) (NO. 97-2296, 624)
4  Nelson v. Jashurek, 109 F.3d 142, 146 (3rd Cir.(Pa.) Mar 18, 1997) (NO. 96-3599) **HN: 3**
5  Hudson v. Hughes, 98 F.3d 868, 872+ (5th Cir.(La.) Nov 05, 1996) (NO. 95-30874) **HN: 2,3**
6  Cleveland v. King County Police, 2001 WL 1105451, *1, 19 Fed.Appx. 592, 593 (9th Cir.(Wash.) Sep 20, 2001) (Table, text in WESTLAW, NO. 00-35747) **HN:1**

7   Ove v. Gwinn, 264 F.3d 817, 823+, 1 Cal. Daily Op. Serv. 7738, 7738+, 2001
    Daily Journal D.A.R. 9579, 9579+ (9th Cir.(Cal.) Sep 04, 2001) (NO. 00-56233)
    **HN: 2,3**

8   Stanfill v. David, 246 F.3d 676, 676 (9th Cir.(Cal.) Dec 14, 2000) (Table, text in
    WESTLAW, NO. 00-15616) **HN: 3**

9   Streater v. Carella, 225 F.3d 663, 663 (9th Cir.(Cal.) Jun 05, 2000) (Table, text in
    WESTLAW, NO. 99-15953)

10  Romero v. Lopez, 208 F.3d 222, 222 (9th Cir.(Cal.) Feb 14, 2000) (Table, text in
    WESTLAW, NO. 98-55897)

11  Dobson v. Jones, 194 F.3d 1316, 1316 (9th Cir.(Mont.) Sep 16, 1999) (Table, text
    in WESTLAW, NO. 98-35630)

12  Weaver v. Gaskins, 185 F.3d 872, 872 (9th Cir.(Cal.) May 27, 1999) (Table, text
    in WESTLAW, NO. 98-15978)

13  Frost v. Galati, 182 F.3d 925, 925+ (9th Cir.(Ariz.) May 13, 1999) (Table, text in
    WESTLAW, NO. 98-15743) **HN: 3**

14  Butler v. Gammick, 173 F.3d 859, 859 (9th Cir.(Nev.) Mar 19, 1999) (Table, text
    in WESTLAW, NO. 98-16441)

15  Wright v. Williams, 162 F.3d 1171, 1171 (9th Cir.(Cal.) Oct 27, 1998) (Table, text
    in WESTLAW, NO. 94-56322) **HN: 2**

16  Cabrera v. City of Huntington Park, 159 F.3d 374, 380, 41 Fed.R.Serv.3d 1223,
    1223, 98 Cal. Daily Op. Serv. 7814, 7814, 98 Daily Journal D.A.R. 10,864, 10864
    (9th Cir.(Cal.) Oct 16, 1998) (NO. 96-55268, 96-55431) **HN: 2**

17  Housley v. U.S., 156 F.3d 1237, 1237 (9th Cir.(Nev.) Jul 28, 1998) (Table, text in
    WESTLAW, NO. 97-15831)

18  Scott v. Lassen County Sheriff Dept., 129 F.3d 127, 127 (9th Cir.(Cal.) Nov 06,
    1997) (Table, text in WESTLAW, NO. 96-16128) **HN: 2,3**

19  Jernigan v. Regan, 125 F.3d 858, 858 (9th Cir.(Cal.) Sep 24, 1997) (Table, text in
    WESTLAW, NO. 96-16267)   **HN: 1,2,3**

20  Helmet Law Defense League v. California Highway Patrol, 122 F.3d 1071, 1071
    (9th Cir.(Cal.) Sep 05, 1997) (Table, text in WESTLAW, NO. 96-16382)  **HN:1**

21  Butterfield v. Bail, 120 F.3d 1023, 1024, 97 Cal. Daily Op. Serv. 5904, 5904, 97
    Daily Journal D.A.R. 9502, 9502 (9th Cir.(Wash.) Jul 25, 1997) (NO. 95-35760)
    **HN: 1,2,3**

22  Alvarez-Machain v. U.S., 107 F.3d 696, 700, 97 Cal. Daily Op. Serv. 1109, 1109,
    97 Daily Journal D.A.R. 1721, 1721 (9th Cir.(Cal.) Sep 24, 1996) (NO. 95-55464,
    95-55768, 95-56121)   **HN: 2**

23  Martinez v. City of Alburquerque, 184 F.3d 1123, 1126+, 1999 CJ C.A.R. 3820,
    3820+ (10th Cir.(N.M.) Jun 15, 1999) (NO. 98-2235) **HN: 2**

24  Ellis v. City of Pittsburg, 2001 WL 1256441, *2 (C.D.Cal. Oct 10, 2001) (NO. C-
    98-2247-PJH)   **HN: 1**

25  Tinsley v. Nocetti, 2001 WL 761295, *1 (N.D.Cal. Jul 02, 2001) (NO. C 01-2027 MMC(PR)) **HN: 2,3**

26  Alatraqchi v. City and County of San Francisco, 2001 WL 637429, *2 (N.D.Cal. May 30, 2001) (NO. C-99-4569 PJH) **HN: 1**

27  Fitzpatrick v. Gates, 2001 WL 630534, *3+ (C.D.Cal. Apr 18, 2001) (NO. CV0004191GAFAJWX) **HN: 1,3**

28  McRae v. Marin County Sheriff Dept., 2000 WL 1482879, *1 (N.D.Cal. Oct 03, 2000) (NO. C00-2712TEH(PR)) **HN: 2**

29  Guerrero v. Gates, 110 F.Supp.2d 1287, 1291 (C.D.Cal. Aug 29, 2000) (NO. CV 00-7165 WJR(CTX)) **HN: 3**

30  Nuno v. County of San Bernardino, 58 F.Supp.2d 1127, 1139, 1999 Daily Journal D.A.R. 12,573, 12573 (C.D.Cal. Jul 28, 1999) (NO. EDCV98175RTVAPX) HN: **2,3**

31  Marquez v. Guttierez, 51 F.Supp.2d 1020, 1025+, 1999 Daily Journal D.A.R. 11,483, 11483+ (E.D.Cal. Jun 04, 1999) (NO. CIV.S-96-457 LKKGGHP) **HN:3**

32  Pugh v. City of Menlo Park, 1998 WL 667858, *1 (N.D.Cal. Sep 23, 1998) (NO. C 98-3586 TEH (PR)) **HN: 2**

33  Johnson v. Burkes, 1998 WL 525794, *1 (N.D.Cal. Aug 17, 1998) (NO. C98-2964TEH(PR)) **HN: 2**

34  Johnson v. Four Seasons Clift Hotel, 1998 WL 345379, *1 (N.D.Cal. Jun 25, 1998) (NO. C 98-2445 TEH (PR)) **HN: 2,3**

35  Hampton v. Baxter, 1998 WL 296371, *1 (N.D.Cal. Jun 01, 1998) (NO. C 98-2191 CRB (PR)) **HN: 2,3**

36  McSwain v. San Jose Police Dept., 1998 WL 46938, *1 (N.D.Cal. Jan 27, 1998) (NO. C 98-0241 TEH PR) **HN: 2**

37  Yanez v. All State Actors, 1996 WL 754091, *1 (N.D.Cal. Dec 30, 1996) (NO. C 96-4275 FMS)

38  Rosenbach v. Nordstrom, 2001 WL 199795, *3 (N.D.Ill. Feb 22, 2001) (NO. 98 C 0726) **HN: 3**

39  Bergeron v. Kitzhaber, 2001 WL 214313, *1 (D.Or. Jan 02, 2001) (NO. CIV. 99-1700-HA) **HN: 1**

40  Jordan v. Crandley, 1999 WL 718616, *3 (E.D.Pa. Sep 07, 1999) (NO. CIV. A. 99-CV-915) **HN: 3**

41  White v. Dunleavy, 1998 WL 13292, *1 (E.D.Pa. Jan 16, 1998) (NO. CIV. A. 97-3184) **HN: 2,3**

42  Jackson v. Mills, 1997 WL 701316, *2+ (E.D.Pa. Nov 07, 1997) (NO. CIV.A. 96-CV-3751) **HN: 2,3**

43  Torres v. McLaughlin, 966 F.Supp. 1353, 1368 (E.D.Pa. Jun 05, 1997) (NO. CIV. A. 96-5865) **HN:1**

44  Rivera v. City of Irving, 2000 WL 370668, *5+ (N.D.Tex. Apr 11, 2000) (NO.

CIV.A.399CV0310P) **HN: 2,3**

45  Pierce v. Mallon, 86 F.3d 1163, 1163 (9th Cir.(Cal.) May 29, 1996) (Table, text in WESTLAW, NO. 95-55454) **HN: 3**

46  Combs v. Parris, 2001 WL 1456625, *2 (N.D.Cal. Nov 14, 2001) (NO. C01-0957MMC(PR)) **HN: 3**

47  Sogbandi v. Markham, 2001 WL 1180709, *1 (N.D.Cal. Sep 28, 2001) (NO. C 00-1397 CRB(PR)) **HN: 3**

48  Anderson v. Pearman, 2001 WL 568619, *2 (N.D.Cal. May 21, 2001) (NO. C 01-0967 CRB PR) **HN:3**

49  Hernandez v. Terhume, 2000 WL 1847645, *2 (N.D.Cal. Dec 12, 2000) (NO. C 00-0848 WHA(PR)) **HN: 2**

50  Miller v. Whitney, 2000 WL 1721063, *1 (N.D.Cal. Nov 07, 2000) (NO. C00-0995CRB(PR)) **HN: 3**

51  Hill v. Alameda County Sheriff's Deputy Moore, 2000 WL 550044, *2 (N.D.Cal. Apr 28, 2000) (NO. C 98-1108 SI(PR)) **HN: 3**

52  Holmes v. Alvarado, 1999 WL 910147, *1 (N.D.Cal. Oct 18, 1999) (NO. C 99-4461 CRB(PR)) **HN: 2,3**

53  Cook v. Mata, 1999 WL 605827, *1 (N.D.Cal. Aug 04, 1999) (NO. C 98-3487 VRW(PR)) **HN: 3**

54  Singleton v. Alameda County, 1998 WL 61315, *1 (N.D.Cal. Feb 04, 1998) (NO. C 98-0305 VRW (PR)) **HN: 2,3**

55  Williams v. McGetrick, 2000 WL 33200556, *1+ (D.Or. Dec 20, 2000) (NO. CV 00-555-AS)

## THE CITY OF BROWNSVILLE

In his deposition (pg. 32 line 15-25, Exhibit #6) Molina claims that everything he did was consistent with the policies and practices of the city of Brownsville. (See Exhibit #7). He also states unequivocally that Brownsville's policy allows officers to shoot fleeing felons regardless of what the felon is doing (see deposition pg. 34 line 8-24, Exhibit #6). This is directly contrary to ***Tennessee v. Garner***, 105 S. Ct. 1694 (1985). The city of Brownsville had a cop who attempted to murder a suspect who had surrendered. Immediately following the shooting, the police department started covering up the crime of its own police officer.

This was taken on as an activity of the police department itself. The investigation of the crime was grossly inadequate and incompetent (see defendant's own experts depositions De Maio pg. 7 line 23, pg. 8 line 23, Exhibit #3 and Harold Warren pg. 10 line 17, pg. 21 line 25, Exhibit #8) also see statement of plaintiff's expert Raul Guajardo, head of the DPS forensic lab for all of South Texas. The standard and regular practice of a police department following such a scene as happened with Reyna, it to do an investigation far different than that which was done and in fact the standard practice in South Texas is to bring in Raul Guajardo and the DPS crime scene scientist to investigate. See sworn statement of Guajardo (Exhibit #9). On at least one prior occasion, the Brownsville police department brought in Guajardo to do the investigation of a police shooting of an individual in his vehicle. Guajardo was brought in to prove the police action to be correct. Guajardo worked with the same police officers involved in the investigation of the shooting of Reyna. Everything done in the prior investigation involving Guajardo was disregarded and evidence was ignored or suppressed.

Regarding issues of qualified immunity, if there are facts issues, such as different stories told by the parties to a case, the case should go to trial. Plaintiff attaches a copy of another case dealing with qualified immunity (see Exhibit #10) which was appealed by the same lawyers who represent the defendants in which they appeal a ruling by this honorable court on the issue of qualified immunity. Although it is not a published case, it sets forth the both the law and refers to the other cases that are controlling in this issue.

## MUNICIPAL LIABILITY

City of Brownsville argues that there is no evidence of a policy and practice and should meet the Monell standard.  We have previously referred the Court to portions of defendant Molina's deposition he states that all time he was acting consistent with City policy and that City policy permits police officers to shoot a fleeing felon regardless of the circumstances.  This testimony in itself is enough to defeat a motion for summary judgment.  However, we have more.  Attached are portions of the deposition of Leslie Sweet (see deposition pg. 5-14, 86-87, Exhibit #11).  Mr. Sweet is a lawyer and he also has a master degree in criminology.  He served with the Dallas police department for 27 years and for 7 years was an assistant chief of police.  Part of that time he was in charge of the patrol division which had approximately 1,900 patrol officers.  Mr. Sweet presently serves as in house counsel, or legal advisor, to the Dallas County Sheriff's department.  As Deputy Chief he participated in the formulation and writing of policy.  As legal advisor to the Sheriff's Department, he is in charge of formulating policies, advising the Sheriff's Department on all legal matters including constitutional legal matters and he is in charge of reviewing all lawsuits filed against the department.  He has stated that not only is the City's written policy inadequate but that by condoning the actions of Officer Rafael Molina, the City has accepted his opinion as its practice and policy.

The City will come back by saying that a single incident does not create a practice.  This may be true; however, a single incident can be evidence of a practice or policy.  ***Canton v. Harris***, 489 U.S. 378.  This is aside from the fact that the City ratified and condoned the

actions by taking no steps or disciplinary actions against Officer Molina. (See deposition of Leslie Sweet pg. 15-17, 25, 30-33, 52-53, 68-69, Exhibit #11).

Accordingly, there is more than enough evidence to defeat the defendants' motion for summary judgment on the issue of the City and its practice and policy.

WHEREFORE, plaintiff prays that the Court deny the defendants' motion for summary judgment.

Respectfully submitted,

HINOJOSA & POWELL, P.C.
Attorneys at Law
612 Nolana, Suite 410
McAllen, TX 78504
(956) 686-2413
(956) 686-8462

BY: _____
      GEORGE P. POWELL
      Attorney at Law
      State Bar No. 16196000

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been mailed, certified mail, return receipt requested, and/or telecopied to the opposing counsel of record on this 29th day of March, 2002.

GEORGE C. KRAEHE
WILLETTE & GUERRA, L.L.P.
3505 Boca Chica Blvd.
Brownsville, TX 78521

_____
GEORGE P. POWELL

12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **RENE REYNA, JR.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **MISC ACTION NO. B-01-64** |
| | § | |
| **CITY OF BROWNSVILLE POLICE** | § | |
| **DEPARTMENT and RAFAEL** | § | |
| **MOLINA,** | § | |
| **Defendants.** | § | |

## AFFIDAVIT IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**STATE OF TEXAS**              §

**COUNTY OF HIDALGO**         §

**BEFORE ME,** the undersigned authority, on this day personally appeared GEORGE P. POWELL, a person known to me, who after being sworn upon his oath, stated that he is the attorney of record for Plaintiff in the above-reference cause, that he attests to the truthfulness of the statements and averments of fact contained therein for which he provided the information, that he has read the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment and that all statements and averments of fact contained therein are true and correct with his personal knowledge and/or to the best of his information and belief. The affiant further states that the copies of the depositions attached as exhibits to this response are true and correct copies of the original depositions taken in this case. Further affiant sayeth not.

