IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 0 9 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| RENE REYNA, JR., | § | |
| Plaintiff, | § | |
| | § | Civil |
| vs. | § | ~~MISC~~ ACTION NO. B-01-64 |
| | § | |
| CITY OF BROWNSVILLE POLICE | § | |
| DEPARTMENT and RAFAEL | § | |
| MOLINA, | § | |
| Defendants. | § | |

## PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**COMES NOW RENE REYNA, JR.** and makes this his supplemental response to the defendants' motion for summary judgment and would show the Court as follows:

I.

On April 4, 2002 the deposition of the plaintiff's expert Raul Guajardo was taken by the defendants' attorney. Plaintiff wishes to supplement his response by including portions of the deposition of Raul Guajardo, Forensic Scientist and Criminalist with the Department of Public Safety for twenty-one (21) years. (See deposition of Raul Guajardo, pg. 12 line 22, pg. 14 line 24, Exhibit #12)

Scientifically, Raul Guajardo has proven conclusively that Molina's testimony and statement as to how the event took place. Molina's statement is that he shot Rene Reyna while he was seated in the vehicle. The bullet passed all the way through Reyna. With also entrance and exit holes in the shirt which Reyna was wearing. (See deposition of Raul

Guajardo, pg. 43. line 20, pg. 44 line 10, pg. 51 line 1, pg. 53 line 25, pg. 112 lines 4-11, pg. 115 lines 11, pg. 119 line 6, Exhibit #12). Plaintiff's contention is that if Reyna was seated in the vehicle, the bullet passed all the way through him and would have been found inside the vehicle. Also, there should have been blood inside the vehicle. The defendants maintain that despite the holes in the shirt, the bullet must have lodged in the folds of the shirt and fallen out after Reyna fell out of the vehicle. Through the use of trace evidence analysis, which in his job with the DPS he has done thousands of time, Guajardo has proven that the bullet core and jacket which passed through Reyna struck a hard object which had a black substance, such as paint or asphalt; substances found outside of the vehicle. There is no question that the bullet was found outside of the vehicle on the street. (See deposition of Raul Guajardo, pg. 43. line 20, pg. 44 line 10, pg. 51 line 1, pg. 53 line 25, pg. 112 lines 4-11, pg. 115 lines 11, pg. 119 line 6, Exhibit #12). What Guajardo has proven is that the bullet did in fact exit all the way through Reyna, through his shirts, and struck a hard object with an asphalt or paint like substance on it. At this point, there is not even a fact issue as to where Reyna was when he was shot. He was without question, outside of the vehicle. This means that Molina is lying. The defendants have no evidence, only speculation not supported by evidence that Reyna was shot while he was inside the vehicle as is claimed by Molina.

It also should be noted that Officer Garza was close to Molina with another suspect when he heard the shots. He immediately turned and saw Molina outside the vehicle, standing over Reyna as Reyna was still falling. If Molina were inside his vehicle when he

shot Reyna, he could not put his vehicle in gear, exited the vehicle and walked (as his says in his deposition) around his vehicle to where Reyna was in the time (.08 seconds) it took Garza to turn and look at him. (See Powers deposition pgs. 66-68, Exhibit # 13). The same thing applies to Officer Flores who was also on the scene. (See deposition of Raul Guajardo, pg. 43. line 20, pg. 44 line 10, pg. 51 line 1, pg. 53 line 25, pg. 112 lines 4-11, pg. 115 lines 11, pg. 119 line 6, Exhibit #12).

WHEREFORE plaintiff requests that the Court consider this extra evidence and again deny the motion for summary judgment.

Respectfully submitted,

HINOJOSA & POWELL, P.C.
Attorneys at Law
612 Nolana, Suite 410
McAllen, TX 78504
(956) 686-2413
(956) 686-8462

BY: _____
GEORGE P. POWELL
Attorney at Law
State Bar No. 16196000

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been mailed, certified mail, return receipt requested, and/or telecopied to the opposing counsel of record on this 8th day of April, 2002.