SIGNED on the 29nd day of March, 2002.

_____
GEORGE P. POWELL

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the 29th day of March, 2002, to certify which witness my hand and official seal.

_____
NOTARY PUBLIC, STATE OF TEXAS

JANIE MORIN
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-17-2004

# RENE REYNA'S DEPOSITION
## EXHIBIT #1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    BROWNSVILLE DIVISION

 4

 5   RENE REYNA, JR.,              )
                                   )
 6        Plaintiff,              )
                                   )
 7   VS.                           )CIVIL ACTION NO. B-00-17
                                   )
 8   CITY OF BROWNSVILLE POLICE)
     DEPARTMENT AND RAFAEL         )
 9   MOLINA,                       )
                                   )
10        Defendants.             )

11

12   ***********************************************

13                 ORAL DEPOSITION OF

14                  RENE REYNA, JR.

15                  JULY 16, 2001

16   ***********************************************

17

18              ORAL DEPOSITION of RENE REYNA, JR.,

19   taken before Dianna Martin, a court reporter and

20   notary public in and for Harris County and the

21   State of Texas, at the Ferguson Unit located at

22   12120 Savage Drive, Midway, Texas  75852, beginning

23   at 12:28 p.m. on the 16th day of July 2001,

24   pursuant to notice and the Federal Rules of Civil

25   Procedure.
```

1  before the incident?

2      A.    Well, yeah because I knew them.  They

3  were acquaintances.

4      Q.    Okay.  Not really good friends though?

5      A.    Well, not my best friends.  I don't

6  think they'd invite me to be their best man to

7  their wedding.  But if the need arose, I'd do them

8  a favor; and they'd do me a favor as well.

9      Q.    Okay.  Well, let's say you got out of

10  prison today.  I mean, would these be the kind of

11  friends you'd go and visit?

12      A.    Not the way I plan to live my life.

13      Q.    Okay.  And you don't know where Armando

14  Gonzalez is now?

15      A.    No, sir.

16      Q.    Okay.  Now, you never got home driving

17  this Lincoln Continental?

18      A.    No, sir.

19      Q.    Did you deviate from your course at any

20  given time?

21      A.    Yes, sir.

22      Q.    Okay.  When was that?

23      A.    After the police officer put his lights

24  on and started chasing me.

25      Q.    How far away from the used car lot were

1      Q.    Okay.  We're now basically sitting

2   across from the table, right?

3      A.    Yes.

4      Q.    And is that how you and Officer Molina

5   were?

6      A.    More or less.

7      Q.    Okay.  And that's when he shot you?

8      A.    That's when he shot me.

9      Q.    Do you recall which bullet hit first?

10      A.    Yes.  It hit my left arm.

11      Q.    Okay.  Which was raised above your head?

12      A.    Which was raised above my head.  So he

13   shot me.  This one grazed.

14      Q.    Okay.

15      A.    More or less it grazed.  I grabbed my

16   arm.  And then I felt another one hit me in the

17   abdomen.

18      Q.    In the abdomen.  Okay.

19      A.    Right here.

20      Q.    Okay.

21      A.    So I got out with my hands up, first one

22   grazed me, so I grabbed.  Then the second one right

23   back to back hits me.  And then that's when I feel

24   the strong hit.  Boom.  So I grab myself.  Then the

25   other one hits me in the leg right here.

1  were pretty fresh.  So it's healed up rather

2  nicely.

3      Q.    Was there an exit wound on that one?

4      A.    No.  As I said it grazed.

5      Q.    So it just kind of grazed.  It kind of

6  glanced off the side of your arm.

7      A.    (Witness nods head.)

8      Q.    Okay.  And so after the third shot hit

9  you, that's when you fell to the ground?

10      A.    The third shot was the one to the -- the

11  leg.

12      Q.    Okay.

13      A.    That's when I fell.

14      Q.    And did he stop shooting after the third

15  shot hit you?

16      A.    Did he stop shooting?  I don't think so

17  because I heard five -- five or six shots.

18      Q.    Okay.  But I mean, did you hear any

19  shots after the third shot hit you?

20      A.    After the third shot?  Yes.

21      Q.    Okay.  How many shots did you hear after

22  that?

23      A.    I really couldn't tell, but I heard

24  popping.

25      Q.    Okay.  Did you hear any shots after you

1    A.    It must have.  But then again, I think
2    it's mandatory when they shoot somebody they call.
3    Q.    Okay.
4    A.    They usually --  I guess, this is what I
5    think, they usually call for back up and call an
6    ambulance.
7    Q.    Okay.
8    A.    I've read lots of books, and I've seen
9    lots of TV.  Real cops say call back up, call the
10   ambulance.
11   Q.    But you're just guessing at that?
12   A.    I'm guessing at that.
13   Q.    Okay.  But certainly if they hadn't
14   called the ambulance and if the ambulance hadn't
15   gotten there when it did, you may have died?
16   A.    I may have died when I was in the
17   hospital either if it wasn't for the doctors.
18   Q.    Okay.
19   A.    I'm not --  I don't how true this is;
20   but the doctor told my mother I had died, medically
21   died.  They had brought me back to life --
22   Q.    Okay.
23   A.    -- after a transfusion.  I don't know
24   how correct that is if they were exaggerating or
25   not.  I pretty much felt like I was going to die.

# MEDICAL RECORDS
## EXHIBIT #2

## NEUROLOGICAL

REFER TO ___ CORD ☐

PUPILS : mm BRISK SLUG FIXED

R ☐ ☐ ☐

L ☐ ☐ ☐

● ● ● ● ● ● ● ●

2 3 4 5 6 7 8 9mm

L.O.C. :

ALERT☐ LETHARGIC☐ OBTUNDED☐ SUPERIOUS☐ COMATOSE☐
BEHAVIOR:
APPROP☐ INAPPROP☐ CONFUSED☐ AGITATED☐ COMBATIVE☐
ORIENTATION: X ___ PERSON☐ PLACE☐ TIME☐
SPEECH: CLEAR☐ SLURRED☐ INCOMPRE☐ ETT/TRACH☐
APHASIC☐ IF APHASIC: EXPRESSIVE☐ RECEPTIVE☐
MOVEMENT: RA LA RL LL
VOL. ☐ ☐ ☐ ☐
COM. ☐ ☐ ☐ ☐
STR. (0-5) ___ ___ ___ ___
OTHER: ___

## CARDIOVASCULAR    ECG ALARMS HI ___ LOW ___ ON ☐

RHYTHM: ___ ECTOPY: ___ LEAD: ___
PM: N/A☐ INT☐ EXT☐ SETTING ___
BOX # ___ TPW'S WRAPPED ☐
HEART SOUNDS: S1 ☐ S2 ☐ OTHER: ___
NAILBEDS: PINK☐ PALE☐ DUSKY ☐ CYANOTIC ☐
CAP REFILL: BRISK☐ SLUGGISH ☐
TED HOSE: N/A☐ R☐ L☐ BIL☐ KNEE HI☐ THIGH HI☐
PULSES: TEMP BRAC RAD. FEM POP DP PT
GRADE R ___
(Ø,D,P) L ___
CHEST TUBES: N/A ☐ PLEURAL: R☐ L☐ MEDIASTINAL X
SXN ___ cm DRAINAGE: SANG☐ SEROSANG☐ SEROUS☐
OTHER: ___

## SKIN

TEMP: WARM☐ DRY☐ COOL☐ DIAPHORETIC ☐
COLOR: MEMBRANES PINK☐ PALE☐ DUSKY☐ CYANOTIC ☐
JAUNDICED ☐
EDEMA: N/A☐ AMT. ___ TYPE ___ LOCATION ___
HEMATOMAS: N/A☐ LOCATION ___
OTHER: ___

### SKIN INTEGRITY ASSESSMENT - Q SHIFT
### RISK FACTORS

IF 2 OR MORE ARE PRESENT, INITIATE PREVENTION PROTOCOL

NON-MODIFIABLE
• AGE > 65
• MULTI-SYSTEM PROBLEMS
• HISTORY OF BREAKDOWN

MODIFIABLE
• IMMOBILE
• MOISTURE
• SHEAR/FRICTION
• EDEMA
• ALTERED MENTAL STATUS
  R/T MEDS OR NEUROLOGY
• MEDICATIONS ANTIBIOTICS,
  VASOACTIVE, STEROIDS
• NUTRITIONAL DEFICITS LOW ALBUMIN
  OR T. PROTEIN UNDER OR OVER
  WEIGHT NPO > 3 DAYS

## PULMONARY    ROOM AIR☐ ___ TED ☐

RATE: EVEN☐ UNEVEN☐ SLOW☐ RAPID☐ UNLABORED☐
LABORED ☐
DEPTH: SHALLOW☐ MOD. ☐ DEEP☐
SECRETIONS: ___
B.S.: CLEAR DIMINISH FINE CRACKLES COARSE CRACKLES WHEEZES
RUL ☐ ☐ ☐ ☐ ☐
RLL ☐ ☐ ☐ ☐ ☐
LUL ☐ ☐ ☐ ☐ ☐
LLL ☐ ☐ ☐ ☐ ☐
CHEST EXPANSION: EQUAL☐ OTHER: ___
ASSISTED: NC☐ ___ VM☐ ___% NRB☐ ETT☐ ___ TRACH☐ ___
VENT SETTINGS: VT ___ RATE ___ F1O2 ___ PS ___ PEEP ___
AC☐ SIMV☐ T-TUBE☐ CPAP☐ OTHER: ___ ALARMS ON☐
OTHER: ___

## GASTROINTESTINAL

ABD: SOFT☐ FIRM☐ NON-DISTD.☐ NON-TEND☐ TEND☐
BOWEL SOUNDS: RUQ. ☐ RLQ. ☐ LUQ. ☐ LLQ. ☐
PRESENT ☐
ABSENT ☐
NG TUBE: N/A☐ NARE R☐ L☐ SXN ___ cm PLACEMENT ✓☐
COLOR: ___
FEEDING TUBE: N/A☐ NARE R☐ L☐ PLACEMENT ✓☐ TYPE: ___
DIET: NPO☐ PO☐ ___ ENTERAL FEEDING ___ TPN☐
OTHER: ___

## RENAL

VOID☐ FOLEY☐ ANURIC☐ DUE TO VOID☐
COLOR: COLORLESS☐ YELLOW☐ STRAW☐ AMBER☐
PINK☐ BLOODY☐
CLARITY: CLEAR☐ CLOUDY☐ SEDIMENT☐ CLOTS☐
DIALYSIS: N/A☐ HEMO☐ PERIT.☐ CAVHD☐
AV ACCESS☐ GRAFT☐ R☐ L☐ THRILL☐ BRUIT☐
OTHER: ___

## PSYCHOSOCIAL

___

SAFETY DEVICES / RESTRAINTS Y☐ N☐ ORDER DOCUMENT☐
TYPE: ___ Call Bell Warm
REASON: ___
HEARING AID☐ GLASSES☐ DENTURES☐ JEWELRY☐ NONE☐
OTHER: ___

## DRESSING / INCISIONS / DRAINS

N/A☐ Dry + Intact

IV: R# (SITE) DRSNG D/I☐ SITE HEALTHY Y☐ N☐
___ (SITE) DRSNG D/I☐ SITE HEALTHY Y☐ N☐
___ (SITE) DRSNG D/I☐ SITE HEALTHY Y☐ N☐

378986J
EYNAJR
RODRIGUEZ RENE
5/18/79  M
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
073986

012581
RENE
000359
019
BROWNSVILLE MED CT

06/23/

### IF TISSUE NOT INTACT, INDICATE LOCATION WITH LINE & PROBLEM #

| SHIFT/INIT. | INTACT Y/N | STAGE | SIZE | ODOR Y/N | TUNNELING Y/N | COLOR | DRAINAGE Y/N | INFLAMATION Y/N |
|---|---|---|---|---|---|---|---|---|
| 7-3 / | | | | | | | | |
| 3-11 / | | | | | | | | |
| 11-7 / | | | | | | | | |

DATE: _3-28_    NUR _____

## NEUROLOGICAL    REFER TO NVS RECORD ☐

PUPILS : mm BRISK SLUG FIXED
R  2  ☑  ☐  ☐
L  2  ☑  ☐  ☐
2 3 4 5 6 7  8  9mm

L.O.C.: _____
ALERT☐ LETHARGIC☐ OBTUNDED☐ SUPERIOUS☐ COMATOSE☐

BEHAVIOR:
APPROP☐ INAPROP☐ CONFUSED☐ AGITATED☐ COMBATIVE☐
ORIENTATION: X _3_____ PERSON☑ PLACE☐ TIME☐
SPEECH: CLEAR☑ SLURRED☐ INCOMPRE☐ ETT/TRACH☐
APHASIC☐ IF APHASIC: EXPRESSIVE☐ RECEPTIVE☐
MOVEMENT:  RA  LA  RL  LL
VOL.  ☑  ☑  ☑  ☑
COM.  ☐  ☐  ☐  ☐
STR. (0-5) ____  ____  ____  ____
OTHER: _____

## CARDIOVASCULAR    ECG ALARMS HI____ LOW____ ON☐

RHYTHM: _Regular_____ ECTOPY: _____ LEAD: _____
PM: N/A☑ INT☐ EXT☐ SETTING _____
BOX # _____ TPW'S WRAPPED ☐
HEART SOUNDS: S1☑ S2☑ OTHER: _____
NAILBEDS: PINK☑ PALE☐ DUSKY☐ CYANOTIC☐
CAP REFILL: BRISK☑ SLUGGISH☐
TED HOSE: N/A☑ R☐ L☐ BIL☐ KNEE HI☐ THIGH HI☐
PULSES: TEMP  BRAC  RAD.  FEM  POP  DP  PT
GRADE R _____
(Ø,D,P) L _____
CHEST TUBES: N/A☑ PLEURAL: R☐ L☐ MEDIASTINAL X____
SXN ____ cm DRAINAGE: SANG☐ SEROSANG☐ SEROUS☐
OTHER: _____

## SKIN

TEMP: WARM☑ DRY☑ COOL☐ DIAPHORETIC☐
COLOR: MEMBRANES PINK☑ PALE☐ DUSKY☐ CYANOTIC☐
JAUNDICED☐
EDEMA: N/A☑ AMT.____ TYPE____ LOCATION _____
HEMATOMAS: N/A☑ LOCATION _____
OTHER: _____

### SKIN INTEGRITY ASSESSMENT - Q SHIFT
### RISK FACTORS

IF 2 OR MORE ARE PRESENT, INITIATE PREVENTION PROTOCOL

NON-MODIFIABLE
• AGE > 65
• MULTI-SYSTEM PROBLEMS
• HISTORY OF BREAKDOWN

MODIFIABLE
• IMMOBILE
• MOISTURE
• SHEAR/FRICTION
• EDEMA
• ALTERED MENTAL STATUS
  R/T MEDS OR NEUROLOGY
• MEDICATIONS ANTIBIOTICS,
  VASOACTIVE, STEROIDS
• NUTRITIONAL DEFICITS LOW ALBUMIN
  OR T. PROTEIN UNDER OR OVER
  WEIGHT NPO > 3    DAYS

## PULMONARY    ROOM AIR☑ ASSISTED☐

RATE: EVEN☑ UNEVEN☐ SLOW☐ RAPID☐ UNLABORED☐
LABORED☐