GEORGE C. KRAEHE
WILLETTE & GUERRA, L.L.P.
3505 Boca Chica Blvd.
Brownsville, TX 78521

_____
GEORGE P. POWELL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RENE REYNA, JR., § | | |
| Plaintiff, § | | |
| § | | |
| vs. § | MISC ACTION NO. B-01-64 | |
| § | | |
| CITY OF BROWNSVILLE POLICE § | | |
| DEPARTMENT and RAFAEL § | | |
| MOLINA, § | | |
| Defendants. § | | |

## AFFIDAVIT IN SUPPORT OF PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**STATE OF TEXAS**           §

**COUNTY OF HIDALGO**     §

BEFORE ME, the undersigned authority, on this day personally appeared GEORGE P. POWELL, a person known to me, who after being sworn upon his oath, stated that he is the attorney of record for Plaintiff in the above-reference cause, that he attests to the truthfulness of the statements and averments of fact contained therein for which he provided the information, that he has read the foregoing Plaintiff's Supplemental Response to Defendant's Motion for Summary Judgment and that all statements and averments of fact contained therein are true and correct with his personal knowledge and/or to the best of his information and belief. The affiant further states that the copies of the depositions attached as exhibits to this response are true and correct copies of the original depositions taken in this

case. Further affiant sayeth not.

SIGNED on the 8th day of April, 2002.

_____
GEORGE P. POWELL


SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the 8th day of April, 2002, to certify which witness my hand and official seal.

_____
NOTARY PUBLIC, STATE OF TEXAS

JANIE MORIN
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-17-2004

**EXHIBIT #12
RAUL GUAJARDO'S DEPOSITION**

```
 1   on what the attorneys want me to do.
 2        Q.   Okay.  But, I mean, based on what you have now,
 3   do you feel like you've done all the analysis you can do
 4   based on what you've been presented to date?
 5        A.   Yes, sir.
 6        Q.   Okay.  All right.  Why don't you give me an idea
 7   of what kind of opinions you were asked to give in this
 8   case?  And -- and I don't mean that you need to state
 9   them, just what -- what kind of opinions were you asked
10   to give?
11        A.   Well, first of all, I was not asked to give
12   opinions.
13        Q.   Okay.
14        A.   It's customary for me to investigate a -- a -- a
15   crime scene or a case or -- or work a case where I go
16   over evidence and I do examination, microscopic
17   examinations, or just reviewing of records or something,
18   and that -- and that -- that sort.  The evidence
19   that -- that I look at prompts me to -- to give a final
20   conclusion on a case and state my opinion of what I think
21   that evidence shows.
22        Q.   Okay.  Well, I guess what I'm getting at is,
23   what is your area of expertise?  What -- what are you an
24   expert in?
25        A.   Well, as you know, I'm a D.P.S. criminal
```

1  trained to detect body fluids, whether it be semen, or
2  blood, or saliva, just a variety of different fluids
3  that -- that -- is customary for a laboratory to detect.
4  Now they do it different.  Now they do DNA, so -- but
5  before, when I was working serology, we -- we really had
6  to go out there and -- and -- and not -- not test for
7  DNA but test for -- test for the blood group substances
8  that are found in -- in the human body and -- and go with
9  that.  It's done differently now.
10          But, basically, the -- the crime scene
11 investigations that -- that -- the many crime scene
12 investigations that they -- that we did, or that I did
13 when I worked for the Department of Public Safety, kind
14 of forced me into a lot of the disciplines that -- that I
15 do now.  One of them is -- is to examine directionality
16 of bullets as they strike a particular -- not so much of
17 a firearms examination.  I -- I'm -- I'm not a firearms
18 examiner.
19      Q.   Uh-huh.
20      A.   But anything that is related to a shooting where
21 I examine the feasibility of -- of certain bullet holes
22 and certain types of directions that -- that -- that may
23 have -- may -- may have taken place.  That -- this kind
24 of thing is -- is what I do.
25      Q.   Okay.  Thank you.  Were you given an explanation

1    A.   I believe that's where it came from, yes sir.

2    Q.   Okay.  Let me ask you this:  How many shots do

3 you think were fired by Officer Molina?