DEPTH: SHALLOW☐ MOD.☑ DEEP☐
SECRETIONS: _____
B.S.: CLEAR DIMINISH FINE CRACKLES COARSE CRACKLES WHEEZES
RUL  ☑  ☐  ☐  ☐  ☐
RLL  ☑  ☐  ☐  ☐  ☐
LUL  ☑  ☐  ☐  ☐  ☐
LLL  ☑  ☐  ☐  ☐  ☐
CHEST EXPANSION: EQUAL☐ OTHER: _____
ASSISTED: NC☐ VM☐ ___% NRB☐ ETT☐ ___ TRACH☐
VENT SETTINGS: VT____ RATE____ F1O2____ PS____ PEEP____
AC☐ SIMV☐ T-TUBE☐ CPA☐ OTHER: ____ ALARMS ON☐

## GASTROINTESTINAL

ABD: SOFT☑ FIRM☐ NON-DISTD☑ NON-TEND☐ TEND☐
BOWEL SOUNDS: RUQ.  RLQ.  LUQ.  LLQ.
PRESENT  ☑  ☑  ☑  ☑
ABSENT  ☐  ☐  ☐  ☐
NG TUBE: N/A☑ NARE R☐ L☐ SXN ____ cm PLACEMENT ☑
COLOR: _____
FEEDINGTUBE: N/A☑ NARE R☐ L☐ PLACEMENT ☑ TYPE:____
DIET: NPO☐ PO☑ Soft ☐ ENTERAL FEEDING ☐ ____ TPN☐
OTHER: _____

## RENAL

VOID☑ FOLEY☐ ANURIC☐ DUE TO VOID☐
COLOR: COLORLESS☐ YELLOW☑ STRAW☐ AMBER☐
PINK☐ BLOODY☐
CLARITY: CLEAR☑ CLOUDY☐ SEDIMENT☐ CLOTS☐
DIALYSIS: N/A☑ HEMO☐ PERIT☐ CAVHD☐
AV ACCESS☐ ____ GRAFT☐ R A☐ LA☐ THRILL☐ BRUIT☐
OTHER: _____

## PSYCHOSOCIAL

_acceptance g hospital_

SAFETY DEVICES / RESTRAINTS Y☐ N☐ ORDER DOCUMENT☐
TYPE: _____
REASON: _____
HEARING AID☐ GLASSES☐ DENTURES☐ JEWELRY☐ NONE☑
OTHER: _____

## DRESSING / INCISIONS / DRAINS

N/A ☐

IV: _left forearm_ ____(SITE) DRSNG D/I☑ SITE HEALTHY Y☑ N☐
____(SITE) DRSNG D/I☐ SITE HEALTHY Y☐ N☐
____(SITE) DRSNG D/I☐ SITE HEALTHY Y☐ N☐

TENET BROWNSVILLE MED CTR
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
000078986        06/23/98
000373

### IF TISSUE NOT INTACT, INDICATE LOCATION WITH LINE & PROBLEM #

| SHIFT/INIT. | INTACT Y/N | STAGE | SIZE | ODOR Y/N | TUNNELING Y/N | COLOR | DRAINAGE Y/N | INFLAMATION Y/N |
|---|---|---|---|---|---|---|---|---|
| 7-3 / | | | | | | | | |
| 3-11 / | | | | | | | | |
| 11-7 / | | | | | | | | |

## NEUROLO_____    REFER TO:_____ ___D □

**PUPILS : mm** BRISK SLUG FIXED
R ___ □ □ □
L ___ □ □ □
2 3 4 5 6 7 8 9mm
**L.O.C. :**
ALERT□ LETHARGIC□ OBTUNDED□ SUPERIOUS□ COMATOSE□
**BEHAVIOR:**
APPROP□ INAPPROP□ CONFUSED□ AGITATED□ COMBATIVE□
**ORIENTATION:** X __3__ PERSON□ PLACE□ TIME□
**SPEECH:** CLEAR□ SLURRED□ INCOMPRE□ ETT□ TRACH□
**APHASIC□ IF APHASIC:** EXPRESSIVE□ RECEPTIVE□
**MOVEMENT:** RA LA RL LL
VOL. □ □ □ □
COM. □ □ □ □
STR. (0-5) 4 3 3 3
OTHER:_____

## CARDIOVASCULAR  ECG ALARMS HI___ LOW___ ON □

**RHYTHM:** Reg        **LEAD:**_____
**ECTOPY:**_____
**PM:** N/A □ INT□ EXT□ SETTING_____
BOX #_____ TPW'S WRAPPED □
**HEART SOUNDS:** S1 □ S2 □ OTHER:_____
**NAILBEDS:** PINK□ PALE□ DUSKY□ CYANOTIC□
**CAP REFILL:** BRISK□ SLUGGISH □
**TED HOSE:** N/A□ R□ L□ BIL□ KNEE HI□ THIGH HI□
**PULSES:** TEMP  BRAC  RAD.  FEM  POP  DP  PT
GRADE R ___ ___ ___ ___ ___ ___ ___
(Ø,D,P) L ___ ___ ___ ___ ___ ___ ___
**CHEST TUBES:** N/A □ PLEURAL: R□ L□ MEDIASTINAL X
SXN___ cm DRAINAGE: SANG □ SEROSANG □ SEROUS□
OTHER:_____

## SKIN

**TEMP:** WARM □ DRY □ COOL□ DIAPHORETIC□
**COLOR:** MEMBRANES PINK□ PALE□ DUSKY□ CYANOTIC□
**JAUNDICED□**
**EDEMA:** N/A □ AMT.  Left thigh.  TYPE_____ LOCATION_____
**HEMATOMAS:** N/A □ LOCATION_____
OTHER:_____

### SKIN INTEGRITY ASSESSMENT - Q SHIFT RISK FACTORS

IF 2 OR MORE ARE PRESENT, INITIATE PREVENTION PROTOCOL

**NON-MODIFIABLE**
• AGE > 65
• MULTI-SYSTEM PROBLEMS
• HISTORY OF BREAKDOWN

**MODIFIABLE**
• IMMOBILE
• MOISTURE
• SHEAR/FRICTION
• EDEMA
• ALTERED MENTAL STATUS
  R/T MEDS OR NEUROLOGY
• MEDICATIONS ANTIBIOTICS,
  VASOACTIVE. STEROIDS
• NUTRITIONAL DEFICITS LOW ALBUMIN
  OR T. PROTEIN UNDER OR OVER
  WEIGHT NPO > 3 DAYS

## PULMONA_____  ROOM AIR □ ____TED □

**RATE:** EVEN □ UNEVEN □ SLOW □ RAPID □ UNLABORED □
LABORED □
**DEPTH:** SHALLOW □ MOD.□ DEEP □
**SECRETIONS:**_____
**B.S.:** CLEAR  DIMINISH  FINE CRACKLES  COARSE CRACKLES  WHEEZES
RUL □ □ □ □ □
RLL □ □ □ □ □
LUL □ □ □ □ □
LLL □ □ □ □ □
**CHEST EXPANSION:** EQUAL □ OTHER:_____
**ASSISTED:** NC□ ___ VM□ ___% NRB□ ETT□ ___ TRACH□
**VENT SETTINGS:** VT___ RATE___ F1O2___ PS___ PEEP___
AC□ SIMV□ T-TUBE□ CPAP□ OTHER:___ ALARMS ON□
OTHER:_____

## GASTROINTESTINAL

**ABD:** SOFT□ FIRM□ NON-DIST□ NON-TEND□ TEND□
**BOWEL SOUNDS:** RUQ.  RLQ.  LUQ.  LLQ.
PRESENT □ □ □ □
ABSENT □ □ □ □
**NG TUBE:** N/A□ NARE R□ L□ SXN___ cm PLACEMENT √□
**COLOR:**_____
**FEEDING TUBE:** N/A□ NARE R□ L□ PLACEMENT √□ TYPE:___
**DIET:** NPO □ PO □ ___ ENTERAL FEEDING □ ___ TPN □
OTHER:_____

## RENAL

___ VOID □ FOLEY□ ANURIC □ DUE TO VOID □
**COLOR:** COLORLESS □ YELLOW □ STRAW □ AMBER □
PINK□ BLOODY □
**CLARITY:** CLEAR □ CLOUDY □ SEDIMENT □ CLOTS □
**DIALYSIS:** N/A□ HEMO□ PERIT□ CAVH□
AV ACCESS□ GRAFT□ R A□ L A□ THRILL□ BRUIT□
OTHER:_____

## PSYCHOSOCIAL   Pt in good spirits

_____
SAFETY DEVICES / RESTRAINTS Y□ N□ ORDER DOCUMENT□
**TYPE:** SRT x 2 call bell in reach
**REASON:** Grand @ bedside for safety
**HEARING AID□ GLASSES□ DENTURES□ JEWELRY□ NONE□**
OTHER:_____

## DRESSING / INCISIONS / DRAINS

N/A□  wound to L arm L thigh + Incision  Abd

IV: ___ (SITE) DRSNG D/I□ SITE HEALTHY Y□ N□
___ (SITE) DRSNG D/I□ SITE HEALTHY Y□ N□
___ (SITE) DRSNG D/I□ SITE HEALTHY Y□ N□

| SHIFT/INIT. | INTACT Y/N | STAGE | SIZE | ODOR Y/N | TUNNELING Y/N | COLOR | DRAINAGE Y/N | INFLAMMATION |
|---|---|---|---|---|---|---|---|---|
| 7-3 / | | | | | | | | |
| 3-11 / | | | | | | | | |
| 11-7 / | | | | | | | | |

IF TISSUE NOT INTACT, INDICATE LOCATION WITH LINE & PROBLEM #

378861
JR
____GUEZ JUAN
05/18/79    M
____NET    019
997-2    BROWNSVILLE MED CTR
(____) -2901
012581
RENE
000378
06/23/00

BROWNSVILLE MEDICAL CENTER
RADIOLOGY REPORT

IENT NAME: REYNAJR, RENE                    ROOM: 0000    LOC: E/R
: 7722826 SSNO#: 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 MR#: 000011738 DOB: 05/18/79 AGE: 19 SEX: M
RESS: 317 WESTERN BLVD              BROWNSVILLE      TX
. DR:   LERMA RUBEN                      ADMIT DATE: 07/06/98
ER DR: LERMA RUBEN
E TO BE DONE: 07/06/98 Stat     TRANSPORT: Wheelchair OX: N IV: N
ER NUMBER: 81870259

CEDURE: FEMUR COMPLETE 2V
EASE DT/TM/ID: 07/06/98 22:03 RACH
GNOSIS: SWELLING TO LT THIGH
GING NUMBER: 147559

MENTS: LEFT FEMUR

RGES 1: 73550

RGES 2:


T FEMUR:

re is a fracture at the ischial bone demonstrated with a bullet present in
 soft tissue.


E:

hnically, the exam is poor and cannot be evaluated.  No obvious fracture.


75
 07/07/98   8:13
 07/07/98  10:53                 ANANT UTTURKAR, M.D.
  mcr  X188m28

000043

49

BROWNSVILLE MEDICAL CENTER

PATIENT:        REYNA, RENE
NUMBER:         78986
PHYSICIAN:      JUAN RODRIGUEZ, M.D.
ADM DATE:       06/23/98
ROOM NO.:       128-1
AGE:            19
SEX:            MALE

## HISTORY AND PHYSICAL EXAMINATION

I was called to the emergency room to attend this gentleman that was
brought by the ambulance after he had been shot several times. At
the time of my examination, I was unable to communicate with the
patient and was unable to know what his name was, and not until later
on when the emergency room physician identified this patient because
he had seen him in the emergency room a few days before and noticed
his suture laceration of his left hand. That way, we found out that
his name was Rene Reyna. As mentioned above, I was unable to
communicate with him as he was unable to give any history.

In my opinion, it was due to several reasons; one of them was that he
had some alcohol on him. He was positive for drugs and it appears to
me that he did not want to cooperate. However, he had a gunshot
wound to the abdomen with entrance on the right flank and exit on the
left flank. He had a gunshot wound to the left thigh with a large
hematoma in thigh itself. Had another gunshot wound in the left
forearm. X-rays were taken and failed to reveal any fractures in the
left forearm. The abdomen was unremarkable. The femur was found to
be with no fractures and apparently, the bullet was closed to the
left ischium and appeared that the bullet had hit the bone itself.

Rectal examination was negative for blood and urine was clear.
Because of these findings and because no family was available, I took
him to the operating room in order to explore and repair his
intra-abdominal injuries and to attempt to perform an arteriogram in
order to rule out the presence of any fatal injury and for
debridement of the wounds in the thigh, and forearm.

IMPRESSION:     GUNSHOT WOUNDS TO THE ABDOMEN WITH PENETRATION
                AND VISUAL INJURIES AND GUNSHOT WOUND TO THE LEFT
                THIGH WITH LARGE HEMATOMA IN LEFT FOREARM.

#9080
D:  06/23/98
T:  06/25/98
TR: nph

JUAN RODRIGUEZ, M.D.

000182

13

**DE MAIO DEPOSITION
EXHIBIT #3**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   RENE REYNA, JR.                §
                                    §
 4   VS.                            §   MISC. ACTION
                                    §   NO. B-0017
 5   CITY OF BROWNSVILLE POLICE     §
     DEPARTMENT AND RAFAEL MOLINA   §
 6
     ------------------------------------------------------
 7              ORAL AND VIDEO DEPOSITION OF

 8                   DR. VINCENT DIMAIO

 9                   JANUARY 10, 2002
     ------------------------------------------------------
10

11   APPEARANCES:

12       FOR THE PLAINTIFF:
             BY:  MR. GEORGE P. POWELL
13           HINOJOSA & POWELL, P.C.
             612 Nolana
14           Suite 410
             McAllen, Texas  78504
15
         FOR THE DEFENDANTS:
16           BY:  MR. CHARLES WILLETTE, JR.
             WILLETTE & GUERRA, L.L.P.
17           International Plaza
             3505 Boca Chica Blvd., Suite 460
18           Brownsville, Texas  78521

19           DR. VINCENT DIMAIO,
                 The Witness;
20
         ALSO PRESENT:
21           LISA RESENDEZ,
                 The Videographer; and
22
             JANENE SMITH,
23               Certified Shorthand Reporter in
                 and for the State of Texas and
24               Registered Professional Reporter

25
```

1    crime scene or crime lab report.  I think there's --

2        A.    Let me see.

3        Q.    It's in your list of items which you reviewed,

4    I think the crime lab report on the gun and ammunition?

5        A.    I requested if they had them.

6        Q.    Oh, excuse me.

7        A.    I -- This letter went out November the 8th,

8    and I said if there are any crime lab reports on the --

9        Q.    Okay.

10       A.    -- gun and ammunition you --

11       Q.    Did you ever get one?

12       A.    No.  I've been informed verbally that the

13   ammu -- Well, the records indicate that the weapon was

14   a .45 caliber Smith & Wesson automatic.

15       Q.    Correct.

16       A.    And that the ammunition is -- Well, it doesn't

17   say that, but I've been informed verbally the

18   ammunition is Federal Hydra-Shok.

19             THE REPORTER:  I'm sorry.  I didn't hear

20   that.