4    A.   I think there were only three shots fired.

5    Q.   All right.  And where did those three bullets

6 go?

7    A.   Okay.  One of them went to his leg, his left

8 leg -- thigh.  The other one went through his abdomen

9 and exited.  And the other bullet struck the rear

10 door -- passenger door and ricocheted.

11   Q.   Okay.  If you -- which -- well, strike that.

12        The bullet that ricocheted -- that hit the

13 bottom door, ricocheted up and hit his left elbow, where

14 did it end up?

15   A.   It ended -- the bullet itself, the core with the

16 metal jacket, was found there on the street.

17   Q.   Okay.  And, of course, we know the one in his

18 thigh is still in his thigh?

19   A.   Right.

20   Q.   And so then where did the one that entered

21 his -- the left side of his abdomen, where did it end up?

22   A.   It ended up on the street.

23   Q.   Okay.  And where were those bullet cores?

24 Let's take the one that went in the abdomen.  From the

25 approximate location that it appears where Reyna was

1   laying was in the street, which side of Reyna was that
2   bullet core laying on?
3       A.   I'm not sure.  I'd have to look at the diagrams
4   and -- and look at that.  What I did was examine a -- a
5   bullet core and a jacket that was found in -- in a
6   specific location on the street.  And at that point, I
7   was not considering Reyna's position or anything.  I was
8   examining those items to see if it was conceivable that
9   those were items that -- that caused the injuries to the
10  abdomen.
11      Q.   Okay.  Do you believe that Molina's -- I'm
12  sorry -- that Reyna's statement that he was facing Molina
13  at the time he was shot, that that scenario is consistent
14  with the wound to the left elbow?
15      A.   It's -- it's possible.  In considering the fact
16  that the bullet hole in the leg is -- is facing Molina,
17  the ricochet -- and I'm not saying which came first or
18  what, but it certainly puts -- the evidence point in the
19  direction of placing Reyna not seated in the vehicle but
20  probably on his way out or -- or partially out already.
21      Q.   Do you believe that the shot to the left
22  elbow, I mean, conclusively in your mind, proves he
23  couldn't have been seated in the car?
24      A.   It's -- it depends where his hands were at the
25  time when -- or going back to Officer Molina's account of

1  A.  Well, I wouldn't go to those extremes.  But I
2  can say that if you examine some evidence that's from a
3  shooting and you find evidence on bullets that indicate
4  that the event different than what other experts are
5  saying, then that is, to me, sufficient grounds to say,
6  "Yes, it's sufficiently -- it's different than -- than
7  your examination because you did not examine this, you
8  did not examine this evidence and only I examined it.
9  And, therefore, I know, based on this evidence that it
10 happened the way I say it."
11     Q.  And what evidence do you think you examined that
12 Mr. Hueske --
13     A.  I don't think I -- I don't think I -- I don't
14 I -- that there's evidence that I examined; I know.
15     Q.  Which -- what is that?
16     A.  Which is the -- the bullet core that was found
17 on the street and the metal jacket that was found on the
18 street, both of those items were once -- in my opinion,
19 ones and the same bullet that went through his abdomen
20 and struck something hard afterwards.  It went through
21 some soft tissue, entered the left side -- it appears it
22 entered the left side.  It went through, and in the
23 process of going through, the evidence that -- that I
24 found that leads me to say this is that there's tests
25 that I performed to, of course, confirm the presence of

1  conclusively the bullet that went through the abdomen,
2  picked up the blood and the fibers on its way through
3  the shirt and -- and through the body, and could not
4  have been the bullet -- could not -- could not have been
5  a -- a bullet that was fired while Reyna was sitting in
6  his vehicle because we would have found evidence of that
7  inside -- inside the vehicle.
8           In fact, this particular bullet had to have
9  gone through the body and struck something hard and
10 disintegrated completely the way it did, and the evidence
11 that it hit something hard after it went through is
12 there.
13      Q.  And you believe that something hard is the
14 asphalt or the street?
15      A.  Well, I -- I'm not saying that it is the only
16 thing that it hit, but there are some black smears on it
17 that could be -- I'm saying -- because I haven't done any
18 analysis on it, but it could be the asphalt.  It -- it
19 could also be maybe a -- it may be paint from the
20 vehicle; I don't know.  In -- in this -- in this kind
21 of case, you can't really tell until you do the analysis.
22      Q.  How would you, then -- how would -- how do you
23 think Reyna was positioned?  How do you think his body
24 was positioned towards Molina to have had an injury wound
25 on the left side, exit on the right side, and end up in