21             THE WITNESS:  Federal Hydra-Shok,

22   H-Y-D-R-A, dash, S-H-O-K, I believe.

23       Q.    (BY MR. POWELL)  Okay.  But did you ever get a

24   crime lab report on the bullets, the ammunition, and

25   that stuff?

1    Q.   If it, in fact, was a gunshot wound, he

2  obviously -- no one has described it accurately, and --

3    A.   They both -- Well, both --

4    Q.   Right.  And he got shot from the right side.

5  Wouldn't you agree?

6    A.   Well, if that was, then he would have to have

7  been shot once this way (indicating), and then he

8  turned this way (indicating), and then he turned back

9  that way (indicating).

10    Q.   Had to have been a lot of turning around?

11    A.   That's right.

12    Q.   Right.  Now, the -- We can't tell from the

13  photos, really, which would be an entry or an exit

14  wound, can we?

15    A.   That's correct.

16    Q.   Okay.  Now, Molina -- You'd made reference to

17  it being more or less a horizontal shot.

18    A.   Something like that, yes.

19    Q.   Molina, if his story is correct, and he is

20  shooting out his window, and Reyna is seated in the

21  vehicle, then he's going to be firing at a downward

22  angle, is he not?  Wouldn't you agree?

23    A.   Well, they're both seated in their vehicles,

24  so they're roughly about the same height.

25    Q.   Well -- Well, their seat would be about the

1  same, except that Molina says that he's shooting over

2  the window.  That means he has to be shooting higher

3  than the window.

4      A.    Right.

5      Q.    And say the door of a window would be about

6  upper chest level, and he gets shot down here

7  (indicating), that means he's being shot from an angle

8  that starts off maybe a foot and a half higher, maybe

9  2 feet higher, but, certainly, it's a foot and a half

10  higher than the wound.  And that would have been -- It

11  would have -- Wouldn't you agree that, if that's the

12  case -- we're only talking 15 feet or so difference --

13  you'd have to be shooting at a downward trajectory?

14      A.    Possibly, depending on the position of

15  Mr. Reyna.  Because, again, let's -- let's go back

16  to -- There's a number of possibilities.  Suppose he is

17  pushing the door.

18      Q.    Suppose.

19      A.    And notice what you do when you do that, or

20  you're pulling the door open, is you tend to -- to

21  balance this way (indicating), so a downward shot

22  actually becomes almost a horizontal shot.

23              Then there's, of course, if you were at

24  the wheel.  It's the same thing.  The problem is, is

25  that -- is that interpretation of these up and down is

1    only significant when it's very marked.

2        Q.   When you say "marked," what do you mean?

3        A.   I mean very significant.

4        Q.   Okay.

5        A.   It's that -- You know, when it's -- it's up

6    and down and everything -- Like, you could argue that,

7    well, this appears maybe a shade higher.  Maybe that's

8    because when they did the surgery, they tucked the

9    belly on that side a little higher.

10       Q.   Could be.

11       A.   So -- So the problem is, is that what you're

12   looking is steep angles, but minor angles --

13       Q.   Well, you would agree, though, that this -- at

14   least, the wounds as they -- as we have them do not

15   reflect a downward trajectory?

16       A.   That's correct.

17       Q.   And I would assume that anyone would have to

18   agree that the top -- that being over a window is

19   higher than the lower abdomen --

20       A.   Right.

21       Q.   -- of someone seated in a car.

22       A.   But then it doesn't go with the downward

23   trajectory of two people standing and facing each other

24   and shooting.

25       Q.   Well, one's bent over, and one's standing.

1       Q.    Why?

2       A.    -- there's only -- There's only three

3   cartridge cases.  Well, you have to have four shots:

4   one, two, three, and four and five.

5       Q.    Well, the cops all thought there was four.

6       A.    What?

7       Q.    The cops all thought there was four.

8       A.    Right.  But -- But -- But you only have

9   physical evidence for three shots.

10      Q.    Correct.

11      A.    And so if you weigh both these possibilities,

12  is it's -- it's consistent with the officer's account.

13  With the other account, you're going to have to have

14  the guy being shot here (indicating), turning this way

15  (indicating), and then being shot.  Again, the

16  trajectory of the bullet wound in the leg should also

17  be down, which it -- it isn't.  It's almost straight or

18  maybe slightly upward.

19              MR. WILLETE:  Can I just make a comment,

20  too, just for clarification?  There's been comments

21  about the -- that all the officers -- Well, the police

22  report said there's four shots.  Well, there's --

23  there's differing stories in there about whether it was

24  two or three or four.

25              MR. POWELL:  Well, okay.  I think the

# DEFENDANTS' DISCLOSURES
# EXHIBIT #4



1" = 55'

A - SIZE

BROWNSVILLE POLICE DEPAR, MENT                    CASE NUMBER 1996304633S

600 E. JACKSON STREET, BROWNSVILLE, TEXAS 78520



BILLY MITCHELL BOULEVARD

CENTRAL AVENUE

V1=RED CHEV.CAVALIER TXLP LKS26D

V2=RED TOYOTA TERCEL TXLP MTP95F

V3=GREY FORD CROWN VICTORIA TXLP SBM91R

1 = SPENT CASING "FEDERAL 45 AUTO"

2 = SPENT CASING "FEDERAL 45 AUTO"

3 = BLACK NIKE CAP.

4 = (SPLIT) BULLET JACKET

5 = LEAD BULLET CORE

6 = BULLET SLUG (METAL JACKET SPLIT)

A = DEBRIS FROM VEHICLE TURN SIGNAL

B = TIRE MARK

C = LIGHT POLE SIDESWIPED BY VEHICLE

SV = SUSPECT VEHICLE

DRAWN BY JUAN HERNANDEZ 2722 with SGT. R.D.JESSE 158

1" = 70'

A - SIZE

**RIVERA v. CITY OF IRVING**
**2000 WL 370668**
**EXHIBIT #5**

Case

**Rivera v. City of Irving**
2000 WL 370668
N.D.Tex.,2000.
April 11, 2000. (Approx. 4 pages)



Only the Westlaw citation is currently available.

MEMORANDUM OPINION AND ORDER

SOLIS, District J.

*1 Now before the Court for consideration is the Motion for Summary Judgment of Defendant City of Irving filed January 31, 2000. After considering the motion, the Plaintiff's response, and the relevant law, the Court hereby GRANTS the motion.

## I. BACKGROUND

Maria Rivera ("Rivera" or "Plaintiff") has sued the City of Irving ("City" or "Defendant"), for claims arising out of her arrest on January 29, 1997, at 1330 Rock Island, Irving, Texas 75060. First Amended Complaint ("Complaint") ¶ 8. On that date, Officer Jonathan Plunkett ("Plunkett") and Officer Keith McCain ("McCain") were on patrol for the City of Irving Police Department. While on patrol, the Officers responded to a call at Plaintiff's apartment complex to investigate suspected drug activity. Plunkett Depo., Def's App. at 41, 62; McCain Depo., Def's App. at 90-95. At approximately 11:00 p.m., the Officers arrived at the apartment complex and saw a group of about fifteen juveniles quickly disburse and run away. The Officers witnessed three or four of these juveniles run into what turned out to be Plaintiff's apartment. Plunkett Depo. at 42-43; McCain Depo. at 95. At this point, the parties' stories about the rest of the evening's events widely diverge.

The Officers testified at their depositions that they went to Plaintiff's apartment to investigate suspected drug activity and found her apartment door open. Plunkett Depo. at 44-45, McCain Depo. at 95-96. Officer McCain knocked on the doorframe and requested permission to enter and search for the juveniles who he had seen run into her apartment. Plunkett Depo. at 44-45; McCain Depo. at 95-98. The Officers contend that with Plaintiff's permission, they entered the apartment, McCain found the suspects, and ordered them outside. McCain Depo. at 98-101. While McCain was inside, Officer Plunkett returned to the doorway in order to prevent anyone else from entering the apartment. He told Vanessa, the Plaintiff's daughter, that she could not enter the apartment. Despite his order, Vanessa pushed him in the chest and tried to enter. Plunkett Depo. at 50-51. In order to control her aggressive behavior, Plunkett placed Vanessa in a restraint hold and began to place her under arrest. Plunkett Depo. at 49-50.

At this point, Plunkett claims that Rivera entered the fray. She allegedly charged out of the apartment towards him, intentionally ran into him, and pushed him in the chest. Plunkett Depo. at 49, 52-53. When Rivera charged him, Plunkett released Vanessa and pushed the Plaintiff aside, causing her to fall on the ground. Plunkett Depo. at 49, 53, 73. With the Plaintiff on the ground screaming at him, Plunkett returned his attention to restraining and arresting Vanessa Plunkett Depo. at 53-54; McCain Depo. at 102-03. Upon hearing all of the commotion, Officer McCain went outside to investigate. He thought Rivera was interfering with Officer Plunkett's discharge of his duties, so McCain picked the Plaintiff up and escorted her to the patrol car. Plunkett Depo. at 54-55; McCain Depo. at 105-07. The Officers arrested Rivera for assault and Vanessa for interfering with the duties of a Police Officer. Plunkett Depo. at 56-57, 61-62.

*2 Plaintiff relates a much more violent rendition of the night's events. First of all, she alleges that the Officer forcibly broke the door open to her apartment when no one immediately answered their knock. Complaint ¶ 8. Once inside the apartment, the Officers ordered everyone outside. Rivera asked the officers for their names and the reason that they were in the apartment. Complaint ¶ 9. Rather than answering her, one of the officers allegedly pushed Rivera's daughter to the side, while the other officer grabbed Rivera and started beating her with his nightstick. Complaint ¶ 9. The officer then threw Rivera to the ground, using the nightstick to beat her back, legs, and thighs. Complaint ¶ 10. Following the beating, he allegedly picked her up and choked her before throwing her into the police

car. Complaint ¶¶ 10-11.

Officer Plunkett maintains that his only contact with the Plaintiff was brushing or pushing her aside after she intentionally ran into him. Plunkett Depo. at 73. Officer McCain states that he never touched her except for escorting her to the patrol car. McCain Depo. at 112-13. Both of the Officers deny ever striking or hitting Plaintiff with a baton or using mace on her. The only injury McCain noticed on Plaintiff was a scratch on her ankle. McCain Depo. at 113, 118-19. Plaintiff contends that she was arrested on the "trumped up" charge of assault and denies striking, attempting to strike, or otherwise threatening the officers in any way. Complaint ¶¶ 12, 14. However, on January 29, 1997, Maria Guadalupe Rivera pled nolo contendre to assault on a public servant for which she received a fine of $532.00. Def's App. 1-2, Rivera Depo. at 11.

Rivera has sued the City under 42 U.S.C. § 1983 (1994) alleging warrantless arrest and excessive use of force in violation of the Fourteenth Amendment. Complaint ¶¶ 27-28. She also alleges causes of action under the Texas Tort Clams Act for the Officers' wrongful and negligent acts committed within the scope of their employment and for the wrongful acts of the Officers in their use of a motor-driven vehicle. Complaint ¶¶ 29-32. The City advances nine separate theories in seeking summary judgment on all of these claims; however, the Court need only address three of them. First, the City argues that the warrantless arrest and excessive use of force claims are barred by *Hudson v. Hughes,* 98 F.3d 868 (5th Cir.1996); second, that Plaintiff has failed to allege a City policy that teaches or condones excessive use of force, and third, that the state claims are barred by sovereign or governmental immunity.

## II. ANALYSIS
### A. Summary Judgment Standard

Summary Judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). All evidence and the inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). The party defending against the motion for summary judgment cannot defeat the motion unless he provides specific facts that show the case presents a genuine issue of material fact, such that a jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57 (1986).

*3 Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Anderson,* 477 U.S. at 248-50; *Abbot v. Equity Group, Inc.,* 2 F.3d 613, 619 (5th Cir.1993). In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to is case, and on which he bears the burden of proof at trial, summary judgment must be granted. *Celotex Corp.,* 477 U.S. at 322-23

Finally, the Court has no duty to search the record for triable issues. *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 403 (6th Cir.1992). The Court need only rely on the portions of the submitted documents to which the nonmoving party directs the Court. *Id.*

### B. Rivera's Warrantless Arrest and Excessive Use of Force Claims
#### 1. Analysis Under *Heck v. Humphrey* and *Hudson v. Hughes*

The City moves for summary judgment on Plaintiff's claims for warrantless arrest and excessive use of force, arguing that the claims are barred as a matter of law. In *Heck v. Humphrey,* 512 U.S. 477 (1994), the United States Supreme Court held that a prisoner cannot bring a suit for damages under 42 U.S.C. § 1983 that challenges the constitutionality of a criminal conviction. In doing so, the Court

declared that a previously developed theory of law making "civil tort actions [in]appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement." *Id.* at 486. Thus, when someone convicted of a crime seeks damages in a § 1983 suit, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 487. However, if the plaintiff can demonstrate that even if successful, the action will not necessarily imply the invalidity of the criminal judgment, then the action should be allowed to proceed unless there is some other bar to the suit. *Id.*

The Fifth Circuit has had two opportunities to apply the principle announced in *Heck*. In *Hudson v. Hughes*, 98 F.3d 868 (5th Cir.1996), the plaintiff had been arrested and convicted on charges of felon in possession of a firearm and for battery of a police officer. He subsequently filed a § 1983 charge against various officials asserting claims of false arrest and excessive use of force. *Id.* at 872. The Court of Appeals found that because the firearm was found only after the arrest, a finding of false arrest for burglary would result in the suppression of the firearm under the Fourth Amendment as the "fruit" of an illegal arrest. *Id.* The suppression of the firearm would necessarily call into question the conviction the firearm charge. Therefore, the Fifth Circuit dismissed the plaintiff's claim for false arrest as barred under *Heck*. *Id.*

*4 Applying the same principles, the *Hudson* Court also dismissed plaintiff's claim for excessive use of force. In Louisiana, where the plaintiff was arrested and convicted, self-defense is a justification defense to the crime of battery of an officer. *Id.* at 873. Under this defense, the criminal defendant must show that his use of force against the officer was both reasonable and necessary to prevent a forcible offense against himself. *Id.* Therefore, if plaintiff successfully proved his claim for excessive use of force, it would necessarily demonstrate his justification for battery of an officer and undermine his conviction for that crime. *Heck* barred the plaintiff's § 1983 claim because it would call into question the validity of his criminal conviction.

The Fifth Circuit once again applied *Heck* in barring another plaintiff's claims under § 1983 for false arrest and excessive use of force. In *Sappington v. Bartee*, 195 F.3d 234 (5th Cir.1999), the plaintiff alleged that he and his wife were parked on the side of the road when police officers approached and took him to jail where the officers then sprayed him with pepper spray, and beat him. *Id.* at 235. In connection with this incident, a jury convicted the plaintiff of aggravated assault of a police officer and sentenced him to 99 years in prison. The Fifth Circuit held that the conviction necessarily implied that there was probable cause for the arrest; therefore, a successful claim for false arrest would undermine the conviction. *Id.* at 237.

The plaintiff in *Sappington* argued that the excessive force charge did not necessarily undermine the validity of conviction for aggravated assault of an officer. He argued that under Texas law, the use of force to resist arrest is justified only if the arresting peace officer uses unnecessary force before the actor offers any resistance. *Id.* at 236 (citing Tex. Pen.Code § 9.31(c)(1)). Therefore, it was possible for the officer to have used excessive force after the plaintiff offered some resistance. He argued that under such circumstances he would have a viable civil rights claim because Texas law does not afford him the defense of self-defense to the criminal charge. *Id.* The plaintiff did not persuade the Court, however, with this theory. The Fifth Circuit noted the numerous inconsistencies between his legal theory and the summary judgment record. *Id.* at 236-37. The plaintiff had previously testified that the officers assault on him began without any provocation on his part at all. In light of his testimony, his § 1983 claim necessarily undermined his criminal conviction. [FN1] *Id.* at 237.