1  police investigators who investigated and made reports
2  in this case are trying to cover up for the -- for
3  Officer Molina?
4     A.   As far as I can tell, the reports seem genuine
5  and honest.  Garza's -- he's not denying the fact
6  that -- that he heard some shots and he turned and he
7  saw Molina standing in front of Reyna as he was falling.
8  I mean, I -- I mean, it doesn't -- it doesn't match
9  the -- Officer Molina's statement.  But I -- I tend to
10 believe Officer Garza more than Molina, that he did see
11 him when he turned and already was in that vicinity.
12    Q.   What is it that you are critical of as it
13 relates to the investigation done by the Brownsville
14 police department in this shooting?
15    A.   Okay.  This is a case where someone is shot, and
16 there is reason to show that the officer was in his right
17 and certainly has all the -- all the potential to -- to
18 have the experts there at -- at his disposal.  All they
19 had to do -- Sergeant Manrique, Hernandez, or the Chief,
20 all they had to was just call, "Come on, we need some
21 assistance.  There's been a shooting."  We would have
22 gone over there.  We would have processed the scene.
23 We would have photographed inside that vehicle, close-up
24 photography.  If there's any tissue that's there or any
25 indication that there was a shooting or there's blood

1  certainty, eliminate the probability that the shooting of
2  Mr. Reyna took place as Officer Molina has described it?
3      A.   Yes.
4      Q.   Please do so.  Tell me what that --
5      A.   Can I read his statement?
6      Q.   Sure.
7           MR. POWELL:  How long did it take you to
8  get that question down to where it actually comes out
9  right?
10          MR. WILLETTE:  A while.
11     A.   First, I speak of the inconsistencies in his
12 statement that he made; that Reyna was seated on the
13 front -- on the seat of the vehicle in an attempt
14 to -- to -- to escape or flee or whatever.  But more
15 importantly, at all -- than that, he makes a statement
16 that says that as -- as -- as Reyna struck the last
17 vehicle that he struck, that he turned the vehicle
18 towards him and he feared for his life.  That is
19 completely inconsistent with his shooting.  That would
20 put the vehicle in front of him as he is shooting, and he
21 would had to have shoot -- shot through the window.  That
22 is not possible.  That -- that is erroneous, and he gave
23 a wrong statement.  I don't want to say a lie, but maybe
24 he was confused.  I don't know, but -- maybe there's an
25 explanation for that statement, I -- I have no idea, but

1        But those are -- those are my findings, and the
2   inconsistencies in the reports that are given by Molina
3   cannot be backed up by Officer Garza, and that's just one
4   of them.  I -- I didn't really look at the other ones
5   that closely, but I did focus on Garza because he was
6   close by.  He heard the shots.
7        Q.   Uh-huh.
8        A.   And I'm not saying that -- that Molina has
9   conspired to change -- or any other officer whatsoever.
10  I am saying that his account of the shooting is not
11  consistent with the evidence that was recovered at the
12  scene.
13       Q.   All right.  Let me do -- go one thing, though.
14  And, evidently, you did take some photographs.
15       A.   Yes.
16       Q.   Could you show me the photographs that you took?
17       A.   Yes, sir.
18       Q.   If I could see those.
19       A.   Some of those photographs I gave to Mr. Powell.
20       Q.   Yeah, unfortunately --
21            MR. WILLETTE:  Let's go off the record for
22  a minute.
23            THE VIDEOGRAPHER:  We're off record.
24            (Off the record at 12:03 p.m.)
25            (On the record at 12:06 p.m.)