FN1. The Court also recognized that his criminal conviction for aggravated assault negated the finding of excessive force by the officer. An aggravated assault justifies the use of any force up to and including deadly force to protect against harm. *Id.* at 237

(citing Tex.Pen.Code § 22.02(a)(1)).

In the instant case, Rivera concedes that Fifth Circuit's rulings in light of *Heck* bar her claim for warrantless or false arrest. Pl's Resp. at 9. She disputes the application of *Heck* as barring her claim for excessive use of force. Therefore, the Court must determine whether her § 1983 claim for excessive use of force, if successful, would undermine Plaintiff conviction for assault on a public servant. The complaint filed by Officer Plunkett alleged that Rivera knowingly caused physical contact with him that she should have known was offensive when she pushed him in the chest and ran into him. Def's App. at 1. The Texas Penal Code defines assault as intentionally or knowingly causing physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. Tex. Pen.Code § 22.01(3)(West Supp.2000). Following her arrest, Plaintiff pled nolo contendre to assaulting a public servant.

*5 Plaintiff does not allege that her actions were justified by self- defense or by any other theory. Rather, she argues that even if she assaulted a police officer, the officers then responded with unreasonable force to subdue her by choking her and striking her with a baton numerous times. According to her argument, the facts presented in her case present a claim for excessive use of force that is conceptually distinct from the conviction for assault so that success on her claim would not necessarily imply the invalidity of her conviction. The Court agrees.

A plea of nolo contendre or a conviction for assault of a police officer does not automatically absolve police officers or the City from liability for damages caused by excessive use of force. The Fifth Circuit assumed without deciding that a situation could arise where an excessive use of force claim would not undermine a conviction for resisting a search. *See Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir.1995). In *Smithart v. Towery*, the Ninth Circuit faced a scenario similar to the one now before the Court. 79 F.3d 951 (9th Cir.1996). There, the plaintiff had tried to run down the police with his vehicle. He alleged that once he got out of his car and his attack on them ended, the officers beat him to the point of breaking one arm and both legs. *Id.* at 952. The Court held that under those circumstances, a successful claim for excessive use of force would not necessarily invalidate plaintiff's conviction for assault with a deadly weapon. *Id.* at 952-53.

Under the current set of facts, it is undisputed that Rivera did not attack either of the officers once they began to place her under arrest. This case differs from the facts of *Sappington* in that here, all of the alleged excessive force happened after she had already committed the offense of assault. In *Sappington,* it seems as though the plaintiff continued to physically struggle with the arresting officers throughout the altercation. Although Rivera denies ever attacking Plunkett, at most she pushed Officer Plunkett in the chest and ran into him prior to her alleged beating. Parties do not dispute that after her initial contact with Plunkett, she did not use any other physical force against the officers. Therefore, she has no self-defense claim that would undermine her conviction for assault. Her current § 1983 claim only asserts that after she assaulted the officers, they used an unreasonable amount of force in subduing and arresting her. Rivera's claim for excessive use of force, even if successful, will not necessarily undermine her conviction for assault of a public servant.

## 2. Analysis Under § 1983

Although Plaintiff's claim for excessive use of force is not barred by the doctrines announced in *Heck* and *Hudson*, Plaintiff's claims fail as a matter of law because she has failed to identify a policy promulgated by the city that caused the alleged constitutional violation.

Municipalities are "persons" subject to liability under 42 U.S.C. § 1983. However, a municipality cannot be held liable for merely employing a tortfeasor. *Monell v. New York City Dep't of Social Serv.*, 436 U.S. 658 (1978). The Supreme Court stated that Congress intended to hold cities liable for the actions of its officials only when an "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 692 Therefore, "it is when execution of a government's policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

*6 The parties do not dispute that the City maintains a policy of training its police officers in the use of the nightstick or "asp baton." [FN2] Plaintiff directed the Court to deposition testimony of McCain stating that he carries a baton while on patrol. Pl's Resp. at 4. He also testified to receiving continual training with the baton teaching him to strike suspects who resist arrest on the back of the leg and calf until the resistance stops. Pl's Resp. at 5. Contrary to Plaintiff's assertions, this testimony does not establish the City's liability.

>   FN2. The Fifth Circuit has defined 'policy' as:

>   (1) A policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy making authority; or

>   (2) A persistent and widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or an official to whom that body had delegated policy making authority.

>   *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.1984)

Rivera offered no evidence that the City has an official policy authorizing or condoning excessive use of force in making arrests or in using the batons. According to the Plaintiff, the City adopted a policy condoning the use of the baton, when necessary, to subdue suspects who are resisting arrest. Plaintiff's evidence describes how the policy condones such force until the resistance stops. By its terms, the policy does not condone the use of excessive force. As police officers are entitled to use force when arresting suspects who react violently, the policy itself does not violate any constitutional provision. Therefore, she must demonstrate that the City maintains an unofficial policy condoning its officers' excessive use of force when making arrests. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 822 (1985)(distinguishing the burden on a plaintiff in a case where the policy is unconstitutional on its face so that a single instance will suffice from a case where the policy is not unconstitutional and therefore requires a greater showing by the plaintiff to establish a municipality's liability). Where a challenged policy is by its terms constitutional, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation." *Id.* at 824.
Rivera has failed to illustrate a persistent practice or custom of an excessive use of force by the City's police officers. Absent such a showing, the City cannot be held liable. *See Fraire v. City of Arlington,* 957 F.2d 1268, 1281 (5th Cir.1992)(affirming summary judgment where plaintiff failed to demonstrate that the City's use of force policy condoned the unnecessary or unjustifiable use of force). Accordingly, the Court hereby GRANTS summary judgment as to Plaintiff's § 1983 claims.

C. Rivera's State Law Claims Against the City

The City seeks summary judgment on Rivera's claims brought under the Texas Tort Claims Act ("TTCA"). [FN3] Defendant argues, and Plaintiff did not refute, that the City has not waived

immunity from suit for intentional acts taken by its agents or officials. Defendant's argument is well-taken.

> FN3. Tex.Civ.Prac. & Rem.Code § 101.001, *et seq.*

The doctrine of sovereign immunity insulates governmental units from liability for the torts of its officers and agents in the absence of a constitutional or statutory provision creating such liability. The Texas Tort Claims Act provides for a limited waiver of governmental immunity for some torts committed by its officers and agents; however, the TTCA expressly reserves immunity in the suit arises from an intentional tort. Tex. Civ. Prac. & Rem.Code § 101.057(2)(West 1997). In cases where the plaintiff alleges that the tort involved the use of a motor vehicle, the governmental unity will still enjoy sovereign immunity from suit if the act was committed intentionally. [FN4] *City of San Antonio v. Dunn*, 796 S.W.2d 258, 261 (Tex.App.--San Antonio 1990, writ denied). False arrest and excessive use of force are both intentional torts for which the City cannot be held liable under for damages under the TTCA. *Id.* Therefore, the Court GRANTS summary judgment on Plaintiff's state law claims.

> FN4. Plaintiff claims that some of the injury arose out of the use of a motor vehicle; however, the use of the motor vehicle was limited to

allegedly throwing Rivera against the police car. This action constitutes an element of her excessive use of force claim and does not involve the use of a motor vehicle as contemplated by the statute. Regardless, as stated herein, it was an intentional act for which the motor vehicle exception would not apply.

## CONCLUSION

*7 For the reasons stated herein, the Court finds that Plaintiff has not raised any genuine issue of material fact as to her claims under § 1983 or the Texas Tort Claims Act. Therefore, the Court hereby GRANTS the Motion for Summary Judgment of Defendant City of Irving and dismisses with prejudice all claims brought by Rivera against the City in this matter.
N.D.Tex.,2000.
END OF DOCUMENT

Copr. (C) West 2002 No Claim to Orig. U.S. Govt. Works

**History**

(Showing 1 document)

➡ 1  **Rivera v. City of Irving,** 2000 WL 370668 (N.D.Tex. Apr 11, 2000) (NO. CIV.A.399CV0310P)

© Copyright West Group 2002



New citation:

**Full** | Negative | Omit Minor

Print                                                                KC Alert

Print                                                    Locate        ▼ 

# RAFAEL MOLINA'S DEPOSITION
# EXHIBIT #6



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RENE REYNA, JR.          ) (
     Plaintiff        ) (
                     ) (
VS.                  ) (
                     ) (   MISC ACTION NO. B-0017
CITY OF BROWNSVILLE    ) (
POLICE DEPARTMENT AND   ) (
RAFAEL MOLINA         ) (
     Defendants       ) (

---

ORAL DEPOSITION OF
RAFAEL MOLINA
NOVEMBER 19, 2001

---

ORAL DEPOSITION OF RAFAEL MOLINA, produced as a
witness at the instance of the PLAINTIFF, taken in the above
styled and numbered cause on NOVEMBER 19, 2001, reported by
PEGGY BRYANT, Certified Court Reporter No. 1208, in and for
the State of Texas, at the offices of Willette & Guerra,
L.L.P., 3505 Boca Chica Boulevard, Brownsville, Texas,
pursuant to the Texas Rules of Civil Procedure.

ORIGINAL

BRYANT & STINGLEY, INC.
McALLEN       HARLINGEN      BROWNSVILLE
(956)618-2366   (956)428-0755   (956)542-1020

10:35  1    Q.    Are they in vehicles or on foot?

10:35  2    A.    No, on foot.

10:35  3    Q.    And you see them coming in the actual roadway?

10:35  4    A.    Yes.

10:35  5    Q.    Like they are coming from back here?

10:35  6    A.    Uh-huh.

10:35  7    Q.    And do they have the other guys with them, the

10:35  8    suspects?

10:35  9    A.    Yes, both of them.

10:35 10    Q.    Okay.  And that's at the time you are handcuffing

10:36 11    Reyna?

10:36 12    A.    Correct.

10:36 13    Q.    Okay.  I presume Reyna is lying down?

10:36 14    A.    Yes.

10:36 15    Q.    Okay.  Is it your opinion that at all times during

10:36 16    this incident you acted in accordance with Brownsville

10:36 17    police procedures?

10:36 18    A.    That's correct, yes, sir.

10:36 19    Q.    Did you -- do you feel that whatever it is you did,

10:36 20    you did in accordance with the way the city trained you and

10:36 21    requires you to perform?

10:36 22    A.    I feel that way, yes, sir.

10:36 23    Q.    Is there anything you did that you feel is

10:36 24    inconsistent with police procedures and policies?

10:37 25    A.    I do not.

10:38  1    the policy and procedures that you have to read, you know,

10:38  2    that they go through with you.

10:38  3         Q.   Is this a city PD manual?

10:38  4         A.   It's a city PD manual, that's correct.

10:38  5         Q.   And in that manual, do you recollect what it says

10:38  6    in regards to the circumstances in which one is allowed to

10:38  7    draw a weapon and use deadly force?

10:39  8         A.   We are allowed to use deadly force in case -- under

10:39  9    circumstances that there is a fleeing felon or if a citizen

10:39  10   is placed in harm or danger of death, you know.

10:39  11        Q.   Okay.  Now, are you allowed to use deadly force

10:39  12   every time there is a fleeing felon?

10:39  13        A.   Yes, sir.

10:39  14        Q.   Regardless of what that felon is doing?

10:39  15        A.   That's correct.

10:39  16        Q.   And that's in the manual?

10:39  17        A.   That's correct.

10:39  18        Q.   Is it your opinion that Reyna was a fleeing felon?

10:39  19        A.   Yes, sir.

10:39  20        Q.   And that pursuant to the policies of the city, you

10:39  21   were justified in using the weapon and using deadly force?

10:39  22        A.   Yes, I was.

10:39  23        Q.   As a fleeing felon?

10:39  24        A.   As a fleeing felon.

10:39  25        Q.   Okay.  The -- well, have you, and to your knowledge

# POLICIES AND PRACTICES
## OF THE CITY OF BROWNSVILLE
### EXHIBIT #7



## *BROWNSVILLE POLICE DEPARTMENT*

# RULES, REGULATIONS, AND POLICY MANUAL

**Second Edition**

**June 1993**

**SECTION 10 USE OF FORCE, WEAPONS, AMMUNITION, AND EQUIPMENT**

I.  USE OF FORCE

A.  Purpose

The purpose of this policy is to provide police officers with guidelines on the use of deadly and nondeadly force.

B.  Policy

This Department recognizes and respects the value and special integrity of each human life. In vesting police officers with the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required. Therefore, it is the policy of this department that police officers shall use only that force that appears reasonably necessary to effectively bring an incident under control while protecting the lives of the officer or another.

C.  Definitions

1.  Deadly Force:  Any use of force that is likely to cause death or serious bodily harm.

2.  Nondeadly Force:  Any use of force other than that which is considered deadly force.

D.  Parameters for use of deadly force.

Police officers are authorized to fire their weapons in order to:

1.  Protect the police officer or others from what is reasonably believed to be an immediate threat of death or serious bodily harm; or,

2.  Prevent the escape of a fleeing felon whom the officer has probable cause to believe will pose a significant threat to human life should escape occur,

3.  Before using a firearm, police officers shall identify themselves and state their intent to shoot, where feasible.

E.  A police officer may also discharge a weapon under the following circumstances:

1.  During range practice or competitive sporting events;

- 49 -

# HAROLD WARREN'S DEPOSITION
# EXHIBIT #8



1     IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3      BROWNSVILLE DIVISION

4

5 RENE REYNA, JR.,    *
    Plaintiff,    *

6          *
 VS.        * MISC ACTION NO. B-0017

7          *
 CITY OF BROWNSVILLE POLICE *

8 DEPARTMENT and RAFAEL MOLINA, *
    Defendants.   *

9

10

11 ***********************************************************

12    ORAL DEPOSITION OF HAROLD WELDON WARREN

13 ***********************************************************

14

15

16    ANSWERS AND DEPOSITION OF HAROLD WELDON WARREN,

17 produced as a witness at the instance of the Plaintiff, taken

18 in the above-styled and -numbered cause on the 21st day of

19 March, A.D., 2002, at 9:01 o'clock a.m., before Mary D.

20 Boudreaux, a Certified Shorthand Reporter in and for the State

21 of Texas, in the offices of Discovery Reporting Systems, Inc.,

22 located at 4245 North Central Expressway, Suite 200, in the

23 City of Dallas, County of Dallas, and State of Texas, in

24 accordance with the Federal Rules of Civil Procedure and the

25 agreement hereinafter set forth.

1     A.    Well, my previous experience with him in Dallas

2   particularly in -- he's reputed to be one of the best in the

3   business or the best.

4     Q.    So you -- that's in his professional capacity as

5   Bexar medical examiner, correct?

6     A.    Yes.  I relied on his information for several years.

7     Q.    Was he working as well as -- well, are you expecting

8   to give an opinion or make any statements regarding the

9   reputation of Vincent DiMaio?

10    A.    Only if I'm asked as far as my knowledge of his

11  reputation goes.

12    Q.    Your knowledge is limited to his work as the medical

13  examiner, or does it also include his work as a private

14  consultant such as in cases like this?

15    A.    Well, I believe they interact.  I believe his total

16  reputation would be good, outstanding, as far as I know.