# EXHIBIT #13
# TIMOTHY POWERS' DEPOSITION

```
11:47   1      A.   He's looking at Reyna.
11:47   2      Q.   Okay.
11:47   3      A.   But in addition to that, the human eye is going
        4  to see any type of movement.  If Officer Molina has his
        5  arm extended and is pointing, I mean, this stuff is like
        6  right here.  He says he's looking straight ahead, yet
        7  part of his vision has got to be seeing Officer Molina,
        8  because these guys now, police officers train, we're
        9  going the old contact cover thing here.  Okay, I'm
       10  behind him, and he's here.  And in questioning, if
       11  Officer Garza's asked, "Are you looking at Officer
       12  Molina's vehicle to see what he's going to do?" he
       13  better say yes, because what he does is very subject to
       14  what Officer Molina does, especially since Garza was the
       15  contact officer.
11:48  16      Q.   So you're saying that even if Molina had been
       17  firing from inside his vehicle, Garza still should have
       18  been able to see that?
11:48  19      A.   Enough to see that there was something -- that
       20  Molina was doing something.  And after the first shot,
       21  I'll guarantee you he's looking inside Molina's car to
       22  go, you know, typical, whoa.  You know, I could give you
       23  a couple of, you know, words they might be saying at the
       24  time those gunshots are being fired.  But what's
       25  interesting is is that he's hearing shots fired -- let
```

```
11:48   1  me back up, if you would permit me.
11:48   2       Q.   Uh-huh.
11:48   3       A.   Officer Flores says Officer Flores is chasing
        4  down the first subject that's bailed out of the car in
        5  the field.  He's struggling with the subject.  He hears
        6  the shots, and the first thing he does, before he even
        7  has this individual handcuffed, is turn and look, which
        8  by the way is a normal thing.  You hear gunshots, first
        9  thing, you look.  Well, Garza hears the first shot,
       10  hears shots, and says he heard them and didn't see them?
       11  And then he sees the subject get out of the vehicle and
       12  then he goes after him?  I don't believe Garza.  I
       13  believe Garza saw this whole thing.
11:49  14       Q.   What do you believe he saw?
11:49  15       A.   I believe he saw Officer Molina park his car,
       16  get out of the car, and from a standing position,
       17  walking towards Rene Reyna, shot him, shot at him four
       18  times with Reyna trying to get out of the vehicle and
       19  surrender.  That's exactly what I think happened,
       20  because I put it on a clock.  I did this whole thing
       21  realtime.
11:49  22       Q.   How did you do that?
11:49  23       A.   What I did is simulate struggling with a
       24  vehicle -- struggling with a subject.  I'm Flores.  I
       25  hear shots.  I immediately turn and look.  That took
```

11:50  1  eight-tenths to one second to do that.  Then what I did
       2  is I went and played the part of Officer Molina.  And
       3  what I did is I did three scenarios.  I did it where the
       4  car is stopped, it's in park, there is no seat belt on,
       5  my gun is pointing out the window.  I get out of the car
       6  and face the subject vehicle.  That averaged 4.2
       7  seconds.
11:50  8           I went back.  I had the car in park but the
       9  seat belt on, gun pointed.  Undid the seat belt, got out
      10  of the car, point the gun at the subject.  5.2 seconds.
      11           Seat belt on, foot on the brake, car in drive,
      12  gun pointing.  Put the car in park, with a gun in my
      13  hand, I might add.  Undo the seat belt, get out of the
      14  car.  5.7 seconds.
11:50 15           Now, meanwhile back at the ranch, Officer
      16  Flores says he hears the gunshots, turns, sees both
      17  officers out of the car, standing with their downed
      18  subjects.  Took him eight-tenths to one second to turn
      19  and see that, yet it would take an officer, even after
      20  those shots are fired, a minimum of 4.2 seconds to get
      21  out of the car.  You tell me.
11:51 22      Q.   Now, when did you do these tests?
11:51 23      A.   Last week.
11:51 24      Q.   Okay.  So you didn't supplement your report,
      25  obviously?