17    Q.    Now, in his deposition he states that this

18  investigation done by the Brownsville police -- and I don't

19  have the page marked or anything.  But do you recollect in

20  there his commenting that the investigation by the Brownsville

21  police was very poorly performed?

22    A.    In some words he indicated that, yes.

23    Q.    Do you have an opinion of that?

24    A.    In some areas I would tend to agree with him.

25    Q.    In what areas?

09:08

09:09

09:09

09:09

09:09

09:10

09:10

1    our internal affairs unit.                                          09:25

2        Q.    Well, you did mention that in the beginning.  That's

3    one of the three investigative units that gets involved.  You

4    got the police on the scene who mark it off, then you bring in

5    the crime scene people, and then you bring in the internal      09:25

6    affairs people?

7        A.    Yes.  Internal affairs may not necessarily be at the

8    scene, but as soon as they can, they start getting the

9    information together that's available.

10       Q.    What is the role of the internal affairs as far as      09:26

11   the investigation goes?

12       A.    Well, here they answered to me for over five years,

13   so I made sure that I had the best investigators in the

14   department.

15       Q.    What would they do when they get on a case where a     09:26

16   policeman shot somebody?

17       A.    They would find and develop every piece of

18   information they could get using what had been done and what

19   they needed to do.  If there was additional work they needed

20   to do, they would do that.                                       09:26

21       Q.    They want to find out what happened?

22       A.    They want to know what happened.

23       Q.    For five years they answered to you.  How many -- in

24   that five-year period, how many instances of a police officer

25   shooting someone took place?                                     09:26

# RAUL GUAJARDO'S SWORN STATEMENT
## EXHIBIT #9



# AFFIDAVIT

**STATE OF TEXAS** §
§
**COUNTY OF HIDALGO** §

BEFORE ME, the undersigned notary public in and for the State of Texas on this day personally appeared RAUL GUAJARDO known to me to be the person whose name is subscribed hereto, who being first duly sworn in the manner provided by law, on oath states as follows:

"My name is RAUL GUAJARDO and I am over the age of 18 and I am giving this affidavit and verification based on my personal knowledge and experience as a forensic scientist. I am a forensic scientist and for twenty-one (21) years I was a Criminalist for the Texas Department of Public Safety Crime Lab located in McAllen. My resume which is attached to this affidavit correctly represents my education and experience. I have investigated thousands of criminal cases in South Texas in my career and testified in Court hundreds of times. I retired from my position with the Department of Public Safety on January 31, 2002 and I am now in the process of setting up a forensic lab with the University of Texas Pan American.

The DPS forensic lab was and is the only forensic lab in South Texas. Not only did we do the forensic work for the department of public safety, but we also did the forensic work for all of the law enforcement departments in the Rio Grande Valley. All forensic work in South Texas came through us.

I regularly would be in charge of forensic work for the City of Brownsville Police Department and I worked with the Cameron County District Attorney's office on a regular basis. Not long before the incident involving Rene Reyna, Jr., I was asked to do the forensic work on a case in which a policeman shot a civilian who was seated in a vehicle. I worked with some of the same officers who were in charge of the investigation of the shooting of Rene Reyna, Jr. In the prior case involving the police officer, I did work to determine what had happened and I provided evidence that exonerated the police officer. I was surprised to learn that I was not called to do the forensic investigation on the Rene Reyna, Jr. case.

After having been retained by Mr. Powell to do a forensic investigation of the Rene Reyna, Jr. case, I have reviewed all the records that have been made available including the reports of the investigation as well as photographs. The investigation was incomplete and not thoroughly done. It was very much different than what I had done on the investigation of the previous shooting by the police officer.

Because I have not participated in the criminal investigation, I was allowed by the Department of Public Safety to accept employment in this case as a consultation in a civil case.

The two (2) reports attached to this affidavit are reports which I prepared in the course of my investigation. They truly and accurately reflect my opinions as to what happened in the case.

SIGNED on the 29th day of March, 2002.

_____
RAUL GUAJARDO

SUBSCRIBED AND SWORN BEFORE ME, the undersigned authority, by the said RAUL GUAJARDO on the 29th day of March, 2002 TO CERTIFY WHICH WITNESS MY OFFICIAL SEAL AND HAND OF OFFICE.

_____
NOTARY PUBLIC, STATE OF TEXAS

JANIE MORIN
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-17-2004

# FORENSIC CHEMICAL
# SERVICE & CONSULTING

Forensic Investigations ◆ Analysis ◆ Expert Testimony ◆ Forensic Consulting

## PRELIMINARY REPORT

November 20, 2001

George P. Powell, Attorney
Hinojosa & Powell, P. C.
612 Nolana, Ste 410
McAllen, TX 78504

RE:  Civil Action Nol B-00-17
     *Rene Reyna, Jr. v. City of Brownsville Police Dept., et al*

## *EVIDENCE SUBMITTED*

On October 31, 2001, I received from your office the following documents for my review:

A)  Photographs from the scene and from Rene Reyna, Jr.
B)  Operative report from Brownsville Medical Center
C)  Police incident report
D)  Deposition from Rene Reyna, Jr.
E)  Supplement reports
F)  Statements from police officers
G)  Statements from witnesses
H)  Scaled diagrams of the shooting scene
I)  Evaluation and employment records from Officer Rafael Molina
J)  Complete Texas Department of Corrections file for Rene Reyna, Jr.
K)  Criminal history records from Rene Reyna, Jr.

On November 19, 2001; by e-mail; Deposition of Rafael Molina

## *EXAMINATIONS REQUESTED*

You requested the examination of the above documents and the shooting reconstruction of the shooting incident on June 23, 1998 at or near the intersection of Billy Mitchell Blvd.and Central Avenue, Brownsville, TX.

## *RESULTS*

After reviewing the above documents, including the bullet entry wound photographs from Rene Reyna, Jr., it is apparent that Officer Molina's incident statement is inconsistent. This conclusion is based on the locations of the bullet entry wounds in the photographs. Three  bullet entry holes are classified as follows:

Page 2
Rene Reyna, Jr. v. Brownsville Police Department

a.) The photograph of the left inside arm bullet entry hole shows that the inside area of the left arm was facing the path of the bullet. The subject could not have been in the normal sitting position when the bullet struck the left inside arm area. If the subject had been sitting in the normal position, the bullet would have struck the subject's left outer arm area. When the subject's left inside arm area was in line with the bullet trajectory, his body orientation would have been facing Officer Molina with the left arm not fully extended.

b.) The photograph showing the subject's left front leg bullet wound shows that the subject was facing Officer Molina when he was shot. The subject could not have been sitting in the 1992 Lincoln Continental when the bullet struck his left front leg. Based on the location and shape of the bullet hole, the subject had to have been standing facing the path of the bullet and Officer Molina.

c.) The photograph of the abdomen bullet wound shows an entry bullet hole and an exit bullet hole. The bullet entered the left side abdomen area and exited directly across the right abdomen area. It is possible that the subject was sitting in the 1992 Lincoln Continental when he was struck with this bullet; however, he had to have had his body turned at such an angle that would explain the bullet entry on the left abdomen and the bullet exit directly across on the right abdomen area. Based on the locations and bullet hole characteristics of the arm and leg wounds, it is more likely that the subject was standing and had turned sideways in line with the trajectory of the bullet. In order for the subject to have been sitting in the vehicle while he was shot in the left abdomen, Officer Molina would have to have been shooting directly across and parallel to the 1992 Lincoln Continental and not behind and to the left of the Lincoln Continental as stated.

## PRELIMINARY CONCLUSIONS

Based on the documents and photographs that were reviewed, Rene Reyna, Jr. could not have been sitting in the 1992 Lincoln Continental when he was shot. Mr. Reyna was more than likely out of the vehicle and was standing directly in line with the trajectory of the bullet that struck his left leg. The bullet hole characteristic on the left inside arm area is somewhat oblong and in line with the length of the arm. This type of bullet wound indicates that the arm was probably not fully extended and may have been in the process of being extended or retracted in line with the bullet path and Officer Molina.

I trust this is of assistance.

Respectfully,

Raul Guajardo
Forensic Scientist

SUBSCRIBED AND SWORN TO before me on the 29TH day of March, 2002.

NOTARY PUBLIC, STATE OF TEXAS

JANIE MORIN
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-17-2004

# FORENSIC CHEMICAL
# SERVICE & CONSULTING

Forensic Investigations ◆ Analysis ◆ Expert Testimony ◆ Forensic Consulting

Supplemental Report

March 07, 2002

George P. Powell, Attorney
Hinojosa & Powell, P. C.
612 Nolana, Ste 410
McAllen, TX 78504

RE:    Civil Action No. B-00-17;
       *Rene Reyna, Jr. v. City of Brownsville Police Dept., et al;*

## EVIDENCE SUBMITTED

On February 01, 2002; In person by Martin Hinojosa:

> **Items**
> Gray t-shirt
> Blue jean cut-offs
> 4x9 white envelope with bullet casing
> Clear zip-lock baggie with five film canisters containing bullet core (#5), split-metal jacket (#4), bullet slug #06), casing (#1) and casing (#2)

## EXAMINATIONS REQUESTED

Examine the items submitted for trace evidence.

## RESULTS

The manufacture information tag on the gray t-shirt indicates that the t-shirt is composed of 92% cotton and 8 % polyester. Microscopic examination of the gray t-shirt indicates that the fiber color of the t-shirt is white cotton with a blend of black polyester.

Four apparent bullet holes were observed on the lower left backside of the gray t-shirt. Three apparent bullet holes were observed on the front upper right area of the gray t-shirt. The apparent bullet holes on the lower left backside of the gray t-shirt exhibit fiber singeing. Apparent body tissue was observed on the inside area of a right front upper apparent bullet hole on the gray t-shirt. Apparent blood was observed on the gray t-shirt.

Page 2
Reyna v. City of Brownsville

No gunshot residue could be observed visually or microscopically on the lower left side holes or on the front right upper holes of the gray t-shirt. The directionality between the lower left backside apparent bullet holes and the right front upper apparent bullet holes of the gray t-shirt indicates that the path of the bullet was slightly angled upwards from the left to the right side. The numerous holes present on the lower left backside and front right upper areas of the gray t-shirt are consistent with the material of the shirt being folded as the bullet entered and exited.

The blue jean cut-off pant exhibits a round apparent bullet hole on the center of the left thigh area of the pant leg. Apparent blood surrounds the apparent bullet hole. No gunshot residues could be observed visually or microscopically.

A presumptive test for the presence of blood was positive on the bullet core (#5). Black tar-like material was observed microscopically on the surface of the bullet core (#5). Apparent body tissue, white cotton and black synthetic fibers were observed microscopically on the bullet core (#5). One of the black synthetic fibers was removed for possible further examinations.

A presumptive test for the presence of blood was positive on the split-metal jacket (#4). Loose black particles were observed on the surface of the split-metal jacket (#4). Apparent body tissue with adhered white cotton fibers tested positive for a presumptive test for blood. Black synthetic fibers were observed on the split-metal jacket (#4). One of the black synthetic fibers was removed for possible further examinations.

The distorted metal jacket bullet slug (#6) has a lead core that is partially fragmented. No blood was detected on the bullet slug (#6). Microscopic examination on the metal jacket area of the distorted bullet slug (#6) indicates the presence of a smeared black substance and pitted areas covered with white compacted granular material. The black smears and white granular material were not removed at this time but can be removed later for identification and characterization.

## OPINIONS AND DISCUSSIONS

The presence of black synthetic fibers and white cotton fibers adhered to the apparent body tissue on the lead core (#5) and the split-metal jacket (#4) indicates that the lead core and the split metal jacket were once whole and subsequently separated after penetrating through the gray t-shirt and striking a hard surface. The fact that presumptive tests for the presence of blood were positive on the lead core (#5) and on the split-metal jacket (#4) is evidence that the two components passed through Reyna's abdomen. Based on the positive presumptive test results for blood, black synthetic fibers, and apparent body tissue with adhered white cotton fibers observed on the lead core and on the split-metal jacket, it is my opinion that the lead core (#5) and the split-metal jacket (#4) were

Page 3
Reyna v. City of Brownsville

once one and the same bullet that went through Reyna's abdomen. Because these two items (#4 and #5) were recovered outside the vehicle that Reyna was driving, it is more likely that Reyna was shot while he was outside the vehicle that he was driving and not while he was sitting inside the vehicle as officer Molina states.

Based on the fact that two of the three bullets that Officer Molina fired can be accounted for, the leg wound and the abdomen wound, it is also my opinion that the distorted bullet (#06) is the bullet that struck the left rear passenger door chrome molding of the 1992 Lincoln Continental that Reyna was driving. It is more likely than not that a lead fragment from the distorted bullet (#06) ricocheted of the left rear passenger door chrome molding and struck Reyna's left forearm. It is also possible to remove the microscopic white granular particles on the metal jacket of the distorted bullet (#06) and compare them to a known chrome molding. Further testing can be done on the black smears observed on the jacket of the distorted bullet (#06) and compared to either paint or asphalt from the pavement.

Based on the new findings on the items examined, Mr. Reyna could not have been sitting inside the 1992 Lincoln Continental when he was shot. The evidence shows that Mr. Reyna was already outside the vehicle when he was shot. It is secondary in importance to try and sequence the shots that were fired if they were fired while Mr. Reyna was outside the 1992 Lincoln Continental.

The casings (#1, #2 and the casing in the 4x9 envelope) were not examined.

Please contact me if you have any questions about the interpretations in this report or if you will need further testing on the items that were mentioned in the report.


Respectfully,

Raul Guajardo
Forensic Scientist


SUBSCRIBED AND SWORN TO before me on the 29TH day of March, 2002.

NOTARY PUBLIC, STATE OF TEXAS

JANIE MORIN
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-17-2004

**OPINION FROM A CASE BY THIS ATTORNEY
EXHIBIT #10**



IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-41382
Conference Calendar

_____

U.S. COURT OF APPEALS
**FILED**

AUG 27 1999

CHARLES R. FULBRUGE III
CLERK

JUAN ANTONIO MONTOYA,

Plaintiff-Appellee,

versus

CITY OF BROWNSVILLE ET AL.,

Defendants,

KIRK MASSEY, Police Officer,

Defendant-Appellant.

--------------------
Appeal from the United States District Court
for the Southern District of Texas
USDC No. B-97-CV-112
--------------------

Before KING, Chief Judge, and JOLLY and DAVIS, Circuit Judges.

PER CURIAM:[*]

Kirk Massey appeals the district court's denial of his

motion for summary judgment in a civil rights lawsuit filed by

Juan Antonio Montoya.  The motion argued that Massey was entitled

to qualified immunity.  The district court held that, under

Montoya's version of events, Massey had arrested him without

probable cause, after he had expressed an opinion about police

officers that Massey did not like.

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 98-41382
-2-

We have jurisdiction to review the denial of a motion for summary judgment based on qualified immunity only to the extent the district court's denial turned on issues of law. Mitchell v. Forsyth, 472 U.S. 511, 528 (1985). Although we lack jurisdiction to review a district court's determination that there exist genuine issues of fact, we do have jurisdiction to review a determination that the issues are material. Colston v. Barnhart, 146 F.3d 282, 284 (5th Cir.), cert. denied, 119 S. Ct. 618 (1998). We accept the district court's statement of the genuinely disputed facts, and we conduct a de novo review of the court's conclusions about materiality. Lemoine v. New Horizons Ranch and Ctr., Inc., 174 F.3d 629, 634 (5th Cir. 1999).

Whether a public official is qualifiedly immune depends on two inquiries. Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 223 (5th Cir. 1999). First, a defendant is entitled to qualified immunity when a plaintiff has failed to allege the violation of a clearly established constitutional right. Id. Second, a defense of qualified immunity will succeed if the defendant's conduct was objectively reasonable at the time in light of clearly established law. Id. Massey insists that his arrest of Montoya was objectively reasonable.

If, as Montoya testified and the district court assumed, Massey arrested him for asserting that police officers are arrogant, Massey violated Montoya's right to be free from arrest without probable cause. "The test for probable cause . . . is whether, at the moment of arrest, the facts and circumstances within [the arresting officer's] knowledge and of which he had

No. 98-41382
-3-

reasonably trustworthy information were sufficient to warrant a
prudent person in believing that [the arrestee] had committed or
was committing an offense." Harper v. Harris County, Tex., 21
F.3d 597, 601 (5th Cir. 1994). In Montoya's account of the
events, he had not been drinking on the day of his encounter with
Massey, and he exhibited no signs of intoxication. If that is
true, Massey did not have probable cause to arrest Montoya for
public intoxication.

Massey argues that there was probable cause to arrest
Montoya for failing to identify himself to an officer. Montoya
contends that this argument was not raised in the district court
and is waived. Massey's argument does appear in the motion for
summary judgment, however. Montoya also contends that he was
never asked to identify himself to Massey. Montoya's testimony
was that he refused to identify himself to another officer at the
detention facility only after Massey had arrested him and
transported him to the facility. Under Montoya's version, "at
the moment of the arrest," Massey could not have had probable
cause to arrest him for an event that had not yet occurred.
Harper, 21 F.3d at 601.

Because there is a genuine issue of material fact, the
denial of Massey's motion for summary judgment is not appealable.

APPEAL DISMISSED.

**LESLIE SWEET'S DEPOSITION
EXHIBIT #11**

1

LESLIE R. SWEET
MARCH 22, 2002

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2              BROWNSVILLE DIVISION

3 RENE REYNA, JR.,          *
     Plaintiff,             *
4                           *
  VS.                       *  MISC. ACTION NO. B-0017
5                           *
  CITY OF BROWNSVILLE POLICE  *
6 DEPARTMENT AND RAFAEL MOLINA,*
     Defendants.            *

7

8

9
 ********************************************************
10
    ORAL AND VIDEOTAPED DEPOSITION OF LESLIE R. SWEET
11
               MARCH 22, 2002
12
 ********************************************************
13


14

15      ORAL AND VIDEOTAPED DEPOSITION OF LESLIE R.

16 SWEET, produced as a witness at the instance of

17 Defendants, and duly sworn, was taken in the

18 above-styled and -numbered cause on March 22, 2002, from

5

LESLIE R. SWEET
MARCH 22, 2002

1 rules and regulations of a deposition that we may

2 usually give a witness who is not familiar with that

3 process, but I would ask you to just do one thing, and

4 that is, when I ask a question, if for any reason you

5 don't understand it, if you're not sure about it, ask me

6 to rephrase it, because I want to assume when you

7 answered it, that you understood it.

8    A.   I understand.

9    Q.   All right.  First of all, I'm going to go

10 through, kind of break this down.  I'm going to go

11 through some of your qualifications and your experience

12 before we actually get into the meat or the substance of

13 this case in general.

14    A.   I understand.

15    Q.   All right.  I know you have your file there.

16 I've had a chance to look at that before the deposition

17 started.  If you have your resume, I think, out there.

18 Good.  We'll start with that.

19        What I'd like to do, first of all, is ask you

20 to just give me a little bit more detail in connection

21 with your resume as it relates to the time that you were

22 with the Dallas Police Department under your experience

23 category.  You have retired assistant chief, '65 to '91.

24 Just could you tell me, in as brief a fashion as you

25 can, from '65 to '91, what different positions did you

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

6

LESLIE R. SWEET
MARCH 22, 2002

1 hold?

2    A.   Yes, I'd be glad to.  I was hired by the City

3 of Dallas Police Department in 1965.  I was a patrol

4 officer working the streets of Dallas.  Promoted to

5 sergeant.  As sergeant, I was a patrol sergeant and

6 crime analysis sergeant.  Made lieutenant.  Went to

7 planning and research and worked on policy development

8 and policy dissemination, long-range planning for the

9 police department.  Also worked as a patrol lieutenant

10 and as a community relations lieutenant.  Made captain.

11 Went back to planning and research once again, doing

12 policy development and long-range planning.  Then went

13 to patrol as a patrol captain.  Was promoted to deputy

14 chief.  Was in charge of our special operations

15 division, which is all the uniformed officers who are

16 answering calls, SWAT teams, canine officers, helicopter

17 patrol and all the odds and ends.  In 1981, I was

18 promoted to assistant chief of police in charge of the

19 patrol bureau.  Retired in 1991 and went back to law

20 school, started practicing law in 1994.

21    Q.   All right.  Thank you.  While you were there at

22 the Dallas Police Department, did you have an

23 opportunity to work with a gentleman named Harold

24 Warren?

25    A.   Yes.

7

LESLIE R. SWEET
MARCH 22, 2002

1    Q.  And did y'all hold similar positions at any

2 given time?

3    A.  Yes.

4    Q.  Tell me when that would have been.

5    A.  From 1981 until Harold retired in 1988 or '89,

6 whenever he retired.  We were both assistant chiefs.

7    Q.  Okay.  And were you in different departments,

8 so to speak, or have different duties?

9    A.  Yes.

10    Q.  What were your duties and what were his duties

11 when y'all were there as assistant chief?

12    A.  His title was Executive Assistant Chief, and he

13 was in charge of Internal Affairs, Intelligence, and

14 that's all I can think of right now, but he was also

15 what we would call the senior assistant chief.  Although

16 he held the same rank and had the same salary, he did

17 replace Chief Prince if he was out of town.  I, on the

18 other hand, was in charge of the patrol bureau.

19    Q.  Okay.  All right.  In your resume, you don't

20 mention this, and I just wanted to find out, have you

21 published any papers, documents, treatises, articles, or

22 anything in connection with your position as an expert

23 witness?

24    A.   No.  The only thing would be associated with my

25 master's degree, a report called "The Repeat Offender in

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

8

LESLIE R. SWEET
MARCH 22, 2002

1 Dallas."

2    Q.   But not in connection with use of force or

3 discharge of weapons or deadly force, use of deadly

4 force, no papers or publications?

5    A.   You're correct, nothing related to what we're

6 here for today.

7    Q.   Okay.  I do take it, though, that you have been

8 involved when you were with the Dallas Police Department

9 in writing policy for the police department?

10    A.   Yes.

11    Q.   And specifically did you write or assist in the

12 preparation of the use-of-force section of the Dallas

13 Police Department policy?

14    A.   Yes.

15    Q.   All right.  Did you do that by yourself or in

16 conjunction with others?

17    A.   In conjunction with others.

18    Q.   Okay.  Do you hold presently any certificates

19 or licenses at all?

20    A.  I have a law license.

21    Q.  Yes, I'm sorry.  Other than your law license?

22    A.  No.

23    Q.  We do show here and you testified that you got

24 your law degree from Texas Wesleyan in 1994?

25    A.  Yes.


DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

9
LESLIE R. SWEET
MARCH 22, 2002

1   Q.  And it does, as far as your experience goes, it

2 indicates that you've been a legal advisor for the

3 Dallas County Sheriff's Office from 1998 to the present?

4   A.  Yes.

5   Q.  What did you do in the way of practice of law

6 from '94 to '98?

7   A.  Private practice.

8   Q.  All right.  What kind of practice was that?

9 Civil?  Criminal?  General?

10   A.  General, both civil and criminal.

11   Q.  Okay.  Have you been involved, in that time

12 when you were in private practice, in civil rights

13 cases?

14   A.  As an attorney, no.

15   Q.  Are you licensed to practice in federal court?

16   A.  The Northern District of Texas, yes.

17   Q.  Now, after you -- well, why did you leave

18 private practice and go to work for the Dallas County

19 Sheriff's Department?  I'm assuming you did.  I'm making

20 that assumption.

21   A.   That's true.  That's what I did.

22   Q.   Okay.

23   A.   Well, I don't know that I have a reason.  The

24 sheriff offered me a job.  The sheriff offered me a job,

25 and I took it.

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

10

LESLIE R. SWEET
MARCH 22, 2002

1   Q.  Okay.  Before that, were you in private

2 practice by yourself as a solo?

3   A.  I shared an office, and we covered each other.

4 We weren't partners as in a written partnership

5 agreement, but I had a partner, an unofficial partner.

6   Q.  Well, was it -- you said the sheriff offered

7 you a job and you took it.  Was it a better monetary,

8 financial decision for you to leave private practice and

9 go to work for the sheriff's office?

10   A.  No.  It was less pressure and fewer hours.

11   Q.  Okay.  All right.  I guess you've been there

12 since '98 to the present?

13   A.  Yes.

14   Q.  And your title is Legal Advisor?

15   A.  True.

16   Q.  And are you one of several?

17   A.  No.

18   Q.  You are the one and only legal advisor?

19   A.  That's true.

20   A.  Oh, no, I'm not the defense counsel.  That's

21 the district attorney's job.

22   Q.  Okay.  You're just assisting in that, like

23 co-counsel, so to speak?

24   A.  Not even that.  I'm just representing the

25 department.  Anytime you're at trial, the D.A. can't sit

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

11
LESLIE R. SWEET
MARCH 22, 2002

1    Q.   Okay.  And then the sheriff -- who was the

2 sheriff, by the way?

3    A.   Jim Bowles.

4    Q.   And what are your duties as the legal advisor?

5 What do you do?

6    A.   Provide legal advice to the sheriff, provide

7 legal advice to his staff and his employees, primarily

8 in the service of papers and service of warrants, in the

9 area of arrest and search warrants, and also in the area

10 of corrections, detainers and how long we can keep

11 somebody.  I coordinate between the sheriff's department

12 and the local judges.  I assist the district attorney in

13 discovery when the sheriff's been sued, in recovering

14 discovery and providing the D.A. with the information he

15 needs.  And usually when a case goes to trial against

16 the sheriff or the County, I'm sitting at the defense

17 table as representing the sheriff.

18    Q.   Are you the defense counsel or you're assisting

19 other defense counsel?

12
LESLIE R. SWEET
MARCH 22, 2002

1 there by himself. It would be the sheriff or the county

2 commissioner. And they send me instead.

3    Q.  I see. You're the county representative at

4 trial?

5    A.  There you go. That's the word I was trying to

6 say.

7    Q.  I gotcha now. Okay. All right. Sorry.

8    A.  I'm the defendant.

9    Q.  You're the defendant.

10        MR. POWERS:  I was getting ready to say

11 that.

12    A.  I also do open records, which is getting to be

13 a bigger and bigger, almost a full-time job.

14    Q.  We covered the fact that in private practice

15 you weren't involved in any civil rights cases. What

16 about since you've been a legal advisor for the County?

17 Have you been involved in any civil rights cases against

18 the County?

19    A.  Yes.

20    Q.   Was that a position that was in existence prior

21 to you taking it?

22    A.   Yes.

23    Q.   And did the other guy retire or resign or

24 whatever and it became open?

25    A.   Yes.

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

20   Q.  That would obviously be where the County is

21 being sued in a civil rights case?

22   A.  Yes.

23   Q.  How many of those cases since 1998 to the

24 present have involved a shooting situation by a Dallas

25 County deputy sheriff?

13
LESLIE R. SWEET
MARCH 22, 2002

1   A.  None.

2   Q.  How many of those claims or lawsuits that you

3 may have assisted in as the legal advisor for the

4 sheriff's office from 1998 to the present have involved

5 claims against a Dallas County deputy sheriff for use of

6 excessive force?

7   A.  I would just have to guess at that.  I can give

8 you an estimate.  Would you like to have an estimate?

9   Q.  Sure.

10   A.  Maybe five, six.

11   Q.  Okay.  But none of those involved shootings?

12   A.  That's correct.

13   Q.  What type of excessive force claims were they,

14 then?

15   A.  Let me think.  Against jail guards.  I'm trying

16 to think if I've had one against a patrol officer or a

17 warrant officer, and I don't remember any against a

18 uniformed officer.  They would have been against jail

19 guards.

20    Q.   All right.  And what were the facts of those

21 use of -- excessive use of physical force?

22    A.   Yes.  I'm not sure I can remember that much of

23 the specific cases.

24    Q.   When was the last one?  Let's pick the last one

25 you can remember.

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

14
LESLIE R. SWEET
MARCH 22, 2002

1    A.  That was a -- excessive use of force?

2    Q.  Right.

3    A.  A lawsuit by a lady who came to our jail, was

4 in the intake section, refused to be searched, two

5 female jail guards restrained her, placed her on the

6 floor so they could search her, and she filed suit that

7 those two jail guards had used excessive force.

8    Q.  All right.  Out of those five or six cases

9 involving excessive force, how many of those actually

10 ended up going to a trial to a verdict?

11    A.  I don't remember any.

12    Q.  Were they all settled or disposed of in some

13 manner other than a jury verdict?

14    A.  Yes.

15    Q.  All right.

16    A.  If they've been disposed of.

17    Q.  Yeah, that's right.  I'm sorry, you're

18 absolutely correct.  Assuming they've been disposed of?

19    A.  Yeah, but some of them are old enough, I think

20 they have been disposed of by some kind of dismissal.

21   Q.  Okay.  But none of a jury verdict?

22   A.  No.

23   Q.  All right.  So you have not been involved in

24 any cases, lawsuits filed against the County that

25 actually went to a jury verdict involving use of

15
LESLIE R. SWEET
MARCH 22, 2002

1 excessive force?

2    A.   That's correct.

3    Q.   Okay.  Have any of those cases of excessive

4 force that you've been working on as a legal advisor

5 involved a claim by a suspect who would have later been

6 convicted of the crime he was involved in with the

7 officer where any excessive force was alleged to have

8 been used by the officer against that suspect?

9    A.   No, I do not remember one with those

10 circumstances.

11    Q.   Okay.  When you were with the City of Dallas,

12 what was -- in 1998, this incident occurred in 1998, by

13 the way, June of 1998.

14    A.   Okay.

15    Q.   In 1998, what was the City of Dallas's policy

16 as it relates to the use of deadly force?

17    A.   In 1998 --

18         MR. POWERS:  You said City of Dallas?

19         MR. WILLETTE:  Yeah.

20          MR. POWERS:  He wasn't with the City at

21 that time.

22    A.  I left the City of Dallas in 1991.

23    Q.  I'm very sorry.  I correct that.  Let me back

24 up, then.  Let me talk about then when you left in 1991.

25 Same question but just in 1991.

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

16
LESLIE R. SWEET
MARCH 22, 2002

1    A.  The City of Dallas policy on deadly force was

2 it should only be used as a last resort.  It should only

3 be used to protect the life of an officer or another

4 officer or the imminent danger to another citizen.

5    Q.  All right.  Do you believe that is still the

6 policy today?

7    A.  I do.

8    Q.  Okay.  And do you believe that policy is

9 constitutional?

10    A.  I do.

11    Q.  Does the Dallas County Sheriff's Office have a

12 policy that includes when it is allowed to use or what

13 its policy is on use of deadly force?

14    A.  Yes.

15    Q.  And what is that?

16    A.  Same policy.

17    Q.  Same policy.  So I assume you believe it's

18 constitutional as well?

19    A.  Yes.

20    Q.  All right.  In your report, you do not mention

21 -- well, strike that.  In your report on the first page,

22 you indicate the date of your report is November 30,

23 2001, and that you have reviewed the deposition of

24 Reyna, the deposition of Molina, and a report from Raul

25 Guajardo, and then you formed your opinions based on

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

17

LESLIE R. SWEET
MARCH 22, 2002

1 those three documents alone?

2    A.   Yes, that's what I had on November 30th, yes.

3    Q.   And in that report, when you get to the use of

4 force -- I'm sorry -- City of Brownsville subsection on

5 the second page, you state that, "It appears that the

6 City of Brownsville has an unconstitutional policy of

7 allowing officers to use deadly force in arresting

8 fleeing felons, or they have an unconstitutional

9 practice by allowing their officers to believe they can

10 use deadly force under any circumstances."  But am I

11 correct in assuming that at the time you wrote this, you

12 didn't even have the City of Brownsville's use-of-force

13 policy?

14    A.   No.  What I had was Officer Molina's deposition

15 and -- yeah, just his deposition where he states that

16 you can shoot at a fleeing felon under any

17 circumstances.

18    Q.   All right.  Well, would you agree with me that

19 one officer doesn't make policy for the City of

20 Brownsville?

21    A.  I don't understand that question.

22    Q.  Do you think one single officer can create

23 policy for a city?

24    A.  No.  I think the department head would be the

25 one that created a policy.


DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

24
LESLIE R. SWEET
MARCH 22, 2002

1 seen several policies where Number 2 would have three or

2 four sentences, trying to clear it out, clarify it all

3 the way out, yeah. This is very abbreviated.

4    Q.  But I'm just asking, have you ever seen one

5 like this?

6    A.  I don't know what you mean by the word "like."

7 Similar?

8    Q.  Abbreviated like this, if you want to use your

9 term. Similar.

10    A.  Not in a long time.

11    Q.  Okay. What would be a long time?

12    A.  Pre-Garner v. Tennessee, which was what, late

13 '70s?

14    Q.  Okay. As far as your opinions that the City of

15 Brownsville has an unconstitutional policy, what are you

16 basing that statement on, then?

17    A.  I think it's an unconstitutional practice.

18    Q.  Well, in your report you say "policy." I'm

19 just trying to clear that up.

20    A.   Did I not say "policy and/or practice" or "or

21 practice"?

22    Q.   Well, let's look at page 2.  Page 2, City of

23 Brownsville.  "It appears that the City of Brownsville

24 has an unconstitutional policy of allowing officers to

25 use deadly force in arresting fleeing felons."  Now, you

25
LESLIE R. SWEET
MARCH 22, 2002

1 do say "or." I'm just trying to break it down.

2　A.　Okay.

3　Q.　What is unconstitutional about their policy?

4　A.　Well, besides my misgivings about Paragraph 2,

5 you know, they do have a policy and --

6　Q.　Okay. So other than your misgivings about

7 Number 2, you don't find their policy, the policy itself

8 -- again, I'm trying to limit it to that right now --

9 you don't find the policy itself to be unconstitutional,

10 other than the misgivings you have about Paragraph 2?

11　A.　Yes, which are very serious misgivings, yes.

12 And the reason I'm being evasive is the policy doesn't

13 say you can shoot a tax evader. I mean, you know, it's

14 not unconstitutional on its face. I just think it's

15 lacking in that it allows officers to feel like Molina

16 did, that he can shoot a fleeing felon.

17　Q.　Right. Now, going on with the rest of that

18 sentence that says "or they have an unconstitutional

19 practice by allowing their officers to believe." That

20 gets more into what you believe Molina thinks can be

21 done and that it's a practice by an officer?

22    A.  Yes.

23    Q.  All right.  Now, you are taking that position

24 as the practice from Officer Molina's deposition?

25    A.  Yes.

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

30
LESLIE R. SWEET
MARCH 22, 2002

1 I would have definitely wanted to have this.  But I

2 thought the deposition covered his position very well.

3    Q.   Okay.  Well, you do see that Officer Molina

4 there on the last page of his statement -- specifically

5 I'll draw your attention to the third page and about

6 halfway through the paragraph where it says --

7    A.   Third page or second page?

8    Q.   Third page.  It's the last page.

9    A.   Well, I've got more pages than you.  I just

10 read the first two pages.

11    Q.   It's where he signs it at the end.  Maybe you

12 got a copy of the same thing.  Here, that's it.  Where

13 he says, "Based on the subject's prior actions in

14 sideswiping my patrol, the patrol car of Officer Garza,

15 Sergeant Flores and the innocent victims involved in the

16 collision, I felt that the suspect was going to continue

17 eluding the Brownsville Police Department.  As a police

18 officer, I feared for my safety and the safety of the

19 public.  In an effort to stop the subject from further

20 subjecting my life and the life of the public in

21 jeopardy, I fired my weapon at the subject."

22        Do you believe that that, as described by

23 Officer Molina, is a justified use of deadly force?

24    A.  I do not believe a reasonable officer would

25 have felt his life was in danger in that case.  I don't

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

31

LESLIE R. SWEET
MARCH 22, 2002

1 see anybody else who is about to die in this case.  You

2 know, I don't think his actions were reasonable, no.

3    Q.   All right.  Now, is this all based on or is

4 this in part based on the fact that you were also

5 considering what Rene Reyna says happened the day of the

6 incident and discounting what Officer Molina says

7 happened the day of the incident?  I guess let me put it

8 that way, add that to it.

9    A.   I don't understand the question.

10    Q.   You know Officer Molina's version of what

11 happened the day of the incident, do you not?

12    A.   I do.

13    Q.   All right.  Do you believe, if that is what

14 happened, that he had justification in using deadly

15 force?

16    A.   No.  I see nobody's life in danger in this

17 case.  At the time of the shooting, I don't see anybody

18 who is in danger of imminent -- of significant body harm

19 or danger.

20    Q.   And this is assuming that Rene Reyna had --

21 well, we know all the events leading up to -- he was --

22 a stolen vehicle, he was going through residential areas

23 at 70, 80 miles an hour.  Well, I'll tell you what.  By

24 Rene Reyna's admissions in his own deposition, he was

25 using his vehicle as a deadly weapon.  He was putting

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

32

LESLIE R. SWEET
MARCH 22, 2002

1 serious -- he was putting himself and others in fear of

2 their life and safety.  He was putting -- could have

3 done serious injury or death to them with that vehicle.

4 He was high on cocaine, alcohol, and Rohypnol.  He

5 didn't respond to Officer Molina's first demand or

6 command to stop.  He kept going, right before he hit the

7 citizen's vehicle.

8        So if we kind of summarize all of that --

9 obviously, more to it, but in that summary form -- and

10 we get up to the fact that he rams the citizen's

11 vehicle, Officer Molina sees him put it in reverse, back

12 up, turn his wheels, and Officer Molina, in his mind, he

13 believes he is getting ready to now head into another

14 busy intersection, possibly at a high rate of speed

15 again, and you don't think that may have caused to put

16 some innocent citizen out there in that intersection

17 that he may have run into, killed, or seriously injured,

18 you don't think that was an immediate threat?

19    A.  That's true.

20    Q.    You don't think that if he would have gone into

21 that intersection --

22    A.    Well, I think it's a possibility somebody would

23 have been injured.  I just don't think that at this

24 time, just because somebody is fleeing from a police

25 officer and driving real fast, that you can kill him to

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

33
LESLIE R. SWEET
MARCH 22, 2002

1 make him stop. I don't think at this time you can

2 constitutionally kill somebody to make him stop running

3 from the police. I just don't think that's what the

4 Constitution interpretation is coming down from the

5 courts.

6    Q.   What would you have done? What do you think

7 should have been done?

8    A.   From the pictures I've seen at that situation,

9 it looks to me like we had him boxed in. If Molina had

10 pulled up beside him, I don't know where he would have

11 went.

12    Q.   Are you familiar with the fact that -- or do

13 you believe it's accepted training to tell a police

14 officer to use his vehicle to disable another vehicle?

15    A.   That's not what I said. I said box him in, not

16 ram him.

17    Q.   Well, what if he then rammed the police vehicle

18 and disabled it and then backed up and took off?

19    A.   And then I think he should have been prosecuted

20 to the full extent of the law for damage of public

21 property.

22    Q.   Well, but I mean, what I'm saying is he

23 wouldn't have been boxed in any longer and the police

24 vehicle, at least the one that he rammed, could have

25 been disabled from chasing him, from following him?

52
LESLIE R. SWEET
MARCH 22, 2002

1 know that Rene Reyna driving that car intends to use it

2 as a deadly weapon, or is it more that an officer in

3 that situation can rely upon what he believes and what

4 he thinks that suspect is getting ready to do with that

5 deadly weapon?

6    A.   Well, if he thinks that the suspect is

7 intentionally trying to run over him or to hit him, or

8 if he thinks that suspect is intentionally trying to run

9 over somebody, then deadly force is more reasonable than

10 the situation we've got here.  Right here it looks like

11 Molina said this guy is not going to stop, he's going to

12 keep fleeing from the Brownsville, and somebody might

13 get hurt on further down the road, so I'm going to use

14 deadly force.  There are two different situations.

15    Q.   And you don't think that Molina could have had

16 it in his mind that, look, this guy has already

17 demonstrated a complete disregard for everybody's safety

18 up to this point?  Would you agree with that?

19    A.   The guy has been acting recklessly, yes.

20   Q.   And that it's very likely that if I don't stop

21 him, he is going to use that vehicle as a deadly weapon

22 and kill someone?

23   A.   No.  I think he becomes unreasonable there.  I

24 think --

25   Q.   You don't think he could make that assumption?


DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

53

LESLIE R. SWEET
MARCH 22, 2002

1   A.  I think it's unreasonable to.  I don't think

2 it's reasonable to kill somebody to keep them from

3 continuing to drive a car.  I mean, it just strikes me

4 as what the Supreme Court is trying to say violates due

5 process.

6   Q.  Okay.  Do you agree that Officer Molina had the

7 right to make a discretionary decision at that point,

8 though, whether to use deadly force or not?

9   A.  No.  I think a reasonable officer would not

10 have come to the conclusion that Molina came to, so, no,

11 I don't think he has unlimited.  I think he's got the

12 discretion to do what a reasonable officer would do in

13 following the law, yes.

14   Q.  Well, I guess my question was that he has the

15 right to use discretion.  An officer has the right to

16 use discretion on whether to use or not to use deadly

17 force.  I'm not talking about whether he uses it.  I'm

18 talking about that he has the discretion to make that

19 decision one way or the other.

20    A.   He has a discretion of whether to use it or

21 not, but his discretion is limited to the fact that he

22 can only use it if it's reasonable and if it falls under

23 the law, yeah.

24    Q.   Sure.  Right.  Okay.  But what I'm talking

25 about is the discretion part, that he has discretion to

68
LESLIE R. SWEET
MARCH 22, 2002

1 him, no, that's not right, you need to reread your

2 general orders.  In fact, he made that statement.  There

3 has been some kind of Internal Affairs investigation and

4 nobody has said, hey, this is borderline or this is --

5 you shouldn't have -- I mean, here is the only reasons

6 you can shoot, or something.  And then there has been no

7 corrective action at all.

8     Q.  This is because of, you say, corrective action

9 should have been taken because of what he said in a

10 deposition three years after the incident as opposed to

11 what he said in his statement the day of the incident?

12     A.  Corrective action in that he shot somebody that

13 he didn't have a right to use justifiable homicide over.

14     Q.  Well, that's your opinion?

15     A.  That's why I'm here, yes.

16     Q.  Right.  But if the Internal Affairs

17 investigated it and determined that they thought the use

18 of force was justified, I guess they did not think

19 corrective action was necessary.  That's assuming that

20 Internal Affairs would be agreeing with you.  I mean,

21 that's what you're making your statement on?

22    A.   Right.

23    Q.   Okay.  And that that is enough to create a

24 practice or a policy?

25    A.   If he uses unjustified deadly force and the

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

69
LESLIE R. SWEET
MARCH 22, 2002

1 department condones it instead of condemning it, and

2 then I think that starts a practice.

3    Q.   Starts a practice?

4    A.   Yes.

5    Q.   There is a difference between starting a

6 practice and it being a practice.

7    A.   Well, I mean, a practice starts somewhere,

8 right?  I don't know.  You're right.  I have not

9 reviewed every shooting in Brownsville's Internal

10 Affairs files.  I have not.  All I've reviewed is this

11 one, this incident.  Now, if -- well, I mean, you say

12 there is a difference.  If they started a practice with

13 this case, it's still a practice, so I don't know.

14    Q.   Well, were you in a situation where you believe

15 one officer who did something while you were assistant

16 chief in the City of Dallas, that one officer did

17 something, that that started a practice?

18    A.   If I condoned it.

19    Q.   And that then other officers with no evidence

20 of anybody else following that practice?

21   A.   Well, then it was a short-lived practice,

22 wasn't it?

23   Q.   But you think it's still a practice?

24   A.   I think if an officer uses deadly force when he

25 shouldn't have and the City condones it, yes, I think

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803

86
LESLIE R. SWEET
MARCH 22, 2002

1 a new tape in, I guess.

2          THE VIDEOGRAPHER:  We're off the record at

3 3:24.

4          (Recess from 3:24 to 3:25)

5          THE VIDEOGRAPHER:  We're back on the

6 record at 3:25.

7                    EXAMINATION

8 BY MR. POWERS:

9    Q.  Mr. Sweet, in regard to your time as head of

10 the patrol officers in the Dallas Police Department, how

11 many patrol officers did Dallas have during that time?

12    A.  Uniformed officers under my command was about

13 nineteen hundred.

14    Q.  And that was the largest segment of the Dallas

15 Police Department; is that correct?

16    A.  True.

17    Q.  You made the statement that you went to great

18 lengths to ensure that the officers understood the

19 policy on use of deadly force.  What were those great

20 lengths that you went to?

21    A.  Regular training on just the subject of deadly

22 force, supplemental training every time they qualified

23 at the pistol range.

24    Q.  How often would that be?

25    A.  Oh, twice a year minimum.  It was twice a year

87
LESLIE R. SWEET
MARCH 22, 2002

1 minimum, and then we sometimes had nighttime firings

2 just periodically. Also, sometime in the '80s, we

3 started a police shooting review to where after a police

4 shooting, after the investigation was completed, we

5 published to the officers what happened.

6 Q. All the officers?

7 A. Yes. Those are the three primary things how we

8 tried to make sure everybody realized that deadly force

9 was a last resort and should only be used to save a

10 life.

11 Q. Okay. Now, there is reference, a number of

12 references to Mr. Reyna driving fast, driving

13 recklessly. It's not -- wouldn't it be fair to say that

14 it's not appropriate to shoot people for driving

15 recklessly and extremely fast, even?

16 A. Yes. There is other types of prosecution

17 besides deadly force.

18 Q. Now, as to his use of alcohol and drugs and

19 what he may have used on the day of the incident, would

20  that make -- does that make any difference to you in

21  your opinions and in your mind as to what Molina should

22  or should not do, to the actions of Molina, what Reyna

23  had done maybe a few hours earlier when Molina wasn't

24  around?

25  A.  Yeah, unless he was so impaired that it

DISCOVERY REPORTING SYSTEMS, INC.
(214) 855-0800/ FAX (214) 855-0803